IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

———————————————————————————

ROBERT CRUMP,

                              Plaintiff,

                                        Civ. Action No.
          vs.                           9:07-CV-1331 (LEK/DEP)

EKPE D. EKPE, *et al.,*

                        Defendants.

———————————————————————————

APPEARANCES:                    OF COUNSEL:

FOR PLAINTIFF:

ROBERT CRUMP, *Pro Se*
31 Cindy Lane
Middletown, New York 10941

FOR DEFENDANTS:

HON. ANDREW M. CUOMO        SUSAN C. Von REUSNER, ESQ.
Attorney General of the State    ASST. ATTORNEY GENERAL
of New York
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

        Plaintiff Robert Crump, a prison inmate who is proceeding *pro se*

and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C.

§ 1983 complaining of the deprivation of his civil rights arising out of events that occurred while he was imprisoned, additionally asserting various pendent state common law claims and asking that the court exercise supplemental jurisdiction over those causes of action.  Plaintiff's complaint, which is comprehensive, comprised of one hundred and fifty six paragraphs and including thirty separate causes of action, centers upon a series of events including two separate, brief periods of disciplinary special housing unit ("SHU") confinement and what he characterizes as ongoing harassment on the part of various corrections officers.  Plaintiff's complaint seeks recovery of compensatory and punitive damages totaling $86.4 million.

Currently pending before the court is a motion brought by the defendants for summary judgment dismissing the plaintiff's complaint.  In their motion, defendants argue that plaintiff's claims should be dismissed for a variety of reasons, including procedurally based upon plaintiff's failure to exhaust his administrative remedies with respect to certain claims, and substantively because he has failed to state viable due process and retaliation claims, adding that his damage claims are barred by the Eleventh Amendment as well as New York Correction Law § 24

and the doctrine of qualified immunity.

Having carefully considered the record now before the court, I recommend that defendants' motion, which plaintiff has not opposed, be granted, and that his complaint be dismissed in its entirety.

I.    BACKGROUND[1]

At the times relevant to the complaint, plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS") and was designated to Riverview Correctional Facility ("Riverview"), located in Ogdensburg, New York.[2] *See* Complaint (Dkt. No. 1) ¶ 33.  Plaintiff's complaint arises out of two separate incidents that occurred while he was confined to Riverview, the first resulting in his confinement for three days in the facility SHU and the second leading to thirty days of keeplock confinement which, he claims, evolved in retaliation for his having filed a grievance complaining about the

_____

[1]    In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).  It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

[2]    Plaintiff was released on parole on January 11, 2008.  *See* Dkt. No. 5; *see also,* Reusner Aff. Exh. B (Dkt. No. 28-10).

procedure for inmate assignments to messhall duty.[3,4]

According to the plaintiff, the genesis of his difficulties was a handwritten grievance filed with the Riverview Inmate Grievance Resolution Committee ("IGRC") on February 13, 2006.   Complaint (Dkt. No. 1) ¶ 20.  Labeling his grievance as "Inmates In Messhall w/o Medical

---

[3]      A Special Housing unit is defined by regulations promulgated by the DOCS as "single- or double-occupancy cells grouped so as to provide separation from the general population [which] may be used to house inmates confined to such units pursuant to Part 301 . . . ."  7 N.Y.C.R.R. § 300.2(b).  Inmates may be admitted to SHU for various reasons, not limited to disciplinary action.  7 N.Y.C.R.R. § 301.1  Inmates in SHU are not completely restricted.  *Husbands v. McClellan*, 990 F. Supp. 214, 217 (W.D.N.Y. 1998); *see also* 7 N.Y.C.R.R. pt. 304.  They are allowed two showers per week and one hour of outdoor exercise per day.  *Id.*  They are entitled to unlimited legal visits and one non-legal visit per week.  *Id.*  SHU inmates have access to counselors and sick call.  *Id.*  Additionally, they can participate in cell study programs and can receive books from the library.  *Id.*

[4]      Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities.  *Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989); *Warburton v. Goord*, 14 F. Supp.2d 289, 293 (W.D.N.Y. 1998) (citing *Gittens*); *Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi*, 46 F.3d 189, 192 (2d Cir. 1995)).  Inmate conditions while keeplocked are substantially the same as in the general population.  *Lee v. Coughlin*, 26 F. Supp.2d 615, 628 (S.D.N.Y. 1998).  While on keeplock confinement an inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise.  *Id.*  Keeplocked inmates can leave their cells for showers, visits, medical exams, and counseling, and can have cell study, books, and periodicals, *Id.*  The primary difference between keeplock and the general population confinement conditions is that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends.  *Id.*  Keeplock is a less severe penalty than SHU; for example keeplocked inmates have access to their personal property, while SHU inmates do not.  *Grant v. Riley*, No. 89 CIV. 0359, 1996 WL 727441, at *1 n. 1 (S.D.N.Y. Dec. 17, 1996).  In addition, keeplocked inmates are afforded more liberal visitation rights.  *Id.*

Screening", Crump complained that inmates were being assigned to messhall program jobs without adequate physical examination or testing for communicable diseases, and that there were one or more inmates with hepatitis C working in the messhal.  *Id.* Exhs. B & C; *see also* Affirmation of Susan C. von Reusner ("Reusner Aff.") (Dkt. No. 28-8) Exh. C (Dkt. 28-11) p. 3.  The IGRC subsequently investigated Crump's grievance, which was stamped received on February 13, 2006 and assigned grievance number RV-8195-06, and prepared a report noting that all inmates are screened upon arrival at Riverview, there is no requirement that inmates assigned to the messhall undergo any medical testing, "[b]oth HIV and hepatitis C are blood born/body fluid carried diseases", and universal precautions are to be used by all who work in those areas.  *Id.* at p. 5.  Notwithstanding these observations, the IGRC agreed that every inmate assigned to the messhall program should be medically cleared at the time of assignment.  *Id.* at p. 4; *see also* Complaint (Dkt. No. 1) Exh. A.

On February 28, 2006, upon review of the IGRC's recommendation, defendant Ekpe D. Ekpe, the superintendent at Riverview, denied Crump's grievance, finding that existing medical review procedures conducted upon an inmate's arrival at the facility and the sick-call process

provide sufficient medical screening of inmates assigned to work in the

messhall.  Reusner Aff. Exh. C (Dkt. No. 28-11) p. 1.  Plaintiff does not

allege that he appealed the superintendent's determination, and it thus

appears that he took no further action regarding this grievance.

Plaintiff maintains that on the morning of March 2, 2006, in

retaliation for filing that grievance, Superintendent Ekpe and defendant

Sergeant Reneiri appeared at the "F-1" Housing Unit, where plaintiff was

then designated, called plaintiff to the officer's observatory station, and

demanded that plaintiff follow them to the messhall and identify any

inmate working there who was infected with HIV or hepatitis C.  Complaint

(Dkt. No. 1) ¶¶ 37-38.  When plaintiff refused to comply and attempted to

explain his grievance, the superintendent became angry, began yelling at

plaintiff and berating him, and commanded that Sergeant Reneiri and

Corrections Officer ("C.O.") Wilkens "get him out of here."  *Id.* at ¶¶ 39-41.

Plaintiff was taken to the facility SHU, where he was processed and

strip searched, and confined for a period of seventy-two hours.  Complaint

(Dkt. No. 1) ¶¶ 42-47, 52; *see also* Declaration of Ekpe D. Ekpe ("Ekpe

Decl.") (Dkt. No. 28-5) ¶ 8.  Plaintiff asserts that while in the SHU he was

interviewed by a facility supervisor, who told Crump that he had been sent

to SHU "in order to make sure that he was not 'starting trouble in their jail'".  Complaint (Dkt. No. 1) ¶ 51.  Defendants maintain that plaintiff's confinement to SHU was spawned by the superintendent's concern for safety and order at the facility pending an investigation of allegations that Crump was spreading rumors among the inmates that workers in the messhall were contagious and that the food they prepared was poisoned, contaminated, and otherwise unsafe to eat.  Ekpe Decl. (Dkt. No. 28-5) ¶ 8.  Although plaintiff asserts that his assignment to SHU was retaliatory, he admittedly did not grieve his three-day SHU confinement.  Declaration of Kristina Monnet ("Monnet Decl.") (Dkt. 28-6) ¶ 8; *see also* Crump Deposition Transcript ("Crump Tr.") (Dkt. No. 28-24) pp. 13, 15, 24, 91-93.

When released from SHU confinement three days later, plaintiff collected the personal belongings that had been taken from him upon his transfer into the unit and discovered that a property inventory form, No. 1-64, had not been completed when they were confiscated.  Complaint (Dkt. No. 1) ¶ 52.  When he returned to the F-1 unit and the cubicle to which he had previously been assigned and unpacked his personal property, Crump found that many of his belongings were missing, damaged, or destroyed.  *Id.* ¶¶ 52-54.

Following his release from SHU confinement, Crump claims to have suffered harassment and threats from unnamed corrections officers who were encouraging plaintiff to file a grievance or civil complaint against Superintendent Ekpe because Ekpe "had no right to do what he did" to Crump.  Crump Tr. (Dkt. No. 28-24) pp. 12-15, 18, 24; *see also* Complaint (Dkt. No. 1) ¶¶ 58-59.  According to plaintiff, the superintendent is the only "black African-American" at Riverview, and his subordinate corrections officers are trying to get him out of that facility so that they can control it.  Crump Tr. (Dkt. No. 28-24) pp. 12-15.  Because Crump was trying to maintain good behavior so that he would be released from the prison, he did not file a grievance or complaint against Ekpe.  *Id.*  As a result, plaintiff was subjected to continued harassment by corrections officers at the facility.  *Id.*

On March 11, 2006 Crump was involved in an incident in which inmates were "horseplaying" in the bathroom.  Complaint (Dkt. No. 1) ¶¶ 60-63; *see also* Crump Tr. (Dkt. No. 28-24) pp. 23-24.  According to prison officials, while standing near the entrance to the bathroom plaintiff shouted out a warning to the inmates inside that a corrections officer was approaching.  Reusner Aff. Exh. G (Dkt. No. 28-15).  When defendant

8

Sears, who responded to the incident, ordered Crump to produce his identification, he became loud and belligerent, arguing that he had not done anything. *Id.* After he disobeyed several orders to return to his cube, C. O. Sears placed plaintiff on "full bed status" and completed a misbehavior report citing Crump for three misconduct charges, including verbal interference, creating a disturbance, and disobeying a direct order. *Id.*

A Tier II disciplinary hearing was conducted by defendant Lieutenant McNally on March 15, 2006 to address the charges contained in the misbehavior report.[5] *See* Reusner Aff. Ex. H (Dkt. No. 28-16). At the commencement of the hearing Crump was advised of and stated that he understood the charges against him, and he pleaded guilty to refusing a direct order, but denied having created a disturbance or having interfered with a corrections employee. *Id.* at pp. 1-2. During the hearing plaintiff testified and was permitted to call two inmate witnesses, both of whom

---

[5]     The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions and can result in minor punishments, such as the loss of recreation privileges. Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the SHU. Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S.Ct. 246 (1998).

testified that Crump had been standing outside of the bathroom watching television at the time of the horseplaying incident but did not shout out that a corrections officer was coming.  *See generally id.*  At the close of the hearing, plaintiff stated that he had no procedural objections to the conduct of the hearing.   *See* Reusner Aff. Ex. H (Dkt. No. 28-16) at p. 7. Based upon the misbehavior report written by Corrections Officer Sears and his finding that the inmate witnesses lacked credibility, defendant McNally found the plaintiff guilty of all three charges and imposed a penalty of thirty days of keeplock confinement, with a concomitant loss of package, commissary and telephone privileges.[6]  *Id.*  Plaintiff appealed the disciplinary finding, and the superintendent affirmed Lieutenant McNally's determination on March 27, 2006.  Reusner Aff. Exh. J. (Dkt. No. 28-18).

---

[6]        The record is not entirely clear as to whether plaintiff was confined to SHU or keeplock for that thirty-day period.  Plaintiff alleges in his complaint and testified at his deposition that he served the time in the facility SHU.  Complaint (Dkt. No. 1) ¶ 66; *see also* Crump Tr. (Dkt. No. 28-24) pp. 25-26.  The transcript of the disciplinary hearing, Dkt. No. 28-16, and disciplinary record, Dkt. No. 28-17, in contrast, reflect that plaintiff was confined to keeplock.  In their statement of undisputed facts, filed in accordance with Local Rule 7.1(a)(3), submitted in support of their motion, defendants assert that plaintiff was sentenced to thirty days of keeplock confinement.  Dkt. No. 28-2 at ¶ 28.  Since it appears plaintiff was assigned to a cubicle while at Riverview, *see* Complaint (Dkt. No. 1) ¶ 53, rather than a cell, an arrangement which would more easily lend itself to a keeplock confinement, and drawing all inferences in plaintiff's favor, I have assumed that plaintiff served his thirty day keeplock confinement at the facility SHU.

While in keeplock, plaintiff sent a letter to Superintendent Epke, stamped received on March 22, 2006, complaining of unspecified threats and fear of reprisals from unidentified corrections officers.  Reusner Aff. Ex. K. (Dkt. No. 28-19)  Sergeant Willett, who is not a named defendant, was assigned to investigate plaintiff's complaint to the superintendent. Complaint (Dkt. No. 1) ¶ 74.  As part of his investigation, Sergeant Willett prepared a report of his interview of the plaintiff, dated April 5, 2006. Reusner Aff. Exh. L (Dkt. No. 28-20).  In it, Sergeant Willet reported that Crump indicated he felt the need for "protection from the superintendent because the superintendent runs the place and all the correction officers are now head hunting him for every rule violation they can get."  *Id.* Plaintiff denies making this statement, but claims that Willet changed plaintiff's story and insisted that Crump's complaints were not with the corrections officers, but with the superintendent for putting him in SHU confinement without reason.  Complaint (Dkt. No. 1) ¶ 74.  By memorandum dated April 19, 2006, Captain Kanaly advised plaintiff that his complaint of threats had been investigated, and it was determined that there was no threat to Crump's safety at Riverview.  Reusner Aff. Exh. L (Dkt. No. 28-20) at p. 2 (unnumbered).

The following day plaintiff filed another grievance, this time identified by him as "Code 1- Forced Into Messhall."  Reusner Aff. Exh. M (Dkt. No. 28-21).  Plaintiff's grievance, designated as number RV-8291-06, complained of his mandatory assignment to messhall duty, unspecified harassment and threats, loss of personal property, and that he was "being targeted for tickets and being found guilty . . . when another inmate has claimed in great respect and honesty that I Crump didn't do that charge but that he did it."  *Id.*  In response to that grievance Superintendent Ekpe 1) advised Crump to follow appropriate claims procedures with regard to alleged, missing items; 2) advised that it appeared there were no longer any disciplinary actions pending; 3) stated that effective May 8, 2006 plaintiff would be programed as a Phase II Program Aid and A-2 Porter; and 4) noted that a sergeant had been assigned to conduct an investigation regarding plaintiff's complaint, and that based upon the investigation it was determined that no further action was necessary and that plaintiff's complaints had been adequately addressed.  Reusner Aff. Exh. N (Dkt. No. 28-22).  On plaintiff's appeal to the DOCS Central Office Review Committee ("CORC"), by decision dated July 5, 2006 the CORC upheld the superintendent's determination, noting that Crump was then

assigned as a program aide in the mornings and a porter in the evening, and also advising Crump that his disciplinary sanction could be appealed in accordance with the DOCS regulations as set forth in 7 N.Y.C.R.R. Part 5. *Id.* Exh. O (Dkt. No. 28-23).

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action on December 21, 2007.  Dkt. No. 1. Named as defendants in plaintiff's complaint are Epke D. Epke, the superintendent of Riverview; Deputy Superintendent Hessel; Lieutenant McNally; Sergeant Reneiri; three John Doe corrections officers; and Corrections Officer Sears.  *Id.*  While plaintiff's claims appear to center upon his first grievance and the retaliation that he allegedly suffered as a direct result of its filing, his complaint includes thirty separate causes of action including for violations of his rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, alleging claims of retaliation, deprivation of liberty and property without due process, and cruel and unusual punishment, all relating to his confinement to SHU and keeplock.  Additionally, plaintiff alleges common law claims of negligence as well as violations of the New York Correction Law and the DOCS regulations.

On April 3, 2009, following the completion of pretrial discovery in the case, defendants filed a motion for the entry of summary judgment dismissing plaintiff's claims as a matter of law.  Dkt. No. 28.  In their motion, defendants argue that plaintiff's claims should be dismissed on the grounds that 1) he failed to exhaust his administrative remedies with respect to claims relating to his seventy-two hour confinement in SHU; 2) he has failed to state viable due process and retaliation claims; and 3) recovery is barred by the Eleventh Amendment as well as New York Correction Law § 24 and the doctrine of qualified immunity.[7]  Despite passage of the deadline for doing so, plaintiff has failed to submit papers in opposition to defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and

---

[7]     Defendants also correctly assert that the claims against the unnamed John Doe defendants must be dismissed as a result of plaintiff's failure to identify and timely serve these defendants.  Rule 4(m) of the Federal Rules of Civil Procedure authorizes dismissal where a summons and complaint is not served within 120 days after filing of the complaint, absent a showing of good cause.   Fed. R. Civ. P. 4(m); *Shuster v. Nassau Cty.*, No. 96 Civ. 3635, 1999 WL 9847, at *1 (S.D.N.Y. Jan. 11, 1999) (Rule 4(m) authorizes dismissal where no service within 120 days after filing of the complaint); *Romand v. Zimmerman*, 881 F. Supp. 806, 809 (N.D.N.Y. 1995) (McAvoy, C.J.) (120-day period for service of a summons and complaint by a plaintiff under Fed. R. Civ. P. 4(m) applies to *pro se* plaintiffs as well as those represented by counsel); *see also*, *e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F. Supp. 1279, 1282 (S.D.N.Y. 1989) (citation omitted) (court lacks jurisdiction until defendants properly served with summons and complaint).  Inasmuch as plaintiff has failed to identify and take steps to obtain jurisdiction over the John Doe defendants, I recommend dismissal of his claims against them.

recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern

District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Plaintiff's Failure to Oppose Defendants' Motion

    Before turning to the merits of plaintiff's claims, a threshold issue to

be addressed is the legal significance, if any, of his failure to oppose

defendants' summary judgment motion, and specifically whether that

failure automatically entitles defendants to summary judgment dismissing

plaintiff's complaint.

    This court's rules provide that

> [w]here a properly filed motion is unopposed and the
> Court determines that the moving party has met its
> burden to demonstrate entitlement to the relief requested
> therein, the non-moving party's failure to file or serve any
> papers as this Rule requires shall be deemed as consent
> to the granting or denial of the motion, as the case may
> be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3).  Undeniably, *pro se* plaintiffs are entitled to some

measure of forbearance when defending against summary judgment

motions.  *See Jemzura v. Public Serv. Comm'n,* 961 F. Supp. 406, 415

(N.D.N.Y. 1997) (McAvoy, C.J.).  The deference owed to *pro se* litigants,

however, does not extend to relieving them of the consequences of Local

Rule 7.1(b)(3).  *Robinson v. Delgado*, No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980 F. Supp.106, 106-07 (N.D.N.Y. 1997) (Pooler, J. & Hurd, M.J.).  Accordingly, absent a showing of good cause defendants' unopposed summary judgment motion should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 231-32 (N.D.N.Y. 2000) (Scullin, C.J.); *Leach v. Dufrain*, 103 F. Supp. 2d 542, 545-46 (N.D.N.Y. 2000) (Kahn, J.).

It should also be noted that the plaintiff's failure to properly oppose defendants' summary judgment motion is not without further consequences.  By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statements unchallenged, thus permitting the court to deem facts set forth in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement.[8]

---

[8]        Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  *See* N.D.N.Y.L.R. 7.1(a)(3)(emphasis in original).

*See Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1

(N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also*

*Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir.

2000) (discussing district courts' discretion to adopt local rules like

7.1(a)(3)). [9]

Based upon plaintiff failure to oppose defendants' motion I

recommend that the court review the motion for facial sufficiency,

accepting defendants' assertions of facts as set forth in their Local Rule

7.1(a)(3) Statement as uncontroverted, and that the motion be granted if

determined to be facially meritorious.

B.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, summary judgment is

warranted when "the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

---

[9]    Copies of all unreported decisions cited in this document have been
appended for the convenience of the *pro se* plaintiff.

U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4, 106 S.Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they

must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C.    Exhaustion of Remedies

As a threshold, procedural basis for dismissal of his claims related to this incident, in their motion defendants contend that plaintiff's failure to file and pursue to completion, a grievance against Superintendent Ekpe,

Sergeant Reneiri, and Deputy Hessel relating to his SHU confinement for seventy-two hours before filing suit, precludes him from asserting any claims arising out of that incident.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S. Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 992 (2002) (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which

must affirmatively be raised by a defendant in response to an inmate suit. *Jones v. Block*, 549 U.S. 199*, 212,* 127 S. Ct. 910, 919 (2007).  In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal.  *See Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 94-95, 126 S. Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies).  "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules."  *Woodford*, 548 U.S. at 95, 126 S. Ct. at 2388; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (citing *Woodford*)*.*[10]

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA.  *See Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing

---

[10]     While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance protocol in order to satisfy the PLRA.  *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004)) (emphasis omitted).

*Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir.1999)).  The IGP consists of a three-step review process.  First, a written grievance is submitted to the IGRC within twenty-one days of the incident.[11]  7 N.Y.C.R.R. § 701.5(a).  The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. 7 N.Y.C.R.R.  §§ 701.4(b), 701.5(b).  If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision.  7 N.Y.C.R.R. § 701.5(c).  The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC, which makes the final administrative decision.  7 N.Y.C.R.R. § 701.5(d).  Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court.  *Reyes v. Punzal*, 206 F. Supp. 2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia*, *Sulton v. Greiner*, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

While plaintiff has alleged in his complaint that he filed a grievance in March of 2006 regarding his later keeplock confinement and that he has

---

[11]     The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances."  7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

fully exhausted his administrative remedies with respect to the claims now raised, *see* Complaint (Dkt. No. 1) ¶¶ 19, 24, the record discloses that although clearly familiar with the IGP, he did not file any grievance related to his confinement in SHU, which began on March 2, 2006.  Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 28-2) ¶ 14. The record establishes that plaintiff filed only two grievances relevant to this action. The first, number RV-8195-06 and dated February 13, 2006, is the grievance complaining of the medical screening procedure for assigning inmates to messhall duty, a grievance which plaintiff claims spawned his three-day confinement to SHU.  Reusner Aff. Exh. C (Dkt. No. 28-11). The second grievance, number RV-8291-06 and dated April 20, 2006, raises a variety of complaints but lacks any reference to the superintendent's order on March 2, 2006 that he be taken to the SHU for a seventy-two hour period to allow for investigation of the allegation that he was spreading dangerous rumors, the procedures which followed for escorting and admitting plaintiff into the SHU, or the conditions within the SHU during that seventy-two hour period.  Reusner Aff. Exh. M (Dkt. No. 28-21).  Indeed, during his deposition plaintiff admitted that he never made any complaint regarding this confinement, explaining that at the

time he was trying to get out of Riverview.  Crump Tr. (Dkt. No. 28-24) pp. 15, 93.

Accordingly, while plaintiff's claims related to his later, Tier II disciplinary proceeding were properly exhausted, all those relating to and/or arising out of his three-day confinement to SHU are subject to dismissal for failure to exhaust available administrative remedies.[12]

D.    Retaliation

As was previously noted, in his complaint Crump alleges that his constitutional rights under the First Amendment were violated when, after he pursued his grievance regarding the medical screening procedures for assigning inmates to work in the messhall, he was subjected to harassment and threats, and disciplinary charges were lodged against him.  Noting the ease with which such claims can be incanted by a prison inmate, defendants seek dismissal of this cause of action as legally

---

[12]    Twenty-one of plaintiff's thirty causes of action, including claims against Epke, Reneiri, Hessel and two John Does, relate to the March 2 through 5, 2006 SHU confinement.  Additionally, in that section of the complaint identified by plaintiff as "legal claim" he alleges violation of the Fourth Amendment right to be free from illegal searches and seizures.  Complaint (Dkt. No. 1) ¶ 149.  The only allegations in the complaint relating to search and seizure are those asserting that when taken to SHU on March 2, 2006 plaintiff was subjected to a strip search and a visual body cavity search and that his personal property was taken at the time of his admission to SHU.  *See id.* at ¶ 46.  Accordingly, to the extent that this alleged constitutional violation relates to this search and/or confiscation of his personal property occurring at the time of his admission to SHU on March 2, 2006, it should be dismissed in light of plaintiff's failure to exhaust his administrative remedies with respect to that claim.

deficient as a matter of law.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies.  *See Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988).  As the Second Circuit has repeatedly cautioned, however, such claims are easily recited and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care."  *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *sub. nom Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992 (2002) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Davis* v. Goord, 320 F.3d 346, 352 (2d Cir. 2003).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action – in

other words, that the protected conduct was a substantial or motivating

factor in the prison officials' decision to take action against the plaintiff.

*Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287,

97 S.Ct. 568, 576 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir.

2007); *Dawes*, 239 F.3d at 492.  If the plaintiff carries this burden, then to

avoid liability the defendants must show by a preponderance of the

evidence that they would have taken action against the plaintiff "even in

the absence of the protected conduct."  *Mount Healthy*, 429 U.S. at 287,

97 S.Ct. at 576.  If taken for both proper and improper reasons, state

action may be upheld if the action would have been taken based on the

proper reasons alone.  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.

1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of

the protected activity in which the inmate plaintiff has engaged, the

adverse action taken against him or her, and the evidence tending to link

the two.  When such claims, which are exceedingly case specific, are

alleged in only conclusory fashion and are not supported by evidence

establishing the requisite nexus between any protected activity and the

adverse action complained of, a defendant is entitled to summary

judgment dismissing a plaintiff's retaliation claims.  *Flaherty*, 713 F.2d at 13.

### 1.   Confinement to SHU from March 2 Through 5, 2006

Plaintiff first asserts that Epke's order on March 2, 2006 to subject Crump to SHU confinement was motivated by the filing of his first grievance.  The only factual allegation against Sergeant Reneiri in this regard is that following Epke's order, he handcuffed and escorted plaintiff to SHU.

It is well recognized that the filing of a grievance is protected conduct, and can thus satisfy the first prong of a retaliation claim. *Graham*, 89 F.3d at 80.  Plaintiff has therefore sufficiently alleged that he engaged in constitutionally protected conduct.  Additionally, after the filing of his grievance plaintiff was undeniably subjected to adverse action, in the form of confinement to SHU, and he has therefore also established the adverse action element of his retaliation claim.  *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004).

Plaintiff's claim fails, however, because he has failed to provide anything but conclusory allegations that the grievance was a substantial or motivating factor behind Epke's actions.  To the contrary, Superintendent

Epke explains that following his denial of plaintiff's grievance on February 28, 2006, there were allegations that plaintiff was spreading rumors among the other inmates that the workers in the messhall were contagious and that the food they prepared was poisoned, contaminated, and otherwise unsafe to eat.  Epke Decl. (Dkt. No. 28-5) ¶ 8.  Legitimately concerned that if those reports proved true plaintiff's unchecked rumors would disturb the prison environment by discouraging inmates from eating in the messhall, Superintendent Epke determined that is was necessary that plaintiff be removed from the general population while the allegations against him could be investigated.  *Id.*  Accordingly, plaintiff was held in SHU for only seventy-two hours and thereafter released to his previous housing unit and cubicle.  Based upon these facts, no reasonable factfinder could conclude that plaintiff's grievance was the motivating factor for his placement in SHU.

With respect to plaintiff's claim against Sergeant Reneiri for his involvement, plaintiff has failed to allege any facts suggesting that he did anything but comply with a direct order issued by the superintendent which, even plaintiff acknowledged, defendant Reneiri was required to do.  Crump. Tr. (Dkt. No. 28-25) p. 64.  Accordingly, there is nothing but a

conclusory allegation that Sergeant Reneiri acted in retaliation, to support plaintiff's retaliation claim against him, and no basis exists for a finding that his actions were taken for any other reason than a direct order from his superintendent.

As noted by defendants, the Second Circuit "ha[s] established a 'presumption that a prison official's acts to maintain order are done for a proper purpose.'" *Hynes v. Squillace*, 143 F.3d at 657 (quoting *Rivera v. Senkowski*, 62 F.3d 80,86 (2d Cir. 1995)).  Accordingly, even if plaintiff had established that the filing of his first grievance was a motivating factor in the superintendent's decision to send him to SHU, the court further finds the defendants have established that in light of plaintiff's alleged dissemination of rumors, the same action would have been taken regardless of the filing of that grievance in order to allow for an investigation and maintain order in the facility.  For these reasons, I conclude that defendants are entitled to summary judgment on this portion of plaintiff's retaliation claims.

## 2.    False Misbehavior Report

Plaintiff's retaliation claims against C. O. Sears and Lieutenant McNally are premised upon issuance of the March 11, 2006 misbehavior

report and the subsequent disciplinary hearing.  As defendants point out,
plaintiff's theory in this regard is inconsistent, if not contradictory.  Plaintiff
appears to allege that defendant Sears' actions were in retaliation for <u>not</u>
filing a grievance or civil complaint against the superintendent for sending
Crump to the SHU.  *See* Complaint (Dkt. No. 1) ¶¶ 59-64, 141; *see also*
Crump Tr. (Dkt. No. 28-24) pp. 102-104.  With regard to defendant
McNally, plaintiff alleges in his complaint that he imposed disciplinary
sanctions based upon Sears' false misbehavior report, in retaliation for
Crump's filing of the first grievance (*see id.* at ¶ 145), but later testified at
his deposition that "Lieutenant McNally and Sears are the ones that
retaliated against me for not filing the grievance, a complaint [against
Epke]" (Crump Tr. (Dkt. No. 28-24) p. 104).  Putting aside these
contradictions, and assuming without deciding that plaintiff has alleged
that he engaged in constitutionally protected conduct giving rise the
alleged retaliation by defendants Sears and McNally, his claims are
subject to dismissal because he has failed to allege, let alone adduce, any
facts supporting an inference of a retaliatory motive.

In cases involving allegations of retaliation based on the filing of
allegedly false misbehavior reports, "[t]he difficulty lies in establishing a

retaliatory motive." *Barclay v. New York*, 477 F. Supp.2d 546, 558

(N.D.N.Y. 2007).   Mere conclusory allegations of such retaliatory

motivation will not suffice to survive a summary judgment motion; to

establish retaliatory animus, which ordinarily must be shown

circumstantially since direct evidence of such motivation is typically

lacking, a plaintiff may cite such factors as "temporal proximity, prior good

discipline, finding of not guilty at the disciplinary hearing, and

statements by defendants as to their motives." *Id.* (citations omitted); *see*

*also Rivera v. Goord,* 119 F. Supp.2d 327, 339 (S.D.N.Y. 2000).

    The only evidence offered by the plaintiff which could potentially

support the finding of a nexus between the protected activity alleged in his

complaint and the subsequent misbehavior report is the inference that

might be drawn by the timing of his first grievance filed on February 13,

2006 and the misbehavior report issued in March 11, 2006.  It is true such

an inference, flowing from a closeness in proximity between protected

activity and the issuance of a misbehavior report, can sometimes suffice

to defeat a summary judgment motion seeking dismissal of a retaliation

claim.  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citing *Flaherty,*

713 F.2d at 14).  In many circumstances, however, this alone is

insufficient to avoid summary judgment.  *Williams v. Goord,* 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) (citing *Ayers v. Stewart*, 1996 WL 346049, at *1 (2d Cir. 1999)); *see also Ethier v. City of Cohoes*, No. 1:02 Civ. 1584, 2006 WL 1007780, *7 (N.D.N.Y. April 18, 2006).

        In this instance, temporal proximity is the only fact that might give rise to a determination by a reasonable factfinder that the misbehavior report was issued in retaliation for protected activity.  Although Crump denies shouting a warning to the inmates "horseplaying" in the bathroom, he admits being in the area of the bathroom door, that he did not immediately produce his identification when requested by C.O. Sears, and that he protested when ordered to do so, denying any wrongdoing. Indeed, the disciplinary hearing conducted by Lieutenant McNally plaintiff pleaded guilty to one of the three charges against him, again admitting his presence in the vicinity of the disturbance, and that he did not immediately comply with defendant Sears' order but tried to provide an explanation. Defendant McNally stated that his determination of guilt was based on the report issued by defendant Sears and his finding that plaintiff's inmate witnesses lacked credibility, and it was made in the context of plaintiff's admissions.  Plaintiff does not allege any facts, and there is no evidence

in the record, that either C.O. Sears or Lieutenant McNally was even aware of his messhall medical procedures grievance, let alone motivated by that grievance to take adverse action against the plaintiff.  Additionally, plaintiff has provided no evidence regarding his prior disciplinary history.  Given the totality of these circumstances, no reasonable factfinder could conclude that the misbehavior report and resulting findings of guilt after the Tier II disciplinary hearing were prompted by retaliatory animus.  I therefore recommend dismissal of this remaining portion of plaintiff's retaliation claim.

####    E.    Harassment

Though not specifically addressed by defendants in their motion, plaintiff's complaint also generally asserts that he was harassed by defendants; no specific factual allegations are provided, and plaintiff's complaint, though including a great deal of detail on other matters, is vague as to the identity of those corrections workers who are alleged to have participated in the harassment.  *See, e.g.,* Complaint (Dkt. No. 1) ¶¶ 58-59.  According to plaintiff the harassment consisted of being pulled aside to isolated areas and prodded by corrections officers to file a civil complaint against superintendent Epke, targeted for random searches,

assigned to the messhall (an apparently less desirable position than he

had as a program aide), and called out by corrections officers by name.

Crump Tr. (Dkt. No. 28-24) pp. 14, 32, 34, 51 and 73.  Liberally construed,

plaintiff's allegations of harassment are, at best, an attempt to state a

violation of his Eighth Amendment right to be free from cruel and unusual

punishment.  His complaint, however, fails to allege any conduct that

would warrant Eighth Amendment protection.

42 U.S.C. § 1983 is not designed to rectify harassment or verbal

abuse.  *See Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Gill v.

Hoadley*, 261 F. Supp.2d 113, 129 (N.D.N.Y. 2003); *Aziz Zarif Shabazz v.

Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998); *Alnutt v. Cleary*, 913

F.Supp. 160, 165-66 (W.D.N.Y. 1996) (citations omitted).  Thus, mere

allegations of verbal abuse do not rise to the level of a constitutional

violation, and are not cognizable under 42 U.S.C. § 1983.  *See Moncrieffe

v. Witbeck*, No. 97-CV-253, 2000 WL 949457, at *3 (N.D.N.Y. June 29,

2000) (Mordue, J.) (allegations that corrections officer laughed at inmate

not actionable under section 1983) (citation omitted); *Carpio v. Walker*,

No. Civ.A.95CV1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997)

(Pooler, J. & DiBianco, M.J. ) ("[v]erbal harassment alone, unaccompanied

by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation").

There are no allegations that plaintiff suffered from the infliction of any physical injury or pain as a result of defendants' harassing conduct. Plaintiff testified at his deposition that no physical force was used against him.  Crump Tr. (Dkt. No. 28-25) at p.42-43.   When asked to identify physical injuries sustained as a result of the alleged harassment by prison workers, plaintiff testified at his deposition that he was "freezing for two days [in SHU], starving, they put me in a cold cell so you get proportional rationale meals."  *Id.* at p. 105.  The record is clear that plaintiff does not claim to have suffered any physical injury as a result of the alleged harassment.  Plaintiff has therefore failed to meet the threshold requirement for an Eighth Amendment violation of showing the "unnecessary and wanton infliction of pain" by prison officials.  *Whitley v. Albers*, 475 U.S. 312, 319, 196 S.Ct. 1078, 1084 (1986).  Consequently, I find plaintiff has failed to establish any facts that would support an Eighth Amendment violation.

F.    Due Process

Another component of plaintiff's complaint focuses upon his contention that his right to procedural due process was abridged in connection with his three-day SHU confinement and his later disciplinary hearing.  In their motion, defendants assert that plaintiff's claim fails at the outset, in light of his inability to prove the deprivation of a protected liberty interest.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards.  *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

### 1.   Liberty Interest

Addressing first plaintiff's seventy-two hour confinement in SHU, restrictive confinement for administrative reasons generally does not implicate a constitutionally protected liberty interest.  *Jones v. Artuz*, No. 93 Civ. 8784, 1994 WL 721362, at *2 (S.D.N.Y. 1994) (citing *Russell v. Coughlin*, 910 F.2d 75, 77 (2d Cir. 1990)).  Notwithstanding this general

rule, a state may by regulation create a constitutionally protected liberty interest if the language employed is unmistakably mandatory. *McMillan v. Scully*, No. 85 Civ. 7280, 1986 WL 7543, at *3 (S.D.N.Y. June 30, 1986) (citing *Hewitt v. Helms*, 459 U.S. 460, 471, 103 S.Ct. 864, 871(1972), *overruled in part by*, *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293)(1985)).

Here, the record reveals plaintiff was confined to SHU for seventy-two hours for administrative reasons in order to maintain order in the facility while the allegation that he was spreading rumors was investigated.[13]  Under the applicable DOCS regulations when an inmate is assigned involuntarily to SHU for administrative reasons, a hearing must be conducted within fourteen days of the inmate's admission.  7 N.Y.C.R.R. § 301.4(a).  Plaintiff was released from SHU in considerably less than fourteen days, before the expiration of the period within which a hearing to determine the propriety of the segregation was even required. Under these circumstances, the controlling regulation does create a

---

[13]     "Administrative segregation admission results from a determination by the facility that the inmates' presence in general population would pose a threat to the safety and security of the facility." 7 N.Y.C.R.R. § 301.4(b).

protected liberty interest, and his seventy-two hour confinement cannot support a procedural due process claim.  *See Malik v. Miller*, 679 F. Supp. 268, 269 (W.D.N.Y.1988) (summary judgment granted dismissing procedural due process claim arising out of administrative confinement for five days pending a disciplinary hearing).

Turning to the plaintiff's disciplinary confinement in keeplock, the Second Circuit has interpreted the Supreme Court's decision in *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293 (1995), to mean that "a prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sealey*, 197 F.3d at 583 (quoting *Sandin*, 515 U.S. at 484, 115 S.Ct. 2293).  Atypicality in a *Sandin* inquiry is normally a question of law.[14]  *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey*, 197 F.3d at 585.   When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of

_____

[14]      In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution.  *Colon*, 215 F.3d at 230-31; *Sealey*, 197 F.3d at 585.

both the length and conditions of confinement.  *See Sealey*, 197 F.3d at

586; *Arce v. Walker*, 139 F.3d 329, 335-36 (2d Cir. 1998); *Brooks v.

DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997); *see also Williams v. Goord*, 111

F.Supp.2d 280, 289 (S.D.N.Y. 2000) (citations omitted) (SHU confinement

in New York generally does not impose atypical and significant hardship

because it remains within the normal range of prison custody).

While not the only factor to be considered, the duration of a

disciplinary confinement remains significant under *Sandin*.[15]  *Colon*, 215

F.3d at 231.  Specifically, while under certain circumstances confinement

of less than 101 days could be shown to meet the atypicality standard

under *Sandin* (*see id.* at 232 n.5), the Second Circuit generally takes the

position that SHU confinement under ordinary conditions of more than 305

days rises to the level of atypicality, whereas normal SHU confinement of

101 days or less does not.  *Id.* at 231-32 (305 days of SHU confinement

constitutes an atypical and sufficient departure).[16]

---

[15]     Segregation for a period of thirty days was found by the Supreme Court
in *Sandin* not to impose a significant hardship on an inmate.  515 U.S. at 485-86, 115
S. Ct. at 2301.  In explaining its reasoning, the Court found that the disciplinary
confinement failed to present "a dramatic departure from the basic conditions" of an
inmate's normal sentence.  *Id.*

[16]     In fact, in *Colon* a Second Circuit panel split markedly on whether or not
adoption of a 180-day "bright line" test for examining SHU confinement would be

Plaintiff's thirty-day keeplock confinement, without more, is patently insufficient to state a protectable liberty interest. *Rodriguez v. McGinnis*, 1 F. Supp.2d 244, 248 (S.D.N.Y. 1998) ("[T]he decisions of the Second Circuit are unanimous that keeplock . . . confinement of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin*.") (quoting *Williams v. Keane*, No. 95 Civ. 0379(JGX)(AJP), 1997 WL 527677, at *6 (S.D.N.Y. Aug. 25, 1997)).[17]  Accordingly, the court finds that dismissal on this basis alone is appropriate.

### 2.   Procedural Protections

Even assuming that plaintiff were able to prove the deprivation of a cognizable liberty interest, his procedural due process claim would nonetheless fail because, based on the record now before the court, it is clear he was afforded ample due process.  The procedural protections to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are both modest and well-established, the

---

appropriate and helpful in resolving these types of cases. 215 F.3d at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

[17]     To the extent that plaintiff alleges a liberty interest in his assignment as a program aide relative to his apparent objection to having been temporarily assigned to the messhall after his disciplinary confinement, his claim must fail.  It is well recognized that inmates do not have a protected interest to participate in prison programs. *Thompson v. LaClair*, No. 9:08-CV-37, 2008 WL 191212 at *4 (N.D.N.Y. Jan. 22, 2008) (Scullin, S.J.) (citing *Boothe v. Hammock*, 605 F.2d 661, 664 (2d Cir. 1979)).

contours of the required protections having been articulated in *Wolff v.*
*McDonnell*, 418 U.S. 539, 563-67, 94 S.Ct. 2963, 2978-80 (1974).  Under
*Wolff*, the constitutionally mandated due process requirements include 1)
written notice of the charges; 2) the opportunity to appear at a disciplinary
hearing and present witnesses and evidence, subject to legitimate safety
and penological concerns; 3) a written statement by the hearing officer
explaining his or her decision and the reasons for the action being taken;
and 4) in some circumstances, the right to assistance in preparing a
defense.  *Wolff*, 418 U.S. at 564-70, 94 S.Ct. at 2978-83.  In order to pass
muster under the Fourteenth Amendment, a hearing officer's disciplinary
determination must garner the support of at least "some evidence".[18]
*Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768 (1985).

The record establishes that plaintiff received a copy of the
misbehavior report setting forth the charges against him in advance of the

---

[18]      The "some evidence" standard under *Hill* has been described as
considerably tolerant.  *See Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir. 2000).
To be sure, the Fourteenth Amendment requires that at least some "reliable evidence"
be contained in the record supporting the hearing officer's determination.  *Sira v.*
*Morton,* 380 F.3d 57, 69 (2d Cir. 2004) (*quoting, inter alia, Luna v. Pico,* 356 F.3d 356,
488 (2d Cir. 2004)).  Based upon the court's review of the hearing transcript, and in
particular plaintiff's admissions during the hearing, I conclude that no reasonable
factfinder could determine that the hearing officer's conclusion was not based upon
"some evidence".

hearing.  Reusner Aff. Exh. H (Dkt. No. 28-16) p.1.  A disciplinary hearing

was conducted, and was recorded.  *See generally id*.  At the

commencement of the hearing the plaintiff confirmed that he was aware of

and understood the charges against him.   Plaintiff was permitted to give

an oral statement, as well as to offer testimony from his own witnesses.

*See generally id.*  At the close of the hearing, when asked if he had any

objections to the procedure followed, plaintiff responded that he did not.

*Id.* at 7.  In addition, after announcing his disposition the hearing officer

advised plaintiff of his right of appeal.  Reusner Aff. Exh. H (Dkt. No. 28-

16) p. 8.  Plaintiff later sought review by the superintendent, and the

hearing officer's determination was upheld on appeal.  Reusner Aff. Exh. J

(Dkt. No. 28-18).  The hearing officer's finding of guilt on two of the

charges was based upon admissions made by plaintiff during the hearing

as well as the misbehavior report.  As to the third charge, plaintiff pleaded

guilty.  The hearing officer's determination was therefore supported by

some evidence, thereby meeting the minimum requirements of the

Fourteenth Amendment.  The procedures that were provided to plaintiff

thus were adequate to afford plaintiff the minimal process to which he was

entitled.

Plaintiff also asserts that when presiding over his Tier II disciplinary proceeding, Lieutenant McNally was not impartial.  To be sure, bias on the part of a disciplinary hearing officer can support a claim of procedural due process deprivation under the Fourteenth Amendment.  *Davidson v. Capuano*, No. 78 Civ. 5724, 1988 WL 68189, at *8 (S.D.N.Y. June 16, 1988)(citing *McCann v. Coughlin*, 698 F.2d 112, 122 (2d Cir. 1983)).  Here again, the inquiry focuses on whether plaintiff was afforded basic due process.  *See  Wright v. Conway*, 584 F.Supp.2d 604, 609 (W.D.N.Y. 2009).

Plaintiff has alleged no facts that would lead a reasonable factfinder to conclude that Lieutenant McNally was biased in conducting the hearing.  There is no allegation of any special relationship between C.O. Sears, the author of the misbehavior report, and McNally, and, as previously noted, there is no evidence that defendant McNally was even aware of plaintiff's initial grievance.  To the contrary, for the reasons explained above, the undisputed evidence shows that Lieutenant McNally fairly conducted the hearing, and that plaintiff was provided more than sufficient due process with respect the disciplinary proceeding.

To the extent that plaintiff's claim of McNally's bias implicates an

insufficient basis for his finding, I have already concluded that the

evidence of plaintiff's guilt more than meets the some evidence standard.

"[A] plaintiff armed with nothing more than conclusory allegations of bias

and prejudgment should not be able to defeat a well-supported motion for

summary judgment."  *Francis v. Coughlin*, 891 F.2d 43, 37 (2d Cir. 1989).

Accordingly, plaintiff's bare allegations, without evidentiary support, are

insufficient to establish a claim of hearing officer bias sufficient to

withstand defendants' motion for summary judgment.[19]  *Id.*

In light of the lack of evidence in the record demonstrating that

plaintiff's procedural due process rights were violated during the course of

his disciplinary hearing, I recommend dismissal of these claims.[20]

---

[19]    In his complaint, plaintiff generally alleges in the section entitled "legal claim" that he seeks redress for violation of his Sixth Amendment rights, among other things.  That constitutional amendment provides the right to a fair trial in all criminal prosecutions.  *See* U.S. CONST. AMEND. VII.  Presumably, plaintiff asserts the Sixth Amendment in relation to his disciplinary hearing.  However, "prison disciplinary hearings are not treated as 'criminal' for the purposes of the Sixth Amendment."  *Sash v. Zenk*, 439 F.3d 61, 63 (2d Cir.), *cert. denied*, 549 U.S. 920, S.Ct. 277 (2006); *see also Wolff*, 418 U.S. at 570, 94 S.Ct. at 2981-82.  As a result, plaintiff's Sixth Amendment claim should be dismissed.

[20]    Any procedural due process claim premised upon the claimed loss of his personal property while in SHU is also subject to dismissal.  The alleged destruction or loss of plaintiff's personal property will not support a claim redressable under § 1983 if "adequate state post-deprivation remedies are available."  *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194 (1984).  The Second Circuit has held New York's post-deprivations remedies adequate to preclude a prisoner's due process claim for lost personal property.  *Love v. Coughlin*, 714 F.2d 207, 208-09 (2d Cir. 1983).

G.     Claims Against Deputy Superintendent Hessel

Although not specifically addressed by defendants, there is a separate and independent basis for dismissal of plaintiff's claims against Deputy Superintendent Hessel.  The only allegations in the complaint against Hessel are found in plaintiff's twenty-fifth cause of action, alleging deprivation of liberty without due process of law in relation to plaintiff's seventy-two hour confinement in SHU.  Complaint (Dkt. No. 1) ¶ 137.  The complaint otherwise lacks factual allegations detailing Hessel's involvement in this occurrence, and it therefore appears that the claim is premised solely upon Hessel's role as deputy superintendent.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).  A supervisor

cannot be liable for damages under section 1983 solely by virtue of being

a supervisor; there is no *respondeat superior* liability under section 1983.

*Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at

501.  Vague and conclusory allegations that a supervisor has failed to

train or properly monitor the actions of subordinate employees will not

suffice to establish the requisite personal involvement and support a

finding of liability.  *Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009)

("To the extent that [a] complaint attempts to assert a failure-to-supervise

claim . . .  [that claim is insufficient where] it lacks any hint that [the

supervisor] acted with deliberate indifference to the possibility that his

subordinates would violate [plaintiff's] constitutional rights.").

    Culpability on the part of a supervisory official for a civil rights

violation can, however, be established in one of several ways, including

when that individual 1) has directly participated in the challenged conduct;

2) after learning of the violation through a report or appeal, has failed to

remedy the wrong; 3) created or allowed to continue a policy or custom

under which unconstitutional practices occurred; 4) was grossly negligent

in managing the subordinates who caused the unlawful event; or 5) failed

to act on information indicating that unconstitutional acts were occurring.

*Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds*, *sub nom.*, *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 2931(2009); *see also, Richardson*, 347 F.3d at 435; *Wright*, 21 F.3d at 501; *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986).

During his deposition plaintiff clarified that he seeks to hold defendant Hessel liable for his confinement in SHU because "he's the deputy of the jail [,and]  he has full knowledge . . .."  Crump. Tr. (Dkt. No. 28-24) p. 45; *see also, id.* at pp. 100-101.  Plaintiff acknowledges that Hessel never spoke to him, and did not order that he be placed in the SHU.  Crump. Tr. (Dkt. No. 28-24) p. 101.  "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."  *Richardson*, 347 F.3d at 435 (citations omitted).  Accordingly, plaintiff's claims against Deputy Superintendent Hessel should be dismissed.  *see*, *e.g.*, *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) (dismissal appropriate where plaintiff does no more than allege that defendant was in charge of prison); *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (same).

H.    Violation of State Law

In addition to setting forth constitutional claims, plaintiff's complaint

asserts that his SHU confinement violated New York Correction Law §§ 112, 137(5) and 138(4) and various regulations of the DOCS.[21]   To the extent that plaintiff attempts to state a claim under 42 U.S.C. § 1983 for the alleged violation of these provisions, such a claim fails as a matter of law.

To state a valid claim under section 1983, "a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citing *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993)).  "A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983."  *Cusamano v. Sobek*, 604 F.Supp.2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases).  "Furthermore, the violation of a DOCS Directive, alone, is not even a violation of a New York State Law or

---

[21]     New York Correction Law § 112 generally relates to the duties of the commissioner of the DOCS relating to correctional facilities.  *See* N.Y. Correct. Law § 112.  In general, section 137(5) prohibits degrading treatment of inmates.  *See id.* at § 137(5).  Section 138(4) provides that "[i]nmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of institutional conditions, policies, rules, regulations, or laws affecting an institution."  *See id.* at § 138(4).  Plaintiff also generally alleges violation of 7 N.Y.C.R.R. "Sections 250-300 et. seg."  Complaint (Dkt. No. 1) ¶ 98.

regulation (much less of 42 U.S.C. § 1983)." *Cabassa v. Gummerson*, 01-CV-1039, 2008 WL 4416411, at *6 n. 24 (N.D.N.Y. Sept. 24, 2008) (Hurd, J.) (internal quotation marks and citation omitted).  This is so because the DOCS directives merely provide a system which the DOCS Commissioner has established to assist him or her in exercising discretion, which he or she retains despite any violation of those directives.  *Id.*

Plaintiff's claims relating to state laws and regulations should, therefore, be dismissed.

### J.    Immunity

Lastly, in support of their motion defendants assert that plaintiff's claims against them are barred by the immunity provided under the Eleventh Amendment as well as the doctrine of qualified immunity, and that his state law claims are precluded by New York Correction Law § 24.

### 1.    Eleventh Amendment

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought.  *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58 (1978).  This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and in favor of state officials

sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[22] *Richards v. State of New York Appellate Division, Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984), *aff'd* 767 F.2d 998 (2d Cir. 1985) (citing *Pugh* and *Cory v. White*, 457 U.S. 85, 89-91, 102 S.Ct. 2325, 2328-29 (1982)).  To the extent that a state official is sued for damages in his or her official capacity, the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[23]  *Kentucky v. Graham*, 473 U.S. 159, 169, 105 S.Ct. 3099, 3105 (1985); *Hafer v. Melo*, 502 U.S. 21, 26, 112 S.Ct. 358, 361 (1991) .

It is unclear whether plaintiffs' claims are alleged against defendants in their individual or official capacities, or both.  To the extent that plaintiff asserts his claims against defendants in their official capacities, plaintiff's damage claims are in reality claims against the State of New York, thus

---

[22]     In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State.   In *Northern Ins. Co. of New York v. Chatham County* the Supreme Court reaffirmed that the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment.  547 U.S. 189,193, 126 S.Ct. 1689, 1693 (2006).

[23]     By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983.  *See Hafer*, 502 U.S. at 30-31, 112 S.Ct. at 364-65.

exemplifying those against which the Eleventh Amendment protects.  As a result, they are subject to dismissal.  *Daisernia v. State of New York*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.).  I therefore recommend that this portion of defendants' motion be granted, and plaintiff's damage claim against the defendants in their capacities as state officials be dismissed

> ### 2.   New York Correction Law § 24

By statute, New York invests state employees, including correctional workers, with immunity from suits requiring them to personally answer state law claims for damages based on activities falling within the scope of the statute, providing that

> 1.   [n]o civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of [the Department of Correctional Services], in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.
>
> 2.   Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of [the Department of Correctional Services] shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24; *see also Ierardi v. Sysco,* 119 F.3d 183, 186-87 (2d Cir. 1997).[24]  Section 24 thus precludes claims against corrections officers brought against them in any court in their personal capacities arising out of the discharge of their duties.  *Baker v. Couglin*, 77 F.3d 12, 14-15 (2d Cir. 1996).  In *Haywood v. Drown*, ___ U.S. ___, 129 S.Ct. 2108 (2009), the Supreme Court recently held this provision unconstitutional to the extent it precludes inmates from pursuing § 1983 actions.  In the wake of *Haywood*, one court in this district has observed that "[a] claim brought pursuant to state law does not implicate the Supremacy Clause, and therefore, the *Haywood* decision does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim."  *May v. Donneli*, 9:06-cv-437, 2009 WL 3049613, at * 5 (N.D.N.Y. Sept. 18, 2009) (Sharpe, J. & Treece, M.J.).  In that case, because the acts of the corrections officers, which were alleged to have violated New York Correction Law § 610, clearly fell within the

---

[24]      To be sure, the immunity afforded under section 24 is by no means absolute; actions taken by corrections workers occurring during the course of their employment but wholly outside of their scope of employment, for example, lack the protection of that section.  The circumstances presented in *Ierardi,* for example, involving a claim of sexual harassment made by a special education teacher employed by the DOCS against a corrections officer assigned to the same facility, serves aptly to illustrate the type of situation in which section 24 would not afford protection.  *Ierardi*, 119 F.3d at 188-89.

scope of their employment, the court found that it lacked jurisdiction to hear such pendent state law claims.  *See id.*

In this case plaintiff's pendent state law claims, alleging violations of the New York Correction Law and the DOCS regulations, as well as common law negligence, indisputably arise from actions taken by the defendants in their roles as corrections employees, including the determinations to administratively confine plaintiff to SHU, to issue a misbehavior report, the conduct of the disciplinary hearing, and the determination that plaintiff was guilty of the charges alleged.  While they may allege constitutional deprivations and actions exceeding the scope of a corrections officer's authority, these types of claims have consistently been treated as giving rise to immunity from suit for pendent state law claims against corrections officers in their individual capacities, whether in state or federal court.  *See, e.g. Baker*, 77 F.3d at 15-16; *Parker v. Fogg*, No. 85-CV-177, 1994 WL 49696, at *9 (N.D.N.Y. Feb. 17, 1994) (McCurn, S.J.).  *Cepeda v. Coughlin,* 128 A.D.2d 995, 996-97, 513 N.Y.S.2d 528, 530 (3d Dep't 1987) (holding Correction Law section 24 applicable to actions against corrections officers for allegedly using excessive force when returning inmates to their cells during a disturbance), *lv. denied*, 70

N.Y.2d 602, 512 N.E.2d 550 (1987).  For this reason, I find that plaintiff's state law claims are precluded by section 24, and recommend that they be dismissed.[25, 26]

IV.   SUMMARY AND RECOMMENDATION

At the heart of plaintiff's complaint is the claim that he was retaliated against for filing a grievance complaining that inmates assigned to work in the messhall did not receive adequate advance medical screening.  Out of this arises thirty causes of action alleging violations of various constitutional provisions as well as New York State Correction Law, the DOCS regulations and common law tort claims.  Having failed to exhaust his administrative remedies regarding his seventy-two hour SHU confinement, I recommend that all of plaintiff's claims relating to that event be dismissed on this procedural basis.  With respect to his claims of retaliation and those relating to alleged violations of his right to due

---

[25]     In any event, even if I were to conclude that those state law claims were not precluded, I would recommend that the court not exercise pendent jurisdiction of such claims, "pursuant to 28 U.S.C. § 1367, which authorizes a federal court to decline supplemental jurisdiction over a state claim if all of the claims over which the court had original jurisdiction were dismissed."  *Stephenson v. Albany County Policymakers*, Civ. No. 6:09-CV-326, 2009 WL 2922805, at *2 (N.D.N.Y. Aug. 14, 2009) (Kahn, J. & Treece, M.J.) (citing 28 U.S.C. § 1367(c)(3)).

[26]     In light of the foregoing, I have declined to address defendants' assertion of qualified immunity as further grounds for dismissal of the complaint.

process, I have concluded that no reasonable factfinder could determine that plaintiff's constitutional rights were violated and therefore recommend dismissal of these claims on the merits.  Additionally, plaintiff has not alleged personal involvement on the part of defendant Hessel, thus failing to provide a basis for a finding of liability against him. To the extent that Crump has named defendants in their official capacities, I recommend dismissal based upon the sovereign immunity afforded by the Eleventh Amendment.  Finally, because violations of state law and regulations do not state a claim under section 1983, and in any event, plaintiff's claims are precluded by New York Correction Law § 24, I recommend dismissal of all of plaintiff's claims that are premised upon violation of state law. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 28) be GRANTED, and that plaintiff's complaint in this action be DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      January 19, 2010
               Syracuse, New York



Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Larry TINSLEY, Plaintiff,
v.
Gary GREENE, Deputy Superintendent of Great
Meadow Correctional Facility; Jim Lanfear,
Maintenance Supervisor, Great Meadow Correctional
Facility; Gary Yule, Corrections Officer, Great Meadow
Correctional Facility; and David Roberts, Senior
Counselor, Great Meadow Correctional Facility,
Defendants.
**No. 95-CV-1765 (RSP/DRH).**

March 31, 1997.

Larry Tinsley, Pro Se.

Dennis C. Vacco, New York State Attorney General,
Darren O'Connor, Assistant Attorney General, of counsel,
for Defendants.

ORDER

POOLER, District Judge.

**\*1** The above matter comes to me following a
report-recommendation and order by Magistrate Judge
David R. Homer, duly filed on the 13th day of September,
1996. Dkt. No. 24. Following ten days from the service
thereof, the clerk has sent me the entire file, including any
objections thereto. Plaintiff Larry Tinsley filed objections.
Dkt. Nos. 25, 26.

In his report-recommendation, Magistrate Judge Homer
advises that Tinsley failed to establish or raise a genuine
issue of material fact regarding the nature of his
confinement. Report-recommendation, Dkt. No. 24, at

9-10. There is no dispute that prison officials confined
Tinsley to keeplock and loss of some privileges for 60
days after they conducted a search of his cell, found a
marijuana cigarette in the cell, and found Tinsley guilty of
possessing a controlled substance after a Tier III
disciplinary hearing. Tinsley's conviction and sentence
were affirmed on administrative appeal. In his lawsuit
under 42 U.S.C. § 1983, Tinsley raises several charges to
the manner in which defendants conducted the search and
disciplinary hearing. However, Tinsley failed to specify in
any manner that his punishment posed an "atypical and
significant hardship on [him] in relation to the ordinary
incidents of prison life." *Sandin v. Connor,* 515 U.S. 472,
----, 115 S.Ct. 2293, 1300, 132 L.Ed.2d 418, ---- (1995).
Without this showing, plaintiff failed to allege a
deprivation of his Fourteenth Amendment due process
liberty interest, and his civil rights claim must fail. *Id.*

In his objections to the report-recommendation, Tinsley
makes general attacks regarding the alleged bias of
Magistrate Judge David Homer and argues that the
magistrate judge has misconstrued his claims. Plaintiff
also asks me to reconsider defendants' summary judgment
motion and review plaintiffs memorandum opposing the
motion. However, Tinsley has not raised any allegation
regarding the nature of his punishment, which is the
threshold issue under *Sandin.* I have reviewed the entire
file in this matter, including plaintiff's many submissions,
and I find that he failed to raised any issue of fact to
support an alleged deprivation of his due process liberty
interests. Magistrate Judge Homer's thorough
report-recommendation is neither biased nor a
mischaracterization of plaintiffs claims.

For the foregoing reasons, it is therefore

ORDERED that the report-recommendation of September
13, 1996, is approved, and

ORDERED that plaintiffs' motion for default summary
judgment is denied as moot, and

ORDERED that defendants' motion for summary

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

judgment is granted, and it is further

ORDERED that the clerk serve a copy of this order upon the parties by regular mail.

IT IS SO ORDERED.
HOMER, United States Magistrate Judge.

REPORT-RECOMMENDATION AND ORDER [FN1]

> FN1. This matter was referred to the undersigned for report and recommendation by United States District Judge Rosemary S. Pooler pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

The plaintiff a New York State Department of Correctional Services (DOCS) inmate currently confined at the Great Meadow Correctional Facility (Great Meadow), brought this pro se action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that defendants violated his rights under the Fourth and Fourteenth Amendments in connection with a search of his cell and ensuing disciplinary hearing. Plaintiff seeks compensatory and punitive damages as well as injunctive relief.

*2 Presently pending are defendants' motion for summary judgment (Docket No. 17), plaintiff's letter-memorandum requesting summary judgment by default (Docket No. 11), and plaintiff's motions for a pre-trial conference (Docket No. 20) and for appointment of counsel (Docket No. 21). For the reasons stated below, it is recommended that the defendants' motion be granted and that plaintiff's motions be denied.

I. BACKGROUND

On October 30, 1995, while plaintiff was incarcerated at Great Meadow, defendant Greene received information from a confidential source that plaintiff was concealing escape materials. Defendant Greene ordered the search of plaintiff's prison cell. The search was executed by Corrections Officer Rando and defendant Yule and was

supervised by Sergeant Smith. No escape materials were found. However, the officers found a rolled cigarette in plaintiff's cell. The cigarette tested positive for marijuana. Plaintiff was placed in keeplock [FN2] and was given a contraband receipt for the cigarette that was removed from his cell.

> FN2. "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995).

Plaintiff was served with a misbehavior report which charged him with possession of a controlled substance. A Tier III disciplinary hearing [FN3] was commenced on November 3, 1995 before defendant Lanfear as the hearing officer. During the hearing, plaintiff claimed that defendant Greene failed to corroborate the reliability of the confidential informant, the search was improperly supervised, he did not receive the requisite contraband slip, defendants did not remove any contraband item from plaintiff's cell, and defendants failed to sign the misbehavior report. Plaintiff also objected when witnesses were not called in the order he had requested.

> FN3. DOCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier III hearing, or superintendent's hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 254.7(iii), 270.3(a) (1995); Walker v. Bates, 23 F.3d 652, 654 (2d Cir.1994), cert. denied, 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995).

At the conclusion of the hearing on November 7, 1995, defendant Lanfear found plaintiff guilty based upon the

statement in the misbehavior report submitted by C.O. Rando endorsed by C.O. Yule. Testimony during hearing by C.O. Yule verified the report and stated the substance was found in Tinsley's cell. Testimony during hearing by

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

Sgt. Sawyer stated he received the item found by C.O. Rando and tested same which proved positive for controlled substance. Testimony was considered during hearing by Tinsley.

Defs.' Statement Pursuant to Rule 7.1(f) (Docket No. 17), Ex. A, p. 16. Plaintiff was sentenced to confinement in keeplock for sixty days and loss of packages, commissary and telephone privileges for sixty days. Shortly after this action was commenced, plaintiff's conviction and sentence were affirmed on administrative appeal.

## II. SUMMARY JUDGMENT

### A. Legal Standard

Under Fed.R.Civ.P. 56(c), if there is "no genuine issue as to any material fact ... the moving party is entitled to judgment as a matter of law ... where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden to demonstrate that no genuine issue of material fact exists falls solely on the moving party. *Federal Deposit Ins. Corp. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994); *see also Heyman v. Commerce and Industry Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975). Once the moving party has provided sufficient evidence to support a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e); *accord Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994).

**\*3** The trial court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmovant. *American Cas. Co. of Reading Pa. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994); *see also Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985). The nonmovant may defeat summary judgment by producing specific facts showing that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d

265 (1986).

### B. Discussion

The defendants move for summary judgment on the grounds that (1) plaintiff's due process allegations fail to state a claim, (2) plaintiff's hearing was conducted in accordance with constitutional requirements, (3) the search of plaintiff's cell did not violate any of plaintiff's constitutional rights, and (4) defendants are entitled to qualified immunity.

### 1. Due Process Liberty Interest

Plaintiff contends that his due process rights were violated because the November 3-7, 1995 disciplinary hearing was improperly executed, and as a result, he was wrongly confined to sixty days keeplock.[FN4] In their motion for summary judgment, defendants contend that under *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), plaintiff lacked any liberty interest protected by the Due Process Clause.

> FN4. New York regulations permit placement in keeplock for both disciplinary and administrative reasons. These include, among others, punishment for misconduct and protective custody. N.Y. Comp.Codes R. & Regs. tit. 7, § 301.1-.7 (1995).

A due process claim as alleged by plaintiff will lie under section 1983 only where the alleged violation infringed a cognizable liberty interest. *Allison v. Kyle,* 66 F.3d 71, 74 (5th Cir.1995). Under *Sandin,* a court must first determine whether the deprivation of which an inmate complains merits the protections afforded by the Due Process Clause. A protected liberty interest

will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force. nonetheless imposes *atypical and significant hardship on the inmate in relation to the*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

*ordinary incidents of prison life.*

*Id.* at 2300 (emphasis added). The Court held that confinement of the plaintiff for thirty days in a segregated housing unit infringed no liberty interest protected by the Due Process Clause. *Id.* at 2302.

At first blush *Sandin* appeared to mark a radical change in the litigation of inmates' due process claims. It appeared to suggest that the number of sufficiently stated claims would be drastically reduced. *See Orellana v. Kyle,* 65 F.3d 29, 31-32 (5th Cir.1995), *cert. denied,* 516 U.S. 1059, 116 S.Ct. 736, 133 L.Ed.2d 686 (1996) ("it is difficult to see that any other deprivations in the prison context, short of those that clearly impinge on the duration of confinement, will henceforth qualify for constitutional 'liberty' status.... [T]he ambit of [inmates'] due process liberty claims has been dramatically narrowed.").

Indeed, several circuit courts have rejected prisoners' due process claims under *Sandin* where the confinement complained of was solely confinement in segregated housing. *See, e.g., Pichardo v. Kinker,* 73 F.3d 612, 613 (5th Cir.1996) (indefinite confinement in administrative segregation for affiliation with gang not atypical and significant under *Sandin* ); *Luken v. Scott,* 71 F.3d 192, 193 (5th Cir.1995), *cert. denied,* 517 U.S. 1196, 116 S.Ct. 1690, 134 L.Ed.2d 791 (1996) (segregation without more implicates no liberty interest); *Rimmer-Bey v. Brown,* 62 F.3d 789, 790-91 (6th Cir.1995)(placement in administrative segregation not atypical and significant in context of life sentence).

**\*4** Several judges in this district have adopted this position. *See Polanco v. Allan,* No. 93-CV-1498, 1996 WL 377074, at \*2 (N.D.N.Y. July 5, 1996) (McAvoy, C.J.) (confinement in a special housing unit (SHU) for up to one year not protected by Due Process Clause); *Figueroa v. Selsky,* No. 91-CV-510 (N.D.N.Y. Oct. 5, 1995) (Scullin, J.) (seven and one-half months in SHU not protected); *Delaney v. Selsky,* 899 F.Supp. 923, 927 (N.D.N.Y.1995) (McAvoy, C.J.) (197 days in SHU not protected); *Ocasio v. Coughlin,* No. 94-CV-530 (N.D.N.Y. Feb. 5, 1996) (Scullin, J.) (180 days in SHU not protected); *Gonzalez v. Coughlin,* No. 94-CV-1119 (N.D.N.Y. Jan. 10, 1996) (Report-Recommendation of

M.J. Hurd) (163 days in keeplock not protected), *adopted,* (N.D.N.Y. May 6, 1996) (Cholakis, J.), *appeal docketed,* No. 96-2494 (2d Cir. June 10, 1996); *Taylor v. Mitchell,* No. 91-CV-1445 (N.D.N.Y. Feb. 5, 1996) (Cholakis, J.) (sixty days in SHU not protected); *Cargill v. Casey,* No. 95-CV-1620, 1996 WL 227859, at \*2 (N.D.N.Y. May 2, 1996) (Pooler, J.) (dismissing as frivolous complaint alleging due process violation resulting in keeplock confinement for thirty days). Under these cases, based solely on its duration, plaintiff's confinement in keeplock for sixty days would not constitute a cognizable liberty interest under *Sandin.*

Other circuits, however, have viewed *Sandin* less as a durational, bright line bar to statement of a claim than as an additional issue of fact for litigation. *See, e.g., Bryan v. Duckworth,* 88 F.3d 431, 433-34 (7th Cir.1996) (question of fact whether disciplinary segregation was atypical and significant under *Sandin* ); *Williams v. Fountain,* 77 F.3d 372, 374 n. 3 (11th Cir.1996) (noting *Sandin* decided by only 5-4 majority and holding that segregation for one year provided basis for assuming atypical and significant deprivation under *Sandin* ); *Gotcher v. Wood,* 66 F.3d 1097, 1101 (9th Cir.1995) (placement in disciplinary segregation presents issue of fact whether it constitutes an atypical and significant deprivation under *Sandin* ).

The Second Circuit appears generally to be following the Seventh, Ninth and Eleventh Circuits. The Second Circuit has not yet definitively addressed the effect of *Sandin* on its prior holdings. *See Rodriguez v. Phillips,* 66 F.3d 470, 480 (2d Cir.1995). It has recently held, however, that *Sandin* does apply retroactively and, it appears, that a plaintiff bears the burden of proving that the deprivation in question imposed an atypical and significant hardship. *See Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996); *Samuels v. Mockry,* 77 F.3d 34, 37-38 (2d Cir.1996); *see also Giakoumelos v. Coughlin,* 88 F.3d 56, 62 (2d Cir.1996) (dicta that whether confinement in SHU is "atypical and significant" under *Sandin* presents question of fact). One judge in this district has concluded from these cases that fact-finding is required to resolve whether a deprivation is atypical and significant. *Compare Silas v. Coughlin,* No. 95-CV-1526, 1996 WL 227857, at \*1 (N.D.N.Y. April 29, 1996) (Pooler, J.) (denying motion to dismiss due process claim where plaintiff was confined in SHU for 182 days, holding that Second Circuit's interpretation of *Sandin* mandated further fact-finding as

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

to nature of plaintiff's alleged deprivation from confinement), *with Cargill v. Casey, supra* (due process claim based on confinement in keeplock for thirty days dismissed as frivolous).

**\*5** Under these cases, consideration must be given to whether a plaintiff has established, or raised, a genuine question of fact concerning his disciplinary confinement. Here, plaintiff has raised no question of fact concerning his confinement in keeplock. Plaintiff has not alleged rare, unique or unusual hardships of the kind cited in *Sandin* as examples of atypical and significant deprivations. 515 U.S. at ----, 115 S.Ct. at 2300 (transfer to a mental hospital and involuntary administration of psychotropic drugs), or that detention in keeplock imposed a hardship on plaintiff because of his special, unique or unusual condition while incarcerated. *See Delaney v. Selsky,* 899 F.Supp. at 927-28 (question of fact whether confinement in SHU created atypical and significant deprivation for inmate who alleged such confinement caused back problems because of his unusual height of nearly seven feet).

Segregated confinement is a known and usual aspect of incarceration in the New York prison system. *See Sandin v. Conner,* 515 U.S. at ----, 115 S.Ct. at 2301 ("Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law."). The existence of keeplock has been authorized by statute, N.Y. Correct. Law § 112(1) (McKinney 1987), and implemented by DOCS regulations. N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995). Those regulations describe the conditions and restrictions of confinement in keeplock. *Id.* at pts. 302-05. The deprivations are, therefore, part of the New York prison "regime ... to be normally expected" by one serving a sentence in that system. *Sandin v. Conner,* 515 U.S. at ----, 115 S. Ct. at 2302.

Moreover. confinement in keeplock or SHU may result not only from the imposition of discipline, as here. Inmates may also be placed in keeplock or SHU for reasons of administration, N.Y. Comp.Codes R. & Regs. tit. 7, § 301.4(b) (1995); protection, *id.* at § 301.5; detention, *id.* at § 301.3; reception, diagnosis and treatment, *id.* at pt. 306; or for any other reason. *Id.* at 301.7(a). The conditions for inmates confined in keeplock, including plaintiff, are the same regardless of the reason

for placement there. *Id.* at pts. 302-05.[FN5]

> **FN5.** Inmates confined for reasons of protection receive somewhat greater privileges. *See, e.g.,* N.Y. Comp.Codes R. & Regs. tit. 7, § 330.4 (1995) (three hours per day outside cell).

Inmates in the New York system have no right to be incarcerated in any particular institution, cell or block of cells, nor do they enjoy a right to be housed in the general prison population or to participate in any particular program offered at an institution. *Cf. Meachum v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (no right to remain in particular prison created by state law); *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (right to good time credits created by state statute). Such matters are committed to the discretion of prison authorities. This grant of broad discretion to prison authorities comports with a principle rationale of *Sandin* that

federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment.... Such flexibility is especially warranted in the fine-tuning of the ordinary incidents of prison life, a common subject of prisoner claims....

**\*6** 515 U.S. at ---- - ----, 115 S.Ct. at 2299-2300.

Here, plaintiff contends at best that his keeplock confinement was "atypical and significant" under *Sandin* because it subjected him to retaliation, caused closer monitoring by DOCS, affected his transfer to other institutions, and impaired his eligibility for certain prison programs. Pl. Mem. of Law at p. 21. These contentions are conclusory and unsupported in any way. They are also unsworn and unsigned. For these reasons alone, plaintiff's contentions should be rejected as failing to raise any issue of fact under *Sandin.*

On their merits as well, however, these contentions should be rejected. While there may be cases where confinement in keeplock might subject an inmate to retaliation from other inmates or guards such that keeplock confinement

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

imposed "atypical and significant" hardships, no such hardship has been demonstrated here by the non-specific, conclusory assertions of plaintiff. As to the contentions regarding plaintiff's monitoring status and his eligibility for transfer and prison programs, all concern matters for which plaintiff has no special rights or interests, all were known to follow his from disciplinary confinement as a regular part of DOCS' regime, and plaintiff has asserted no hardship atypical or significant as to him concerning these matters.

For these reasons plaintiff has failed to meet his burden of demonstrating the existence of any factual issue under *Sandin.* Accordingly, defendants' motion on this ground should be granted.

2. Due Process

Defendants assert that, notwithstanding *Sandin,* plaintiff was not denied due process.

The Due Process Clause requires that an inmate faced with disciplinary confinement has a right to at least twenty-four hours advance notice of the charges against him and to be informed of the reasons for the action taken and the evidence relied upon by the hearing officer. In addition, an inmate has the right to call witnesses and present evidence in his defense "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals." *Wolff v. McDonnell,* 418 U.S. 539, 564-66, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *McCann v. Coughlin,* 698 F.2d 112, 121-22 (2d Cir.1983). These rights implicitly include the right to make a statement in the inmate's defense and the right to marshal the facts. *See Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *see also Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986).

Where an inmate is illiterate or where the charges are unusually complex, the inmate is entitled to seek the assistance of another inmate or an employee. *Wolff v. McDonnell,* 418 U.S. at 570. The Second Circuit has extended this right, and directed that inmates who are confined pending a hearing be provided with some form of assistance. *Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988). Corrections officials are required only to provide inmates with the opportunity to exercise these due process rights. *See, e.g., Maiid v. Henderson,* 533 F.Supp. 1257, 1273 (N.D.N.Y.), *aff'd,* 714 F.2d 115 (2d Cir.1982) ("although [the inmate] had the right to call witnesses at his hearing, there is no evidence in the record that he ever invoked this right").

*7 Here, plaintiff argues first that the hearing officer failed to call witnesses in the requested order. However, due process does not mandate that plaintiff be permitted to call his witnesses in a particular order.

Second, plaintiff alleges that the hearing officer failed to conduct an in camera inquiry into the original source of information on which the search was authorized to determine if that source was reliable. However, the issues at the hearing were the results of the search, not the reasons why the search was initiated. The hearing officer's decision did not rest in any part on the information from the confidential informant. Due process thus did not require inquiry into the reliability of the original information.

Third, plaintiff contends that although the original misbehavior report contains the signatures of both defendant Yule and Officer Rando, his copy reflects only defendant Yule's signature. However, an inmate has no right to receive a statement of charges signed by any particular official.[FN6]

> FN6. A misbehavior report is to be made by the employee who has observed the incident. Where another employee has personal knowledge of the facts, he shall, where appropriate, endorse his name on the other employee's report. *N.Y. Comp.Codes R. & Regs. tit. 7, § 251-3.1(b) (1995).* The misbehavior report here was signed by J. Rando and endorsed by G. Yules as an employee witness, and it is endorsed by the area supervisor. *See* Defs.' Statement Pursuant to Rule 7.1(f), Ex. A, p. 1, Inmate Misbehavior Report.

Fourth, plaintiff claims that defendant Roberts failed to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

provide him with various documents plaintiff requested pursuant to New York's Freedom of Information Law after the disciplinary hearing concluded. This claim as well falls outside the scope of the Due Process Clause as described by the cases discussed above. Defendants' failure to provide the requested documents did not violate plaintiff's constitutional right.

Accordingly, defendants' motion should be granted on this ground as well. [FN7]

> **FN7.** Throughout his complaint and pleadings, plaintiff refers jointly to his right to due process/equal protection. The facts and arguments in plaintiff's complaint and pleadings point only to a due process claim. No facts or arguments relating to the Equal Protection Clause are asserted. Nevertheless, to the extent plaintiff's complaint is deemed to assert a claim for violation of the Equal Protection Clause, defendants' motion for summary judgment should be granted as to that claim as well.

3. Cell Search

Plaintiff alleges that the search of his cell on October 30, 1995 violated his Fourth Amendment protection against unreasonable searches and seizures. [FN8] In *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Supreme Court held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Id.* at 526. Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights. *DeMaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.1995) (Kaplan, J.). Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights. [FN9] Defendants' motion for summary judgment as to claims regarding the search of plaintiff's cell should be granted.

> **FN8.** In his complaint plaintiff also appears to allege that the search violated his Fourteenth Amendment right to due process because he received a receipt for the seizure of the marijuana five hours after the search was

conducted and never received any report of the search. To the extent plaintiff asserts such a claim, summary judgment should be granted to the defendants for the reasons set forth in subsections 1 and 2 above.

> **FN9.** Nor can an inmate recover under section 1983 for intentional destruction of his personal property by a state employee, as long as the state provides a meaningful post-deprivation remedy. *Hudson v. Palmer,* 468 U.S. at 533. New York provides such a remedy in section 9 of the New York Court of Claims Act. *Smith v. O'Connor,* 901 F.Supp. 644, 647 (S.D.N.Y.1995). Plaintiff may pursue any claim regarding destruction of his personal property in state court.

4. *Qualified Immunity*

Defendants argue in the alternative that they are entitled to summary judgment on the ground of qualified immunity.

A government official is entitled to qualified immunity if his or her conduct did not violate "a clearly established" constitutional right of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994). The contours of the right must be established to the extent that a reasonable official would recognize his acts violated that right. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The following factors must be considered to determine whether a right is clearly established:

**\*8** (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question, and (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). A determination in favor of a public officer based on qualified immunity is appropriate when, at the time the officer was acting, the right in question was not clearly established or, even if the right was established, it was not objectively reasonable for the official to recognize that his conduct violated the right. *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993); *Ying Jing Gan v. City of New York,* 996 F.2d 522 (2d Cir.1993).

Here, among other reasons, the defendants could not reasonably have known that the search of plaintiff's cell violated any of his Fourth Amendment rights or that plaintiff's due process rights were violated by the failure to call witnesses in the order requested by plaintiff. *Cf. Walker v. Bates,* 23 F.3d 652, 656-57 (2d Cir.1994), *cert. denied,* 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995) (prison disciplinary hearing officer entitled to qualified immunity in suit claiming violation of due process from denial of prisoner's right to call witnesses in disciplinary hearing); *Cookish v. Powell,* 945 F.2d 441, 449 (1st Cir.1991) (prison official entitled to qualified immunity from charge of violating prisoner's Fourth Amendment rights by conducting body cavity search in view of prison guards of opposite sex). Therefore, the defendants' motion on this ground should be granted.

### III. APPOINTMENT OF COUNSEL

Also pending is a renewed application by plaintiff for appointment of counsel (Docket No. 21). A review of the file in this matter reveals that the issues in dispute in this case are not overly complex. Further, there has been no indication that plaintiff has been unable to investigate the critical facts of this case. Finally, no special reason appears why appointment of counsel at this time would be more likely to lead to a just determination of this litigation. Therefore, based upon the existing record in this case, appointment of counsel is unwarranted.[FN10]

> FN10. Also pending is plaintiff's motion for a pre-trial conference and evidentiary hearing (Docket No. 23). This motion is untimely and is hereby denied. Plaintiff has also moved for summary judgment by default (Docket No. 11) in

response to defendants' request for an extension of time to answer the complaint. This extension was granted by order dated March 15, 1996 and defendants have answered. Accordingly, it is recommended that this motion be denied as moot.

### IV. CONCLUSION

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion for summary judgment be GRANTED; and it is further

RECOMMENDED that plaintiff's motion for summary judgment by default be DENIED; and it is hereby

ORDERED that plaintiff's renewed motion for appointment of counsel is DENIED without prejudice; and it is further

ORDERED that plaintiff's motion for a pre-trial conference and an evidentiary hearing is DENIED; and it is further

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon the parties to this action.

*9 Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1997.
Tinsley v. Greene

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)
(Cite as: 1997 WL 160124 (N.D.N.Y.))

Not Reported in F.Supp., 1997 WL 160124 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1996 WL 727441 (S.D.N.Y.)
(Cite as: 1996 WL 727441 (S.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Joel GRANT Plaintiff,
v.
Sup't D. RILEY, Capt. W. Thorne, Lt. T. Healey, Sgt. J. Buonato, Sgt. W. Connolly, C.O. Hess, C.O. Wilbur, C.O. McHugh, C.O. Hinden Defendants.
No. 89 CIV. 0359 (BSJ).

Dec. 17, 1996.

Joel Grant, plaintiff pro se.

Dennis C. Vacco, Attorney General of the State of New York, Joseph Mirabella, Assistant Attorney General, New York City, for defendants.

MEMORANDUM & ORDER

JONES, DISTRICT COURT.

*1 Plaintiff *pro se* Joel Grant, a former inmate of the New York State Department of Correctional Services ("DOCS"), while incarcerated initiated this action pursuant to 42 U.S.C. § 1983, alleging that defendants violated his rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. On November 23 1993, the Court granted defendants' motion for summary judgment with respect to plaintiff's claims under the First, Fourth, and Eighth Amendments, but allowed his cause of action against defendants Riley, Wilbur, and Healey with respect to the alleged Fourteenth Amendment violation to survive.

In light of new case law, defendants move once again for summary judgment on the due process claim. For the following reasons, the motion is GRANTED.

BACKGROUND

At all times relevant to this motion, plaintiff was an inmate at the Fishkill Correctional Facility ("Fishkill"). In mid-November 1988, plaintiff was informed that he was to be taken to a hospital outside the prison for treatment of a leg problem. Defendant Wilbur, a corrections officer, was scheduled to act as an escort on that excursion.

Plaintiff, however, feared Wilbur, believing that the officer harbored ill will towards him due to plaintiff's earlier filing of a grievance. As a result, plaintiff balked at the attempt to transport him to the hospital and signed a refusal form to that effect. That form contains a handwritten statement warning plaintiff that he could be the subject of a misbehavior report if he refused to go the hospital and that he might be liable for costs incurred due to the cancelled trip. Plaintiff alleges that the warning was not on the form when he signed it.

Due to plaintiff's refusal to go to the hospital, a misbehavior report was filed. At a disciplinary hearing held December 1, 1989, plaintiff was found guilty of violating call slip procedures. Accordingly, the hearing officer, defendant Thomas Healey, sentenced him to ten days in keeplock.

Plaintiff appealed his sentence to defendant Riley. On December 5, 1989, Riley excused plaintiff from serving the last five days of his sentence. Plaintiff thus served a total of 5 days in keeplock for refusing to travel to the hospital.

At Fishkill in 1988, the conditions imposed upon DOCS' inmates confined to keeplock differed from those kept in general population.[FN1] For instance, keeplocked inmates were permitted two showers a week, while those in general population could take three. In addition, keeplocked inmates could not participate in prison programs, in which those in general population spent most of their time (although there was and is neither a regulation or directive

Not Reported in F.Supp., 1996 WL 727441 (S.D.N.Y.)
(Cite as: 1996 WL 727441 (S.D.N.Y.))

guaranteeing inmates time spent in a program, nor law requiring inmates to participate in any level of programming). Despite these differences, however, keeplocked inmates were (1) permitted access to library materials and personal property and (2) entitled to the same level of exercise and visitation rights as those in general population. Moreover, there is no indication that they could not leave their cell to obtain medical help. Plaintiff does not allege that the circumstances surrounding his keeplock confinement differed significantly from these general conditions imposed on keeplocked inmates.

> FN1. In addition, the conditions imposed upon inmates in keeplock differed from those imposed upon inmates confined to Special Housing Units ("SHU"). In 1988, inmates were placed in SHUs for, among other things, administrative reasons or protective custody. Those in keeplock had *more* freedom than those in SHUs. For instance, keeplocked inmates had access to personal property, while those in SHU did not. Additionally, keeplocked inmates had general visitation rights, while those in SHUs were permitted only one day per week of visitation.

## DISCUSSION

*2 Defendants Riley, Wilbur, and Healey move for reconsideration of the Court's earlier denial of their motion for summary judgment with regard to plaintiff's claim that they violated his due process rights. An intervening change in controlling law is a major ground justifying reconsideration. *Virgin Atlantic Airways, Ltd. v. National Mediation Bd.,* 956 F.2d 1245, 1254 (2d Cir. 1992); *see also Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1383 (1983) (finding that law of case doctrine "directs a court's discretion," but does not limit its power to reconsider earlier decisions). Since such case law is present here, *see infra,* reconsideration is appropriate.

In reconsidering, the Court must apply the well-settled law governing motions for summary judgment, which dictates that summary judgment may be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.56;

*Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548 (1986); *Mays v. Mahoney,* 23 F.3d 660, 662 (2d Cir. 1994). To grant a motion for summary judgment, the Court must determine that a reasonable fact finder could not find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2511-12 (1986). Thus, the moving party bears the burden of proving the absence of a genuine issue of material fact. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970). If the moving party meets this burden, the burden shifts to the non-moving party to present evidence of specific facts showing that a genuine issue exists. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514.

On June 19, 1995, the Supreme Court decided *Sandin v. Connor,* -- U.S. --, 115 S.Ct. 2293 (1995). In *Sandin,* the Court held that constitutional liberty interests:

> will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Id.* at --, 115 S.Ct. at 2300. Applying these principles to the facts before it, the Court held that a prisoner's placement in segregated confinement for 30 days did not work a major disruption in his environment and therefore did not present the kind of atypical, significant deprivation in which a state might conceivably create a liberty interest. *Id.* at --, 115 S.Ct. at 2297-2301 ("Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law.").

Although decided more than five years after the events surrounding plaintiff's disciplinary hearing took place, *Sandin* applies retroactively and thus controls this case.[FN2]*Samuels v. Mockry et al.,* 77 F.3d 34, 37 (2d Cir. 1996); *see also Solem v. Stumes,* 465 U.S. 638, 642, 104 S.Ct. 1338, 1341 (1983) ( "as a rule, judicial decisions apply retroactively"). Therefore, to prevail here Grant must at least establish that the confinement he complains of created an atypical and significant hardship in his prison environment. [FN3]*See Frazier v. Coughlin,* 81 F.3d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 727441 (S.D.N.Y.)
(Cite as: 1996 WL 727441 (S.D.N.Y.))

313, 317 (2d Cir. 1996) (explaining *Sandin* in light of other cases discussing inmates' liberty interests); *Uzzell v. Scully,* 893 F. Supp. 259, 263 (S.D.N.Y. 1995) (applying *Sandin*) ("a prisoner does not have a protected liberty interest in remaining free from... [segregated] confinement").

FN2. Plaintiff complains in his response to defendants' motion for summary judgment that defendants procrastinated in order to wait for *Sandin* to be decided and thereafter move for summary judgment behind its weighty authority. There is no evidence at all, however, to justify this allegation. Rather, plaintiff originally moved for summary judgment on this claim *before* the Supreme Court decided *Sandin* and, as stated, now properly moves to reargue based on new controlling law.

FN3. The Court notes that in addition to showing an atypical and significant hardship, Grant must also prove that New York State has granted its inmates a protected liberty interest in remaining free from the confinement about which he complains. See *Frazier,* 81 F.3d at 317.

**\*3** However, there is no evidence that plaintiff's ten-day sentence in keeplock -- of which, only five days were served -- amounted to the kind of atypical and significant hardship necessary to implicate a liberty interest; keeplock did not work a major disruption in his prison environment. Rather, at the relevant time the only significant differences between keeplocked inmates and those in general population at Fishkill related to their ability to leave their cells and participate in prison programs -- those in keeplock could not participate, while those in general population spent most of their time in various modules (although no regulation requires this). Additionally, the record is clear that keeplocked prisoners maintained many of the privileges available to those in the general population. For instance, keeplocked inmates not only had access to library books and periodicals, but also were entitled to the same amount of exercise as those in general population. Moreover, their visitation rights were not curbed at all. Simply put, therefore, Grant's keeplock did not implicate a liberty interest. *See Uzzell,* 893 F. Supp. at 363 (keeplock does not invoke liberty interest).

Accordingly, defendants' motion is GRANTED. The Clerk of the Court is directed to enter judgment to this effect.

So ordered.

S.D.N.Y.,1996.
Grant v. Riley
Not Reported in F.Supp., 1996 WL 727441 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)
(Cite as: 1999 WL 9847 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Lawrence SHUSTER, Plaintiff,
v.
NASSAU COUNTY, et al., Defendants.
**No. 96 Civ. 3635(JGK).**

Jan. 11, 1999.

Lawrence Shuster, Fountain Valley, CA, for the Plaintiff, pro se.

Gina M. Amorini, Mineola, NY, for Nassau County.

Michael Kennedy, Assistant Attorney General, Office of the Attorney General, Division of State Counsel, Litigation Bureau, New York, NY, for Hon. Zelda Jones & NYS Dept. of Motor Vehicles.

*OPINION AND ORDER*

KOELTL, J.

**\*1** The plaintiff filed this action against various defendants alleging false arrest and malicious prosecution for violations of the New York Vehicle and Traffic Law (VTL). The docket sheet reflects that the complaint was filed on May 15, 1996. Defendants Judge Zelda Jonas, the New York State Department of Motor Vehicles (collectively, the "State defendants"), and Nassau County, who have not answered or moved with respect to the complaint or the amended complaint, have requested that the amended complaint be dismissed pursuant to Rule 4(m) of the Federal Rules of Civil Procedure because they have never been properly served with the summons and complaint or amended complaint. The docket sheet in this action does not reflect any service on any defendant. The

Court therefore by Order dated February 17, 1998 directed the plaintiff to advise the Court in writing why this action should not be dismissed for failure to serve the summons and complaint on the defendants within 120 days of filing of the complaint. While the plaintiff has responded, it is clear that he has never properly served any of the defendants.

I.

Rule 4(m) authorizes a court upon motion to dismiss an action without prejudice as against a defendant if service of the summons and complaint is not made upon that defendant within 120 days after the filing of the complaint. This Rule also authorizes courts to dismiss an action sua sponte, provided that the court first gives notice to the plaintiff. See Fed.R.Civ.P. 4(m); see also Gowan v. Teamsters Union (237), 170 F.R.D. 356, 359-60 (S.D.N.Y.1997) (dismissing action filed by a pro se, in forma pauperis plaintiff pursuant to Rule 4(m)).

Separate rules govern service upon state agencies and upon individuals. Under the Federal Rules of Civil Procedure, "[s]ervice upon a state ... or other governmental organization ... shall be effected by delivering a copy of the summons and of the complaint to its chief executive officer or by serving the summons and complaint in the manner prescribed by the law of that state...." Fed.R.Civ.P. 4(j)(2). Service upon an individual is made by delivering a copy of the summons and complaint to the individual personally, by leaving a copy thereof at the individual's dwelling house or usual place of abode with a person of suitable age and discretion residing there, or by delivering a copy to an agent authorized to receive service of process. See Fed.R.Civ.P. 4(e)(2). The rule further provides that an individual may also be served in accordance with state law. See Fed.R.Civ.P. 4(e)(1).

Under New York law, a state officer sued in an official capacity or a state agency must be served by:

(1) delivering the summons to such officer or to the chief executive officer of such agency or to a person

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)
(Cite as: 1999 WL 9847 (S.D.N.Y.))

designated by such chief executive officer to receive service, or (2) by mailing the summons by certified mail, return receipt requested, to such officer or to the chief executive officer of such agency, and by personal service upon the state in the manner provided by subdivision one of this section.

**\*2** N.Y. C.P.L.R. 307(2). Subdivision (1) provides that "personal service upon the state shall be made by delivering the summons to an assistant attorney-general at an office of the attorney-general or to the attorney-general within the state." Hence, "[s]ervice on a state officer may be made either by personal delivery to the officer or by certified mail to the officer. Service on a state agency may be made either by personal delivery to the chief executive officer of the agency (or the chief executive's designee) or by certified mail to the chief executive." N.Y. C.P.L.R. 307(2) supplemental practice commentaries (McKinney 1998).

The New York rules for serving an in-state natural person parallel Fed.R.Civ.P. 4(e)(1), but with additional requirements. Like Rule 4, service may be by personal delivery to the person being served, see N.Y. C.P.L.R. 308(1), or to a duly appointed agent for service. See N.Y. C.P.L.R. 308(3). Service may also be made by delivering the summons to a person of suitable age and discretion at the actual place of business, dwelling place, or usual place of abode of the person to be served, provided that the summons is also mailed to that person's last known residence or sent by first class mail to that person's actual place of business. See N.Y. C.P.L.R. 308(2).

In addition, where service under sections 308(1) and (2) cannot be made with due diligence, service may be effected by nailing the summons to the door of the actual place of business, dwelling place, or usual place of abode of the person to be served, and by mailing the summons to that person at his or her last known residence or by sending the summons by first class mail to that person's actual place of business. See N.Y. C.P.L.R. 308(4). Under sections 308(2) and (4), the delivery and mailing must occur within twenty days of each other. See N.Y. C.P.L.R. 308(2) & (4).

II.

On May 15, 1996, the plaintiff filed the original complaint in this action. On August 14, 1996, the plaintiff filed an amended complaint. In February 1998, well past the 120-day limit for timely service of process, the State defendants requested dismissal of the action pursuant to Rule 4(m). (See Letter from Michael Kennedy dated Feb. 13, 1998). The plaintiff was ordered to advise the Court by March 2, 1998 why the case should not be dismissed on that basis. (See Order dated Feb. 17, 1998). The plaintiff filed a response dated February 17, 1998. The plaintiff also filed a response received on August 13, 1998. In August 1998, more than two years after the original complaint was filed and nearly two years after the amended complaint was filed, the State defendants and defendant Nassau County requested dismissal of this action on the grounds that they still had not been served. (See Letter from Michael Kennedy dated Aug. 3, 1998; Letter from Gina Amorini dated Aug. 3, 1998).

(A)

The plaintiff does not argue that he complied with Rule 4 by delivering the summons and complaint to the chief executive officer of the DMV. Nor does he allege that he delivered the summons and complaint to Judge Jonas, who is sued in her personal and official capacities, personally or to a person of suitable age and discretion at Judge Jonas' dwelling place or usual place of abode. Nor has there been compliance with N.Y. C.P.L.R. 307(2) with respect to either the DMV or Judge Jonas. With respect to the DMV, there has been neither personal delivery to the chief executive officer of the DMV or the chief executive's designee or by certified mail to the chief executive with personal service on an assistant attorney-general or the attorney-general. The plaintiff also has not complied with similar provisions with respect to Judge Jonas.

**\*3** Instead, the plaintiff contends that he had served the State defendants by twice delivering the summons and complaint to the Nassau County Regional Office of the State Attorney General, on July 30, 1996 and February 6, 1998. (See Return of Service (unsigned), attached to Feb. 17, 1998 Shuster Letter). To support his argument that service on the Nassau office constituted effective service on the State defendants, the plaintiff submitted a copy of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)
(Cite as: 1999 WL 9847 (S.D.N.Y.))

a letter from the Office of the Attorney General stating that its Nassau office would accept service on behalf of, among others, Judge Zelda Jonas in a different action. In addition, he argues that the complaint was also attached to the Order to Show Cause which was served on the Nassau office. (*See* Order to Show Cause attached to Feb. 17, 1998 Shuster Letter). The plaintiff also argues that under New York State law, service on the Attorney General's Office is sufficient.

Under New York law, delivering the summons and complaint to a regional office of the State Attorney General does not by itself constitute effective service on a state agency or an individual officer sued in her official capacity. *See Berkowitz v. New York City Bd. of Educ.,* 921 F.Supp. 963, 968 (S.D.N.Y.1996); *Dawkins v. Hudacs,* 159 F.R.D. 9, 10 (N.D.N.Y.1994); *Town of Clarkstown v. Howe,* 206 A.D.2d 377, 614 N.Y.S.2d 327, 328 (2d Dep't 1994); *Sannella v. Regan,* 111 A.D.2d 964, 490 N.Y.S.2d 61 (3d Dep't 1985). Moreover, there is no evidence that the Nassau office was authorized to accept service on behalf of the DMV. As to Judge Jonas, the fact that the Nassau office had been designated to receive service on her behalf in another case does not authorize that office to accept service for her in this case.

The plaintiff also contends that he served the State defendants by handing their attorney a copy of the complaint in this Court on or about July 30, 1996. Even if proven, this is also not sufficient under the Federal Rules and New York law unless the attorney is authorized by appointment or by law to receive service of process. *See United States v. Ziegler Bolt and Parts Co.,* 883 F.Supp. 740, 749 (Ct. Int'l Trade 1995); *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1289 (S.D.N.Y.1989); *Gibbs v. Hawaiian Eugenia Corp.,* 581 F.Supp. 1269, 1271 (S.D.N.Y.1984). The plaintiff has neither alleged nor provided proof that the State defendants intended to be bound by the acceptance of the complaint by their attorney. While the authority of an attorney to accept service may be implied from the surrounding circumstances indicating the intent of the client, *J & L Parking Corp., Inc. v. United States,* 834 F.Supp. 99, 102 (S.D.N.Y.1993); *Olympus Corp. v. Dealer Sales and Serv., Inc.,* 107 F.R.D. 300, 305 (S.D.N.Y.1985), there is no evidence in this case to establish such intent. The State defendants never acted in any way to indicate that the attorney was authorized to

accept service of process. The State defendants never answered the Complaint or filed a responsive pleading, and specifically asserted in correspondence that there had been no service of process. Indeed, the State defendants notified the plaintiff at least as early as February 1998 that service was insufficient. (*See* Feb. 13, 1998 Kennedy Letter).

**\*4** Although the plaintiff is acting *pro se,* his failure to comply with basic procedural rules cannot be excused, particularly in light of the fact that he is familiar with litigation. He has already filed numerous other lawsuits and numerous motions. *See, e .g., Shuster v. Eiberson,* No. CV-92-1524 (E.D.N.Y. Apr. 23, 1993); *Shuster v. Fenster,* No. 92 Civ. 2323; *Shuster v. Citibank,* No. 93 Civ. 4182, 1994 WL 267550 (S.D.N.Y. June 15, 1994); *Shuster v. Prudential Securities Inc.,* No. 91 Civ. 0991, 1991 WL 102500 (S.D.N.Y. June 6, 1991); *Shuster v. Olem,* 96 Civ.1993, 1997 WL 167046 (S.D.N.Y. Apr. 8, 1997); *Shuster v. Eiberson,* No. 97 Civ.1988, slip. op. (S.D.N.Y. Aug. 12, 1997); *Shuster v. Oppleman,* No. 96 Civ. 1689 (S.D.N.Y. filed Mar. 7, 1996); *Shuster v. Voel,* No. 96 Civ. 8240 (S.D.N.Y. filed Nov. 1, 1996). Accordingly, the State defendants' request for dismissal without prejudice pursuant to Rule 4(m) is granted.

(B)

The docket sheet also does not reflect service of process on defendant Nassau County. Fed.R.Civ.P. 4(1) requires proof of service in the form of an affidavit by the server. *See* Fed.R.Civ.P. 4(1). While it is true that, by its terms, the failure to comply with Fed. R. Civ. 4(1) does not affect the validity of the service, the plaintiff has submitted no proof of timely service for any of the defendants. Nor has the plaintiff explained how he purportedly served Nassau County pursuant to federal or state law. The plaintiff has offered no explanation for his failure to serve in response to the Court's directive or to Nassau County's letter requesting dismissal. Nor has he requested an extension of the time to serve. Because the plaintiff was given notice that the case would be dismissed absent a showing of good cause for the failure to serve the defendants, and has failed to make this showing, defendant Nassau County's application for dismissal without prejudice pursuant to Rule 4(m) is also granted. *See, e.g., Urquidez v. Officer Lyon # 7505,* No. 97 Civ. 884, 1997 WL 414158 at *1

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)
(Cite as: 1999 WL 9847 (S.D.N.Y.))

(S.D.N.Y. July 23, 1997).

(C)

Similarly, the docket sheet also does not reflect that any of the remaining defendants named in the amended complaint have been served. They include individual defendants D. Dillon, N. Levy, Richard Kramer, "Mr. Rainville," Skip Dwyer, R. Jackson, A. Aducci, and "U.S.A. (Bruce [illegible] )," each of whom is sued in his or her official and personal capacities; the Nassau County Republican Party; and unnamed "clients of Frank Cocozzelli" (collectively, the "remaining defendants"). Although the 120-day limit for service of process has long expired, courts generally consider three factors in determining whether "good cause" exists to warrant an extension of the time for service:

(1) whether the delay in service was "the result of mere inadvertence," or whether there has been a "reasonable effort" to effect service[,] ... (2) prejudice to the defendant[,] ... [and 3] whether or not the plaintiff has moved under Fed.R.Civ.P. 6(b) for an enlargement of time in which to effect service.

*5 Gordon v. Hunt, 116 F.R.D. 313, 319-21 (S.D.N.Y.1987).

These factors do not support an extension of the time to serve the remaining defendants in this case. The plaintiff was directed by the Court to explain the delay in serving the defendants but failed to do so. The plaintiff has not moved for additional time to serve any of the defendants. Moreover, to permit service at this late date would unfairly prejudice the remaining defendants. See Gowan, 170 F.R.D. at 359-60. The delay in proceeding against them has been excessive. Accordingly, pursuant to Rule 4(m), the case against the remaining defendants is dismissed without prejudice.

III.

The plaintiff has also filed a partially illegible "letter and

motion for order" in which he seeks an injunction to stop further court proceedings in Nassau County for alleged violations of section 511 of the New York Vehicle and Traffic Law. He argues that the injunction should be granted because all of his past violations of the Vehicle and Traffic Law have been expunged from his record. The Court has already considered and denied a similar motion by the plaintiff on the grounds that the plaintiff failed to show either irreparable harm or a likelihood of success on the merits. See Shuster v. Nassau County, 948 F.Supp. 282 (S.D.N.Y.1996). In the present motion, which consists of one paragraph, the plaintiff offers no new facts to establish either of these requirements for a preliminary injunction. Therefore, the plaintiff's motion for a preliminary injunction is denied.

IV.

The plaintiff also moves for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). This motion is plainly improper because there have been no responsive pleadings because the defendants were never effectively served. The motion is therefore denied.

V.

The plaintiff also moves for an order directing Nassau County to send to the plaintiff a copy of the transcript of a 1996 proceeding before Judge Eiberson in which Judge Eiberson allegedly dismissed various Vehicle and Traffic Law charges against the plaintiff. To the extent that this is a discovery request, it is denied as moot.

CONCLUSION

For the reasons explained above, this action is dismissed without prejudice. The plaintiff's motion for a preliminary injunction is denied. The plaintiff's motion for judgment on the pleadings is denied. The plaintiff's motion for an order directing Nassau County to produce a court transcript is denied as moot.

SO ORDERED.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)
(Cite as: 1999 WL 9847 (S.D.N.Y.))

S.D.N.Y.,1999.
Shuster v. Nassau County
Not Reported in F.Supp.2d, 1999 WL 9847 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)
(Cite as: 1998 WL 278264 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Anthony ROBINSON, Plaintiff,
v.
Jane DELGADO, Hearing Officer and Lieutenant; and
Donald Selsky, Director of Inmate Special Housing
Program, Defendants.
**No. 96-CV-169 (RSP/DNH).**

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for
Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, Ellen Lacy
Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

*1 Anthony Robinson, a former inmate incarcerated by the
New York State Department of Corrections ("DOCS"),
sued two DOCS employees, alleging that they violated his
right to due process in the course of a disciplinary
proceeding and subsequent appeal. On September 9, 1997,
defendants moved for summary judgment. Defendants
argued that plaintiff failed to demonstrate that the fifty
days of keeplock confinement that he received as a result
of the hearing deprived him of a liberty interest within the
meaning of the Due Process Clause. Plaintiff did not
oppose the summary judgment motion, and Magistrate
Judge David N. Hurd recommended that I grant it in a
report-recommendation filed April 16, 1998. Plaintiff did
not file objections.

Because plaintiff did not file objections, I "need only
satisfy [myself] that there is no clear error on the face of
the record in order to accept the recommendation."
Fed.R.Civ.P. 72(b) advisory committee's note. After
reviewing the record, I conclude that there is no clear error
on the face of the record. After being warned by
defendants' motion that he must offer proof in admissible
form that his disciplinary confinement imposed an
"atypical and significant hardship on the inmate in relation
to the ordinary incidents of prison life," Robinson failed
to offer any such proof. Sandin v. Conner, 515 U.S. 472,
115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995).
Consequently, he cannot maintain a due process challenge.
Id. Therefore, it is

ORDERED that the report-recommendation is approved;
and it is further

ORDERED that defendants' motion for summary
judgment is granted and the complaint dismissed; and it is
further

ORDERED that the Clerk of the Court serve a copy of this
order on the parties by ordinary mail.
HURD, Magistrate J.

REPORT-RECOMMENDATION

The above civil rights action has been referred to the
undersigned for Report and Recommendation by the
Honorable Rosemary S. Pooler, pursuant to the local rules
of the Northern District of New York. The plaintiff
commenced the above action pursuant to 42 U.S.C. § 1983
claiming that the defendants violated his Fifth, Eighth, and
Fourteenth Amendment rights under the United States
Constitution. The plaintiff seeks compensatory and
punitive damages.

Presently before the court is defendants' motion for
summary judgment pursuant to Fed R. Civ. P. 56.
However:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)
(Cite as: 1998 WL 278264 (N.D.N.Y.))

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

**\*2** The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d

15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1998.
Robinson v. Delgado
Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Marcus COTTO, Plaintiff,
v.
Daniel SENKOWSKI, Superintendent of Clinton
Annex; T.J. Howard, Hearing Officer; J. Maggy,
Sergeant; Byron Wind, Officer; Barry Rock, Officer;
and Philip Coombe, Jr., Acting Commissioner,
Defendants.
**No. 95-CV-1733 (RSP/DNH).**

Oct. 23, 1997.

Marcus Cotto, Plaintiff, pro se, Auburn Correctional
Facility, Auburn, New York.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, New York,
Darren O'Connor, Esq., Asst. Attorney General, of
Counsel.

MEMORANDUM DECISION AND ORDER

POOLER, D.J.

**\*1** This matter comes to me following a
report-recommendation by Magistrate Judge David N.
Hurd, duly filed on the 29th of August, 1997. Following
ten days from the service thereof, the Clerk has sent me
the entire file, including any and all objections filed by the
parties herein.

In his *pro se* complaint, Cotto alleges that in August 1995,
he and some other inmates were attacked while
incarcerated at Clinton Correctional Facility. Compl., Dkt.
No. 1, ¶ 2. Cotto alleges that as a result of this incident he
was charged with engaging in violent conduct and conduct

which disturbed the order of the facility. *Id.* Although
Cotto was found guilty of these charges and sentenced to
a term of one year in the Special Housing Unit and loss of
six months good time, his sentence was reversed on
administrative appeal. *Id.* Cotto brought this action
pursuant to 42 U.S.C. § 1983, alleging various violations
of his rights under the Eighth and Fourteenth
Amendments. *Id.*

By motion filed March 3, 1997, defendants sought
summary judgment. Dkt. No. 17. Plaintiff filed no papers
in opposition to the motion. In his report-recommendation,
the magistrate judge recommended that I grant defendants'
motion pursuant to Local Rule 7.1(b)(3), which provides
that, absent a showing of good cause, failure to respond to
a motion shall be deemed consent to the relief requested.
Dkt. No. 19, at 2. Cotto has filed no objections to the
report-recommendation.

After careful review of all of the papers herein, including
the magistrate judge's report-recommendation, it is

ORDERED that the report-recommendation is hereby
approved, and it is further

ORDERED that defendants' motion for summary
judgement is GRANTED and the complaint against them
dismissed in its entirety, and it is further

ORDERED that the Clerk of the Clerk serve a copy of this
order on the parties by regular mail.

IT IS SO ORDERED.
DAVID N. HURD, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter was referred to the undersigned by the
Honorable Rosemary S. Pooler, for
Report-Recommendation pursuant to the Local Rules of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

the Northern District of New York.

Plaintiff commenced the above § 1983 action making various allegations regarding violations of his civil rights under the United States Constitution. Pursuant to Fed.R.Civ.P. 56, the defendants have moved for summary judgment alleging that there is no genuine issue as to any material fact and that as a matter of law they are entitled to judgment.

The defendants have filed a motion pursuant to Fed.R.Civ.P. 56 granting summary judgment in favor of the defendants on grounds including that there is no genuine issue as to any material fact, and that the defendant is entitled to judgment as a matter of law.

It is now more than ninety days beyond the date when the response papers were due, and the plaintiff has not filed any papers in opposition to the motion. "Failure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." Rules of U.S. Dist. Ct. for Northern Dist. of N.Y., L .R. 7.1(b)(3).

*2 NOW, upon careful consideration of the notice of motion, statement pursuant to Local Rule 7.1(F), with exhibits attached, and the memorandum of law submitted in support of the defendants' motion; and there being no opposition to the motion, it is

RECOMMENDED that the motion be granted and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(I), the parties have ten days within which to file written objections to the foregoing report. Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert denied, 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(I); Fed.R.Civ.P. 72, 6(a), 6(e); Roldan v. Racette, 984 F.2d

85, 89 (2d Cir.1993); Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1997.
Cotto v. Senkowski
Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

*1 Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia*, that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff[FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s
Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented
separately from NHCC. Accordingly, when a

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

> FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF. NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to

tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

> FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up." It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In addition, to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. FN6 The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

> FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form FN7 to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." FN8 *Id.* at 2-3. NCCF indexes all grievance

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

> FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

> FN8. Hargrove has not argued that he was unaware of this five-day deadline.

> FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

**(4)**

**Authenticity of the Grievance Forms and Other**

**Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II; Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy copy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial.

McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

### Discussion

### (1)

### Summary Judgment Standard

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005).* Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of*

*Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

*7 Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window

provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19, 2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams,* 418 F.Supp.2d at 101, 102 (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams,* 418 F.Supp.2d at 101 (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

*8 Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins*

*v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See,e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6, 2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No.99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14]*Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

> **FN14.** Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

> **FN15.** Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs' Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d. at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

[does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at \*4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at

1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at \*8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at \*2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at \*8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465, at \*4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

**c. Special circumstances**

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane,* 2006 WL 3096031, at *8; *Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to

seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering the presentation of the opposing party's claim or defense." *McMunn,* 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

Ⓒ Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
**No. 9:04-CV-0471.**

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney General, The Capitol Albany, NY, for Defendants.

***DECISION and ORDER***

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting various violations of his constitutional rights arising out of his placement at the Southport Correctional Facility. In his Complaint, Plaintiff alleges that he was improperly sent to the Special Housing Unit ("SHU") at a maximum security facility and that being in SHU has put his life in jeopardy. Currently before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 seeking dismissal of the Complaint in its entirety for failure to exhaust administrative remedies.

**I. FACTS**[FN1]

> **FN1.** The following facts are taken from Defendants' statement of material facts submitted pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts

are deemed admitted because they are supported by the record evidence and Plaintiff failed to submit an opposing statement of material facts as required by Rule 7.1(a)(3). Plaintiff was specifically advised by Defendants of his obligation to file an opposing statement of material facts and to otherwise properly respond to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State Department of Correctional Services. Plaintiff signed the instant Complaint on April 7, 2004. On his Complaint form, Plaintiff indicated that there is a grievance procedure available to him and that he availed himself of the grievance procedure by filing a complaint with the IGRC [FN2], followed by an appeal to the superintendent of the facility, and then to the Central Office Review Committee in Albany. The Complaint indicates that Plaintiff is "waiting for response from Albany." The Complaint was filed on April 27, 2004.

> **FN2.** Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant Complaint, Plaintiff filed a grievance relating to the issues presented in this case. On April 19, 2004, the IGRC recommended that Plaintiff's grievance be denied. Plaintiff then appealed that decision to the facility Superintendent. In the meantime, on April 27, Plaintiff commenced the instant litigation. On May 3, 2004, after Plaintiff filed the Complaint in this case, the Superintendent denied Plaintiff's grievance. On May 5, 2004, Plaintiff appealed the decision to the Central Office Review Committee in Albany. On June 23, 2004, the Central Office Review Committee denied Plaintiff's appeal. Plaintiff did not file any other grievances in connection with the matters raised in this lawsuit.

Defendants now move to dismiss on the ground that Plaintiff commenced the instant action before fully exhausting his available administrative remedies.

**II. DISCUSSION**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in _Neal v. Goord,_ 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." _Id._ at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." _Id._

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. _Mojias v. Johnson,_ 351 F.3d 606, 610 (2d Cir.2003); _see also_ 7. N.Y.C.R.R. § 701.1, _et seq._ Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. _Neal,_ 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 &#128;&#128; 1395(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of 1996 was patently false; there was no explanation offered

that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff, [FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

> FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

> FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

FN3. The amended complaint reads as follows:

That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed

Affirmation of Service, also dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

> **FN5.** Plaintiff himself filed objections which were not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.[FN6] On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

> **FN6.** In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

**\*3** Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

_Energy Co._, 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] _See,Silva Run Worlwide Ltd. v. Gaming Lottery Corp._, 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. _See,_Fed.R.Civ.P. 3, 5(e). For _pro se_ litigants, who are not imprisoned and have been granted _in forum pauperis_ relief, their complaints are deemed filed when received by the Pro Se Office. _See,Toliver v. County of Sullivan,_ 841 F.2d 41 (2d Cir.1988). The complaint of a _pro se_ prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. _Houston v. Lack,_ 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); _Dory v. Ryan,_ 999 F.2d 679, 682 (2d Cir.1993), _modified on other grounds,_25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. _Noble v. Kelly,_ 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. _See e.g.,Forster v. Bigger,_ 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); _Hosendove v. Myers,_ 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); _Hayes v. N .Y.S. D.O.C. Officers,_ 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); _Torres v. Irvin,_ 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

**\*4** In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres, 33 F.Supp.2d at 270).* Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002).* Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.FN10 The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the

record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and an opportunity to respond to the exhaustion issue and his failure remains clear.

FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

*5 Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT



Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Roger SULTON, Plaintiff,
v.
Charles GREINER, Superintendent of Sing Sing Corr.
Fac., Doctor Halko & P.A. Williams of Sing Sing Corr.
Fac. Medical Department, Doctor Lofton, Defendants.
No. 00 Civ. 0727(RWS).

Dec. 11, 2000.

Roger Sulton, Wende Correctional Facility, Alden, NY, Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General of the State of New York, New York, NY, By: S. Kenneth Jones, Assistant Attorney General, for Defendants, of counsel.

*OPINION*

SWEET, J.

**\*1** Defendants Charles Greiner ("Greiner"), past Superintendent of Sing Sing Correctional Facility ("Sing Sing") and Dr. Nikulas Halko, ("Halko"), P.A. Williams ("Williams"), and Dr. Lofton ("Lofton"), all of the Sing Sing Medical Department, (collectively, the "Defendants"), have moved to dismiss the amended complaint of *prose* inmate Roger Sulton ("Sulton"), pursuant to Fed.R.Civ.P. 12(b)(6) and 12(h)(2) for failure to exhaust administrative remedies. For the reasons set forth below, the motion will be granted.

*Prior Proceedings*

Sulton filed the complaint in this action on February 2,

2000, asserting a claim against the Defendants under Section 1983 for alleged violation of his constitutional rights under the Eighth Amendment for acting with deliberate indifference to his serious medical needs. Sulton filed an amended complaint on May 3, 2000, to identify additional defendants to his suit. Additionally, Sulton alleges negligent malpractice by the Sing Sing medical staff. Sulton seeks monetary damages. The instant motion was filed on August 9, 2000, and was marked fully submitted on September 6, 2000.

*Facts*

The Defendants' motion comes in the posture of a motion to dismiss for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). However, both the Defendants and Sulton have submitted materials outside the pleadings. Where a District Court is provided with materials outside the pleadings in the context of a 12(b)(6) motion to dismiss, it has two options: the court may exclude the additional materials and decide the motion on the complaint alone or convert the motion to one for summary judgment. *See* Fed.R.Civ.P. 12(b); *Kopec v. Coughlin,* 922 F.2d 152, 154 (2d Cir.1991); *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court has determined to treat the instant motion as a motion for summary judgment. Therefore, the following facts are gleaned from the parties' submissions, with all inferences drawn in favor of the non-movant as required on a motion for summary judgment. They are not findings of fact by the Court.

Sulton is a prison inmate who was incarcerated in Sing Sing at the time of the incidents in question. Greiner was Superintendent of Sing Sing at that time. Halko was and is a doctor on medical staff at Sing Sing. Williams and Lofton are alleged to be affiliated with the Sing Sing Medical Department.

According to Sulton, on October 8, 1998, he slipped on a flight of wet stairs, where there was no "wet floor" sign posted, and injured his left knee. The next day his knee was swollen and the pain "was real bad." That same day Sulton went to sick call and saw P.A. Williams. Williams

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

ordered x-rays and also ordered "no-work, feed-in cell, pain killers and a cane" for Sulton. The swelling went down, but the pain got stronger.

For four months Sulton complained to the Sing Sing medical staff about his pain. During this time his left knee would give out "at any time." Yet, "nothing was done." However, the Sing Sing Medical Department did send Sulton to the Green Haven Correctional Facility for an M.R.I. and, subsequently, knee surgery was recommended by an attending physician on April 23, 1999. A hinged knee brace was recommended for post-surgery recovery.

**\*2** At some point thereafter, Sulton wrote to Greiner concerning his medical problem and he was placed on "a call-out" to see Halko. Halko then informed Sulton that he would not be going for surgery because Correctional Physician Services [FN1] ("CPS") would not allow it. CPS wanted the inmate to undergo physical therapy before they would approve surgery. Sulton continued to be in pain and requested outside medical care from Williams. However, Williams could not do anything about Sulton's surgery until it was approved by CPS.

> FN1. CPS is the health maintenance organization which must pre-approve any outside medical service to be provided to inmates outside of the correctional facility.

In September 1999, Sulton was transferred to Wende Correctional Facility ("Wende"). The medical department there provided him with physical therapy for his left knee, which was "still in constant pain" and was prone to giving out beneath his body weight.

Sulton filed grievance # 14106-99 on November 3, 1999, and on November 24, 1999, he received a response from the Inmate Grievance Resolution Committee (the "IGRC"). Sulton contends that on that same date he indicated his desire to appeal their decision to the Superintendent. Sulton did not appeal his grievance to the highest level of administrative review, the Central Office Review Committee (the "CORC"). In a letter to Wende Superintendent Donnelly ("Donnelly") dated December 17, 2000, Sulton complained that he never received a response to his appeal of the IGRC decision. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly stated that he concurred with the IGRC's decision.

In January 2000, "plaintiff['s] legs gave out and the right leg took the weight of the body ... causing the plaintiff to suffer ... torn joints in the ankle area." Surgery was performed on the ankle and he was placed on "medical confinement status."

*Discussion*

I. *This Action Will Be Dismissed For Plaintiff's Failure To Comply With The Prison Litigation Reform Act Of 1996*

In his amended complaint, Sulton alleges that he filed a grievance and, although initially the Defendants were unable to identify the grievance, by his opposition to the instant motion Sulton has identified the process he undertook to pursue his grievance.

Section 1997e(a) of the Prison Litigation Reform Act (the "PLRA") provides that:

No action shall be brought with respect to prison conditions under ... 42 U.S.C. § 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In enacting Section 1997e(a), Congress made exhaustion mandatory. *Salahuddin v. Mead,* 174 F.3d 271, 274-75 (2d Cir.1999). As a result, where an inmate fails to satisfy the PLRA's exhaustion requirement, the complaint must be dismissed. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435, 439-40 (S.D.N.Y.2000) (citations omitted).

In New York, the relevant administrative vehicle is the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

Inmate Grievance Program ("IGP"). *See* N.Y. Correct. Law § 139 (directing Commissioner of the Department of Correctional Services to establish a grievance mechanism in each correctional facility under the jurisdiction of the Department); N.Y. Comp.Codes R. & Regs., tit. 7, § 701.1 (instituting IGP). New York inmates can file internal grievances with the inmate grievance committee on practically any issue affecting their confinement. *See* In re Patterson, 53 N.Y.2d 98, 440 N.Y.S.2d 600 (N.Y.1981) (interpreting N.Y. Correct. Law § 139 broadly); N.Y. Comp.Codes R. & Regs., tit. 7, §§ 701.2(a) (inmates may file grievances about the "substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services ...") and 701.7 (procedures for filing, time limits, hearings and appeals).

**\*3** The New York State Department of Correctional Services ("DOCS") has established a grievance program with specific procedures which must be followed in order for a prisoner to exhaust his administrative remedies. *See* Petit v. Bender, No. 99 Civ. 0969. 2000 WL 303280, at \*2-\*3 (S.D.N.Y. March 22, 2000) (holding that prisoner failed to exhaust his administrative remedies where prisoner only partially complied with the grievance procedures established by Section 701 *etseq.*). These procedures include a requirement that an inmate appeal a Superintendent's decision to the CORC by filing an appeal with the Grievance Clerk. *See* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7(c)(1).

There is, however, an additional issue to be addressed in this case, which is that the administrative remedies available to Sulton do not afford monetary relief. The Second Circuit has not yet ruled on whether the PLRA's exhaustion requirement applies where the available administrative remedies available do not provide the type of relief the prisoner seeks. *Snider v. Dylag,* 188 F.3d 51, 55 (2d Cir.1999) ("We note that it is far from certain that the exhaustion requirement of 42 U.S.C. § 1997e(a) applies to deliberate indifference claims ... under Section 1983, where the relief requested is monetary and where the administrative appeal, even if decided for the complainant, could not result in a monetary award.").

There is disagreement among the district courts within this circuit as to this issue, although there is "clear trend ... to find exhaustion applicable even where the requested relief,

money damages, cannot be awarded by the administrative body hearing the complaint." *Santiago v. Meinsen,* 89 F.Supp.2d at 440; *see* Snider v. Melindez, 199 F.3d 108, 114 n. 2 (2d Cir.1999) (noting disagreement among courts as to applicability of exhaustion requirement where administrative remedies are unable to provide the relief that a prisoner seeks in his federal action); *but cf.* Nussle v. Willette, 224 F.3d 95, (2d Cir.2000) (holding that exhaustion not required for excessive force claim because such claim is not "prison conditions" suit and overruling district court decisions applying exhaustion requirement to excessive force claims seeking monetary relief).

Moreover, this Court has previously held that a prisoner must exhaust his administrative remedies before seeking relief in federal court in connection with a prison conditions claim even where a prisoner seeks damages not recoverable under an established grievance procedure. *Coronado v. Goord,* No. 99 Civ. 1674, 2000 WL 52488, at \*2 (S.D.N.Y. Jan. 24, 2000); *Edney v. Karrigan,* No. 99 Civ. 1675, 1999 WL 958921, at \*4 (S.D.N.Y. Oct. 14, 1999). This is the rule that will be applied here.

In his response to the motion to dismiss, Sulton indicates that he filed grievance # 14106-99 on November 3, 1999 and on November 24, 1999 he received a response IGRC and that on the same date Sulton indicated his desire to appeal their decision to the Superintendent. Sulton does not contend that he appealed his grievance to the highest level of administrative review, namely, the CORC. Instead, Sulton has asserted that Superintendent Donnelly never replied to the appeal of the IGRC decision and submits a letter dated December 17, 2000 in which Sulton complains that he never received a response from Donnelly. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly concurred with the decision of the IGRC denying Sulton relief. There is no evidence in the record that Sulton appealed the grievance to CORC.

**\*4** Accordingly, because Sulton failed to exhaust his administrative remedies by appealing the grievance to the CORC, his claims of medical indifference will be dismissed pursuant to 42 U.S.C. § 1997e. *See* Petit, 2000 WL 303280, at \*3.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

*Conclusion*

Therefore, for the reasons set forth above, the Defendants'
motion will be granted and the amended complaint will be
dismissed without prejudice to the action being renewed
once Sulton has exhausted all administrative remedies.

It is so ordered.

S.D.N.Y.,2000.
Sulton v. Greiner
Not Reported in F.Supp.2d, 2000 WL 1809284
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



101 F.3d 687, 1996 WL 346049 (C.A.2 (N.Y.))
(Table, Text in WESTLAW), Unpublished Disposition
(Cite as: 101 F.3d 687, 1996 WL 346049 (C.A.2 (N.Y.)))

**C** NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA2 s 0.23 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Second Circuit.
Howard AYERS, Plaintiff-Appellant,
v.
Sergeant Paul STEWART and Captain David Stark,
Defendants-Appellees.
**No. 96-2013.**

June 25, 1996.

Appeal from the United States District Court for the Western District of New York.
Howard Ayers, pro se, Attica, NY, for appellant.

Troy Oechsner, Assistant Attorney General, of counsel, of the State of New York, for appellees.

W.D.N.Y.

AFFIRMED.

Before OAKES, ALTIMARI, and WALKER, Jr., Circuit Judges.

**\*1** This cause came on to be heard on the transcript of record from the United States District Court for the Western District of New York (Telesca, *Judge* ), and was submitted.

ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of said district court be and it hereby is AFFIRMED.

Plaintiff-appellant Howard Ayers, who is proceeding *pro se* and *in forma pauperis,* appeals from a November 29, 1995 judgment of the district court granting summary judgment to the defendants pursuant to Fed.R.Civ.P. 56(c).

On November 22, 1993, Ayers filed a *pro se* complaint, pursuant to 42 U.S.C. § 1983, against Sergeant Paul Stewart and Captain David Stark of Elmira Correctional Facility, alleging that (1) Stewart filed a false administrative segregation recommendation against Ayers in retaliation for Ayers having filed a prison grievance against Stewart; (2) Stark violated Ayers's procedural due process rights while acting as a hearing officer for the administrative hearing, which resulted in Ayers being placed in administrative confinement; and (3) Stewart violated Ayers's due process rights by confiscating papers from Ayers's cell.

We review the district court's grant of summary judgment de novo to determine whether a genuine issue of material fact exists. *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,*502 U.S. 849 (1991). We draw all inferences in the light most favorable to the nonmoving party. *Gallo v. Prudential Residential Servs. Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). Reviewing a claim of retaliation by an inmate, however, mandates skepticism and particular care, because of the ease with which such a claim can be fabricated. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

Ayers' allegation that a meeting had transpired among the defendants, during which they allegedly agreed to confine Ayers, is conclusory and is totally unsupported by the record. As such, it cannot defeat summary judgment. *See Finnegan v. Board of Educ.,* 30 F.3d 273, 274 (2d Cir.1994) (conclusory allegations insufficient to survive summary judgment motion on retaliation claim). Given the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

101 F.3d 687, 1996 WL 346049 (C.A.2 (N.Y.))
(Table, Text in WESTLAW), Unpublished Disposition
(Cite as: 101 F.3d 687, 1996 WL 346049 (C.A.2 (N.Y.)))

weakness of his retaliation claim, Ayers' reliance on circumstantial evidence of retaliation-namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him-does not suffice to defeat summary judgment. *See Colon, 58 F.3d at 873* ("If ... circumstantial evidence represented the sum total of [plaintiff's] proof, we might be inclined to affirm the grant of summary judgment based on the weakness of [plaintiff's] case."); *see also Flaherty v. Coughlin, 713 F.2d 10, 13-14 (2d Cir.1983).*

Although we have been reluctant to affirm summary judgment in cases where the party opposing the motion was not allowed to conduct discovery, *see, e.g., Flaherty, 713 F.2d at 13,* Ayers was given ample opportunity. Ayers conducted discovery and received five separate answers to interrogatories from Stewart. Despite his use of discovery mechanisms, Ayers is unable to ascertain information that would substantiate his claims. Although Ayers has attached two new affidavits to his brief on appeal to substantiate his claim that Stewart tried to coerce inmates to testify against him in the administrative segregation hearing, this evidence was not before the district court and we therefore do not consider it. Consequently, the district court properly granted the defendants' motion for summary judgment.

**2** Finally, the district court properly concluded that Ayers failed to establish the necessity of further discovery pursuant to Fed.R.Civ.P. 56(f). In order to oppose a motion on the basis of Rule 56(b), the plaintiff must file an affidavit detailing: (1) what facts are sought and how they are to be obtained; (2) how those facts are reasonably expected to create a genuine issue of material fact; (3) what efforts the affiant has made to obtain those facts; and (4) why these efforts were unsuccessful. Ayers's general assertion that he needed more discovery does not meet these requirements, for Ayers fails to state what additional information he needs or how it will create a genuine issue of material fact.

We have considered the plaintiff's remaining contentions and affirm substantially for the reasons stated by the district court. For the reasons set forth above, the judgment of the district court is hereby AFFIRMED.

C.A.2 (N.Y.),1996.
Ayers v. Stewart
101 F.3d 687, 1996 WL 346049 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)
(Cite as: 2006 WL 1007780 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Gary ETHIER, Plaintiff,
v.
CITY OF COHOES, New York, James Ward, Patrick
Abrams, and Jeffrey Guzy, Defendants.
**No. 1:02-CV-1584.**

April 18, 2006.

David Brickman, Office of David Brickman, Albany, NY, for Plaintiff.

Gregg T. Johnson, Jacinda Hall Conboy, Girvin, Ferlazzo Law Firm, Albany, NY, for Defendants.

***DECISION and ORDER***

THOMAS J. McAVOY, Senior United States District Judge.

**\*1** Plaintiff Gary Ethier commenced the instant action against Defendants claiming violations of his civil rights in connection with his employment as a police officer for the City of Cohoes, New York. Presently before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 seeking dismissal of the Complaint in its entirety.

**I. FACTS**

Plaintiff was a police officer with the City of Cohoes, New York. During his first few years with the Cohoes Police Department ("CPD") (1991-1993), Plaintiff was trained and/or supervised by Defendants James Ward ("Ward")

and Patrick Abrams ("Abrams"). On August 21, 1995, Plaintiff drove his police vehicle onto a curb and sidewalk, nearly striking a pedestrian with the vehicle. As a result of this incident, Plaintiff was the subject of an internal investigation by the CPD. Plaintiff ultimately pleaded guilty to violating Cohoes Police Department General Order 0012-95 entitled "Rules of Conduct" and agreed to undergo a psychological evaluation, undertake remedial instruction on the operation of a police vehicle, and take any tests deemed necessary by the psychologist.

On February 24, 1997, Plaintiff arrested Patrick O'Donnell. After the arrest, but before Plaintiff transported O'Donnell to the police station, O'Donnell suffered injuries to his head and face. There also was damage to the rear window of a police vehicle. As a result of this incident, Plaintiff was the subject of an internal investigation.

On January 8, 1998, while Plaintiff was in pursuit of Richard Maynard, Mr. Maynard's body struck the ground and/or a retaining wall on multiple occasions before Plaintiff placed Maynard under arrest, causing Maynard to suffer injury to his face. As a result of this incident, Plaintiff was the subject of an internal investigation. This investigation resulted in Plaintiff's pleading guilty in April 1998 to violating Cohoes Police Department General Order 92-5 ("Off Duty Arrests"). As a result of this guilty plea, Plaintiff agreed that he would receive a letter of reprimand and thirty day suspension without pay, which suspension was to be held in abeyance for one year unless Plaintiff was found guilty of violating Cohoes Police Department General Order 92-5 or 0019-48 ("Physical Force") as a result of the January 8, 1998 incident involving the arrest of Maynard.

On September 25, 1998, Plaintiff placed John Gaston upon or against a police vehicle while attempting to arrest him. During the course of the arrest, Gaston suffered injury to his face and body and there was damage to the police vehicle, including a dented fender and cracked windshield. This incident resulted in an internal investigation.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)
(Cite as: 2006 WL 1007780 (N.D.N.Y.))

In 1998, there were discussions in the CPD regarding Plaintiff's participation in the D.A.R.E. program with the Cohoes City School District. School District officials advised Defendants that if Plaintiff was permitted to participate in the D.A.R.E. program, the school would drop the program.[FN1]

> FN1. Although Plaintiff denies this allegation, he fails to point to any record evidence tending to suggest that it is not true. Accordingly, this fact is deemed admitted. N.D.N.Y.L.R. 7.1(a)(3).

*2 On February 3, 1999, Plaintiff effected a traffic stop of Eric Sawyer. Plaintiff kicked and struck Sawyer before restraining Sawyer, causing injury to Sawyer's face. This conduct resulted in another internal investigation.

On February 16, 1999, Plaintiff physically restrained Eugene Aquilina and pushed Nicole Brown while attempting to arrest Aquilina. Brown lodged a civil complaint against Plaintiff alleging excessive force and misconduct. This incident also was the subject of an internal investigation.

On March 5, 1999, Plaintiff physically restrained and maced Kyle Durocher while attempting to arrest him. Durocher filed a civil complaint against Plaintiff alleging excessive force and misconduct. This incident was the subject of an internal investigation.

On March 12, 1999, Plaintiff stopped a vehicle suspected of violating the New York State Vehicle and Traffic Law. According to Plaintiff, he smelled alcohol and believed the driver to be driving under the influence of alcohol. The driver of the vehicle was Defendant City of Cohoes Corporate Counsel, John Doherty. Plaintiff contends that he administered sobriety tests and an alco-sensor test to Doherty, all of which he failed. Plaintiff further contends that Sergeant Kubik, who was at the scene, spoke with Defendant Ward who advised that Plaintiff was to bring Doherty to the police station where he was to be released to someone who had not been drinking. When Plaintiff returned to the police station with Doherty, a taxi was called for Doherty and he was released. Plaintiff was neither reprimanded nor charged with respect to his conduct on March 12, 1999.

On March 17, 1999, Plaintiff was involved in a heated verbal exchange with CPD Detective Thomas Ross and his spouse at Mac's Tavern and Restaurant. By memorandum dated March 26, 1999, Plaintiff was advised that an internal investigation was being conducted with respect to the March 17 incident.

A meeting was conducted with CPD Chief Heslin, Defendant Ward, Lieutenant Ross, and Plaintiff concerning the March 17, 1999 incident. During the meeting, Plaintiff made a remark concerning Ross' wife, after which Ward ended the meeting and escorted Plaintiff out of the CPD.[FN2]

> FN2. Plaintiff denied this assertion, which is contained in Defendant's N.D.N.Y.L.R. 7.1(a)(3) statement of material facts. The denial is not supported by a citation to the record as required by that rule. Accordingly, Defendants' assertion (and all other assertions to which Plaintiff asserted a blanket denial with no citation to the record) is deemed admitted. *See* n. 1 *supra*.

On or about March 22, 1999, Ward assigned Plaintiff to formal training. The formal training consisted of Plaintiff's being assigned to Sergeant Kubik when Kubik was working. When Kubik was not working, Plaintiff was to perform inside duties and not leave the police station without a supervisor. Plaintiff also was prohibited from assuming the duties of a tour supervisor. It was also ordered that Plaintiff would not be counted as manpower so, if the need arose, the CPD may have to call for overtime.

In April 1999, Plaintiff was directed to submit to a mental health evaluation. On April 22, 1999, Kubik prepared a memorandum indicating that Plaintiff had met the training objectives set forth on March 22, 1999. On April 28, 1999, Plaintiff was assigned to a two-man unit. Plaintiff continued to be prohibited from acting as a tour supervisor.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)
(Cite as: 2006 WL 1007780 (N.D.N.Y.))

**\*3** On October 20, 1999, Plaintiff returned to unrestricted duty. Plaintiff consented to the withdrawal of all contractual grievances he and/or his union filed on his behalf between March 17, 1999 and October 20, 1999. On November 14, 1999, Plaintiff violated CPD Order 0057-95 by leaving his post without proper notification.

On March 24, 2000, Plaintiff entered a dwelling occupied by Hani Khalil. Plaintiff used physical force to arrest Khalil. Khalil lodged complaints against Plaintiff alleging an unlawful search, the use of excessive force, and misconduct. This resulted in an internal investigation.

On May 8, 2000, Plaintiff was issued a Notice of Discipline. Plaintiff requested an arbitration hearing concerning the Notice of Discipline. Following a full evidentiary hearing at which Plaintiff was represented by counsel, the arbitrator found Plaintiff guilty of various charges against him. Plaintiff was found guilty of violating CPD Order 12-95 (Rules of Conduct), 19-94 (Use of Force), 15-95 (Prisoners Detained in Cellblock),[FN3] 57-95 (Patrol Zones), and 98-95 (Constitutional Guarantees). In all, Plaintiff was found guilty of eight out of twenty-one charges. The arbitrator imposed a penalty of two months suspension without pay. There was no appeal of the arbitrator's decision.

> FN3. Plaintiff required Khalil to remove his pants while in the cell block without any reason to believe that such action was necessary.

On May 18, 2001, Plaintiff was again charged with misconduct. It was alleged that Plaintiff gave false testimony. Specifically, there was an allegation that Plaintiff was present during the arrest of Bret Woodworth, who claimed that the CPD used excessive force against him. At Woodworth's trial, Plaintiff denied remembering arresting Woodworth. Defendant Guzy, on the other hand, testified that Plaintiff was present during the arrest, raising a conflicting account of the incident. It was Plaintiff's position that he was outside during the arrest and, therefore, not present. At a subsequent administrative hearing, Guzy admitted that Plaintiff was not, in fact, involved in Woodworth's arrest. Defendants sought to terminate Plaintiff's employment if he was found guilty of the charges. These charges resulted in no guilty findings

and Plaintiff was reinstated with all of his pay and benefits.

Plaintiff's police vehicle sustained damage on January 23, 2003. Plaintiff failed to timely report this damage. This was the subject of an internal investigation. On March 18, 2003, Plaintiff accepted the finding that he violated the CPD rules for failure to report damage to his vehicle. Plaintiff also accepted the disciplinary action of two week suspension without pay and forfeiture of two weeks accrued vacation.

Effective April 20, 2003, Plaintiff was appointed to a position of police officer with the Rennselaer Police Department. On April 21, 2003, Plaintiff voluntarily signed a letter of resignation and sent it to the CPD.

Based on the foregoing, Plaintiff commenced the instant action pursuant to 42 U.S.C. § 1983 alleging violations of his First, Fifth, and Fourteenth Amendment rights. Defendants now move to dismiss the Complaint in its entirety.

## II. STANDARD OF REVIEW

**\*4** It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see Tenenbaum v. Williams,* 193 F.3d 581, 592 (2d Cir.1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

If the movant is able to establish a basis for summary

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)
(Cite as: 2006 WL 1007780 (N.D.N.Y.))

judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002). However, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d. Cir.1998). With this standard in mind, the Court will address Defendants' motion.

## III. DISCUSSION

a. *Due Process*

Defendants move to dismiss the "stigma plus" due process claims on the grounds that: (1) Plaintiff's employment was not terminated and, thus, he was not deprived of a property interest; and (2) he was afforded due process of law with respect to the charges against him. Plaintiff has failed to respond to this portion of Defendants' motion, thereby indicating his consent to the dismissal of this claim. *See* N.D.N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its entitlement to the relief requested therein, the non-moving party's failure to file or service any papers as this Rule requires shall be deemed as consent to the granting ... of the motion.")

With respect to the charges filed against Plaintiff, the uncontroverted evidence is that he was afforded all process due. Specifically, Plaintiff was given notice of the charges against him and was afforded the opportunity of a full pre-deprivation hearing at which time he could be represented by counsel, presented with the evidence against him, and present his own evidence. In several instances Plaintiff did not avail himself of this opportunity, *see* Def.'s Rule 7.1(a)(3) stmnt. at ¶¶ 33, 66, thereby waiving his due process claims. *Morrisroe v. Safir,* 1998 WL 709822, at \*2 (S.D.N.Y.1998). In another instance, a full hearing was held at which several charges were upheld against Plaintiff. *Id.* at ¶¶ 42, 44, 52. Plaintiff declined to appeal the decision. *Id.* at ¶ 54. Plaintiff again invoked this procedure with respect to the perjury charges. After a full hearing, Plaintiff was acquitted of the charges. *Id.* at ¶¶ 62, 63, 64. It is, thus, evident that Plaintiff was afforded all process that was due. *See Patterson v. City of Utica,* 370 F.3d 322, 329 (2d Cir.2004).

\*5 To the extent Plaintiff asserts a stigma-plus claim, that claim, too, must fail. "A person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983.... Loss of one's reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment." *Id.* at 329.

Here, Plaintiff fails to identify any such tangible interest. Plaintiff was not terminated from his employment with the CPD. Plaintiff does not point to any other actions undertaken by Defendant that amount to a loss of a sufficient tangible interest to sustain a stigma-plus claim. Assuming Plaintiff can identify other tangible interests, he fails to point to any false statements made public by Defendants for which he was not afforded a name clearing hearing. Although Plaintiff was the subject of several charges that resulted in his being suspended without pay for sixty days, Plaintiff was afforded a full hearing after which he was found not guilty of some of the charges against him and found guilty on eight of the charges. With respect to other charges or disciplinary actions against Plaintiff, he either withdrew his grievances or consented to the findings against him. *See.* Def's Rule 7.1(a)(3) stmnt. at ¶¶ 10, 33, 66. Thus, any employment decisions (such as his suspension) were based on charges found to be true and for which he was afforded the opportunity of a hearing. With respect to the perjury allegations, Plaintiff was afforded a full administrative hearing and exonerated of the charges. No employment action was taken against him on account of any alleged perjury. Accordingly, Plaintiff's due process claims must be dismissed. *Id.*

b. **First Amendment**

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)
(Cite as: 2006 WL 1007780 (N.D.N.Y.))

Plaintiff also claims that he was retaliated against for engaging in protected speech. Plaintiff contends that his desire to arrest Corporation Counsel Doherty constituted speech on a matter of public concern and that Defendants retaliated against Plaintiff for engaging in such protected speech. Although Plaintiff cites many cases for the proposition that speech directed at the integrity of government entities constitutes protected speech (a proposition with which this Court does not disagree), the fundamental problem with Plaintiff's claim is there is no evidence that he engaged in protected speech or that Defendants were aware of any such speech.

While the determination of whether speech is protected "may be somewhat fact-intensive, it presents a question of law for the court to resolve." *Johnson v. Ganim,* 342 F.3d 105, 112 (2d Cir.2003). Whether speech is protected depends on its context, form and content. *Connick v. Myers,* 461 U.S. 138, 147-48 (1983). Speech by a public employee is on a matter of public concern, and protected by the First Amendment, if it relates "to any matter of political, social, or other concern to the community." *Id.* at 146. "However, speech that relates primarily to matters of personal interest or internal office affairs, in which the individual speaks as an employee rather than as a citizen, will not support a First Amendment retaliation claim." *Kelly v. City of Mount Vernon,* 344 F.Supp.2d 395, 402 (S.D.N.Y.2004). Speech that arises in the usual course of a public official's duties is generally not protected. *See Cahill v. O'Donnell,* 75 F.Supp.2d 264, 273 (S.D .N.Y.1999)("A communication by an employee to an employer in the course of the employee's normal duties, in routine form, and containing standard contents, is not likely to address a matter of public concern."). Speech about individual or isolated problems within a police department, or one of its officers, are not matters of public concern. *Cahill,* 75 F.Supp.2d at 272 (internal office affairs are not matters of public concern.). As the Supreme Court has stated: "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark-and certainly every criticism directed at a public official-would plant the seed of a constitutional case." *Connick,* 461 U.S. at 147-49. On the other hand, a claim of systemic or endemic problems in a police department might rise to the level of protected public speech. *See Collins v. Christopher,* 48 F.Supp.2d 397, 408 (S.D.N.Y.1999)(collecting cases),

**\*6** The uncontroverted evidence before the Court is that on March 12, 1999, Plaintiff pulled over a car that was being driven by Corporation Counsel Doherty. Plaintiff smelled alcohol emanating from the driver and, therefore, instructed the driver to exit the vehicle to perform sobriety tests. According to Plaintiff, Doherty failed the tests. Based upon Sergeant Kubiks' direction (Kubik having received orders from Defendant Abrams), Plaintiff did not arrest Doherty and, instead, drove him to the police station where he was then released. There is no evidence in the record that Plaintiff expressed his desire to arrest Doherty, that he disagreed with Abrams's order not to arrest Doherty, that Plaintiff otherwise spoke out on the issue of letting Doherty go, that Plaintiff was raising concern about the covering up of the criminal acts of political figures, or was otherwise raising concern about endemic issues within the police department. The mere acts of performing his duties as a police officer by pulling Doherty over, administering sobriety tests, taking him to the police station, and letting him go were all within the course of Plaintiff's employment as a police officer and, therefore, not protected speech. *See Kelly,* 344 F.Supp.2d at 403 (finding that a police officer's investigations into illegal firearms which involved the mayor's son and the child of another police officer were not protected speech because they arose during a normal police investigation).

In support of his claim, Plaintiff cites to his Exhibit B which is a memorandum dated March 16, 1999 written from Plaintiff to Ward. That memorandum, however, does not evidence Plaintiff's having engaged in protected speech. A review of the memorandum reveals that it is Plaintiff's fact based recount to Abrams of the events of March 12, 1999. Nowhere in that memorandum does Plaintiff indicate that he wanted to arrest Doherty, that he thought Doherty should be arrested, that he disagreed with the decision to let Doherty go, that he was complaining about pervasive problems within the police department, or that he was discussing any problem within the CPD. In his memorandum of law, Plaintiff contends that he insisted that Doherty be arrested. Plaintiff points to no evidence to back this up.[FN4] Plaintiff does not even submit an affidavit stating that he intended his memorandum to be a report of wrongdoing within the CPD or to otherwise constitute speech on a matter of public concern. *See Morris v. Crow,* 142 F.3d 1379, 1382 (11th Cir.1998) ("Not only must the speech be related to matters of public interest, but the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)
(Cite as: 2006 WL 1007780 (N.D.N.Y.))

purpose of the expression must be to present such issues as matters of 'public' concern.") (holding that a police report prepared by a police officer concerning his investigation into a traffic accident did not constitute protected speech).[FN5]

FN4. The Court declines to scour the record in an attempt to find triable issues of fact. *See Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002)("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted)

FN5. Moreover, there is evidence suggesting that Plaintiff's actions were motivated purely by his own personal self-interest. It appears that, at the time of the March 12 incident, Plaintiff was seeking to have a clause inserted into the relevant collective bargaining agreement ("CBA") whereby the municipality would indemnify officers for punitive damages awarded against them. Doherty opposed having such a clause in the CBA. There is testimony that Plaintiff had expressed a desire to "get back" at Doherty for his position on the issue.

Even if Plaintiff subjectively believed that he was engaging in protected speech, Abrams would not reasonably have understood Plaintiff's memorandum as complaining about government integrity or concealing the drunk driving of a political figure. There is no indication that there was endemic problems concerning the covering up by the CPD of the criminal activities by politicians or other systemic problems in the CPD. The only reasonable conclusion is that Plaintiff was speaking as a public employee and not as a public citizen. Accordingly, the Court finds that Plaintiff did not engage in protected speech. Plaintiff's First Amendment claims must, therefore, be dismissed.

**\*7** Even assuming, *arguendo,* that Plaintiff did engage in protected speech, there is insufficient evidence of a nexus between any such speech and any alleged adverse employment action. The Court recognizes the close temporal proximity between the March 12, 1999 arrest of Doherty and Plaintiff's being subjected to a change in his work duties commencing on March 22, 1999. The Court further recognizes that a close temporal relationship between the protected activity and the adverse employment action can give rise to an inference of causation. In this case, however, to hold that the temporal relationship is sufficient would be to ignore the overwhelming uncontroverted evidence of Plaintiff's misconduct leading up to the March 26, 1999 letter changing Plaintiff's duties (the "March 26 letter") and the lack of any evidence tending to suggest that the Doherty incident had anything to do with Plaintiff's discipline. *See Simpson v. New York State Dept. of Civil Services,* 2006 WL 93011 (2d Cir. Jan. 9, 2006) ("While the temporal proximity of these events gives rise to an inference of retaliation for the purposes of appellant's prima facie case, without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext.") (citing *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 770 (2d Cir.1998) for the proposition that a "strong temporal connection between the plaintiff's complaint *and* other circumstantial evidence is sufficient to raise an issue with respect to pretext.") (emphasis in original); *Colon v. Coughlin,* 58 F.3d at 872-873; *Ayers v. Stewart,* 101 F.3d 687, 1996 WL 346049, at \*1 (2d Cir.1996) (unreported decision); *Richter v. Monroe County Dept. of Social Serv.,* No. 01 Civ. 6409, 2005 WL 351052, at \*14 (W.D.N.Y. Feb. 11, 2005) ("Temporal proximity alone is insufficient to carry plaintiff's burden of proof beyond the prima facie stage, and nothing she has submitted shows that she will be able to persuade a fact-finder that the retaliation played a part in her termination."); *Ziemba v. Thomas,* 390 F.Supp.2d 136, 157 (D.Conn.2005).

It is undisputed that Plaintiff had a lengthy history of misconduct, including the use of excessive force, going back to at least as far as 1995. In the first three months of 1999 alone, he was the subject of three complaints of the excessive use of force-one on February 3, 1999, another on February 16, 1999, and another on March 5, 1999. On March 17, 1999, after the March 12 Doherty incident involving Doherty and before the issuance of the March 26 letter, Plaintiff admits he was involved in a heated exchange with Detective Ross and his spouse. There is further evidence that, during a meeting later that day, Plaintiff insulted Detective Ross's wife, which caused

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)
(Cite as: 2006 WL 1007780 (N.D.N.Y.))

Ward to end the meeting and escort Plaintiff out of the police station. On March 26, 1999, Plaintiff was ordered to undergo additional training, to be supervised by Kubik, and disqualified from being a tour supervisor.

**\*8** This history of misconduct gave Defendants ample reason to require Plaintiff to undergo additional training and to require that Plaintiff be under the supervision of Kubik. Moreover, the terms of the March 26 letter clearly relate to Plaintiff's prior incidents of misconduct. Part of that training included reviewing with Plaintiff department policies on the rules of conduct and the use of force. Directive 1 and 3 of the March 26 letter obviously related to the incident between Plaintiff and Detective Ross. Specifically, those directives prohibited Plaintiff from entering the restaurant at which the incident occurred, prohibited Plaintiff from communicating with persons involved in the incident, and required Plaintiff to report any contact with any persons involved in the incident. Nothing about the March 26 letter tends to suggest that it was issued on account of the March 12 incident involving Doherty. Other than the previously discussed memorandum from Plaintiff to Ward, there is no evidence in the record that Plaintiff ever spoke to Ward or anybody else about the Doherty incident, or that any of the Defendants discussed the Doherty incident with Plaintiff or amongst themselves. In fact, Plaintiff specifically admitted that he never received a written reprimand concerning his conduct on March 12, 1999, nor did Plaintiff receive any disciplinary charges which referred to his conduct on March 12, 1999. Def.'s Rule 7.1(a)(3) stmnt. at ¶ 25. It, therefore, cannot be said that a fair minded trier of fact could reasonably conclude that the March 12 Doherty incident was a motivating factor in the March 26, 1999 change in Plaintiff's duties.

On March 15, 1999, Plaintiff made a request to Abrams to switch one of his days with Abrams. Abrams is purported to have responded "start acting like a cop and I'll treat you like one." Even assuming Abrams' refusal to switch days with Plaintiff was on account of protected speech, the refusal to switch a day of work is not an adverse employment action. Moreover, the evidence before the Court is that, although Abrams initially denied Plaintiff's request, he ultimately granted it.

Further, any claim that the March 12, 1999 incident

caused the March 26, 1999 change in duties is time-barred. Plaintiff's Complaint was filed on December 23, 2002, which is more than three years after Plaintiff was returned to full active duty in October 1999 and long after the issuance of the March 26, 1999 letter. The same reasoning would apply to any other claimed adverse employment actions that occurred prior to December 23, 1999, including Plaintiff's claim that he was illegally subjected to a mental health evaluation in March 1999, or that his request to switch certain days off was denied. These allegations are time-barred.

With respect to any other alleged employment actions identified by Plaintiff (a verbal counseling in March 2000, the March 2000 investigation into the Khalil incident, and any subsequent incidents), they all occurred long after the March 12, 1999 and, thus, no inferences of causation may be drawn between the timing of the March 12, 1999 Doherty incident and these other alleged adverse employment actions. Plaintiff has failed to point to sufficient other circumstantial evidence from which a fair-minded trier of fact could reasonably conclude that these other incidents in 2000 and later were on account of the March 12, 1999 Doherty incident.[FN6] Defendants did not take any employment actions against Plaintiff except as imposed by an independent arbitrator and/or as consented to by Plaintiff. Accordingly, no fair-minded trier of fact could reasonably conclude that Plaintiff was subjected to adverse employment action on account of the March 12, 1999 Doherty incident.

> [FN6.] Plaintiff alleges that Sergeant Meeker stated "But it's Gary Ethier, and when it comes to Gary Ethier you know that there is special circumstances that we have to follow." This statement attributed to Sergeant Meeker does not come from an affidavit of Sergeant Meeker or deposition testimony from Sergeant Meeker. In fact, Plaintiff claims this statement to have made, but provides no citation in the record to support it. This statement is hearsay and will not be considered in connection with the pending motion.

**IV. CONCLUSION**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)
(Cite as: 2006 WL 1007780 (N.D.N.Y.))

**\*9** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN ITS ENTIRETY. Plaintiff's Complaint is DISMISSED. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Ethier v. City of Cohoes
Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Shawn MONCRIEFFE, Plaintiff,
v.
Linda WITBECK, Corrections Officer at Coxsackie
Correctional Facility; B. Schwebler; Dominic Mantello,
Superintendent; C.O. Weeks; C.O. Jensen; and C.O.
McFarlene, Defendants.
**No. 97-CV-253.**

June 29, 2000.

Shawn Moncrieffe, Auburn Correctional Facility, Auburn,
New York, Plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General for the State of
New York, Steven H. Schwartz, Assistant Attorney
General, Department of Law, the Capitol, Albany, New
York, for Defendants.

MEMORANDUM-DECISION AND ORDER

MORDUE, J.

*INTRODUCTION*

**\*1** Plaintiff moves and defendants cross-move for
summary judgment under Section 56(b) of the Federal
Rules of Civil Procedure in this *pro se* action pursuant to
42 U.S.C. § 1983 alleging violations of his rights under
the Fourth, Eighth and Fourteenth Amendments to the
United States Constitution.

Presently before the Court is the Report-Recommendation
of the Hon. Magistrate Judge David R. Homer dated
December 23, 1998, recommending that plaintiff's motion

be denied and defendants' cross-motion be granted in part
and denied in part.

Plaintiff filed timely objections to the
Report-Recommendation.

*FACTS*

In his complaint, plaintiff alleges that between August and
November, 1996, while he was housed in the Special
Housing Unit of Coxsackie Correctional Facility,
defendant Correctional Officer Linda Witbeck deprived
him of a food tray six times; that Witbeck deprived him of
things such as recreation and supplies six times; that
Witbeck laughed at him four times while he was in the
shower; that Witbeck sexually harassed plaintiff once
"when she felt [plaintiff's] genitals and rear end during a
regular recreation pat frisk;" that Witbeck ransacked his
cell; and that in some unspecified manner Witbeck gave
him a death threat. Plaintiff further alleges that during the
same period defendant Correctional Officer Weeks
sexually harassed him during a routine pat frisk when
Weeks "felt [plaintiff's] genitals a few times." Plaintiff
claims that on two occasions defendant Correctional
Officer McFarlene entered his cell and ransacked it while
plaintiff was in the shower and once confiscated "a few of
[plaintiff's] things." Plaintiff also claims that defendant
Correctional Officer Jensen threatened him once and
assaulted him once by kicking him in the back. Plaintiff
states that the grievance supervisor, defendant Schwebler,
did not log and number plaintiff's grievances as required
and that Superintendent Dominic J. Mantello disregarded
plaintiff's numerous complaints.

Magistrate Judge Homer recommended denial of plaintiff's
motion for summary judgment and dismissal of all of
plaintiff's claims except his Eighth Amendment claim
against Witbeck for denial of food.

*DISCUSSION*

Pursuant to 28 USC § 636(b)(1)(C), this Court must make

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

a de novo determination of those portions of the Magistrate Judge's Report-Recommendation to which plaintiff has specifically objected. Here, plaintiff objects to Magistrate Judge Homer's recommendations except with respect to the issues of verbal harassment, threats and denial of recreation. He erroneously states that the Report-Recommendation does not address the claim that Witbeck laughed at him while he was in the shower; however, this allegation amounts to a claim of verbal harassment, which is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Accordingly, the Court will address all other issues de novo.

Summary Judgment is appropriate when the pleadings, affidavits, and any other supporting papers demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). Facts, inferences therefrom and ambiguities must be examined in a context which is most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

**\*2** The movant bears the initial burden of showing that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party has met this burden the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita* at 586. The moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P.56(e); *Liberty Lobby* at 250.

Where summary judgment is sought against a *pro se* litigant the Court must afford him special solicitude. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

A. *Defendant Mantello*

Plaintiff alleges that defendant Mantello is liable because, as Superintendent of the Coxsackie Correctional Facility, he "disregarded" numerous complaints made to him by plaintiff. More specifically, plaintiff alleges that (1) Mantello failed to remedy a wrong after having learned of

it and (2) that Mantello was negligent in his supervision of subordinate employees.

Magistrate Judge Homer concluded in his Report-Recommendation that plaintiff failed to demonstrate a claim against Mantello. With respect to plaintiff's first allegation that Mantello failed to remedy a wrong, the Magistrate Judge determined that either Mantello or his subordinates investigated plaintiff's grievances. Because plaintiff's complaints were investigated and it was concluded that the grievances were without merit, Mantello satisfied his obligations with respect to plaintiff's grievances.

The Magistrate Judge similarly rejected plaintiff's second claim that Mantello negligently supervised subordinate employees who were allegedly violating his constitutional rights. Magistrate Judge Homer concluded that no claim was stated because, whereas the law requires gross negligence to impose supervisor liability, plaintiff merely alleged negligence. In addition to determining that plaintiff's claim was without merit for failure to plead and prove gross negligence, Magistrate Judge Homer also concluded that plaintiff had failed to establish even ordinary negligence on the part of Mantello.

Plaintiff objects to Magistrate Judge Homer's conclusion that he failed to establish supervisor liability. Plaintiff argues that the record establishes gross negligence in that Mantello was aware that plaintiff's rights were being violated but chose to ignore them by failing to investigate or remedy same.

In order to establish a successful § 1983 claim, a plaintiff must establish that a defendant was personally involved in the alleged rights violation. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). An official is not liable in a section 1983 action under the doctrine of respondeat superior. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981). However, an individual who occupies a supervisory position may be found personally involved by: (1) direct participation; (2) failing to remedy a wrong after learning of the violation through a report or appeal; (3) creating a policy or custom under which unconstitutional practices occurred or allowing the policy or custom to continue; or (4) gross

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

negligence in managing subordinates whose conduct caused the unlawful condition or event. See *Wright*, 21 F .3d at 501.

**\*3** With respect to plaintiff's objection arguing that Mantello was grossly negligent, plaintiff simply reiterates his original arguments and relies on evidence already in the record and considered by the Magistrate Judge. Plaintiff merely reiterates in his objections to the Report-Recommendation that he has established a case

which includes gross negligence as evidence [sic] in plaintiff's motion. (See plt. motion for summary judgment, memo. Of law pg. 23 with annexed exibits [sic] and plt. Reply decl. Pg. 11 with attached exibits [sic] ). Moreover, the record is legally sufficient to establish and impose supervisory liability. (See exibits [sic] attached to plt. motion for summary judgment and Reply motion).

As Magistrate Judge Homer correctly stated, the record clearly reveals that Mantello or his subordinate employees investigated plaintiff's grievances and rejected them as being without merit. As such, there is nothing in the record indicating that Mantello either turned a blind eye to plaintiff's complaints. Simply stated, plaintiff's assertion that Mantello ignored his complaints is refuted by the investigations conducted regarding the complaints. Similarly, plaintiff's allegation that Mantello failed to remedy a wrong is without merit because the record reflects that the investigation of the complaints came to the conclusion that no wrongs were being committed.

Aside from reiterating his initial arguments, plaintiff has failed to provide the Court with anything further in his objection which would warrant disturbing the sound conclusion of the Magistrate Judge. Accordingly, this Court accepts Magistrate Judge Homer's determination to dismiss plaintiff's claim with respect to defendant Mantello.

B. *Verbal Threats and Harassment*

Plaintiff alleges that he was subjected to verbal threats and harassment in that corrections officers laughed and

insulted him while he showered. Plaintiff also maintains that he was subjected to threats of violence. Magistrate Judge Homer recomended that defendants were entitled to summary judgment because plaintiff failed to establish an actual injury resulting from the alleged threats or harassment.

A claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco*, 994 F.Supp. 460, 474 (S.D.N.Y.1998); *Malsh v. Austin*, 901 F.Supp. 757, 763 (S.D.N.Y.1995). As correctly noted by the Magistrate Judge, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Picco 994 F.Supp. at 474*. Similarly, "threats do not amount to violations of constitutional rights." *Malsh*, 901 F.Supp. at 763.

Even assuming that the alleged verbal harassment and threats occurred, plaintiff has failed to plead or prove that there were any accompanying actual injuries. Furthermore, plaintiff does not object to the findings of the Magistrate Judge with respect to verbal threats and harassment. After a thorough review of the Report-Recommendation the Court adopts the recommendation of the Magistrate Judge.

C. *Excessive Force*

**\*4** Plaintiff alleges that defendant Jensen kicked him once in the back on November 9, 1996. He states that he suffered pain but does not claim that he sought medical assistance. Plaintiff does not allege that Jensen acted maliciously or sadistically.

Magistrate Judge Homer found that plaintiff had failed to annunciate an actionable claim for excessive force. More particularly, he concluded that the alleged kick, even if true, was of limited duration and that there was no malicious intent on the part of the corrections officer.

It is well settled that "the unnecessary and wanton inflction of pain ... constitutes cruel and unusual

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

punishment forbidden by the Eighth Amendment."
*Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting
*Whitley v. Albers*, 475 U.S. 312 (1986))(internal quotation
marks omitted). In reviewing a prisoner's claim a Court
must consider whether the prison official acted with a
sufficiently culpable state of mind and whether the alleged
wrongdoing was objectively harmful enough to establish
a constitutional violation. *Hudson* at 8. In considering
whether the prison official possessed a culpable state of
mind while engaging in the use of force, the inquiry is
whether the prison official applied force maliciously and
sadistically to cause harm. *Id.* at 7. The extent of an
inmate's injuries is relevant to this inquiry, as is the nature
and duration of the act. *James v. Coughlin*, 13 F.Supp.2d
403, 409 (W.D.N.Y.1998); *Reyes v. Koehler*, 815 F.Supp.
109, 113-14 (S.D.N.Y.1993). Important in considering the
alleged wrongdoing is determining whether the force was
applied in a good faith effort to maintain or restore prison
discipline or maliciously and sadistically to cause harm.
*Hudson* at 7.

With respect to the nature of the wrongdoing, a prisoner
must demonstrate that the deprivation alleged is
sufficiently serious or harmful enough to reach
constitutional dimensions. *Romano v. Howarth*, 998 F.2d
101, 104-05 (2d Cir.1993). A prisoner is not required to
demonstrate that he sustained a serious injury; *de minimis*
use of force does not, however, give rise to an Eighth
Amendment claim. *Hudson* at 9-10.

Plaintiff's allegations, even if true, do not support a
determination that Jensen acted maliciously or sadistically.
Interestingly, in his objections to the
Report-Recommendation, plaintiff admits that the kick
was of limited duration. In the balance of his objection
plaintiff merely reiterates his opinion that the evidence
submitted supports an inference of malice. The Court
concludes that the conduct alleged is not sufficiently
serious or harmful to reach constitutional dimensions.
Accordingly, defendants are entitled to summary judgment
dismissing plaintiff's excessive force claim.

D. *Access to the Courts*

Plaintiff alleges that he was denied access to the courts as
a result of cell searches, confiscation of documents and

denial of supplies between August and November 1996.
Plaintiff alleges that these actions were motivated to
frustrate his efforts to litigate.

*5 Magistrate Judge Homer recommended that the
defendant's motion to dismiss this claim should be granted.
The Magistrate Judge found that plaintiff's claim of denial
of access to the courts was unsubstantiated with any
evidence which demonstrated that plaintiff had suffered
any actual injuries from any alleged wrongful conduct. To
the contrary, Magistrate Judge Homer concluded that
plaintiff's claims were supported by a thirty-five page
memorandum of law containing both case and statutory
authority as well as an exhibit related to state court
proceedings-all of which demonstrated plaintiff's full and
adequate ability to litigate his claims.

It is well established that prisoners have a constitutional
right to access to the courts. "To state a claim that his
constitutional right to access the court was violated,
plaintiff must allege facts demonstrating that defendants
deliberately and maliciously interfered with his access to
the courts, and that such conduct materially prejudiced a
legal action he sought to pursue." *Smith v. O'Connor*,
901 F.Supp. 644, 649 (S.D.N.Y.1995); *see Morello v.*
*James*, 810 F.2d 344, 347 (2d Cir.1987). In other words,
in order to establish a violation of his right of access to the
courts, an inmate must demonstrate that he has suffered or
imminently will suffer actual harm in presenting a claim to
the court. *Lewis v. Casey*, 518 U.S. 343 (1996).

In his objections to the Report-Recommendation, plaintiff
restates arguments already considered by Magistrate Judge
Homer. He states that "[p]laintiff further reiterates that he
has incurred irreparable harm and injury as a result of the
lack of legal services he received while confined in
Coxsackie SHU." Plaintiff goes on to note that his
complaints would not have been able to have been brought
had he not been transferred to the Elmira Correctional
Facility. Implicit in this statement is that plaintiff was in
fact allowed to bring his claims. Assuming *arguendo* that
plaintiff was not allowed to bring his claims until after
transfer, the fact still remains that plaintiff did in fact have
the ability to air his grievances. Therefore, at best,
plaintiff's hardship was delay in bringing his claims. As
plaintiff has not established how such an alleged delay has
prejudiced his rights or amounted to an injury, he fails to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

make the requisite showing of actual injury for a successful claim. As such, the Court accepts Magistrate Judge Homer's recommendation and grants defendant's motion as to this claim.

E. *Sexual Harassment*

With respect to plaintiff's sexual harassment claim, Magistrate Judge Homer concluded that plaintiff failed to establish an actionable case. Magistrate Judge Homer found that the conduct involved was *de minimus* and, therefore, did not violate a constitutionally protected right.

Sexual abuse of an inmate by a corrections officer may reach constitutional dimensions and give rise to an Eighth Amendment claim. *Boddie v. Schnieder,* 105 F.3d 857, 859 (2d Cir.1997). When reviewing an Eighth Amendment claim stemming from an allegation of sexual abuse, a Court must consider whether the conduct alleged is sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. *Id* at 861. The Court must further consider whether the prison official involved possessed a sufficiently culpable state of mind. Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may be sufficient evidence of a culpable state of mind. *Id.* at 861.

**\*6** As set forth above, plaintiff claims that defendants Weeks and Witbeck, each on one occasion, conducted pat frisks in an improper manner. Assuming the truth of these allegations for the purposes of these motions, they are not sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. Plaintiff has failed to demonstrate any severe physical or psychological harm that he has suffered as a result of the alleged harassment. Thus, plaintiff's allegations of sexual abuse fail to state a claim cognizable under the Eighth Amendment. Defendants are therefore entitled to summary judgment dismissing this claim.

F. *Cell Searches*

Plaintiff alleges that he was subjected to cell searches

which were designed to harass. Plaintiff's initial pleadings merely allege same with no evidence to support the claim. As a result, Magistrate Judge Homer concluded that plaintiff's claim was without merit and recommended that defendant's motion be granted.

"[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer,* 468 U.S. 517, 526 (1984), even where the search is retaliatory in nature. *Higgins v. Coombe,* 1997 WL 328623, at \*7 (S.D.N.Y.1997). Prisoners do, however, enjoy Eighth Amendment protection from searches that lack any legitimate penological interest and are intended solely to harass. *Nilsson v. Coughlin,* 1987 WL 129823, at \*4 (S.D.N.Y.1987), see also *Hudson* at 530.

Plaintiff fails to raise anything in his objections to the Magistrate Judge's Report-Recommendation which would warrant disturbing the sound conclusion and recommendation found therein. As Magistrate Judge Homer correctly stated the law with respect to plaintiff's claim, and since plaintiff fails to provide any evidence to support his argument that the alleged searches were improper, the Court concludes that this claim is without merit and grants defendant's motion.

G. *Deprivation of Food and Recreation*

Prison officials have a duty under the Eighth Amendment to provide humane conditions of confinement: adequate food, clothing, shelter and medical care. Denial of a minimal civilized measure of life's necessities violates the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825 (1994). Depriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment. *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *Odom v. Sielaff,* 1995 WL 625786, at \*5 (E.D.N.Y.1995); *see also Rhodes v. Chapman,* 452 U.S. 337, 348 (1981).

Plaintiff alleges that corrections officer Witbeck denied him food on six occasions and on at least two occasions contaminated his food with spit or perfume. In support of their motion to dismiss, defendants rely on an affidavit

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)
(Cite as: 2000 WL 949457 (N.D.N.Y.))

from Witbeck denying the allegations. Defendants also rely on copies of logbook entries for the SHU in which plaintiff was housed. Because these logbooks do not contain clear entries for some of the dates in issue and would not likely reflect the wrongful denial of meals to an inmate by a corrections officer, they do not establish as a matter of law that defendants never denied plaintiff food. Credibility assessments and choices between conflicting versions of events are matters for a fact-finder at trial, not for the Court on a summary judgment motion. *Fischl v.. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). Thus, plaintiff's motion and defendants' cross-motion for summary judgment are denied with respect to the issue of whether plaintiff's Eighth Amendment rights were violated by deprivation of food.

**\*7** Plaintiff further alleges that he was deprived of his Eighth Amendment rights where he was allegedly denied recreation on a single occasion. Magistrate Judge Homer concluded that denial of recreation on a single occasion was not sufficiently serious to support a constitutional claim. Plaintiff does not object to these recommendations.

Although prisoner's have a constitutional right to exercise, a claim alleging deprivation of this right requires a showing of a serious deprivation and deliberate indifference on the part of prison officials. *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996); *Barnham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996). As illustrated by the Report-Recommendation, denial of recreation for eighteen out of nineteen days has been upheld in the Second Circuit and denials of up to seventy-five days have been upheld elsewhere. *Arce v. Walker,* 907 F.Supp. 658 (W.D.N.Y.1995), *aff'd in part, vacated in part*139 F.3d 329 (2d Cir.1998); *Green v. Ferrell,* 801 F.2d 765 (5th Cir.1986).

Based on the foregoing, the Court concludes that the alleged denial of recreation on a single occasion does not support a claim for deprivation of constitutional rights. Accordingly, defendant's motion is granted with respect to this element of plaintiff's claim.

*CONCLUSION*

After a careful review of the file, party submissions and applicable law, it is hereby

ORDERED that Magistrate Judge Homer's Report-Recommendation dated December 23, 1998 is ACCEPTED IN FULL; and it is further

ORDERED that plaintiff's motion for summary judgment is DENIED in all respects; and it is further

ORDERED that defendant's cross-motion for summary judgment be DENIED with respect to plaintiff's claim against defendant Witbeck regarding the alleged deprivation of food and GRANTED in all other respects.

IT IS SO ORDERED

N.D.N.Y.,2000.
Moncrieffe v. Witbeck
Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Robert del CARPIO, Plaintiff,
v.
Hans WALKER, Superintendent; Edward Dann, Deputy
Superintendent; Lt. Battle, Officer of the Adjustment
Committee; Officer York; Officer Kimak, Auburn Corr.
Facility, Defendants.
**No. Civ.A.95CV1502RSPGJD.**

Oct. 15, 1997.

Robert del Carpio, Federal Medical Center, Lexington, Kentucky, pro se.

Dennis C. Vacco, New York State Attorney General, The Capitol, Albany, New York, for defendants, Lisa Renee Harris, Assistant Attorney General, of Counsel.

**ORDER**

POOLER, J.

**\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge Gustave J. Di Bianco, duly filed on the 18th day of September, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no party having submitted objections [FN1] thereto, it is

FN1. I note that the magistrate judge's report recommendation was returned to the court

undelivered because the plaintiff is no longer at the address listed in the court's file, which is the last address plaintiff instructed the court to use. By Order filed November 22, 1995, Magistrate Judge Gustave Di Bianco ordered that plaintiff "promptly notify the Clerk's Office of any change in his address." Dkt. No. 3 at 4. The same order provided that "failure to keep such office apprised of [plaintiff's] current address will result in the dismissal of the instant action." *Id.* I do not rely on plaintiff's failure to notify the court of his current address as a basis for dismissing the action; I merely note that plaintiff cannot in the future claim, in reliance on his failure to receive a copy of the report-recommendation, that he was deprived of the opportunity to file objections due to any fault of the court.

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. The defendant's motion is granted and the action dismissed for the reasons set forth in the Magistrate Judge's Report.

3. The Clerk serve a copy of this Order on the parties by regular mail.

IT IS SO ORDERED.
GUSTAVE J. DI BIANCO, Magistrate J.

**REPORT-RECOMMENDATION**

This matter has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, United States District Judge pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c).

In the instant civil rights complaint, the plaintiff alleges

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

that while he was incarcerated, defendants York and Battle harassed plaintiff and filed false misbehavior reports against him in retaliation for the exercise of his right to redress grievances and the right to practice his religion in violation of the First and Fourteenth Amendments of the Constitution. Plaintiff also alleges Eighth Amendment violations as a result of defendants' actions.

The complaint seeks both injunctive and monetary relief.

Presently before the court is the defendants' motion for summary judgment pursuant to FED.R.CIV.P. 56. For the following reasons, the undersigned will recommend granting the defendants' motion and dismissing the complaint.

**DISCUSSION**

**1. Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED.R.CIV.P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.*

**2. Facts**

In his complaint, plaintiff alleges a chronology of events, commencing in May of 1995. Plaintiff states that he wrote letters to Superintendent Walker about defendants York

and Kimak. Plaintiff alleges that these two defendants constantly harassed plaintiff. Plaintiff then alleges that after he complained of their actions to prison officials, defendants York and Kimak participated in filing false misbehavior reports against plaintiff in retaliation for his complaints. Plaintiff also alleges that defendant York forced plaintiff to continue working when York knew that plaintiff's heart condition would not permit him to do as York asked. Plaintiff also claims that defendant York refused to feed the plaintiff. Plaintiff refers to three misbehavior reports that he alleges were fabricated.

**\*2** Plaintiff states that he has written to Superintendent Walker many times, but Walker has failed to remedy the situation. Plaintiff states that due to Walker's failure to remedy the problem, York and Kimak believe that they can continue to harass the plaintiff without adverse consequences. Plaintiff claims that Deputy Superintendent Dann failed to properly investigate plaintiff's allegations against York and Kimak. Plaintiff states that Lieutenant Battle was a hearing officer involved in the allegedly retaliatory misbehavior charges.[FN1] Plaintiff claims that defendant Battle did not properly evaluate or credit the plaintiff's testimony or the testimony of plaintiff's witnesses.

> FN1. The court notes that Lieutenant Battle was the hearing officer in only *one* of the plaintiff's disciplinary hearings. Lieutenant Perkins presided over the other two disciplinary hearings. Plaintiff did not sue Lieutenant Perkins.

**3. Respondeat Superior**

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), and that the doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

Defendants Walker and Dann argue that the plaintiff has not alleged sufficient personal responsibility to survive a motion for summary judgment. Clearly, neither Walker nor Dann directly participated in the alleged violations. Plaintiff seeks to establish personal responsibility by claiming that these defendants failed to remedy the violations after learning of them through a report or appeal.

Plaintiff alleges that he began writing to defendant Walker in May of 1995 about harassment by defendant York. It is true that personal responsibility of a supervisory official may be established if the official learns of the violation through a report or appeal and fails to remedy the situation. *Williams, supra.* However, the letter or complaint must alert the supervisory official to the constitutional violation of which the plaintiff complains. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Watson v. McGinnis,* 964 F.Supp. 127, 129-30 (S.D.N.Y.1997).

**\*3** In the instant case, the plaintiff's complaints to defendant Walker about York and Kimak relate to the alleged harassment that the plaintiff was suffering. There is no evidence that the Superintendent or Deputy Superintendent Dann knew anything about the plaintiff's allegation of retaliatory misbehavior reports. Thus, they could not be held liable for any claims of retaliation. The grievances that the plaintiff submitted were all investigated as shown by the defendants' exhibits. One of the grievances dealt with an allegation of "false keeplock."

[FN2] Defendants' Exhibit C. A review of the documents relating to the grievance and all the appeals associated therewith, shows no evidence that defendants Walker or Dann were ever informed of the situation. In fact, the grievance is signed by an individual named Duncan in the space reserved for the Superintendent's signature. Defendants' Exhibit C at p. 6. Attached to the grievance papers are all the memoranda regarding the investigation of the issue.

    FN2. This was the June 6, 1995 grievance mentioned in plaintiff's complaint.

Defendants' Exhibit J contains plaintiff's June 11, 1995 letters [FN3] to defendant Walker. The letters stated that defendants York and Kimak were trying to cause the plaintiff to have a heart attack by their harassment. The harassment included not releasing the plaintiff for "chow" and preventing plaintiff from timely visits to the law library. Plaintiff mentioned a false misbehavior charge, but stated that this allegation was being handled in the Cayuga County Court.

    FN3. There are two letters in Exhibit J. Both are dated June 11, 1995. One is typed and one is handwritten.

One of plaintiff's June 11 letters was given to Deputy Superintendent Dann, who asked Lieutenant Jackson to investigate the issues raised. Defendants' Exhibit K includes documents relative to Lieutenant Jackson's investigation of the matter, including memoranda of interviews of the officers involved. Although the investigation did not achieve the result desired by the plaintiff, this does not constitute the requisite personal involvement by Walker or Dann in any alleged constitutional violations.

In fact, defendant Dann wrote plaintiff a memorandum stating the results of Lieutenant Jackson's investigation. Defendants' Exhibit K. The memorandum stated that although no merit had been found in plaintiff's claims, Sergeant Lupo was told to speak with the plaintiff to make sure his concerns were addressed. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

**4. Due Process**

The complaint in this action focuses upon defendant York and Kimak's retaliatory misbehavior reports, however, in passing, the plaintiff also states that Lieutenant Battle "closed his eyes to the evidence," did not properly evaluate the plaintiff's testimony, and "covered" for the officers. These claims could be interpreted as raising a procedural due process claim in addition to the substantive retaliation claim.

The court would first point out that there were three allegedly retaliatory misbehavior reports. Lieutenant Battle was the hearing officer only at *one* of the hearings. Lieutenant Perkins was the hearing officer for the other two hearings. Plaintiff does not mention Perkins in the complaint at all. Thus, the undersigned will consider a procedural due process claim on the one hearing over which defendant Battle presided which took place on July 17, 1995. Defendants' Exhibit S. The formal charge was served on plaintiff on July 13, 1995, and charged plaintiff with refusing a direct order and being out of place. Id. at p. 3 (transcript of disciplinary hearing). Officer Kimak was the individual signing the misbehavior report. Defendants' Exhibit R.

**\*4** In order for a plaintiff to be awarded damages under section 1983 for an alleged violation of procedural due process, the court must find that as a result of conduct performed under color of state law, plaintiff was deprived of life, liberty, or property without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In the instant case, there is no dispute that the defendants acted under color of state law. In *Bedoya,* the Second Circuit indicated that "[w]hat remains is a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined in keeplock ...; and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Id.* at 351-52 (citing *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460-61, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

In order to determine whether a liberty interest existed, courts, until recently, were relying on the Supreme Court decision in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In *Hewitt,* the Supreme Court

noted that a state could create a liberty interest through a statute or regulation by utilizing language of unmistakably mandatory character, limiting the discretion of the decision maker. *Id.* After the decision in *Hewitt,* lower courts, as well as the Supreme Court, focused more upon the language of the statute or regulation, rather than upon the character of the deprivation. *See e.g., Kentucky Dep't of Corrections, supra; Hernandez v. Coughlin,* 18 F.3d 133 (2d Cir.1994) (finding no liberty interest after examining regulations associated with the Family Reunion Program), *cert denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994); *Matiyn v. Henderson,* 841 F.2d 31 (2d Cir.1988) (finding liberty interest in remaining free from administrative segregation based on New York regulations); *Gittens v. LeFevre,* 891 F.2d 38, 41 (2d Cir.1989) (finding a liberty interest in remaining free from keeplock based on language of the regulations).

The Supreme Court has held that the *Hewitt* analysis is not applicable and has led to undesired results in prison cases. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Courts may no longer rely *solely* upon the language of the regulations when determining whether a liberty interest exists. *Id.* at 2300. The Court stated in Sandin that "the search for a negative implication from mandatory language in prison regulations has strayed far from the real concerns under-girding the liberty protected by the Due Process Clause." *Id.* The court also stated that it was *returning* to the principles established in *Wolff* and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). *Id.* Ultimately, the court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

**\*5** *Sandin* rejected the notion that any action taken by prison personnel for punitive reasons encroaches on a liberty interest. *Id.* at 2301. The court referred to as "dicta" statements in other cases implying that solitary confinement automatically triggers due process protections. *Sandin,* 115 S.Ct. at 2301 (citing *Wolff,* 418 U.S. at 571 n. 19; *Baxter v. Palmigiano,* 425 U.S. 308, 323, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). Applying this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

standard to the facts in *Sandin,* the court determined that Conner's discipline in segregated confinement for 30 days did *not* present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.*

In determining what constituted "atypical and significant" deprivations, the *Sandin* court compared disciplinary segregation with other forms of segregation; compared the plaintiff's confinement with conditions in general population to see whether the inmate had suffered a major disruption in his environment; and examined whether the *length* of the inmate's sentence was affected. *Id.*

The Second Circuit has not yet squarely addressed the issue of whether after *Sandin* an inmate facing a disciplinary hearing has a liberty interest, protected by due process. The Second Circuit has *implied* that whether a deprivation is atypical and significant involves fact finding. *See Frasier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) ("[t]he extensive fact-finding of the district court permits us to measure Frasier's SHY claim by the standard of *Sandin*"); *Samuels v. Mockry,* 77 F.3d 34, 38 (2d Cir.1996) (assessment as to whether inmate had a protected liberty interest may require fact finding).

Some courts in New York have also read *Sandin* narrowly and have distinguished the holding when applying the *Sandin* factors and distinguishing the situation experienced by inmate Conner to that experienced by New York inmates who face Tier III disciplinary hearings. *See Campo v. Keane,* 913 F.Supp. 814, 820-21 (S.D.N.Y.1996); *see Moolenaar v. Finn,* No. 94 Civ. 6778 n. 4 (S.D.N.Y. March 14, 1996) (commenting that the case involved a Tier II hearing with no *possibility* of loss of good time and contrasting Tier III hearings where such loss is possible). As noted by the courts in *Campo* and *Moolenaar,* a recognized Second Circuit principle is that due process rights must be determined with respect to the "potential penalty." *Campo,* 913 F.Supp. at 821 (citing *McKinnon v. Patterson,* 568 F.2d 930, 939 (2d Cir.1977), *cert denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). Some courts, however, have squarely rejected the potential penalty theory, opting instead to examine the facts and length of each confinement to determine whether the confinement was atypical and significant. *See Marino v.. Klages,* No. 95-CV-1475 (N.D.N.Y. March 27, 1997) (declining to adopt the potential penalty approach);

*Delany v. Selsky,* 899 F.Supp. 923, 927-28 (N.D.N.Y.1995) (considering length of confinement together with plaintiff's unusual physical problems).

**\*6** In the instant case, the plaintiff was subjected only to a *Tier II* hearing, in which the maximum possible penalty he could receive was 30 days of segregated housing or keeplock. *See* N.Y.Comp.Codes R. & Reg. Tit. 7 § 254.7(a)(iii) and (vi). There is no possibility in a Tier II hearing of a loss or even a recommended loss of good time. Regardless of the disposition, the length of an inmate's sentence cannot be affected as a result of a Tier II hearing. Even under the potential penalty approach, this plaintiff, who was only sentenced to five days of keeplock for the hearing that he is challenging would not have a liberty interest in being free from that confinement. Thus, any procedural due process claim against Lieutenant Battle, based on the July 17, 1995 disciplinary hearing may be dismissed.

**5. Verbal Harassment**

Plaintiff states that defendants York and Kimak harassed him "to death." Verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation. *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997). Thus, any claims of general verbal harassment by either defendant may be dismissed.

**6. Retaliation**

Even after the Sandin decision, a claim that a false misbehavior report was filed in retaliation for the exercise of a constitutional right, is still actionable as a violation of *substantive due process.* The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d Cir.1988). In cases where the defendants' actions are taken

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

for both retaliatory and legitimate reasons, ultimately the defendants must show that they would have taken the same action absent the retaliatory motive. *Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir .1994).* Courts recognize, however, that claims of retaliation may be prone to abuse. *Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983).* The court in Flaherty described three situations where retaliation is claimed, each situation requiring a different approach by the court. *Id.* The court stated that a retaliation claim supported by specific and detailed allegations must be pursued with full discovery. *Id.* Whereas, a claim that contains "completely conclusory" allegations may be dismissed on the pleadings alone. *Id.* The third situation involves a complaint alleging facts that give rise to a "colorable suspicion of retaliation." *Id.* This third type of case will support at least documentary discovery. *Id.*

In the instant case, the plaintiff alleges that officers York and Kimak filed the false misbehavior reports in retaliation for plaintiff's complaints and grievances against them. Plaintiff also alleges that defendant York retaliated against plaintiff for the exercise of a First Amendment right to practice his religion. This latter claim is not explained by the plaintiff. He does not allege specifically what First Amendment right he was exercising or how the defendants' actions were in retaliation for the exercise of that right.

**\*7** Defendants have submitted all the records relating to the disciplinary hearings. With respect to the charges, a review of the transcripts of the disciplinary hearings shows that the plaintiff was given the opportunity to explain his behavior at the disciplinary hearing. *See e.g.* Defendants' Exhibit M at p. 4. Exhibit M is the transcript of the disciplinary hearing that took place on June 11, 1995 for a misbehavior that occurred on June 7, 1995. The misbehavior involved the plaintiff failing to obey an order to continue working. The plaintiff admitted that he did not continue working when defendant York told him to continue. *Id.* Plaintiff stated that his medical condition was preventing him from continuing. *Id.* Essentially, the plaintiff admitted his behavior, but alleged a defense that his medical condition prevented him from following the officer's order.

Thus, the misbehavior report was not ***false.*** Rather, the

plaintiff had an explanation for his misbehavior that the hearing officer did not believe. In fact, hearing officer Perkins adjourned the hearing to "check into [[[plaintiff's] medical profile." *Id.* at p. 5. The hearing was reconvened on July 12, 1995, and Lieutenant Perkins had reviewed the plaintiff's medical record. *Id* . at p. 6. Perkins determined that although the plaintiff did have a health problem, there was no indication that he could not work. *Id.* Whether the hearing officer made the correct decision is not the issue. It is clear that at worst, there could have been a dual motivation for defendant York's misbehavior report, and plaintiff did admit failing to obey the officer's order, albeit with reason.

The misbehavior report of July 8, 1995 resulted in a hearing on July 12, 1995. First, the officer fling the misbehavior report was Officer Hoey. The misbehavior report involved unauthorized legal assistance and unauthorized legal exchange. Defendants' Exhibit P (transcript of July 12 hearing). A frisk of the plaintiff's cell resulted in finding 81 pages of legal work that belonged to other inmates. Plaintiff did not dispute that the legal papers were in his cell, but argued that he was using the other individuals' papers to work on his own legal matters. *Id.* at p. 3. The hearing officer simply did not believe the plaintiff's explanation. *Id.* at p. 5.

Neither defendant York nor defendant Kimak was directly involved in the search or the misbehavior report of July 7, 1995. Thus, there is no evidence that this misbehavior report was false and in retaliation for any constitutional right exercised by the plaintiff.

The final misbehavior report was authored by defendant Kimak and involved refusal to obey an order and being out of place. The disciplinary hearing was held on July 17, 1995. Defendants' Exhibit S (transcript of disciplinary hearing). The misbehavior report stated that when plaintiff was returning from his shower, he refused to obey Officer Kimak's order get back into plaintiff's cell. Defendant Kimak stated in the report that plaintiff had stopped at one of the cells and placed his hands inside. *Id.* at p. 3. Plaintiff alleged at the hearing that he was returning from the shower, but he did not stop at anyone's cell and did not disobey any orders. *Id.* at p. 4. Plaintiff also told the hearing officer that defendant Kimak's actions were in retaliation for plaintiff's complaints against Kimak. *Id.* at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

pp. 4-5. Plaintiff called two inmate witnesses to testify at the hearing. *Id.* at p. 7. His first witness was very unclear, but essentially testified that he did not hear the officer give plaintiff an order. *Id.* The second inmate was more articulate and stated that after plaintiff exited the I shower, he always went straight back to his cell. *Id.* at p. 12. Moore testified that he did not hear any order given. *Id.* However, Lieutenant Battle found the witnesses incredible and found plaintiff guilty of the misbehavior. It would appear that the only evidence of retaliation is the plaintiff's allegation of complaints against Kimak and York. A review of the documents I relating to the misbehavior reports shows that even if the plaintiff's statements are credited, the misbehavior reports could have been written for valid reasons as well as invalid reasons. Thus, the plaintiff cannot maintain an action for retaliation in the instant case.

### 7. Eighth Amendment

**\*8** Plaintiff makes some vague allegations that the defendants forced him to work when he was not capable. Plaintiff admitted at his disciplinary hearing that he wanted to work but needed to take a break. Lieutenant Perkins looked through the plaintiff's medical records and found no limitations with respect to the work he could do. The medical record did note a heart condition.

The Eighth Amendment prohibits the infliction of cruel and unusual punishments, including punishments that involve the unnecessary and wanton infliction of pain. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). In order to state a claim based on inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A plaintiff must allege that his access to physicians for necessary medical care was unreasonably delayed or denied or that prescribed medical treatment was not administered. *Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982) (citing *Todaro v. Ward,* 431 F.Supp. 1129, 1133 (S.D.N.Y.), *aff'd,* 565 F.2d 48 (2d Cir.1977)). Plaintiff's claims, although not specifically involving medical care, do involve allegations that the defendants violated the doctor's orders, and are governed by the same deliberate indifference standard. Deliberate indifference,

whether evidenced by medical staff or by officials who allegedly disregard the instructions of the medical staff requires more than negligence, but less than conduct taken for the very purpose of causing harm. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). In order for a prison official to act with deliberate indifference, the official must know of and disregard an excessive risk to inmate health and safety. *Id.* at 1979. The official must both be "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* In the instant case, defendant York allegedly told the plaintiff to keep working when plaintiff stated that he needed a break. The defendant could not have been deliberately indifferent since there was no medical limitation on plaintiff's work in his medical file. Thus, York could not have known about and disregarded a serious risk to plaintiff. Additionally, according to the misbehavior report, the plaintiff had already taken a break when defendant York told plaintiff to keep working. Thus, based on the undisputed facts, there is no evidence that defendant York violated the plaintiff's Eighth Amendment rights relating to his medical condition. Plaintiff also indicated in his complaint that defendant York refused to let plaintiff out of his cell to be fed. Plaintiff wrote a grievance on June 29, 1995 regarding being released "for chow." Defendants' Exhibit D. However, it does not appear that Officer York was involved in the incident. In fact, the grievance was resolved informally. Thus, the plaintiff does not state any Eighth Amendment claim for a retaliatory denial of food or for any denial of food.

**\*9 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the defendants' motion for summary judgment (docket # 15) be **GRANTED,** and the complaint be **DISMISSED.**

Pursuant to 28 1 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R .Civ.P. 6(a),

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

6(e), 72.

N.D.N.Y.,1997.
Carpio v. Walker
Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1986 WL 7543 (S.D.N.Y.)
(Cite as: 1986 WL 7543 (S.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
George McMILLAN, Plaintiff,
v.
Charles SCULLY, et al., Defendants.
**No. 85 Civ. 7280 (JFK).**

June 30, 1986.

George McMillan, *pro se*

Robert Abrams, Attorney General of the State of New York, New York City, for defendants; Arnold D. Fleischer, Assistant Attorney General, of counsel.

*OPINION and ORDER*

JOHN F. KEENAN, District Judge:

**\*1** Before the Court are cross-motions for summary judgment, in a *pro se* action brought pursuant to 42 U.S.C. § 1983 seeking monetary damages and injunctive relief. Plaintiff George McMillan (hereinafter "McMillan") moves for an order pursuant to Rule 56 of the Federal Rules of Civil Procedure granting summary judgment on his claim that he was denied equal protection and due process in violation of the fourteenth amendment of the United States Constitution.[FN1] Defendants Charles J. Scully, Superintendent of Green Haven Correctional Facility ("Scully"), and Martha Stinchcomb, Senior Counselor and Program Committee Chairperson, Green Haven Correctional Facility ("Stinchcomb"), cross-move for summary judgment dismissing the complaint. For the reasons stated below, plaintiff's motion is denied and defendants' motion is granted.

*BACKGROUND*

There is little dispute as to the facts of this case. Green Haven Correctional Facility has promulgated the following procedures regarding inmate program assignment pursuant to the New York State Department of Correctional Services policy. Defendants' Ex. A, B. When an inmate enters Green Haven, he meets with a counselor who explains the various program choices available at the facility. The inmate then meets with the Program Committee to discuss and receive a program assignment. At that time, the Committee informs the inmate that participation in a program is mandatory, and that refusal to join a program will result in placement on "Limited Idle Status" in the "Minimum Privilege Community" (hereinafter "MPC"). The MPC is a confinement area of Green Haven where inmates who refuse program assignments or who are guilty of other inmate misbehavior are placed. The inmate is also informed that whenever he decides to participate in a program, he will be re-admitted to the general prison population. Stinchcomb Aff.

One June 5, 1985, McMillan appeared before the Program Committee to receive a program assignment. Defendants contend that at that meeting, McMillan was informed that participation in a program is mandatory, that refusal to participate in a program results in confinement to the MPC, and that an inmate can be released from the MPC when he accepts a program assignment. Defendants' Ex. 3G. Plaintiff does not specifically deny these statements. Rather, McMillan acknowledges only that he was informed that if he did not accept a program assignment, he would be confined or "locked up." Plaintiff's Memorandum, at 2. Defendants assert and McMillan agrees that at the Program Committee meeting, McMillan refused a program assignment because of his desire to be transferred to another correctional facility. McMillan believed that acceptance of a program would somehow reduce his chances for transfer. *Id.*

On June 5, 1985, McMillan also refused to sign a Green Haven form which confirms his refusal to accept a program assignment and acknowledges his understanding of the aforementioned confinement procedures. On June 7, 1985, McMillan was placed in the MPC. He remained there until January 30, 1986, when he was transferred to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1986 WL 7543 (S.D.N.Y.)
(Cite as: 1986 WL 7543 (S.D.N.Y.))

Clinton Correctional Facility.

**\*2** There being no specific indications to the contrary, the Court accepts the defendants' allegations that they followed all procedures regarding program assignment and post-refusal inmate detention established both at the Green Haven Facility and by the State of New York. Plaintiff was also given an opportunity to discuss his program assignment with the Program Committee. McMillan refused to participate in a program, however, and was consequently confined in the MPC.

### DISCUSSION

Summary judgment is appropriately granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as matter of law." Fed.R.Civ.P. 56(c). As the above discussion indicates, there is no dispute as to the material facts presented by the parties in this case. Accordingly, the Court turns to an examination of the legal arguments concerning the alleged violations of the plaintiff's constitutional rights.

Plaintiff argues that he was denied equal protection in violation of the fourteenth amendment of the United States Constitution because he was treated differently than other inmates similarly situated in confinement to the MPC. Specifically, McMillan argues that inmates in the MPC "guilty of violating serious rules of inmate misbehavior," Plaintiff's Memorandum, at 7, are formally charged with a violation of prison rules, granted a hearing before prison officials, and given notice of punishment before they are confined pursuant to New York State Codes, Rules and Regulations (hereinafter "NYCRR"), Chapter V, §§ 251-254. Plaintiff's Memorandum, at 5. McMillan points out that he was confined automatically following his "misbehavior" and was never afforded the above procedures required by state law.

The plaintiff's equal protection argument, however, is without merit. Plaintiff incorrectly compares himself to those inmates who were placed in the MPC for "disciplinary" confinement. Inmates admitted to the MPC for disciplinary purposes are entitled by state law to specific, pre-confinement procedures. NYCRR Chapter VI, § 304.4 and Chapter V, §§ 251-254. Plaintiff's confinement, however, can properly be termed "administrative." McMillan was automatically assigned to the MPC pursuant to NYCRR Chapter VI, § 304.1(a)(1) for the purpose of administrative "program planning" NYCRR Chapter I, § 1.5(h), and is not entitled to any special, pre-confinement procedures. NYCRR Chapter VI, § 304.2(a). In the equal protection context, the plaintiff is more appropriately compared to those inmates who have also refused to participate in a prison program. McMillan's equal protection claim thereby fails because he is treated no differently than these similarly situated inmates.

Automatic confinement is a legitimate administrative response by prison officials to a refusal to participate in a prison program. Indeed, the United States Court for the Western District of New York reached the same conclusion after it reviewed a similar claim brought by inmates at the Attica Correctional Facility in *Brown v. Smith,* No. 79-289E, slip op. (W.D.N.Y. October 2, 1984). In *Brown,* the inmates refused to take program assignments because they did not receive their requested selections, and were automatically confined to a special housing unit. *Brown,* slip op. at 4. The *Brown* court concluded that the way in which program assignments are established at state correctional facilities is within the facility's administrative discretion. The administration of prison programs, including the use of automatic confinement, did not implicate the equal protection rights of the Attica inmates. *Id.,* at 4-5.

**\*3** The plaintiff's additional constitutional claim involves a denial of procedural due process before his automatic confinement. McMillan asserts that he was deprived of his liberty interest in not being assigned to the MPC without implementation of pre-confinement procedures established by state law. FN2 Plaintiff's Answer to Defendants' Cross-Motion for Summary Judgment, (hereinafter "Plaintiff's Answer"), p. 1. The threshold inquiry in this type of constitutional violation is whether the claimant has been denied a valid liberty interest within the meaning of the due process clause. *Meacham v. Fano,* 427 U.S. 215, 223 (1976). A liberty interest may be created by state regulations, *Hewitt v. Helms,* 459 U.S. 460, 469 (1983), or by mutual understandings and institutional practices. *Perry*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1986 WL 7543 (S.D.N.Y.)
(Cite as: 1986 WL 7543 (S.D.N.Y.))

*v. Sinderman,* 408 U.S. 593, 601 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972).

Regarding the creation of a constitutional liberty interest by state law, the Supreme Court has stated that the mere existence of procedures for administrative confinement does not imply a protected liberty interest. *Hewitt,* 459 U.S. at 471. Indeed, the Supreme Court has pointed out that "[i]t would be ironic to hold that when a state embarks on such desirable experimentation it thereby opens the door to scrutiny by the federal courts, while states that choose not to adopt such procedural provisions entirely avoid the strictures of the Due Process Clause." *Id.* A liberty interest can be created, however, when a state uses language of "unmistakable mandatory character" requiring that established procedures and "substantive predicates" be observed before confinement. *Id.* In *Hewitt,* Pennsylvania law created a liberty interest by enumerating special procedures and prerequisites that "shall" be implemented before an inmate is placed in a special housing unit for administrative purposes. *Id.,* n. 1 and n. 6. In contrast, Green Haven and New York State have not established special procedures that must be followed before automatic administrative confinement. The state has, however, created a substantive prerequisite to detention in an inmate's refusal to participate in a program. The Court concludes, therefore, that New York has created a liberty interest in the inmate's freedom not to be confined without refusing to participate in Green Haven's prison programs.

Alternatively, the Supreme Court has also stated that a person has an interest worthy of due process protection "if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Perry,* 408 U.S. at 601. Institutional practices or habits that the *Perry* court termed an "unwritten common law" can create a constitutional liberty interest. *Id.,* at 602. No such institutional understanding concerning procedural steps preceding automatic confinement exists at the Green Haven Facility. Inmates should expect to be held in administrative detention during their stay at prison. As the Supreme Court stated in *Hewitt,* "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt,* 459 U.S. at 468. Green Haven practices do require, though, that a program refusal occur before

placement in the MPC. Due to the briefings given at Program Committee meetings, it is widely known among both prison officials and inmates that this prerequisite exists. Accordingly, the Court finds that Green Haven's policies do not imply a liberty interest in not being confined without the implementation of specific procedures. Its practices do, however, create a protected interest in not being placed in the MPC without the predicate of an inmate's refusal to participate in a prison program.

**\*4** The plaintiff's insistence that the state has created a liberty interest in both pre-MPC confinement procedure and program refusal stems from his misunderstanding of the nature of his status in the MPC. McMillan was placed in a special housing unit for administrative, rather than disciplinary purposes. Administrative confinement is generally accorded less procedural due process than disciplinary incarceration. *Hewitt,* 459 U.S. at 473-75;*Sulie v. Duckworth,* 583 F.Supp. 995, 1001 (N.D.Ind.1984).

The plaintiff seeks to carve out an exception to the prison rules concerning program assignment. McMillan asserts that because accepting a program assignment might reduce his chances for transfer, he should be spared the usual confinement that follows a program refusal. This request is both unprecedented and unnecessary. No such routine request should allow an inmate to circumvent administrative rules designed to promote prison safety and discipline. Moreover, transfers are normally handled by the Department of Correctional Services. The plaintiff should have pursued his desired transfer along established channels instead of interfering with the administration of the Green Haven prison.

Upon establishing that the plaintiff possesses a liberty interest worthy of protection, the Court must determine what process is due. As the Supreme Court stated in *Hewitt,* "[t]he requirements imposed by the Clause are, of course, flexible and variable dependent upon the particular situation being examined." *Hewitt,* 459 U.S. at 472. Determining the appropriate process involves a consideration of several factors including the interests of the inmate, the concerns of the correctional facility, and the advantages of pre-confinement procedures. *Id.,* at 472-73.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1986 WL 7543 (S.D.N.Y.)
(Cite as: 1986 WL 7543 (S.D.N.Y.))

The liberty interest of the plaintiff, albeit constitutionally recognized, is not of great moment. Automatic placement in the MPC obviously limits McMillan's freedoms. However, the plaintiff can determine the duration of his detention. McMillan need only have agreed to participate in a program to be released from the MPC. Any constitutional concern with indefinite confinement is unfounded in this case because the plaintiff could have ended it voluntarily. See *Mims v. Shapp,* 744 F.2d 946 (3rd Cir.1984). The concerns of the state in this situation are, on the other hand, highly important. Prison officials clearly play a central role in maintaining order and security in prisons. It is crucial to Green Haven administrators to have the freedom to conduct prison programs in a manner that is efficient and orderly given the resources, personnel, and inmates present at the facility. Consequently, the Supreme Court has noted that prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices." *Hewitt,* 459 U.S. at 472.

The value derived from pre-confinement process is especially significant in determining the appropriate process in McMillan's situation. It is important to require some sort of predicate prison condition or inmate action before confinement in order to prevent arbitrary detention in the MPC. The need for pre-confinement procedural steps such as a hearing is, however, much less pressing for several reasons. The administration of a prison often involves subjective, even "intuitive" judgment by prison administrators. *Id.,* at 474. In addition, very few objective facts are associated with this type of confinement, and they are easily and completely discovered by both parties. A complex, adversarial hearing would neither enlighten Green Haven officials as to how to improve administration of prison programs, nor contribute material evidence to the disposition of the plaintiff's case.

**\*5** As in *Hewitt,* the only process that is due and was received by McMillan is of a relatively "informal" nature. *Id.,* at 476. First, the plaintiff fulfilled the substantive prerequisite to detention of refusing a program assignment. He also received notice of his potential assignment to the MPC when he was briefed by the Program Committee. The plaintiff had actual notice of his confinement when he refused a program assignment.

Moreover, McMillan was given a hearing sufficient for the purposes of due process. At the June 5, 1985 Program Committee session, he had an opportunity to present evidence concerning both his program choice and his proposed exception to prison rules. This meeting also gave prison officials an opportunity to gather relevant evidence, largely in receiving McMillan's refusal to participate in a program, and to assess the legitimacy of his objections.

The plaintiff was, therefore, not deprived of any process that he is constitutionally required to receive before detention in the MPC. This conclusion accommodates the overriding need of Green Haven officials to be free of judicial interference in prison administration and recognizes the relatively minimal liberty interest retained by the plaintiff.

*CONCLUSION*

For the foregoing reasons, plaintiff's motion for summary judgment is denied, and defendants' motion for summary judgment is granted. The action is hereby dismissed.

SO ORDERED.

FN1. Plaintiff also claims a violation of the equal protection clause of the New York State Constitution. N.Y. Const. art. I, § 11. The coverage of the New York State Constitution's equal protection clause is the same as that of the federal Constitution. U.S. Const. amend. XIV § 1. *People v. Smith,* 97 Misc.2d 115, 118, 411 N.Y.S.2d 146, 149 (Albany County Ct.1978); *Town of Greenburgh v. Board of Sup'rs of Westchester County,* 53 Misc.2d 88, 89, 277 N.Y.S.2d 885, 889 (Sup.Ct. Westchester County 1967). As the analysis of the plaintiff's claim is essentially the same under both clauses, this discussion will refer only to the federal equal protection clause.

FN2. Plaintiff also mentions other threatened liberty interests including knowledge of the duration of his confinement (Plaintiff's

Not Reported in F.Supp., 1986 WL 7543 (S.D.N.Y.)
(Cite as: 1986 WL 7543 (S.D.N.Y.))

Memorandum, at 5-6) and the variety of
privileges enjoyed by inmates in the general
prison population. *Id.,* at 6.

S.D.N.Y.,1986.
McMillan v. Scully
Not Reported in F.Supp., 1986 WL 7543 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1994 WL 721362 (S.D.N.Y.)
(Cite as: 1994 WL 721362 (S.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Howard JONES, Plaintiff,
v.
C. ARTUZ, Superintendent, Green Haven Correctional
Facility, R. Burns, Correctional Officer, Defendants.
**No. 93 Civ. 8784 (MBM).**

Dec. 30, 1994.

Howard Jones, (pro se).

G. Oliver Koppell, Atty. Gen. of the State of N.Y., Angela
M. Cartmill, Asst. Atty. Gen., New York City, for
defendants.

OPINION AND ORDER

MUKASEY, District Judge.

**\*1** Plaintiff, Howard Jones, a *pro se* complainant, brings
this action under 42 U.S.C. § 1983. Plaintiff alleges that,
while an inmate at Green Haven Correctional Facility, he
was wrongfully "keeplocked"-confined to his cell-by
prison officials acting under color of law. Plaintiff claims
his due process rights were violated because his
confinement pending a disciplinary hearing was arbitrary
and unconstitutionally long, in violation of the Civil
Rights Act, 42 U.S.C. § 1983. Defendants now move to
dismiss under Fed.R.Civ.P. 12(b)(6), or in the alternative,
for summary judgment, pursuant to Fed.R.Civ.P. 56.
Plaintiff has submitted an affidavit in opposition, and also
requests leave to amend the complaint. Because both
parties have submitted matters outside the pleadings and
this court has considered them, the motion is treated as
one for summary judgment. Fed.R.Civ.P. Rule 12(b). As
explained below, defendants' motion for summary
judgment is granted, and leave to amend the complaint is

denied.

I.

On May 22, 1993, at 5:20 a.m., defendant, corrections
officer R. Burns, ordered plaintiff, who usually worked in
the kitchen, to join other inmates Burns was escorting to
the kitchen. In the presence of the other inmates, plaintiff
refused, claiming he was excused from work because he
was on the "Alternatives to Violence call-out," which was
to begin later that morning. Prisoners selected for the
Alternatives to Violence Workshop were excused from
usual work assignments if they chose to attend. Plaintiff
was one of the inmates selected. (Aff. in Opp.Ex. A)
Plaintiff alleges he showed Burns a memorandum that
included his name among those who were on that day's
"Alternatives to Violence call-out." (Complt. ¶ IV) Burns
told plaintiff he must report for kitchen duty and would be
excused for the later call-out. After plaintiff refused to
report for kitchen duty, and did so in the presence of the
prisoners Burns was escorting, Burns secured plaintiff's
cell and plaintiff was charged with: (1) refusing direct
order; (2) [inmate] out of place; and (3) movement
regulation violation. (Cartmill Aff.Ex. A, C) At his
disciplinary hearing, plaintiff was found not guilty of all
charges. The hearing officer relied on the memo listing
plaintiff's name among those selected for the Workshop,
on plaintiff's record as a good worker, and on his past
participation in various rehabilitation programs. (Cartmill
Aff.Ex. C) Plaintiff now claims he was wrongfully
keeplocked and did not receive a hearing within a
constitutionally permissible time.

II.

Plaintiff appears *pro se,* therefore the complaint "must be
held to less stringent standards than formal pleadings
drafted by lawyers." Estelle v. Gamble, 429 U.S. 97, 106
(1976), (citations omitted). Plaintiff appears to claim his
constitutional rights to substantive and procedural due
process were violated.

Because the court has considered matters outside the

Not Reported in F.Supp., 1994 WL 721362 (S.D.N.Y.)
(Cite as: 1994 WL 721362 (S.D.N.Y.))

pleadings, this motion is treated as one for summary judgment, pursuant to Fed.R.Civ.P. 56(b). Summary judgment is proper when the evidence demonstrates "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). All evidence must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Here, the material facts are undisputed. Plaintiff disobeyed the direct order of a correctional officer. In accordance with Green Haven procedure, plaintiff was keeplocked. An Inmate Misbehavior Report was filed and a Tier II hearing was held, as required, within seven days of the incident. N.Y.Comp.Codes R. & Regs. tit. 7, § 251-5.1 (1989) ("[t]he hearing must be commenced as soon as is reasonably practicable ... but in no event may it be commenced beyond seven days of said confinement"). Plaintiff, provided with an assistant of his choosing from Green Haven, was found not guilty of all infractions charged.

                    III.

**\*2** Plaintiff claims he was unconstitutionally deprived of a liberty interest after the May 22 incident. Burns's administrative action in securing plaintiff's cell after plaintiff refused a direct order was entirely proper. Pursuant to N.Y.Comp.Codes R. & Regs. tit. 7, § 251-1.6(c) (1989), "[a]n inmate who ... refuses to participate in an assigned activity may be confined to his cell." Thus, Burns acted within the bounds of his authority. Generally, restrictive confinement imposed for administrative reasons does not implicate a constitutionally protected liberty interest. *Russell v. Coughlin,* 910 F.2d 75, 77 (2d Cir.1990). A state regulation may, however, create a constitutionally protected liberty interest if the language employed is of "an unmistakenly mandatory character, requiring that certain procedures 'shall' 'will' or 'must' be employed." *Id.* (quoting *Hewitt v. Helms,* 459 U.S. 460, 471-72 (1983)). Because N.Y.Comp.Codes R. & Regs. tit. 7, § 251-1.6(c) does not contain the requisite mandatory language, no protected liberty interest was implicated.

This case is distinguishable from *Walker v. Bates,* 23 F.3d 652, 658-59 (2d Cir.1994), which held that a disciplinary

charge, later dismissed, which causes the arbitrary confinement of an inmate to a special housing unit, may violate that inmate's constitutional right to due process, if that confinement is punitive. *Walker* permits such an inmate to seek damages from the officials responsible. That is not the case here. Unlike the inmate in *Walker,* plaintiff in the instant action was lawfully keeplocked to his own cell for disobeying a direct order. He was not moved to a special housing unit. He was not arbitrarily confined, and his confinement was administrative, not punitive. (Cartmill Aff.Ex. A) Refusing to obey the direct order of a guard is exactly the kind of behavior that potentially threatens the safety, security and order of the facility, a threat addressed by N.Y.Comp.Codes. R. & Regs. tit. 7, § 251 et seq. There is no dispute that plaintiff, in the presence of other inmates, refused Burns's direct order. (Complt. ¶ IV, Cartmill Aff.Ex. A) Burns, faced with a situation where an inmate is marked for two call-outs, both starting at different times, acted reasonably and lawfully to maintain discipline and order.

The Supreme Court has recognized that policies and practices intended to preserve internal order and discipline in institutional settings deserve great deference. *Bell v. Wolfish,* 441 U.S. 520, 546 (1979). The control of a large number of prisoners by a relatively small group of guards can result in volatile situations unless correctional officers are free to act promptly and decisively in accordance with prison procedures. As the Supreme Court stated in *Pell v. Procunier,* 417 U.S. 817, 823 (1974), the maintenance of security within a correctional facility is of paramount concern. That concern is engaged here. When plaintiff refused a direct order from corrections officer Burns, in front of several other prisoners, Burns, in order to maintain discipline, exercised his sound discretion to keeplock plaintiff immediately, in accordance with N.Y.Comp.Codes R. & Regs. tit. 7, § 251-1.6(c).

**\*3** Plaintiff's claim that he was denied substantive due process also fails. Although "[t]he arbitrary imposition of confinement can constitute a *substantive* due process violation," *Grillo v. Coughlin,* 31 F.3d 53, 57 (2d Cir.1994) (citing *Lowrance v. Achtyl,* 20 F.3d 529 (2d Cir.1994)) (emphasis in original), Jones was not arbitrarily confined. Plaintiff disobeyed the direct order of a guard, in the presence of other prisoners. Defendant Burns acted lawfully and in accordance with Green Haven procedure when keeplocking plaintiff. Under these circumstances

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 721362 (S.D.N.Y.)
(Cite as: 1994 WL 721362 (S.D.N.Y.))

plaintiff's confinement cannot be called arbitrary, within the meaning of *Grillo.* The disciplinary hearing was conducted in full compliance with the provisions of N.Y.Comp.Codes R. & Regs. tit. 7, § 251 *et seq.* After being found not guilty of the infractions charged, plaintiff was immediately released from keeplock. Neither plaintiff's substantive nor his procedural due process rights were violated.

Plaintiff's claim that he was keeplocked for a constitutionally impermissible time also is without merit. N.Y.Comp.Codes & Regs. tit. 7, § 251-5.1 permits a disciplinary hearing, such as the one involved here, to take place up to seven days after administrative confinement is imposed. The hearing took place within this seven-day period. It appears plaintiff claims the six-day interval between the imposition of administrative confinement and his hearing violated his procedural due process rights. The Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539 (1974), set forth the due process procedural safeguards a state must adopt when handling charges of prisoner misconduct. The Second Circuit has repeatedly held that the procedures established by New York are constitutional within the meaning of *Wolff. Walker,* 23 F.3d at 656. Because the hearing complied in all respects with New York law, no constitutional violation occurred. For the foregoing reasons, defendant Burns's motion for summary judgment is granted.

The motion to dismiss the superintendent of Green Haven, C. Artuz, is granted. It has long been the rule in the Second Circuit that the doctrine of *respondeat superior* does not apply in § 1983 claims, absent a showing of personal responsibility by defendants. *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.), *cert. denied,* 414 U.S. 1033 (1973). Generally, supervisory personnel enjoy qualified immunity. There are four ways in which supervisory personnel, such as Superintendent Artuz, might be held liable for the actions of their subordinates: (1) direct participation; (2) knowledge of a constitutional violation and failure to remedy the problem; (3) allowing a policy of unconstitutional practices to continue; and (4) gross negligence in training or supervision of subordinates. *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). Nothing in the pleadings alleges that defendant Artuz had personal responsibility within the meaning of *Williams.* The motion to dismiss defendant Artuz therefore is granted.

IV.

**\*4** Plaintiff requests leave to amend the complaint as follows: (1) dismiss Superintendent Artuz from the action because he lacked personal involvement; (2) join Lt. Quackenbush and Sgt. Tokars as defendants; and (3) change the amount of compensatory and punitive damages. The undated amended complaint adds no new allegations against those presently a party to this action. Leave to amend is denied for the following reasons.

Fed.R.Civ.P. 15(a) states that leave to amend "shall be freely given." However, when the requested amendments would be futile and of no benefit to the movant, it is within the discretion of the court to deny leave to amend. *Foman v. Davis,* 371 U.S. 178, 181 (1962). If, as here, the "claims would be subject to dismissal under Fed.R.Civ.P. 12(b)(6), the court should refuse to grant leave to amend rather than assent and then await a motion to dismiss." *Bank of New York v. Sasson,* 786 F.Supp 349, 352 (S.D.N.Y.1992). The request to drop Superintendent Artuz as a party to this suit is moot. The request to add additional parties to this suit is denied because no service has been made on the individuals named in the amended complaint. Therefore, this court lacks personal jurisdiction and, pursuant to Fed.R.Civ.P. 4, cannot hear any claim against those persons. Furthermore, even if the court had personal jurisdiction, the claims against those individuals plaintiff wants to add as defendants would be dismissed on a Rule 12(b)(6) motion because plaintiff has described no culpable conduct on their part. The request to change the amount of money damages is also denied. For the aforementioned reasons, defendants' motion for summary judgment is granted. Plaintiff's motion for leave to amend the complaint is denied.

SO ORDERED:

S.D.N.Y.,1994.
Jones v. Artuz
Not Reported in F.Supp., 1994 WL 721362 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 721362 (S.D.N.Y.)
(Cite as: 1994 WL 721362 (S.D.N.Y.))

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

☞  Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Jack WILLIAMS, Plaintiff,
v.
J.P. KEANE, Superintendent, J. BUONATO,
Lieutenant, P. GIBSON, Lieutenant and J. BUMP,
Corrections Officer, Sing Sing Correctional Facility,
Defendants.
**No. 95 CIV. 0379 AJP JGK.**

Aug. 25, 1997.

*OPINION AND ORDER*

PECK, United States Magistrate Judge.

**\*1** In this 42 U.S.C. § 1983 action, pro se plaintiff Jack Williams has sued the Superintendent, two Lieutenants and a Corrections Officer at the Sing Sing Correctional Facility for alleged violations of due process, equal protection and cruel and unusual punishment in connection with an alleged sexual assault during a "pat-frisk," and Williams' subsequent alleged seven-day (actually six-day) keeplock confinement.

The parties have consented to disposition of this action by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

Presently before the Court is defendants' summary judgment motion. Under *Sandin v. Conner* and its progeny, seven days in keeplock does not state a constitutional claim for violation of due process. Under the Second Circuit's recent decision in *Boddie v. Schnieder,* Williams' allegation of sexual fondling during a single pat-frisk is not sufficiently egregious to state a harm of federal constitutional proportions under the Eighth Amendment. Accordingly, for the reasons set forth below, the Court grants defendants' summary judgment motion.

*FACTS*

*The Alleged Incident*

On November 15, 1994, at approximately 1:15 P.M., a metal detector was set off as plaintiff Jack Williams left the mess hall with several other inmates. (Williams Dep. at 29, 43; Defs' Rule 56.1 Stmt. ¶¶ 29-33.) Williams and other inmates were ordered to stand up against the wall for a routine "pat-frisk" and search for contraband. (Williams Dep. at 29-30; Bump Aff. ¶¶ 10-13; Defs' Rule 56.1 Stmt. ¶¶ 32-33.) It is undisputed that pat-frisks are a normal occurrence in prisons, especially for prisoners exiting the mess hall where metal utensils are used. (Williams Dep. at 29-31; Williams 3(g) Stmt. ¶ 10; Gibson Aff. ¶¶ 6-7; Bump Aff. ¶¶ 5-7; Defs' Rule 56.1 Stmt. ¶¶ 11, 13-24, 34; Defs' Ex. D: DOCS Directive No. 4910.)

However, the nature and extent of defendant Officer Bump's pat-frisk on Williams is disputed. Williams testified:

I had my hands up against the wall. He started fondling my chest. He went down, opened my pants up, put his hands down my pants, starts feeling me, but to keep repeatedly doing that. He felt my testicles, kept doing that. At the same time I was moving down the wall. I was telling him, "What are you doing?" You know, I got kind of hostile with him and other officers, they intervened and told me leave, told him to stop the procedure, told me to leave the mess hall, which I left, but I got his name before I left and wrote it up.

(Williams Dep. at 30; *see also id.* at 43-44.) In contrast, Officer Bump stated that he conducted a routine pat-frisk of Williams that involved a "limited physical touching of the inmate's groin area, from the outside with clothes on, and genitals, which is a prime spot for hiding weapons and other contraband." (Bump Aff. ¶ 13.) Bump also stated that "[a]t no time did I 'fondle' or touch Mr. Williams

Page 2

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

sexually." (Bump Aff. ¶ 18.)

**\*2** Later that day, Officer Bump issued a misbehavior report for Williams' hostile, aggressive, and uncooperative behavior during the pat-frisk. (Bump Aff. ¶¶ 14-15; Defs' Ex. C at p.6: Inmate Misbehavior Report.) Officer Bump's Inmate Misbehavior Report states:

> I gave him a direct order to place his hands on the wall and spread his legs -- and he refused to comply by continuously moving down the wall, and removing his hands. He eventually did comply when an additional officer stepped to him. Inmate Williams ... repeatedly cursed me by calling me "a mother fucker and a goddamn faggot." As a result of this inmate's action this misbehavior report is submitted.

(Defs' Ex. C.) Williams admits asking whether Bump was gay, but denies cursing at him. (Williams Dep. at 44.)

The Misbehavior Report, or "ticket," was then given to defendant Lieutenant Buonato[FN1] for review. (Bump Aff. ¶ 19; Defs' Rule 56.1 Stmt. ¶ 42.) In accordance with prison policy, the "review lieutenant" determines whether the allegations on the ticket support the charge and, if so, warrant the inmate's placement in keeplock. (Buonato Aff. ¶ 5; Defs' Rule 56.1 Stmt. ¶ 43; *see* Williams Dep. at 46.) Lieutenant Buonato filed his review on November 16, 1994, concluding that the charges were adequately set forth and that a Tier II disciplinary hearing was warranted. (Buonato Aff. ¶¶ 7-10; Defs' Rule 56.1 Stmt. ¶ 43.)

> FN1. Williams named Lieutenant Buonato as a defendant because he allegedly improperly reviewed the misbehavior report and unjustifiably placed Williams in keeplock. (Cplt. ¶ IV (E); Williams Dep. at 49-50; *compare* Buonato Aff. ¶¶ 7-10.)

*Williams' Placement in Keeplock and Subsequent Hearing*

Williams was placed in keeplock on November 16, 1994, the day he received a copy of the Inmate Misbehavior

Report and the day after the incident. (Williams Dep. at 32-33, 39-40; Defs' Rule 56.1 Stmt. ¶ 44.)

Prison guidelines provide that a hearing on the charges must be held as soon as practical, but in no case longer than seven days from when the inmate is placed in keeplock. *See* 7 N.Y.C.R.R. § 251-5.1. (*See also* Williams Dep. at 50-51; Cplt. ¶ IV (C).)[FN2]

> FN2. Section 251-5.1 provides:

> > Where an inmate is confined pending a disciplinary hearing or superintendent's hearing, the hearing must be commenced as soon as is reasonably practicable following the inmate's initial confinement pending said disciplinary hearing or superintendent's hearing, but, in no event may it be commenced beyond seven days of said confinement without authorization of the commissioner or his designee.

> 7 N.Y.C.R.R. § 251-5.1.

Williams Tier II hearing took place on November 21, 1994 at 3:00 P.M. (Defs' Rule 56.1 Stmt. ¶¶ 47, 49; Gibson Aff. ¶ 11; Defs' Ex. C at p. 1; Williams Dep. at 40.) Defendant Lieutenant Gibson[FN3] found Williams not guilty at the conclusion of the Tier II disciplinary hearing. (Defs' Rule 56.1 Stmt. ¶ 51; Gibson Aff. ¶¶ 13, 15-16; Williams Dep. at 41-42; Defs' Ex. C at p. 1.) Lieutenant Gibson stated on the record that Williams was uncomfortable with the search, especially "where he was being touched." (Gibson Aff. ¶ 15; Defs' Rule 56.1 Stmt. ¶ 53; Defs' Ex. C at p. 2.) Gibson also found that Officer Bump conducted himself within the scope of his official duties and in accordance with prison rules. (Defs' Rule 56.1 Stmt. ¶ 54; Gibson Aff. ¶ 17.) Williams characterized Lieutenant Gibson's hearing as "fair." (Williams Dep. at 58, 60; Gibson Aff. ¶ 18; Defs' Rule 56.1 Stmt. ¶ 55.)

> FN3. Williams named Lieutenant Gibson as a defendant because Williams alleges that the hearing should have been held within the 7-day

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

**\*3** Williams was released from keeplock on November 21, 1994. (Williams Dep. at 42-43, 51, 53.) While Williams alleges that he spent seven days in keeplock (Cplt. ¶ IV(D); Williams Dep. at 51, 62; *see* Defs' Rule 56.1 Stmt. ¶ 48), it appears that Williams was in keeplock for six days (November 16 to November 21).

Williams named Superintendent Keane as a defendant, alleging that Keane did not properly train the corrections officers under his control. (Cplt. ¶ IV(E).) Keane also conducted an internal facility investigation into Officer Bump's conduct, which found that Bump complied with all prison rules. (Defs' Rule 56.1 Stmt. ¶¶ 58-59; Keane Aff. ¶¶ 11-12.)

*ANALYSIS*

To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. *See* 42 U.S.C. §1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55 (1988). "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted); *cert. denied,* 512 U.S. 1240, 114 S. Ct. 2749 (1994); *accord, e.g., Ruiz v. Selsky,* 96 Civ. 2003, 1997 WL 137448 at \*4 (S.D.N.Y. March 24, 1997) (Peck, M.J.); *Morris v. Dann,* No. 95-CV-975, 1996 WL 732559 at \*3 (N.D.N.Y. Dec. 11, 1996). Proof that state procedural law was violated does not by itself constitute a deprivation of due process because "[f]ederal constitutional standards rather than state law define the requirements of procedural due process." *Russell v. Coughlin,* 910 F.2d 75, 78 n.1 (2d Cir. 1990); *accord, e.g., Ruiz v. Selsky,* 1997 WL 137448 at \*4.

*I. UNDER SANDIN V. CONNER, SIX DAYS IN KEEPLOCK DOES NOT CONSTITUTE AN ATYPICAL AND SIGNIFICANT DEPRIVATION OF A PROTECTED LIBERTY INTEREST*

A. *Sandin v. Conner*

Defendants' summary judgment motion on the keeplock claim turns, in part, on application of the Supreme Court's decision in *Sandin v. Conner,* 515 U.S. 472, 115 S. Ct. 2293 (1995), which significantly changed the prisoner due process landscape. The Supreme Court there held:

> [W]e believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause. The time has come to return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum.* Following *Wolff,* we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

**\*4** 115 S. Ct. at 2300 (fn. & citations omitted).

In *Sandin,* the prisoner was charged with a disciplinary infraction for physical interference with a correction officer, for using abusive or obscene language and for harassing employees. *Id.* at 2295-96. The disciplinary committee refused the prisoner's request to present witnesses, found him guilty of the alleged misconduct and sentenced him to 30 days disciplinary segregation in the prison's Special Holding Unit (SHU). *Id.* The Supreme Court found that the inmate was not entitled to the procedural protections set forth in *Wolff v. McDonnell,* 418 U.S. 539, 94 S. Ct. 2963 (1974). *Sandin v. Conner,* 115 S. Ct. at 2302. The Supreme Court stated:

> *We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest. The record shows that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

those conditions imposed upon inmates in administrative segregation and protective custody. We note also that the State expunged Conner's disciplinary record with respect to the "high misconduct" charge 9 months after Conner served time in segregation. Thus, Conner's confinement did not exceed similar, but totally discretionary confinement in either duration or degree of restriction. Indeed, the conditions at Halawa [prison] involve significant amounts of "lockdown time" even for inmates in the general population. *Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.*

*Id.* at 2301 (footnotes omitted and emphasis added).

As a result of *Sandin,* the Second Circuit has announced a two-part standard which prisoners must satisfy to establish a procedural due process claim due to segregated confinement:

> To prevail, [the plaintiff inmate] must establish both that [1] the confinement or restraint creates an "atypical and significant hardship" under *Sandin,* and that [2] the state has granted its inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement or restraint.

*Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir. 1996); *accord, e.g., Santana v. Keane,* 90 Civ. 6309, 1996 WL 465751 at *3 (S.D.N.Y. Aug. 14, 1996). A prisoner who satisfies both of these elements would be entitled to the procedural due process protections enunciated by *Wolff v. McDonnell,* 418 U.S. at 556-58, 94 S. Ct. at 2974-75, and its progeny. *See, e.g., Barnes v. Starks,* 95 Civ. 4891, 1996 WL 648956 at *3 & n.4 (S.D.N.Y. Nov. 6, 1996); *Santana v. Keane,* 1996 WL 465751 at *3 & n.1.

**B.** *Williams' Action Fails Because It Is Based on A Miscalculation of the Time He Spent in Keeplock*

**\*5** Williams notes, correctly, that New York's prison regulations require a disciplinary hearing to be held within

7 days of the inmate's placement in keeplock for a disciplinary infraction. 7 N.Y.C.R.R. § 251-5.1. Williams then argues, incorrectly, that he spent 7 days in keeplock before the disciplinary hearing at which he was found not guilty and immediately released from keeplock. (*See* Williams Dep. at 50-51; Cplt. ¶ IV (C).) In fact, however, the incident occurred on November 15, 1994, Williams was placed in keeplock on November 16, and his hearing was held and he was released from keeplock on November 21, 1994. (*See* Fact section, above.) Thus, on the undisputed facts, Williams was in keeplock from November 16 to November 21, at most *six* days. Accordingly, the hearing was held and Williams was released from keeplock within the seven days required by New York's prison regulations. Since the regulations were not violated, it is not necessary to examine either prong of the two-prong *Sandin* analysis; defendants are entitled to summary judgment on the keeplock claim. *See Soto v. Walker,* 44 F.3d 169, 173 (2d Cir. 1995) (even a violation of 7 N.Y.C.R.R. § 251-5.1 "alone would not be enough generally to establish a constitutional claim"); *Dudley v. Coombe,* 96 Civ. 1665, 1997 WL 423074 at *2 (S.D.N.Y. July 28, 1997) (in light of 7 N.Y.C.R.R. § 251-5.1 requiring hearing within seven days, prisoner did not have liberty interest in five-day keeplock stay without hearing).

**C.** *Application of Sandin to Confinement of 6 Days in Keeplock*

Even if the Court were to assume, contrary to the undisputed evidence, that Williams' keeplock stay violated state regulations, defendants are entitled to summary judgment under the first prong of the *Sandin* analysis.

In recent decisions, the Second Circuit has clearly instructed that the *Sandin* analysis requires a factual inquiry as to the length and conditions of confinement:

> The language and analysis in *Sandin* make clear that the Court did not intend to suggest that discipline in segregated confinement could never present such an "atypical, significant deprivation." ... [W]e now state explicitly: *Sandin* did not create a per se blanket rule that disciplinary confinement may never implicate a liberty interest.... [D]istrict courts must examine the circumstances of a confinement to determine whether

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

that confinement affected a liberty interest.

**\*6** *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir. 1997); *see also, e.g., Sealey v. Giltner,* 116 F.3d 47, 52 (2d Cir. 1997); *Brooks v. Difasi,* 112 F.3d 46 (2d Cir. 1997).

While the courts have not yet determined what length of confinement will constitute an "atypical or significant hardship," the decisions in the Second Circuit are unanimous that keeplock or SHU confinement of 30 days or less in New York prisons is *not* "atypical or significant hardship" under *Sandin. See, e.g., Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir. 1996) (12 days in SHU); *Johnson v. Coughlin,* 90 Civ. 1731, 1997 WL 431065 at \*1 (S.D.N.Y. July 30, 1997) (8 days confinement prior to disciplinary hearing); *Sullivan v. Schweikhard,* 95 Civ. 0276, 1997 WL 349983 at \*3 (S.D.N.Y. June 25, 1997) (9 days in keeplock); *Duncan v. Keane,* 95 Civ. 1090, 1997 WL 328070 at \*2 (S.D.N.Y. June 13, 1997) (30 days keeplock); *Harris v. Keane,* 962 F. Supp. 397, 404 (S.D.N.Y. 1997) (23 days in keeplock; the "Second Circuit's post-Sandin decisions are unanimous that keeplock of 60 days or less in New York prisons is not an "atypical hardship.'"); *Saulter v. Hanslmaier,* 94 Civ. 6855, 1997 WL 177887 at \*2 (S.D.N.Y. April 14, 1997) (7 days in keeplock); *Ragland v. Crawford,* 95 Civ. 10069, 1997 WL 53279 at \*3 (S.D.N.Y. Feb. 7, 1997) (1 day in keeplock); *Torres v. Keane,* 94 Civ. 4845, 1997 WL 35507 at \*1 (S.D.N.Y. January 30, 1997) (21 days in keeplock); *Grant v. Riley,* 89 Civ. 0359, 1996 WL1727441 at \*2-3 (S.D.N.Y. Dec. 17, 1996) (10 days in keeplock, only 5 of which were served); *Barnes v. Starks,* 95 Civ. 4891, 1996 WL 648956 at \*3 (S.D.N.Y. Nov. 6, 1996) (21 days in keeplock); *Santana v. Keane,* 90 Civ. 6309, 1996 Wl 465751 at \*5 (S.D.N.Y. Aug. 14, 1996) (9 days in keeplock during a prison sentence of at least 7 years); *Pampalone v. Young,* 95 Civ. 2348, 1996 WL 511569 at \*3 (S.D.N.Y. August 7, 1996) (Peck, M.J.) (10 days in keeplock); *McAllister v. Zydel,* 929 F. Supp. 102, 104 (W.D.N.Y. 1996) (15 days in keeplock); *Chambers v. Coughlin,* 95 Civ. 298, 1996 WL 243202 at \*2 & n.6 (S.D.N.Y. May 10, 1996) (7 days in SHU); *Beaty v. Scully,* 92 Civ. 3407, 1996 WL 209933 at \*2 (S.D.N.Y. April 30, 1996) (11 days in SHU); *Slaughter v. Coughlin,* 94 Civ. 6734, 1996 WL 200308 at \*3 (S.D.N.Y. April 25, 1996) (10 or 11 days in keeplock); *Leyro v. Kennedy,* 95 Civ. 0198, 1996 WL 191741 at \*1 (S.D.N.Y. April 22, 1996) (several days in keeplock); *Ramirez v. Coughlin,* 93

Civ. 0765, 1996 WL 194324 at \*3-4 (S.D.N.Y. April 22, 1996) (30 days combination of SHU and keeplock); *Dawkins v. Healy,* 94 Civ. 6382, 1996 WL 145989 at \*2 (S.D.N.Y. April 1, 1996) (15 days in keeplock) *judgment vacated and reconsideration in part,*1996 WL 280737 at \*2 (S.D.N.Y. May 28, 1996) (reconsideration limited to issue of retaliation); *Powell v. Scully,* 92 Civ. 5334, 1996 WL 145962 at \*3 (S.D.N.Y. April 1, 1996) (7 days of cell confinement); *Benton v. Keane,* 921 F. Supp. 1078, 1079 (S.D.N.Y. 1996) (9 days in administrative confinement); *Ketchmore v. Stormer,* 94 Civ. 8271, 1996 WL 117572 at \*2-3 (S.D.N.Y. March 18, 1996) (10 days of cell confinement); *Moolenaar v. Finn,* 94 Civ. 6778, 1996 WL 112200 at \*3 (S.D.N.Y. March 14, 1996) (15 days in keeplock); *Walker v. Mahoney,* 915 F. Supp. 548, 553-54 (E.D.N.Y. 1996) (23 days in administrative segregation) (citing unpublished 2d Cir. dispositions); *Ahlers v. Keane,* 94 Civ. 3297, 1995 WL 375920 (S.D.N.Y. June 22, 1995) (10 days keeplock), *aff'd* (unpublished decision), 101 F.3d 684, No. 95-2454, 1996 WL 281351 at \*1 (2d Cir. May 22, 1996); *Martin v. Mitchell,* 92-CV-716, 1995 WL 760651 at \*3 (N.D.N.Y. Nov. 24, 1995) (30 days keeplock); *Schmelzer v. Norfleet,* 903 F. Supp. 632, 634-35 (S.D.N.Y. 1995) (11 days in keeplock); *Jackson v. Keane,* 93 Civ. 6453, 1995 WL 622593 at \*3 (S.D.N.Y. Oct. 24, 1995) (14 days in SHU); *Kozlek v. Papo,* 94 Civ. 1429, 1995 WL 479410 at \*2 (S.D.N.Y. Aug. 11, 1995) (10 days in SHU); *Uzzell v. Scully,* 893 F. Supp. 259, 262-63 (S.D.N.Y. 1995) (23 days in keeplock).

**\*7** Indeed, decisions in this Circuit have held that keeplock or SHU confinement of longer than 30 days does not implicate a liberty interest. *See, e.g., Frazier v. Coughlin,* 81 F.3d at 317-18 (12 days in SHU and eleven months in "close supervision unit"); Thompson v. Keane, 95 Civ. 2442, slip op. at 5-6 (S.D.N.Y. Aug. 6, 1997) (91 days in SHU); *Ruiz v. Selsky,* 96 Civ. 2003, 1997 WL 137448 at \* 5 (S.D.N.Y. March 24, 1997) (Peck, M.J.) (192 days in SHU during 10-20 year prison sentence); *Reaves v. Williams,* 95 Civ. 0281, 1997 WL 10132 at \*4-5 (S.D.N.Y. Jan. 10, 1997) (90 days of keeplock imposed, of which 69 days were served); *Odom v. Keane,* 94 Civ. 8032, 1997 WL 3262 at \*1 (S.D.N.Y. Jan. 6, 1997) (46 days of keeplock); *Coleman v. Galgano,* 95 Civ. 5835, 1996 WL 715533 at \*1, 3 (S.D.N.Y. Dec. 11, 1996) (60 days in SHU and 180 days in keeplock); *Whitfield v. Scully,* 94 Civ. 3290, 1996 WL 706932 at \*5 (S.D.N.Y. Dec. 6, 1996) (60days in SHU); *Bennett v. Dolan,* 93 Civ. 5215, 1996 WL 499519 at \*1, 3 (S.D.N.Y. Sept. 4, 1996)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

(45 days of keeplock imposed, 24 days served); *Nogueras v. Coughlin,* 94 Civ. 4094, 1996 WL 487951 at *5 (S.D.N.Y. Aug. 27, 1996)* ("210 days in SHU does not in and of itself trigger due process concerns."); *Duncan v. Keane,* 93 Civ. 6026, 1996 WL 511573 at *3-5 (S.D.N.Y. Aug. 22, 1996)* (Peck, M.J.) (58 days in keeplock); *Brown v. McClellan,* 93-CV-0901, 1996 WL 328209 at *5 (W.D.N.Y. June 11, 1996)* (two confinements in SHU for 60 days each); *Guzman v. Kelly,* 88-CV-1391, 1996 WL 291985 at *3 (W.D.N.Y. May 28, 1996)* (8 months in SHU); *Trice v. Clark,* 94 Civ. 6871, 1996 WL 257578 at *2-3 (S.D.N.Y. May 16, 1996)* (150 days in SHU); *Arce v. Coughlin,* 93 Civ. 4702, 1996 WL 252371 at *6-7 (S.D.N.Y. May 14, 1996)* (120 days in SHU); *Camacho v. Keane,* 95 Civ. 0182, 1996 WL 204483 at *2 (S.D.N.Y. April 25, 1996)* (90 days, only 40 days of which were served, in keeplock); *Rouccchio v. Coughlin,* 923 F. Supp. 360, 373 (E.D.N.Y. 1996)* (47 days in SHU) (citing cases, including unpublished 2d Cir. decisions upholding 60 days SHU and 71 days segregated confinement); *Villano v. Irvin,* 93-CV-0196, 1996 WL 343251 at *3 (W.D.N.Y. March 18, 1996)* (85 days in keeplock out of a 90-day keeplock sentence); *White v. Artuz,* 94 Civ. 4592, 1996 WL 84498 at *2 (S.D.N.Y. Feb. 27, 1996)* (55 days in protective custody); *Walker v. Mahoney,* 915 F. Supp. 548, 553-54 (E.D.N.Y. 1996)* (23 days in administrative segregation) (citing unpublished 2d Cir. dispositions upholding 60 and 71-day confinements); *Rivera v. Coughlin,* 92 Civ. 3404, 1996 WL 22342 at *4-5 & n.6 (S.D.N.Y. Jan. 2, 1996)* (89 days in disciplinary segregation; loss of good time credits reversed administratively so no effect on length of sentence); *Rosario v. Selsky,* 94 Civ. 6872, 1995 WL 764178 at *5-6 (S.D.N.Y. Dec. 28, 1995)* (120 days imposed but inmate served less than 3 months in SHU during a ten-year sentence); *Tulloch v. Coughlin,* 91-CV-0211, 1995 WL 780970 at *1-2 (W.D.N.Y. Dec. 22, 1995)* (180 days in SHU; loss of good time allowance restored through prior state proceeding; implies that any SHU confinement, regardless of length, is permissible under *Sandin*), *appeal dismissed on other grounds* (unpublished decision), 101 F.3d 1393, 1996 WL 414457 (2d Cir. 1996); *Morales v. Santor,* 94-CV-217, 1995 WL 760625 at *2 (N.D.N.Y. Dec. 4, 1995)* (60 days in keeplock); *Ross v. Jewett,* 91-CV-1414, 1995 WL 760675 at *2, *4 (N.D.N.Y. Nov. 27, 1995)* (60 days in keeplock), *aff'd* (unpublished decision), No. 96-2004, 1996 WL 304752 (2d Cir. June 7, 1996); *Zamakshari v. Dvoskin,* 899 F. Supp. 1097, 1108 (S.D.N.Y. 1995)* (Peck, M.J.) (60 days in SHU); *Delaney v. Selsky,* 899 F. Supp. 923, 927-28 (N.D.N.Y. 1995)* (365 days in SHU ordinarily not atypical but because plaintiff over 7 feet tall and SHU bed too small for him, summary judgment denied); *Medina v. Bartlett,* 94-CV-0358, 1995 WL 529624 at *2 (W.D.N.Y. Aug. 28, 1995)* (no liberty interest created by 2,555 days in SHU); *McMiller v. Wolf,* 94 Civ. 0623, 1995 WL 529620 at *1, *3 (W.D.N.Y. Aug. 28, 1995)* (365 days in SHU reduced to approximately 180 days in SHU); *Carter v. Carriero,* 905 F. Supp. 99, 104 (W.D.N.Y. 1995)* (360 days reduced to 270 days in SHU); *Hutchinson v. Adorno,* 93 Civ. 3949, 1994 WL 549568 (S.D.N.Y. Oct. 6, 1994),* *aff'd* (unpublished decision), No. 94-2652, 1995 WL 737493 at *1-2 (2d Cir. Dec. 13, 1995)* (1 year of segregated confinement and 90 days keeplock, reduced to 71 days in segregated confinement).

**8* Chief Judge McAvoy of the Northern District of New York concluded that "courts in this and other districts have subsequently [to *Sandin*] ruled that increasingly lengthy periods of segregated housing did not impose an 'atypical and significant hardship' within the meaning of *Sandin*. Indeed, *it now appears that any period of segregation of one year or less affords no protected liberty interest.*" *Polanco v. Allan,* No. 93-CV-1498, 1996 WL 250237 at *3 (N.D.N.Y. May 6, 1996)* (emphasis added) (365 days in SHU upheld), *reaffirmed on reconsideration,* 1996 WL 377074 at *2 (N.D.N.Y. July 5, 1996)* ("the general rule of a year or less seems appropriate, absent extraordinary circumstances, which plaintiff has not offered"; 365 days in SHU was not "outside the parameters of plaintiff's sentence").[FN4]

FN4.*But see Wright v. Miller,* 96 Civ. 1224, 1997 WL 438795 at *3 (slip op. at p. 6) (S.D.N.Y. July 31, 1997)* (12-15 months in SHU may create atypical and significant hardship; summary judgment denied); *Porter v. Coughlin,* 964 F. Supp. 97, 103 (W.D.N.Y. 1997)* (36 months in SHU creates liberty interest); *Bishop v. Keane,* 92 Civ. 6061, 1995 WL 384443 at *3 n.4 (S.D.N.Y. June 28, 1995)* (whether 87 days in keeplock imposes atypical or significant hardship is a question of fact precluding summary judgment); *Lee v. Coughlin,* 902 F. Supp. 424, 431 (S.D.N.Y. 1995)* (376 days in SHU imposed an "atypical and significant hardship" for an inmate serving a 2-year sentence), *motion for reconsideration granted, Lee v. Coughlin,* 914 F. Supp. 1004, 1005

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

(S.D.N.Y. 1996) (reconsideration granted for defendants to address recent *Sandin* decision); *Williams v. Fountain,* 77 F.3d 372, 374 n.3, 376 (11th Cir.) (assumes that a year of solitary confinement is a substantially "atypical and significant hardship" entitling plaintiff to due process, but finds that prisoner received sufficient due process), *cert. denied,* 117 S. Ct. 367 (1996).

Consistent with the above-cited cases, whatever *Sandin*'s outer limits, it is clear that Williams' confinement of 6 days[FN5] in keeplock does not constitute an "atypical or significant hardship" under *Sandin.*[FN6] Accordingly, the Court grants defendants' summary judgment motion on this first issue.

FN5. The Court's analysis would be no different if plaintiff had spent 7 days in keeplock as Williams originally alleged.

FN6. Because Williams has not established the first *Frazier* prong (that his 6 day keeplock confinement is an atypical and significant hardship under *Sandin*), the Court need not reach the second *Frazier* prong (of whether New York has granted its inmates a liberty interest in being free of disciplinary confinement).

II. *UNDER BODDIE v. SCHNIEDER, WILLIAMS' ALLEGATION OF SEXUAL ABUSE DOES NOT RISE TO A CONSTITUTIONAL DEPRIVATION*

A. *In Boddie v. Schnieder, the Second Circuit Recognized an Eighth Amendment Claim for Sexual Abuse*

**\*9** Williams' second claim, for alleged sexual abuse by Corrections Officer Bump, is governed by the Second Circuit's recent decision in *Boddie v. Schnieder,* 105 F.3d 857 (2d Cir. 1997), which recognized a § 1983 Eighth Amendment[FN7] claim for sexual abuse by a corrections officer, but also found the complaint of conduct there to not involve a harm of federal constitutional proportions. The same is true of Williams' claim here.

FN7. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."

In *Boddie,* the Second Circuit recognized that the "Eighth Amendment sets constitutional boundaries on the conditions of imprisonment. The 'unnecessary and wanton infliction of pain' on a prisoner constitutes cruel and unusual punishment in violation of the Eighth Amendment." *Id.* at 861. The Eighth "Amendment proscribes more than physically barbarous punishments. The Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity and decency,' against which we must evaluate penal measures." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S. Ct. 285, 290 (1976) (citations omitted).

*Boddie* reiterated a two-prong, objective-subjective test for Eighth Amendment violations, including claims of sexual abuse:

An official violates the Eighth Amendment when two requirements are met. First, the alleged "punishment" must be, "objectively, sufficiently serious." Under the objective standard, "conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." Second, the prison official involved must have a "sufficiently culpable state of mind." Because sexual abuse by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims.

*Boddie,* 105 F.3d at 861 (citations omitted, including to *Farmer v. Branham,* 511 U.S. 825, 834, 114 S. Ct. 1970, 1977 (1994)).[FN8]

FN8. *See also Mathie v. Fries,* No. 1274, Docket 96-9138, 1997 WL 426567 at *3 (2d Cir. July 31, 1997), *affirming* 935 F. Supp. 1284, 1299 (E.D.N.Y. 1996) (pretrial detainee awarded damages for sexual assault including sodomy by

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

prison official). Decisions in other circuits similarly recognize a § 1983 Eighth Amendment claim for serious sexual abuse by prison personnel. *See, e.g., Freitas v. Ault,* 109 F.3d 1335 (8th Cir. 1997) (to prove a constitutional claim for sexual abuse, the inmate must demonstrate that the alleged abuse objectively caused "pain," and that the officer involved subjectively had a "sufficiently culpable state of mind."); *Jordan v. Gardner,* 986 F.2d 1521, 1527-31 (9th Cir. 1993) (female inmates stated valid § 1983 Eighth Amendment claim challenging prison policy allowing cross-gender clothed body searches); *Watson v. Jones,* 980 F.2d 1165, 1165-66 (8th Cir. 1992) (summary judgment for defendant female correction officer reversed where inmates alleged sexual harassment and sexual fondling of male prisoners during pat frisks almost daily over a two-month period); *Meriwether v. Faulkner,* 821 F.2d 408 (7th Cir.) (complaint that transexual inmate is regularly forced to strip before male guards and inmates states Eighth Amendment claim), *cert. denied,* 484 U.S. 935, 108 S. Ct. 311 (1987); *Thomas v. District of Columbia,* 887 F. Supp. 1, 4-5 (D.D.C. 1995) (summary judgment for defendant denied where corrections officer sexually harassed plaintiff including touching his penis and tried to coerce prisoner to have sexual relations); *Women Prisoners of District of Columbia Dep't of Corrections v. District of Columbia,* 877 F. Supp. 634 (D.D.C. 1994) (court found numerous violations of the Eighth Amendment for repeated rape, sexual assaults and harassment of female prisoners), *aff'd in part on other grounds, reversed in part on other grounds,* 93 F.3d 910, 928 (D.C. Cir. 1996), *cert. denied,* 117 S. Ct. 1552 (1997), *on remand,* CA No. 93-2052, 1997 WL 361600 at *2-3 (D.D.C. June 16, 1997) (ordering remedial measures to eliminate sexual harassment); *Galvan v. Carothers,* 855 F. Supp. 285, 291 (D. Alaska 1994) ("minimal standards of privacy and decency include the right not to be subject to sexual advances, to use the toilet without being observed by members of the opposite sex, and to shower without being viewed by members of the opposite sex"; nevertheless, summary judgment for defendant on qualified immunity grounds).

**\*10** Objectively, "[s]exual abuse may violate contemporary standards of decency and can cause severe physical and psychological harm," and "has no legitimate penological purpose." *Boddie,* 105 F.3d at 861. As to the subjective prong of the test, "[w]here no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind." *Id.*

The Second Circuit in *Boddie* nevertheless affirmed the district court's dismissal of Boddie's claim:

[A]llegations of sexual abuse may meet both the subjective and the objective elements of the constitutional test, thereby stating an Eighth Amendment claim under Section 1983. However, we agree with the district court that Boddie nevertheless failed to state an Eighth Amendment claim. He asserts a small number of incidents in which he allegedly was verbally harassed, touched, and pressed against without his consent. No single incident that he described was severe enough to be "objectively, sufficiently serious." Nor were the incidents cumulatively egregious in the harm they inflicted. The isolated episodes of harassment and touching alleged by Boddie are despicable and, if true, they may potentially be the basis of state tort actions. But they do not involve a harm of federal constitutional proportions as defined by the Supreme Court.

*Boddie,* 105 F.3d at 861.[FN9]

FN9. The Second Circuit summarized Boddie's allegations as follows:

First, Boddie maintains that on March 3, 1993, Officer B. Schnieder, a female corrections officer, "made a statement" that Boddie believed to be "a pass" at him, but that he "could not be sure."

Second, Boddie claims that on the next day, Schnieder squeezed his hand, touched his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

penis, and said, "[Y]ou know your [sic] sexy black devil, I like you."

Third, Boddie alleges that on March 19, 1993, ... Schnieder stopped [him], accused him of wearing an orange sweatshirt, and told him to take off the sweatshirt. According to Boddie, he resisted, stating that he was a cardiac patient, that the hallway was very cold, and that he would give the sweatshirt to her when they returned to his cellblock. When Boddie began to walk past the officers, Schnieder stopped him, "bumping into [his] chest with both her breast so hard [he] could feel the points of her nipples against [his] chest." Boddie states that Schnieder did this to Boddie twice, pinning him to a door. When he tried to pass her again, Schnieder again bumped into him, this time "with her whole body vagina against penis pinning [him] to the door."

*Id.* at 859-60.

B. *Williams' Allegation of Sexual Abuse Fails to State a Valid Claim Under § 1983*

**\*11** Williams' allegations, like Boddie's, are not sufficient to state a valid § 1983 claim for sexual abuse. The conduct alleged by Williams, accepting his allegations as true, is no more egregious than the conduct in *Boddie.* Moreover, the instant case involves only a single incident of alleged abuse, whereas *Boddie* involved several. Thus, under *Boddie,* it is clear that Williams' claim does "not involve a harm of federal constitutional proportions as defined by the Supreme Court." *Boddie,* 105 F.3d at 861;*see also, e.g., Green v. Elias,* 9 F.3d 1551 (9th Cir. 1993) (affirms grant of summary judgment to defendant correction officer where male prisoner alleged female guard grabbed his genitals during a clothed pat frisk of inmates leaving the dining hall); *Kaestner v. Mitchell,* No. C 96-2370, 1996 WL 428357 at *1 (N.D. Cal. July 24, 1996) (alleged unwarranted sexual advances including touching of prisoner's buttocks "does not rise to the level of egregious, pervasive and/or widespread sexual harassment necessary to implicate the Eighth Amendment."); *Duncan v. Keane,* 95 Civ. 1090, 1995 WL 649931 at *5-6 (S.D.N.Y. Nov. 6, 1995) (claim that correction officer felt plaintiff's rear end does not provide sufficient facts to state Eighth Amendment claim); *Friedman v. Young,* 702 F. Supp. 433, 434, 436 (S.D.N.Y. 1988) (complaint that correction officer fondled plaintiff's genitals and anus during pat search dismissed; "[a]ccepting the allegations of the complaint [as true], the line between a pat down and a fondle is too insubstantial to support the burden of supporting a claim for constitutional tort.").

Accordingly, accepting for purposes of this motion Williams' version of the facts, this isolated incident during a routine pat-frisk fails to state an Eighth Amendment claim under *Boddie.* The Court grants defendants' summary judgment motion on this second issue.

*CONCLUSION*

For the reasons set forth above, defendants' summary judgment motion is granted. The Clerk of the Court is directed to enter judgment for defendants dismissing this action with prejudice.

SO ORDERED.

DATED:

S.D.N.Y.,1997.
Williams v. Keane
Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 191212 (N.D.N.Y.)
(Cite as: 2008 WL 191212 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Milton THOMPSON, Plaintiff,
v.
Darwin LaCLAIR, Superintendent; A. Mckee,
Correctional Officer; and N. Irwin, Lieutenant,
Defendants.
**No. 9:08-CV-37 (FJS/DEP).**

Jan. 22, 2008.

Milton Thompson, Malone, NY, pro se.

**MEMORANDUM-DECISION AND ORDER**

SCULLIN, Senior District Judge.

**I. BACKGROUND**

**\*1** The Clerk of the Court has sent Plaintiff Milton Thompson's civil rights complaint, his application to proceed *in forma pauperis,* and a fully executed inmate authorization form to the Court for its review. *See* Dkt. Nos. 1-3. Plaintiff has also filed a motion for injunctive relief.[FN1]

> FN1. The Court notes that Plaintiff has failed to submit his motion for injunctive relief in the form that the Court's Local Rules require. Specifically, he has neglected to file a memorandum of law in support of his motion. *See* L.R. 7.1(a), (f). In light of the lack of clarity surrounding Plaintiff's application and his *pro se* status, the Court will overlook this deficiency and will consider Plaintiff's motion for a temporary restraining order at this time.

In his *pro se* complaint, Plaintiff alleges, among other things, the denial of a constitutionally cognizable liberty interest without having been afforded procedural due process, as required under the Fourteenth Amendment to the United States Constitution, cruel and unusual punishment in violation of his rights under the Eighth Amendment, and a third cause of action, denominated as the second, based upon the loss of certain of his property and the denial of an internal claim for reimbursement to compensate him for that loss. *See, generally,* Complaint ("Dkt. No. 1"). Plaintiff's due process claim, the sole cause of action implicated in his motion for injunctive relief, stems from an August 2007 disciplinary hearing that resulted in a finding of guilt and the imposition of a penalty of thirty days in keeplock confinement with a corresponding loss of recreation, package, commissary, and phone privileges. *See id.*

**II. DISCUSSION**

**A. *In forma pauperis application***

After reviewing Plaintiff's *in forma pauperis* application, *see* Dkt. No. 2, and in light of his filing of a signed inmate authorization form, the Court finds that Plaintiff may properly proceed with this matter *in forma pauperis.*

**B. Injunctive relief**

In support of his motion for injunctive relief, Plaintiff alleges that, as a result of his confinement in the special housing unit ("SHU"), he was removed from an Alcohol Substance Abuse Treatment program ("ASAT") before he completed that program.[FN2] *See* Dkt. No. 4. Plaintiff requests that the Court direct Defendants to expunge his record regarding the disciplinary penalty and credit him for the five-and-one-half months of the ASAT program that he completed prior to his confinement in keeplock and, presumably, further direct Defendants to permit him to complete the program as soon as possible. *See id.; see also* Dkt. No. 1 at 10 (requesting that Plaintiff receive

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 191212 (N.D.N.Y.)
(Cite as: 2008 WL 191212 (N.D.N.Y.))

credit for all the time that he invested in the ASAT program and be permitted to complete that program). To establish that he will suffer irreparable harm, absent the injunctive relief he seeks, Plaintiff states that he is due to appear before the New York State Parole Board in February, 2008, at which time he will be required to demonstrate that he has completed the ASAT program or risk denial of parole. *See* Dkt. No. 4.

> FN2. According to Plaintiff's complaint, the disciplinary keeplock sanction also caused his expulsion from an Aggression Replacement Training program ("ART") shortly before its completion. *See* Dkt. No. 1 at 9.

The standard that a court must use when considering whether to grant a request for injunctive relief is well-settled in this Circuit. To warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief. *See D.D. ex rel. V.D. v. New York City Bd. of Educ., 465 F.3d 503, 510 (2d Cir.2006)* (quotation omitted).

### 1. Irreparable harm

*2 Where an alleged deprivation of constitutional harm is involved, courts generally do not require that the party seeking injunctive relief make a further showing of irreparable harm. *See Mitchell v.. Cuomo, 748 F.2d 804, 806 (2d Cir.1984)* (quotation and other citations omitted). In this case, Plaintiff alleges that, in spending thirty days in the SHU as a result of his disciplinary infraction, he lost the five-and-one-half months of credit he earned while he was enrolled in the ASAT program and was unable to complete that program. According to Plaintiff, he is due to appear before the New York State Parole Board in February, 2008, and his failure to complete the ASAT program may result in the denial of parole. Accepting Plaintiff's allegations as true **for the sole purpose of considering this motion,** the Court finds that, to the extent that Plaintiff might be denied parole because of his failure to complete the ASAT program as a result of his thirty-day SHU confinement in August, 2007, the Plaintiff

**may** suffer irreparable harm related to his alleged due process claim should the Court deny his request for injunctive relief. FN3

> FN3. The Court makes **no** finding at this time that Plaintiff has **actually** suffered irreparable harm.

### 2. Likelihood of success on the merits or sufficiently serious questions regarding the merits and a balance of hardships tipping decidedly toward Plaintiff

Even assuming, for the sake of argument, that a movant has established the possibility of irreparable harm, a party is not entitled to the issuance of interim injunctive relief absent proof of the likelihood of succeeding on the merits of a claim or evidence that establishes sufficiently serious questions going to the merits of such a claim and a balance of hardships tipping decidedly toward the party seeking such relief. *See Covino v. Patrissi, 967 F.2d 73, 77 (2d Cir.1992)* (citation omitted).

In the present case, Plaintiff has submitted only his own affidavit containing his request for injunctive relief and outlining briefly the reasons why he believes the Court should grant his request. Based upon the Court's review of these materials, in conjunction with Plaintiff's complaint, it is evident that the record lacks any proof that Plaintiff is likely to succeed on the merits of his due process claim or any evidence that establishes sufficiently serious questions going to the merits of that claim and a balance of the hardships tipping distinctly toward Plaintiff.

Plaintiff's motion for injunctive relief is rooted in his claim that he was denied a constitutionally cognizable liberty interest without being afforded the procedural due process that the Fourteenth Amendment requires. To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he both possessed an actual liberty interest and that he was deprived of that interest without being afforded sufficient process. FN4 *See Tellier v. Fields, 280 F.3d 69, 79-80 (2d Cir.2000)* (quotation omitted); *Hynes v. Squillace, 143 F.3d 653, 658 (2d Cir.1998)* (citation omitted); *Bedoya v. Coughlin, 91 F.3d 349, 351-52 (2d*

Not Reported in F.Supp.2d, 2008 WL 191212 (N.D.N.Y.)
(Cite as: 2008 WL 191212 (N.D.N.Y.))

Cir.1996) (citation omitted)

> FN4. Although Plaintiff argues primarily that he possessed and was deprived of an actual liberty interest, he fails to disclose the nature of the insufficient process he received during the course of his disciplinary hearing, as the second prong of the relevant inquiry requires. The Supreme Court articulated the contours of the procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest in *Wolff v. McDonnell, 418 U.S. 539, 564-67 (1974),* that is, (1) written notice of the charges; (2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; (3) a written statement from the hearing officer explaining his decision and the reasons for the action being taken; and (4), in some circumstances, the right to assistance in preparing a defense. *See id.; see also Eng v. Coughlin, 858 F.2d 889, 897-98 (2d Cir.1988).* Given Plaintiff's lack of allegations regarding the nature of the process violated, the Court makes no finding as to whether the procedural requirements of the Fourteenth Amendment were met under *Wolff* during the course of Plaintiff's hearing.

**\*3** In *Sandin v. Conner,* 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest, a plaintiff must sufficiently demonstrate that the State actually created a protected liberty interest in being free from segregation and that the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484; *see also Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. Since the prevailing view is that by its regulatory scheme New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor, *see, e.g., LaBounty v. Coombe,* No. 95 CIV 2617, 2001 WL 1658245, \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, \*6 (N.D.N.Y. Feb. 6, 2001), the Court must determine whether the conditions of Plaintiff's SHU confinement as alleged rise to the level of an atypical and significant hardship under *Sandin.* If they do not, then Plaintiff is not likely to succeed on the merits

of his due process claim.

Atypicality in a *Sandin* inquiry is normally a question of law .[FN5] *See Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including an analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary. *See Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336.

> FN5. In cases in which there is a factual dispute concerning the conditions or duration of confinement, however, it may be appropriate to submit those disputes to a jury for resolution. *See Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999).

Although not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin. See Colon,* 215 F.3d at 231. Significantly, although under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin, see id.* at 232 n. 5, the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not.[FN6] *See id.* at 231-32 (305 days of SHU confinement constitutes an atypical and "sufficient departure from ordinary incidents of prison life").

> FN6. In fact, in *Colon,* a Second Circuit panel split markedly about whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See Colon,* 215 F.3d at 232-34 (Newman, J.), 235-37 (Walker & Sack, J.J., concurring in part).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 191212 (N.D.N.Y.)
(Cite as: 2008 WL 191212 (N.D.N.Y.))

It is likely that Plaintiff's due process claim is deficient because of his failure to establish that he possessed, but was deprived of, a cognizable liberty or property interest; courts have consistently held that disciplinary confinement for periods similar to those involved in this instance do not rise to a level sufficient to support a procedural due process claim. *See Smart v. Goord,* 441 F.Supp.2d 631, 640 (S.D.N.Y.2006) ("[T]he decisions in the Second Circuit are unanimous that keeplock ... of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin."* (internal quotation omitted)); *Zimmerman v. Seyfert,* No. 9:03-CV-1389, 2007 WL 2080517, *21 (N.D.N.Y. July 19, 2007)* (noting that the plaintiff's "thirty-day disciplinary sentence in SHU does not rise to the level of an atypical and significant deprivation sufficient to create a liberty interest"); *Fullwood v. Vosper,* No. 9:99CV1586, 2007 WL 119456, *5 (N.D.N.Y. Jan. 9, 2007)* (holding that "thirty-day keeplock confinement and loss of phone, package, and commissary privileges, where [the plaintiff] fails to delineate 'abnormal' conditions, is insufficient to qualify as an atypical and significant hardship"). Therefore, the Court finds that Plaintiff's thirty-day commitment in the SHU did not constitute a constitutionally cognizable liberty deprivation.

**4** It is possible that Plaintiff is contending that his removal from the ASAT program deprived him of a liberty interest. Likewise, the Court could construe Plaintiff's complaint to allege that the potential for the denial of parole due to his failure to complete the ASAT program amounts to a liberty interest deprivation. Inmates, however, do not have a constitutional right to be released on parole or to participate in prison programs. *See Boothe v. Hammock,* 605 F.2d 661, 664 (2d Cir.1979) (no constitutionally protectable expectation of parole entitling inmate to due process safeguards); *Gissendanner v. Menifee,* 975 F.Supp. 249, 251 (W.D.N.Y.1997) (holding that " 'a prisoner does not hold a protected interest in [prison] programs' " (quoting *Deutsch v. United States,* 943 F.Supp. 276 (W.D.N.Y.1996))). Since an essential element of a § 1983 claim is that "the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States," *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994) (citation omitted), any due process challenge grounded in either of these theories fails to state an actionable claim under 42 U.S.C. § 1983.

Based upon its review of Plaintiff's motion for injunctive relief, the Court finds that Plaintiff has failed to allege facts that demonstrate any likelihood of success on the merits of his Fourteenth Amendment claim or any serious questions related to the merits of that claim.

### III. CONCLUSION

Accordingly, after reviewing the entire file in this matter and the applicable law and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's *in forma pauperis* application is **GRANTED.**[FN7] The Clerk of the Court shall issue summonses and forward them, along with copies of the complaint, to the United States Marshal for service on Defendants. The Clerk of the Court shall forward a copy of the summons and complaint by mail to the Office of the Attorney General of the State of New York, together with a copy of this Order; and the Court further

> **FN7.** The Court notes that, although it has granted Plaintiff's application to proceed *in forma pauperis,* he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**ORDERS** that the Clerk of the Court shall provide the Superintendent of the facility that Plaintiff has designated as his current location with a copy of Plaintiff's authorization form and notify that official that Plaintiff has filed his action and is required to pay the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915; and the Court further

**ORDERS** that the Clerk of the Court shall provide a copy of Plaintiff's authorization form to the Financial Deputy of the Clerk's Office; and the Court further

**ORDERS** that Defendants or their counsel shall file a response to Plaintiff's complaint as provided for in the Federal Rules of Civil Procedure after service of process on Defendants; and the Court further

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 191212 (N.D.N.Y.)
(Cite as: 2008 WL 191212 (N.D.N.Y.))

END OF DOCUMENT

**ORDERS** that Plaintiff's motion for injunctive relief is **DENIED** without prejudice to renewal following service of the complaint and an appearance on behalf of Defendants; and the Court further

**\*5 ORDERS** that the parties shall file all pleadings, motions and other documents relating to this action with the Clerk of the United States District Court, Northern District of New York, 7th Floor, James Hanley Federal Building and Courthouse, 100 South Clinton Street, Syracuse, New York 13261-7367. **A party must accompany any paper that it files with the Clerk of the Court or the Court with a certificate showing that the party has mailed a true and correct copy of that paper to all opposing parties or their counsel. The Clerk of the Court will return, without processing, any document that it or the Court receives which does not include a certificate of service showing that the party served a copy of that document on all opposing parties or their attorneys.** Plaintiff must comply with any requests of the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions, which they must make returnable before the assigned Magistrate Judge with proper allowance for notice as the Rules require. **Plaintiff must also promptly notify the Clerk's Office and all parties or their counsel of any change in his address; his failure to do so will result in the dismissal of this action.** The Court will decide all motions based upon the submitted papers without oral argument unless the Court orders otherwise; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on Plaintiff in accordance with the Court's Local Rules.

**IT IS SO ORDERED.**

N.D.N.Y.,2008.
Thompson v. LaClair
Not Reported in F.Supp.2d, 2008 WL 191212 (N.D.N.Y.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Ronald DAVIDSON, Plaintiff,
v.
Clement B. CAPUANO, David R. Harris and Joseph P. Keenan, Defendants.
**No. 78 CIV. 5724 (RLC).**

June 16, 1988.

OPINION AND ORDER

NINA GERSHON, United States Magistrate:

**\*1** In this civil rights action brought pursuant to 42 U.S.C. § 1983, plaintiff Ronald Davidson (formerly Ronald Finkelstein) alleges that the defendants deprived him of his constitutional right to procedural due process of law in a prison disciplinary proceeding. Specifically, he claims that the hearing officer was not impartial, and that he was not permitted to call witnesses, make an oral statement, or present documentary evidence in his defense. In addition, the requisite written statement detailing the evidence relied on by the hearing officer in determining his guilt is alleged to be inadequate. Davidson seeks damages for the loss of package room and prison account privileges from October 1, 1978 to January 31, 1979 and for the loss of a prison job and of a kosher diet which resulted from his transfer to another institution.

Plaintiff filed his *pro se* complaint in this matter on November 30, 1978. In February of 1983, the case was referred to me for all proceedings and entry of judgment pursuant to 28 U.S.C. § 636(c) and in November of that year I granted plaintiff's request for appointment of counsel. Plaintiff's second amended complaint was filed on October 29, 1984 and he subsequently moved for partial summary judgment on the ground that a prior judgment in his favor in a New York State Article 78

proceeding precluded the defendants from relitigating certain issues of liability. The defendants also moved for summary judgment on numerous grounds, including res judicata on the basis that plaintiff failed to assert the Section 1983 damages claim in the prior state action. On January 31, 1985 I granted summary judgment for defendants, finding that, under New York law, res judicata principles precluded this federal action. The Court of Appeals for the Second Circuit reversed this ruling in Davidson v. Capuano, 792 F.2d 275 (2nd Cir.1986) and the case was remanded for further proceedings.

Now before me are the parties' motions for summary judgment on the grounds not previously addressed. The parties were given the opportunity to brief the remaining legal issues in supplemental papers. Both parties also have now submitted statements pursuant to Local Civil Rule 3(g). The plaintiff moves for partial summary judgment on certain liability issues under the principle of collateral estoppel. The defendants move for dismissal of the complaint on several grounds: res judicata arising from a second Section 1983 action previously adjudicated in this Court; absolute and qualified immunity; lack of personal involvement; and absence of merit to the procedural due process claims.

*FACTUAL BACKGROUND*

None of the material facts raised by the parties' motions are in dispute. The disciplinary proceeding at issue in this lawsuit began on September 8, 1978 when a "Misbehavior Report" charging Davidson with fraud in violation of prison regulations was filed by Institution Steward Sunny Schriver and Correctional Officer K. Keane. Briefly summarized, the report alleges that on or about May 18, 1978 plaintiff placed an order for merchandise with the J.C. Penny department store under the name Reverend Ronald Finkelstein and that in July he notified the store and the institution that he, in fact, did not order any merchandise and that someone else had placed the order and charged it to his account. The report discounted this denial by Davidson by stating that he had exhibited knowledge of the order that only the person who placed it could possess and that he had a prior history of improperly using the title "Reverend" in making purchases. The report

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

also noted that plaintiff had solicited and received a refund from the store which was credited to his inmate account on August 4, 1978. Davidson was accused of seeking additional refunds by submitting a claim to the prison and by writing a letter to the store on August 21, 1978 claiming that he had not received the reimbursement.

Davidson was served with a copy of the "Misbehavior Report" on September 8, 1978 and was brought, on September 11, 1978, before the prison Adjustment Committee. The Committee determined that the charges required a Superintendent's Proceeding. On September 13, 1978, defendant Harris, then the Superintendent of the Green Haven facility, appointed defendant Deputy Superintendent Capuano to conduct the hearing. Three days later, a "Formal Charge" was served on Davidson which reiterated the substance of the fraud accusations set out in the Misbehavior Report.

**\*2** Pursuant to New York State prison regulations governing prison disciplinary proceedings (See 7 N.Y.C.P.R. § 253, *et seq.*), plaintiff was permitted to select a member of the prison staff to assist him in preparing a defense to the charge. The regulations required the assistant to investigate any reasonable factual claim the inmate could make in his defense and to submit a written report to the hearing officer, including any documentary evidence and the statements of witnesses that the inmate requested be interviewed. Plaintiff selected Correctional Counselor Hutchinson to assist him. Hutchinson submitted a preliminary report to defendant Deputy Superintendent Keenan on September 21, 1978. The report noted requests by Davidson that certain witnesses be interviewed and that samples of his signature be compared with the merchandise order form at issue. Under the heading "Inmate's Explanation or Statement About Charges", Hutchinson referred Keenan to a two page document written by Davidson and entitled "Statement of Events Leading to Administrative Charges Against Me and the Superintendent's Proceeding".

The Superintendent's Proceeding was convened on September 24, 1978 before defendant Keenan. He read the charges to plaintiff and asked him, "What do you say?". Plaintiff responded, "Not guilty", and asked to make a statement. Keenan told him, "Not at this time", and adjourned the hearing. Keenan then instructed Hutchinson

to take the statements of the three witnesses that Davidson had designated. Hutchinson took statements from two of the witnesses, an inmate named Conroy and a guard named Boluanger who worked in the package room. The third witness, Officer Gilroy, who also worked in the package room, was not interviewed. Hutchinson stated in his September 28, 1978 report that Gilroy's statement was unnecessary because the only information Gilroy could provide, regarding packages received by Davidson, would come from the same records that Boluanger examined and reported on.

On September 29, 1978, Capuano assumed his role as hearing officer for the Superintendent's Proceeding. Prior to the actual hearing he interviewed Schriver and Keane, the authors of the initial Misbehavior Report. According to an affidavit submitted by Capuano on the motion for summary judgment, he also reviewed the hearing file, which included the misbehavior report, the statements of the witnesses that Davidson had designated and plaintiff's two page written statement concerning the charges. (Capuano Afft. ¶ 6(h)). The Superintendent's Proceeding was reopened on October 7, 1978.[FN1] When the hearing began, Capuano read the accusations from the Formal Charge and then stated, "On the first hearing you pleaded not guilty. I have since interviewed the individuals initiating the misbehavior report-I subsequently affirm the charge of fraud." Capuano then announced Davidson's punishment: two years loss of privileges in the use of his inmate account and the package room, along with restitution for the phone charges incurred by the prison in response to the claim for reimbursement.

Davidson responded by asking to make a statement. Capuano assented and Davidson began by protesting that he had not been given the "opportunity to present [his] case" or to explain "his side of the story". Capuano then made some reference to the written statement that plaintiff had given Hutchinson.[FN2] Davidson stated that he wanted to supplement the statement in order to "make it clear". He also asked to submit certain documents as evidence and to call witnesses to testify in his defense.

**\*3** In the ensuing discussion, Davidson offered to submit various pieces of correspondence and orders for merchandise that he authored under the title "Reverend", none of which were placed through the institution or out

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

of his inmate account. By these documents Davidson sought to prove that he had never used his clerical identity in the manner charged and to show that he had not placed the order in question. Plaintiff also denied that it was his signature on the order and argued that the circumstances pointed to a fraud committed by someone else to "harass" or to "spite" him. Regarding the accusation that he had sought multiple reimbursements, Davidson stated that, once he was informed that a refund was deposited in his account, he stopped all activity to collect the funds.

After Davidson's presentation Capuano stated that he still found plaintiff guilty. Davidson then argued that his prior disciplinary record did not warrant the penalty imposed. Capuano in response "held in abeyance" 18 months of the two year suspension of privileges. He did, however, state that he was now going to recommend to the "Program Committee" that plaintiff be transferred to another institution.

Following the hearing, Davidson wrote a letter to defendant Superintendent Harris protesting the outcome of the hearing and in particular claiming that Capuano had violated his due process rights. He stated that he had not been allowed to make a statement in his own defense and that Capuano had not permitted him to call witnesses or present documentary evidence.

On October 10, 1978, Capuano signed the "Superintendent's Proceeding Report." Under the heading "Evidence Relied Upon", he wrote: "Misbehavior Report submitted by S. Schriver, Steward". This form, along with the rest of the record of the proceeding was then submitted to Superintendent Harris for review.

By his affidavit submitted on this motion Harris explained the review process and its purpose (Harris Afft. ¶ 2):

[I]t was my practice as Superintendent of GHCF to review each of the proceedings to check for compliance with the procedural due process requirements set forth in Chapter V of 7 NYCRR ...

Such a review process would consist of my scanning the

entire Superintendent's Proceeding file ... to ascertain, among other things ... whether the facts of an incident had been adequately developed and the inmate given an opportunity to present a defense;

Harris did not, however, conduct the review of Davidson's hearing.[FN3] At that time, Harris was absent from the facility and Deputy Superintendent Keenan was appointed Acting Superintendent. In this role, Keenan handled routine matters, including the review of disciplinary matters. On October 10, 1978, Keenan reviewed Davidson's case and concluded that all applicable procedural due process requirements had been met.

Davidson wrote a second letter to Superintendent Harris on October 13, 1978. He referred to his initial correspondence and repeated his claim that he had been deprived of his due process rights. In particular, he quoted from provisions of the state regulations granting him the right to an impartial hearing officer and the opportunity to make an oral statement at the hearing. Defendant Keenan received both of plaintiff's letters in his capacity as Acting Superintendent. After speaking with Capuano about the complaints, Keenan rejected Davidson's arguments concerning the validity of the hearing and sent him a memorandum to that effect.

**\*4** In November of 1978, plaintiff filed two lawsuits, this Section 1983 action in federal court and an Article 78 proceeding in the New York Supreme Court, Dutchess County. In the latter case, brought against Superintendent Harris and Richard Hongisto, Commissioner of Correctional Services, plaintiff sought an order vacating the Superintendent's proceeding and restoring his lost privileges. As described more fully at p. 17, *infra,* the state court, by order dated January 31, 1979, granted the requested relief.

Plaintiff was transferred from Green Haven to another prison facility in January of 1979. The following March, he filed a second Section 1983 lawsuit in this court alleging that the transfer violated his First Amendment right to freely practice his religion. (79 Civ. 1523 (CES)). This case was tried before a jury which rendered a verdict in favor of the defendants.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

*DISCUSSION*

Rule 56 of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* --- U.S. ----, 107 S.Ct. 1570 (1987).

On a motion for summary judgment, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion ...; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 247-248 (1986) (emphasis in original). Material facts are determined by the substantive law underlying the action; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* The moving party bears the burden of demonstrating the absence of any material and genuine issue of fact in dispute. *Adickes v. Kress,* 398 U.S. 144, 157 (1970). Although this burden is a difficult one to meet, motions for summary judgment, when properly employed, permit a court to terminate frivolous claims and to concentrate its resources on meritorious litigation. *Knight v. United States Fire, supra,* 804 F.2d at 12. The Supreme Court has stated that a motion for summary judgment is properly regarded as:

an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action'.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact ..., but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*5 *Celotex v. Catrett,* 477 U.S. 317, 327 (1986).

*I. DEFENDANTS' MOTION: RES JUDICATA*

The defendants' first argument for dismissal of the complaint is that under the principle of res judicata, another Section 1983 lawsuit which was brought against the same three defendants, Harris, Keenan and Capuano, and decided against plaintiff bars him from pursuing this action. Res judicata provides that a valid judgment on the merits is a bar to a subsequent action between the same parties upon the same claim. "Such a judgment precludes subsequent litigation both of issues actually decided in determining the claim asserted in the first action and of issues that could have been raised in the adjudication of that claim." *N.L.R.B. v. United Technologies Corp.,* 706 F.2d 1254, 1259 (2d Cir.1983).

It is undisputed that in the previous lawsuit, there was a final judgment on the merits between the same parties. The sole issue remaining is whether the claim in the present case is the same as that raised in the previous litigation.

Although the instant case was filed first, plaintiff's other lawsuit, *Finkelstein v. Harris, Keenan, Butterfield, McDermott and Capuano,* 79 Civ. 1523 (CES), went to trial in August of 1983. In that action plaintiff sought to recover damages resulting from violation of his First Amendment rights by prison officials. He alleged that the defendants had transferred him to another maximum security facility with knowledge that he would be deprived of the kosher diet that he received at the Green Haven prison. A jury decided in favor of the defendants on this freedom of religion claim. In the pending suit, plaintiff is seeking damages for the violation of his due process rights in the prison disciplinary proceeding which eventually led to the transfer at issue in the other case. Plaintiff is alleging some of the same damages in both suits, that is the loss of prison employment and his kosher diet from the transfer.

The defendants argue that the overlap in the events underlying the two suits and the fact that the damages sought are partially the same is dispositive of the identity

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

of claims issue. These similarities, however, do not resolve the issue. "[T]he fact that several operative facts may be common to successive actions between the same parties does not mean that a judgment in the first will always preclude litigation in the second." *Tucker v. Arthur Anderson & Co.,* 646 F.2d 721, 727 (2d Cir.1981).

The test for determining if the claims asserted are the same for purposes of res judicata involves the application of several criteria: whether the same evidence is needed to maintain both causes of action; whether the essential facts and issues are similarly presented in both cases; and whether a different judgment in the second action would impair or destroy the rights or interests established by the first judgment. *See Hereneden v. Champion Intern. Corp.,* 525 F.2d 130, 133-134 (2d Cir.1975); *N.L.R.B. v. United Technologies, supra,* 706 F.2d at 1260.

First of all, the issues involved in the two suits are markedly different. In this case, the defendants' conduct with regard to Davidson's rights at the Superintendent's Proceeding is at the heart of the matter; in order to prevail, plaintiff must prove that the defendants violated his due process rights, and that these violations proximately caused his damages, including the transfer to another prison, and the subsequent loss of a job and a special diet. In the first case, by contrast, the primary issue was the defendants' knowledge of plaintiff's religious beliefs and their failure to accommodate his practices and diet in the transfer to another facility. Even though the transfer to another prison is an event which is involved in both actions, there is no question that the "wrongful acts" alleged against the defendants are different. *See Herenden, supra,* 525 F.2d at 134. It necessarily follows that no judgment obtained in the present case will impair or destroy any of the rights or interests established by the prior judgment. The finding that the defendants were not liable under allegations that they deprived plaintiff of his freedom to practice his religion will not be affected by any determination as to whether the disciplinary hearing was valid under due process standards. Accordingly, I find that the claims asserted by plaintiff in the two lawsuits are not the same and that res judicata does not bar plaintiff from pursuing this action. Defendants' motion for summary judgment on this basis is denied.

II. *DEFENDANT HARRIS'S MOTION: LACK OF*

*PERSONAL INVOLVEMENT*

**\*6** Defendant David Harris, formerly the Superintendent of the Green Haven facility, has moved for dismissal of the complaint against him on the ground that he was not actually involved in or responsible for the alleged due process violations.[FN4] 42 U.S.C. § 1983 imposes personal liability on the individual who "subjects or causes to be subjected" any person to the deprivation of a right guaranteed by the federal Constitution or statutes. Accordingly, liability cannot be imposed simply on the basis of respondeat superior, *Monell v. Dept. of Social Services,* 436 U.S. 658 (1978), and personal involvement of the defendant must be shown. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978). In the prison setting, a Section 1983 damage claim against a prison official "requires a showing of more than the linkage in the prison chain of command." *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

The requisite showing of personal involvement in a case such as this may be made in several ways. As stated in *Williams v. Smith,* 781 F.2d 319, 321 (2d Cir.1986) (citations omitted):

The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

Plaintiff argues that Harris may be found "personally responsible" for his participation in the disciplinary proceeding process. According to plaintiff, Harris's selection of Capuano as hearing officer and his delegation of the review process to Keenan evinces either a policy of allowing constitutional deprivations to occur or gross negligence in the managing of his subordinates. The single incident alleged in this lawsuit, however, is insufficient proof of such claims. "[A]bsent more evidence of supervisory indifference, such as acquiescence in a prior

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

pattern of conduct, a policy [may] not ordinarily be inferred from a single incident of illegality." *Sarus v. Rotundo,* 831 F.2d 397, 402 (2d Cir.1987) (quoting *Turpin v. Mailet,* 619 F.2d 196, 202 (2d Cir.), *cert. denied,* 449 U.S. 1016 (1980)). *Cf. McCann v. Coughlin,* 698 F.2d 112 (2d Cir.1984), where the court held prison officials liable for their gross negligence and deliberate indifference upon a showing that that no prisoner had ever been allowed to call witnesses at a certain type of disciplinary proceeding, in clear violation of the Constitution.

**\*7** On the undisputed facts relating to Harris's role in the alleged due process violations, plaintiff, has, however, shown personal involvement in one area. Plaintiff is claiming that Capuano, by virtue of his supervisory relationship to the personnel who brought the charges, was biased and therefore Harris's appointment of Capuano as hearing officer deprived him of a fair hearing. If this claim against Capuano were meritorious, Harris's act of appointing Capuano would constitute direct participation by Harris in the deprivation of Davidson's due process rights.

I have determined, however, that no constitutional violation occurred when Capuano served as hearing officer (see pp. 19-20, *infra* ). Harris was not personally involved, therefore, in the claims alleged by plaintiff and he is entitled to summary judgment and dismissal of the complaint against him.

### III. *DEFENDANTS KEENAN AND CAPUANO'S MOTION: ABSOLUTE IMMUNITY*

Defendants Keenan and Capuano move for summary judgment on the ground that they are entitled to the common law defense of absolute immunity from liability in this civil rights action. They argue that in their capacity as hearing officers they serve a "quasi-judicial" function and therefore cannot be held liable for any errors committed in the course of disciplinary proceedings. This argument is without merit. The Supreme Court has expressly held that prison officials who preside over disciplinary proceedings are not entitled to claim absolute immunity. *Cleavinger v. Saxner,* 474 U.S. 193 (1986).

### IV. *PLAINTIFF'S MOTION: COLLATERAL ESTOPPEL*

Turning to the merits, plaintiff moves for partial summary judgment on the ground that the defendants are collaterally estopped from relitigating some of the liability issues that were determined against them in prior litigation. The prior litigation which plaintiff invokes is the Article 78 proceeding which he commenced in November, 1978 in the Supreme Court, Dutchess County. In that suit, Davidson alleged that he had been deprived of his due process rights under the federal Constitution and state law in the October 7, 1978 disciplinary hearing which is at issue in this lawsuit. The defendants in the proceeding were Superintendent Harris and Richard Hongisto, the Commissioner of the New York state prison system, and plaintiff sought only equitable relief: an order vacating the decision rendered at the disciplinary hearing and the restoration of his prison privileges.

Plaintiff seeks to preclude the defendants from relitigating the specific findings made by the Supreme Court on January 31, 1979, following an evidentiary hearing, namely, that plaintiff's constitutional due process rights were violated at the disciplinary hearing by Capuano's failure to consider documentary evidence and to allow Davidson to make a statement.

**\*8** The Second Circuit Court of Appeals has recently held, under very similar factual circumstances, that the plaintiff in a federal Section 1983 action is not entitled to use an Article 78 state court judgment for purposes of collateral estoppel. *Gutierrez v. Coughlin,* 841 F.2d 484 (2d Cir.1988). The Court cited its decision in the instant case, *Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986), for the proposition that damages for civil rights violations may not be recovered in an Article 78 proceeding. Because of this, the Court found, the individuals named as defendants in the state action could not be held personally liable and therefore "they did not have the same incentive to litigate that state court action as they did the federal § 1983 action." *Id.* at 486 (citing to *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 330-31 (1979)). The Court of Appeals also noted that, in the Article 78 proceeding, the defenses of absolute or qualified immunity, or lack of personal involvement, had not been available to the defendants. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

Plaintiff's motion for partial summary judgment on the basis of the doctrine of collateral estoppel is therefore denied.

V. *DEFENDANTS' MOTION: NO DUE PROCESS VIOLATIONS OCCURRED*

The defendants have moved for summary judgment on the ground that plaintiff's allegations of due process violations are meritless. A discussion of a prisoner's right to procedural due process must begin with the case of *Wolff v. McDonnell,* 418 U.S. 539, 563-572 (1974). In *Wolff,* the Supreme Court held that in disciplinary proceedings inmates are entitled to minimal due process rights. Under the Fourteenth Amendment, the inmate must receive advance written notice of the charges and be allowed to make a statement, call witnesses and present documentary evidence in his defense when doing so will not be unduly hazardous to institutional safety or correctional goals. 418 U.S. at 566. In addition, after the hearing is completed, the inmate must be given a written statement by the factfinder as to the evidence relied upon and the reasons for the disciplinary action taken. Under the guidance of *Wolff,* the lower federal courts have further delineated a prisoner's procedural entitlements, such as the right to a fair and impartial factfinder. *See McCann v. Coughlin,* 698 F.2d 112, 122 (2d Cir.1983). [FN5]

A. *Appointment of Capuano as Hearing Officer*

Plaintiff claims that it was improper for Capuano to serve as hearing officer because of his supervisory relationship to the officers who originally filed the charges. It has been established in this Circuit that, in order to ensure a fair hearing, an administrator who was a witness to an act charged against an inmate, or who has investigated the underlying charges, may not serve as hearing officer. *McCann v. Coughlin, supra,* 698 F.2d at 122 n. 10. It is also true that "in some circumstances the nature of one's position or the relationship between that position and the outcome of the adjudication disqualifies that person from serving with the impartiality mandated by the Due Process Clause...." *Powell v. Ward,* 542 F.2d 101, 103 (2d Cir.1979).

When plaintiff was brought up on charges, Capuano served as the Deputy Superintendent for Administration and he was responsible for many areas of prison business, including Inmate Accounts and Inmate Claims. Acting in this role, Capuano served as the direct supervisor to Schriver and Keane, the personnel who authored the Misconduct Report filed against plaintiff. However, it is undisputed that Capuano was not personally involved in the investigation leading to the filing of formal charges and that he was not knowledgeable of the details or the outcome of the investigation prior to being appointed to hear the matter.

**\*9** Under these facts, it was proper for Capuano to serve as the hearing officer. The mere fact that Capuano heard a case which arose out of his area of administrative supervision does not offend due process. In *Powell v. Ward, supra,* the Court of Appeals modified a District Court injunction to remove a restriction against prison administrators responsible for institutional security from presiding over Superintendent's Proceedings at which an inmate was charged with acts threatening prison security. The rationale behind plaintiff's claim that Capuano could not conduct a hearing to determine the veracity of charges brought by subordinate employees within his sphere of responsibility was specifically rejected in the *Powell* case. The defendants are entitled to summary judgment on this claim.

B. *The Naming of Witnesses Who Capuano Interviewed*

Davidson's second alleged due process deprivation is that Capuano failed at the October 7, 1978 hearing to identify the persons who initiated the Misbehavior Report; while Capuano stated at the hearing that he had interviewed the authors of the report he did not tell plaintiff their names. It is unnecessary to determine if this error, in and of itself, would constitute a due process violation. Despite Capuano's omission, the names of the persons who filed the Report, Schriver and Keane, were plainly known to plaintiff at the time of the hearing. It is undisputed that Davidson was served with a copy of the report on September 8, 1978 and that the names of the authors are clearly noted on the report. Moreover, prior to the Superintendent's hearing, plaintiff had mailed a *pro se* complaint to this court (to begin this litigation) which named Schriver and Keane as defendants for their role in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

instigating charges against him.

C. *Davidson's Presentation of a Defense*

Plaintiff next charges that he was not permitted to present a defense to the charges at the hearing. First, Davidson alleges that Capuano did not allow him to submit documentary evidence in his favor. From the transcript of the hearing, it appears that plaintiff possessed certain documents that he wanted Capuano to consider. These documents were offered to prove that, although Davidson had used the name Reverend Ron Finkelstein to make purchases from retailers, he never utilized the title "Reverend" when placing orders through his prison account:

*Finkelstein:* I have not been given the opportunity to present my case. Now I have evidence here which I wish to present....

**\*10***Finkelstein:* Now the only time that I have used the name Rev. Finkelstein is when I had orders sent in as paid and you can examine them if you wish. It says here that they have been paid.

*Capuano:* Do you wish to submit them for the record?

*Finkelstein:* If you wish to examine them. I'd like to have them back since I don't have a photostatic of them, but if you'd like to look at them right here you can see they've all been paid for, and not one of them sir would be listed on the inmate account ledger because I've never sent them out through the institution....

*Capuanao:* How did you send these out?

*Finkelstein:* I had my folks ... send them out and pay for them and here's a receipt.... I have never made any orders ... for a substantial amount of money through the institution ..., never $34 or $35 and I've never used the title Rev. Finkelstein.

From this portion of the transcript I conclude that plaintiff was given an opportunity to present his documentary evidence at the hearing. Although the transcript does not indicate what weight Capuano gave the documents, the evidence was non-probative as to the particular incident of which plaintiff was charged and Capuano clearly had the right to disregard or exclude such evidence without offending due process of law. As the Supreme Court in *Wolff v. McDonnell, supra,* 418 U.S. at 566-67, noted:

[T]he inmate ... should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals.... It may be that an individual threatened with serious sanctions would be normally entitled to present witnesses and *relevant documentary evidence,* but here we must balance the inmate's interest ... against the needs of the prison,.... prison officials must have the necessary discretion to keep the hearing within reasonable limits.... Although we do not prescribe it, it would be useful for the Committee to state its reasons for refusing to call a witness, whether it be for *irrelevance, lack of necessity*.... There is much play in the joints of the Due Process Clause, and we stop short of imposing a more demanding rule with respect to witnesses and documents. (emphasis added)

From the portion of the transcript quoted above, the documents plaintiff offered tended to prove only that plaintiff had in the past used the title "Reverend" to place orders, through his family, for outside merchandise. They did not prove or disprove whether the particular order to J.C. Penny at issue at the hearing was placed by him, or whether he had attempted to obtain duplicate refunds from the retailer and the institution. Capuano's conduct at the hearing with regard to plaintiff's documentary evidence did not violate plaintiff's due process rights and the defendants are entitled to summary judgment on this claim.

Plaintiff also argues that Capuano improperly refused his request to call witnesses to testify at the hearing. It is undisputed that Davidson asked Capuano to call inmate Conroy and Officer Gilroy, from the package room, to testify and that Capuano did not act on the request. Conroy and Gilroy were originally listed by plaintiff as witnesses when he solicited the assistance of Counselor Hutchinson

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

under 7 N.Y.C.R.R. § 253.3(1), prior to the hearing.

**\*11** Hutchinson took the statement of Conroy on September 28, 1978. The statement, which was made part of the hearing record, shows that Conroy's knowledge of the events leading up to the charges was limited to statements that plaintiff made to him. Conroy stated that prior to the filing of the Misconduct Report, Davidson had sought his advice on how to recover money improperly disbursed from an inmate account. At that time, plaintiff told Conroy that the order was not his and that someone had forged his name.

Plaintiff's express purpose is seeking the testimony of Gilroy was to verify that he had not received any package which corresponded to the order at issue. Although Officer Gilroy's statement was never taken, the desired information that no such package had been received was supplied by Officer Boluanger in a statement which was made part of the hearing record. Gilroy's statement would have been cumulative.

Under these undisputed facts,[FN6] the absence of these witness at the hearing did not breach the due process clause. Procedural due process only requires that relevant, probative testimony be received at a disciplinary hearing. "While there can be no doubt that a prisoner should ordinarily be permitted to call witnesses in his defense, the prisoner's right is obviously not unbridled and must at a minimum be subject to a preliminary showing that the proposed witnesses may have probative testimony to offer." _Pino v. Dalsheim,_ 605 F.Supp. 1305, 1315 (S.D.N.Y.1984).

The third aspect of his defense that Davidson claims Capuano denied him at the hearing was an opportunity to make an oral statement. It is undisputed that Capuano began the proceeding by reading the charges and then pronouncing his determination that plaintiff was guilty. When Davidson protested that he be allowed to give his side of the story, however, Capuano allowed him to speak.

A lengthy dialogue then ensued between Davidson and Capuano during which plaintiff denied that it was his signature on the order form in question and offered the

documents (discussed above) to show that he only used the name "Reverend" to place orders through family intermediaries. In addition, plaintiff argued that the package may have been directed to another part of the institution because, as evidenced by the statement of officer Boluanger, the package never arrived. As to the accusation that he sought duplicate refunds, plaintiff stated that he received the "pink slip" informing him that the refund check had been deposited in his account a month late and that, once he did learn that the refund came in, he stopped all action to collect from the department store. Plaintiff also stated that, although he did not know who placed the order, it could be someone with a personal grudge against him, who placed the order out of spite or in order to harass him. In support of this argument, plaintiff noted that the shoes were ordered in sizes 8 and 9, neither of which would fit him. Finally, he related that Hutchinson, the prison employee he chose to help him assemble a defense, told him that a similar fraud had occurred several months before in the institution.

Minimum due process, as set forth by _Wolff v. McDonnell, supra,_ requires only that the inmate facing disciplinary charges be given an opportunity to confront the accusations by making a statement in his defense which will be weighed by the factfinder against the evidence presented against him. The transcript reveals that plaintiff was given ample opportunity to present his side of the story and argue against the accusations made against him. Although Capuano erred in assuming that Davidson had presented his defense in a prior written statement and in pronouncing the finding of guilt at the outset of the hearing, the error, which was promptly corrected, does not rise to the level of a due process violation.[FN7]

D. _The Statement of Evidence Relied Upon_

**\*12** The last due process violation alleged by plaintiff is that Capuano's written statement of the evidence he relied upon in determining Davidson's guilt was inadequate. The Supreme Court held in _Wolff v. McDonnell, supra,_ 418 U.S. at 564, that "there must be a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." (citation omitted). Such statements are necessary because (_Id._ at 565):

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

[T]he actions taken at such proceedings may involve review by other bodies. They might furnish the basis of a decision ... to transfer an inmate to another institution ..., and are certainly likely to be considered by state parole authorities.... Written records of proceedings will thus protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding. Further, as to the disciplinary proceeding itself, the provision for a written record helps to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly. Without written records, the inmate will be at a severe disadvantage in propounding his own cause to or defending himself from others.

In this instance, Capuano, following the hearing, filled out a form entitled "Superintendent's Proceeding Report". Under the heading of "Evidence Relied Upon," he wrote: "Misbehavior Report submitted by S. Schriver, Steward". In light of the nature of the charges and the quantity and quality of the evidence presented to Capuano before and during the hearing, this statement does not fulfill the requirements of *Wolff, supra,* and plaintiff's right to due process was violated in this regard.

As previously described, Capuano was presented with many sources of information concerning the charges brought against Davidson. The Misbehavior Report was only the first document to set forth the accusations and to initiate the disciplinary proceedings. After Capuano was appointed hearing officer he was provided with additional documents, including two reports by Counselor Hutchinson, and the written statements of plaintiff, inmate Conroy and Officer Boluanger.[FN8] In addition, Capuano personally conducted interviews with Schriver and Keane, the authors of the Misbehavior Report, during which he solicited inculpatory information concerning the charges which went outside the scope of the original report.

Similar, limited statements listing only a source or sources of information relating to charges have been found to be inadequate. As stated by the Court in *Powell v. Ward,* 487 F.Supp. 917, 930 (S.D.N.Y.1980), *modified on other grounds,* 643 F.2d 924 (2d Cir.), *cert. denied,* 454 U.S. 832 (1981):

*13 ... the forms themselves are inadequately completed ... [T]he statement of evidence relied upon most often consists of a list of the source of information presented to the hearing board. For example, one statement lists as evidence relied upon 'misbehavior reports, discussion at Superintendent's Proceeding. Interview with Sgt. Pompellone re: charges ...' Another statement merely says 'reports from C.O. Stephen and C.O. Young.' This information does not 'protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding.' "

Here too, the "statement" by Capuano consists merely of a reference to a source of information presented to him; even though Capuano was not required to raise and analyze every argument presented by Davidson (*see, Pino v. Dalsheim,* 605 F.Supp. 1305, 1316 (S.D.N.Y.1984)) the Constitution mandates that an explanation of the evidence relied on consist of more than the incorporation of a single report when the charge is refuted and complex or lengthy evidence bearing on the charges is presented to the factfinder.

The case law from other Circuits supports this conclusion. In *Hayes v. Thompson,* 555 F.2d 625, 632-33 (7th Cir.), *cert. denied* 434 U.S. 959 (1977), the Court held that a statement of the evidence relied on, which simply stated that the decision was based upon two reports filed by correctional personnel, did not meet minimum due process requirements:

Rather than pointing out the essential facts upon which the inferences were based, the Committee merely incorporated the violation report and the special investigator's report. This general finding does not ensure that the prison officials will act fairly. Nor will this finding protect against subsequent collateral effects based on a misunderstanding of the initial decision.

*See also, King v. Wells,* 760 F.2d 89, 93-94 (6th Cir.1985).

In cases where statements referring only to whole reports submitted to the factfinder have been found to be adequate, it was evident what evidence the factfinder

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

relied on and how the finding of guilt was reached. *See e.g. Brown v. Frey,* 807 F.2d 1407, 1412-14 (8th Cir.1986); *Saenz v. Young,* 811 F.2d 1172, 1174 (7th Cir.1987). In *Brown,* the Court declined to follow the requirement in the Sixth and Seventh Circuits of what it termed a 'technical and detailed' reconstruction of the incident. 807 F.2d at 1413. It upheld a statement which incorporated a "violation conduct report" and a joint memorandum by three correctional officers involved in the incident because an examination of the documents made it "immediately apparent what statements in them were relied upon by the board in reaching its decision." Furthermore, the statements implicating the prisoner were unambiguous and nothing remaining in the documents was contradictory to the decision of guilt in the matter. The Court warned, however, that in certain situations due process would require a disciplinary board to refer to specific statements within the submitted reports, rather than just incorporating the report by reference. "For example, a certain report may be so lengthy ..., or the report may contain contradictory or ambiguous statements, making it difficult to ascertain with certainty what statements in the report the board relied on in reaching its decision." *Id.*

Similarly, the Court in *Saenz, supra,* upheld an evidentiary statement which referred only to a guard's written statement. The guard had witnessed an attempted battery by one inmate on another and had recorded his observations. At the hearing, the report was submitted and the board also considered the inmate's testimony denying involvement in the incident. Under these circumstances, the Court found it "plain the committee relied on the reporting officer's eyewitness account.... Obviously, the committee believed the conduct report and disbelieved the plaintiff. As there is no mystery about its reasoning process, despite the extreme brevity ... that statement is not so deficient as to create error of constitutional magnitude." *Id.* at 1174. The Court distinguished previous holdings in the Circuit which rejected similar statements of reasons, because in those previous cases either the charge, or the evidence before the disciplinary body, was complicated. In those instances, when "the committee fails to explain its findings, the reviewing court will find it difficult and maybe impossible to determine whether the committee on one hand found facts showing that the prisoner really was guilty of the charges, or on the other hand based the finding of guilt on erroneous legal premises." *Id.*

*14 In the instant case, neither the charge nor the evidence presented to Capuano for a decision was so simple that the mere incorporation of the misconduct report satisfied due process. Moreover, in contrast to the circumstances in *Brown, supra,* it is not readily apparent which part or parts of the misconduct report Capuano relied on in determining that Davidson was guilty of the charges.

Plaintiff is entitled to summary judgment on this issue of liability. Although plaintiff's motion does not seek summary judgment on the merits of his due process claims, this Court is empowered to award summary judgment to the non-moving party when there are no disputed issues of material fact and judgment is appropriate as a matter of law. *See Lowenschuss v. Kane,* 520 F.2d 255, 261 (2d Cir.1975); *Brandon v. Board of Ed. of Guilderland,* 487 F.Supp. 1219, 1233 (S.D.N.Y.1980); *aff'd,* 635 F.2d 971 (2d Cir.1980); *cert. denied,* 454 U.S. 1123 (1981).

## VI. *DEFENDANTS' MOTION: QUALIFIED IMMUNITY FROM LIABILITY*

The defendants argue that, even if any of plaintiff's procedural due process rights were violated, they acted in good faith and are thus immune from personal liability for damages.

The affirmative defense of qualified or "good faith" immunity will generally shield administrative officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). As explained in the recent Supreme Court decision in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039 (1987), (citations omitted): "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action has previously been held unlawful, but it is to say that in light of preexisting law the unlawfulness must be apparent."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

The use of this objective standard, measuring the reasonableness of a person's conduct by reference to clearly established law, permits the resolution of insubstantial claims on summary judgment. As stated in *Harlow,* at pp. 818-19 (footnote omitted):

**\*15** [T]he judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at the time was not clearly established, an official could not ..., fairly be said to 'know' that the law forbade conduct not previously identified as unlawful.... If the law was clearly established, the immunity defense should ordinarily fail, since a reasonably competent official should know the law governing his conduct.

*See also, McCann v. Coughlin,* 698 F.2d 112, 124 (2d Cir.1983), where the Court stated: "[Prison] officials can be held liable only for actions which were unlawful at the time in issue.... [They], however, may be charged with constructive knowledge of the established law at the time." (citations omitted).

At the time of plaintiff's 1978 disciplinary hearing, it was clearly established under *Wolff v. McDonnell, supra,* that a prisoner had the right to receive a statement of the evidence relied upon to protect him from collateral consequences and to provide a sufficient basis for review of the proceedings. *See McCann v. Coughlin, supra,* 698 F.2d at 124-25. Under *Anderson v. Creighton, supra,* 107 S.Ct. at 3039, it must also be determined whether a reasonable official would understand that the statement of evidence relied on in this case violated that right, that is to say, whether in light of preexisting law, the unlawfulness of the statement was apparent.

I conclude that Capuano and Keenan are not entitled to immunity under this standard. This conclusion follows from the decision in *Powell v. Ward, supra,* 487 F.Supp. at 936, where the Court found the superintendent of a New York State prison facility in contempt and ordered damages and injunctive relief for her failure to comply with the procedural requirements established in *Wolff v. McDonnell,* and set forth in a 1975 Order by the district

court in response to earlier litigation. (See *Powell v. Ward,* 392 F.Supp. 628 (S.D.N.Y.1975), *modified on appeal,* 542 F.2d 101 (2d Cir.1976)). Specifically, the Court found (among other violations) that, during the time between the issuance of the Order in 1975 and the contempt motion filed in early 1979, the prison administrators had failed to provide adequate statements of the evidence they relied on in ruling on disciplinary matters. As noted earlier (see p. 28, *infra* ) the Court found that statements akin to the one at issue here were constitutionally inadequate: "The statement of evidence relied upon most often consists of a list of the source of information presented to the hearing board. For example, ... 'misbehavior reports, discussion at Superintendent's Proceeding. Interview with Sgt. Pompellone re: charges and information ...' Another statement merely says 'reports from C.O. Stephen and C.O. Young." '

The plaintiffs in *Powell* requested damages resulting from the due process violations and the defendant raised the defense of qualified immunity. In response, the Court held (487 F.Supp. at 936): "The immunity defense is unavailing here, where 'the constitutional right allegedly infringed was clearly established at the time of her challenged conduct', 'she knew or should have known of that right, and [she] knew or should have known that [her] conduct violated the constitutional norm' " (quoting *Procunier v. Navarette,* 434 U.S. 555, 562 (1978)). *See also Chavis v. Rowe,* 643 F.2d 1281, 1288-89 (7th Cir.), *cert. denied,* 454 U.S. 907 (1981)

**\*16** The plaintiff is entitled to summary judgment on this issue. Defendants Capuano and Keenan are not immune from personal liability and damages may be assessed against them.

VII. *DEFENDANTS' MOTION: PLAINTIFF IS LIMITED TO NOMINAL DAMAGES*

The defendants' final argument on their motion for summary judgment is that plaintiff is limited to nominal damages for any due process violations that may have occurred. In order to collect damages in a Section 1983 action for the violation of due process, the plaintiff must demonstrate that the constitutional violation caused him some actual injury, for damages are not "presumed to flow

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

from every deprivation of procedural due process". *Carey v. Piphus,* 435 U.S. 247, 263 (1978). If the plaintiff cannot show causation, only nominal damages may be awarded. *Id.; McCann v. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983).

In his complaint, plaintiff has alleged that he was injured in several ways and that the constitutional violations caused his injuries. Specifically, he claims that he was deprived of the privileges of using the package room and his inmate account for approximately a one year period and that he was wrongfully transferred to another institution where he lost the benefit of a prison job and a kosher diet.

The failure of Capuano to provide an adequate written statement of the evidence relied on did not "directly bear on the integrity of [the] decision making process" or the outcome of the hearing. *McMann v. Coughlin, supra,* 698 F.2d at 126. Here, as in *McCann,* plaintiff's inability to show a link between the inadequate statement of evidence and the outcome of the hearing precludes him from demonstrating that the punishment he received was an injury caused by this particular due process violation.

Similarly, in responding to defendant's motion, plaintiff has not shown that the transfer to another prison (and thus the loss of the job and the diet), as recommended by Capuano at the close of the disciplinary hearing, is in any way attributable to the inadequate statement of evidence relied on. There is simply no basis within the record upon which a factfinder could find that the inadequacy of the statement played any role in the decision to transfer him to another institution. As plaintiff has failed to demonstrate this causal connection, an award of damages "would constitute a windfall, rather than compensation." *Carey v. Piphus, supra,* 435 U.S. at 260.

Plaintiff is entitled, however, to recover nominal damages, for "the denial of procedural due process should be actionable for nominal damages without proof of actual injury." *Id.* at 266-67. The amount due plaintiff is one dollar. *See, e.g. Auwood v. Harry Brandt Booking Office, Inc.,* 647 F.Supp. 1551, 1555-56 (D.Conn.1986).

**\*17** Plaintiff's Second Amended Complaint also includes a prayer for punitive damages. Punitive damages may be awarded in a Section 1983 action (*see Carlson v. Green,* 446 U.S. 14, 22 (1980)), when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56 (1983).

I find that summary judgment is properly entered for the defendants on this issue, for, as stated in *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (quoting *Anderson v. Liberty Lobby, supra* ):

the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... "[T]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict...."

"In essence, ... the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

In this instance, plaintiff, in opposing defendants' motion for summary judgment on the issue of punitive damages must offer concrete evidence from which a reasonable juror could return a verdict in his favor as to defendant's state of mind (that is evil motive or intent, or reckless or callous indifference to plaintiff's rights) in order to recover punitive damages. *See Anderson v. Liberty Lobby, supra,* 477 U.S. at 256;*Contemporary Mission Inc. v. New York Times Co.,* 842 F.2d 612, 621-22 (2d Cir.1988).

Capuano and Keenan have submitted affidavits on the motion for summary judgment in which they explain their conduct with regard to plaintiff's disciplinary proceeding. Their statements concerning the statement of evidence relied on by Capuano does not reflect the type of conduct or state of mind which is susceptible to an award of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

punitive damages. In response, plaintiff has not presented any evidence to this Court to support his wholly conclusory claim that the defendants' conduct in this matter was such that punitive damages may be awarded.

Rule 56(e) provides that a party opposing a properly supported motion for summary judgment may not rest upon "mere allegation ..., but must set forth specific facts showing that there is a genuine issue for trial.... This is true even where the evidence is likely to be within the possession of the defendant [e.g. the defendant's state of mind], as long as the plaintiff has had a full opportunity to conduct discovery". _Anderson, supra,_ 477 U.S. at 256-257. The defendants are therefore granted summary judgment on the issue of punitive damages.

## CONCLUSION

Defendant Harris' motion for summary judgment is granted. Defendants Capuano and Keenan are granted summary judgment as to all of plaintiff's due process claims except that pertaining to the adequacy of the post-hearing statement of evidence relied on. As to that particular claim and the defendants' defense of qualified immunity, the plaintiff is granted summary judgment. The defendants' motion on the issues of nominal and punitive damages is granted. The parties are directed to submit a proposed judgment pursuant to this order on five days' notice.

**\*18** SO ORDERED.

> FN1. The hearing was tape recorded and a transcript of the hearing has been submitted by the defendants as an exhibit to their motion. Plaintiff does not dispute the accuracy of the transcript of the tape recording.

> FN2. The exact reference is not clear from the transcript. It is undisputed that certain portions of the tape are inaudible, and there is no material dispute as to what occurred during the moments of inaudibility.

> FN3. The identity of the person who conducted the review in this case was the source of some confusion. The review form was originally thought by all parties to have been signed by Harris, but it is now undisputed that defendant Keenan conducted the review and signed the review form in his own name, but over the signature line of "David H. Harris."

> FN4. Harris is the only defendant to move for dismissal on this basis.

> FN5. Plaintiff argues that the defendants violated not only his rights under the Constitution, but also specific state regulations governing disciplinary proceedings. (See, 7 N.Y.C.R.R., part 253, chapter V.). He has not set forth a pendent state claim, but is contending that the violation of state regulations is actionable under Section 1983. This contention is meritless. "[I]t is unnecessary for us to determine if [the defendants] have violated any applicable state law. Clearly, [such] a violation is not cognizable under § 1983." _Pollnow v. Glennon,_ 757 F.2d 496, 501 (2d Cir.1985). "State procedural requirements do not establish federal constitutional rights." _Bolden v. Alston,_ 810 F.2d 353, 358 (2d Cir.), cert. denied,--- U.S. ----, 108 S.Ct. 229 (1987).

> FN6. Plaintiff has never suggested that these witnesses could have offered any other information or that they would have testified any differently at the hearing if they were called.

> FN7. Capuano has submitted an affidavit in support of his motion for summary judgment, in which he states that he did not take plaintiff's oral statement prior to finding him guilty because he believed that plaintiff's defense was contained in the 2 page written statement submitted to Counselor Hutchinson. Although Capuano admits that prior to the hearing he had determined that Davidson was guilty of the charges, he states that, once he realized his error regarding the written statement, he considered

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

what Davidson said at the hearing and then confirmed his earlier findings after no new evidence came to light.

My conclusion that no due process violation took place does not rest upon Capuano's explanation. The critical factor is that, on the undisputed record of the proceedings, Davidson was allowed to speak at length in his defense.

FN8. It is unclear what other sources of evidence were reviewed by Capuano prior to the hearing. The defendants, in support of their motion for summary judgment have provided copies of all the forms, correspondence, memoranda and records (authored by the plaintiff, the department store personnel and the prison staff) having to do with the order for merchandise, the investigation following plaintiff's denial of the order and the efforts made to secure a reimbursement of funds. Although Capuano, in his affidavit in support of the motion, does not discuss these documents, both Hutchinson, in his preliminary report, and Schriver, in her interview, referred Capuano to some additional documentation which they believed supported the accusations against plaintiff.

S.D.N.Y.,1988.
Davidson v. Capuano
Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Samuel CABASSA, Plaintiff,
v.
Craig GUMMERSON, Corrections Captain, Auburn
Correctional Facility; Donald Selsky, Assistant Deputy
Commissioner, Director of Special
Housing/Disciplinary Program; Anthony Graceffo,
Chief Medical Officer, Auburn Correctional Facility;
Glenn S. Goord; Hans Walker; Gary Hodges; D.W.
Seitz; Terry Halcott; Christine Coyne Nancy O'Connor;
Ann Driscoll; John McClellen; John Rourke, Captain,
Security Services at Auburn Correctional Facility;
Koors, Head Pharmacist at Auburn Correctional
Facility; Robrt Mitchell, Correctional Counselor at
Auburn Correctional Facility; and Androsko, Registered
Nurse, Auburn Correctional Facility, Defendants.
**No. 9:01-CV-1039.**

Sept. 24, 2008.

Samuel Cabassa, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, David L. Fruchter, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

***ORDER***

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Samuel Cabassa, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a Report
Recommendation dated June 30, 2008, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' second motion for summary
judgment (Docket No. 81) be granted in part and denied

in part. Objections to the Report Recommendation have
been filed by the parties.

Based upon a de novo review of the portions of the
Report-Recommendation to which the parties have
objected, the Report-Recommendation is accepted and
adopted. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED in part and
DENIED in part as follows:

A. Plaintiffs Fourth Cause of Action is DISMISSED in its
entirety;

B. Plaintiffs Fifth Cause of Action is DISMISSED to the
extent that it asserts:

(a) Any Fourteenth Amendment procedural due process
claim whatsoever;

(b) A First Amendment access to courts claim against
defendant Hans Walker;

(c) A First Amendment retaliation claim against defendant
Hans Walker;

2. Defendants' second motion for summary judgment is
otherwise DENIED, so that, surviving that motion is:

(a) Plaintiffs First Amendment access-to-courts claim
against defendants D.W. Seitz and Craig Gummerson
asserted in the Fourth Amended Complaint's Fifth Cause
of Action; and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

(b) Plaintiffs First Amendment retaliation claim against defendants D.W. Seitz and Craig Gummerson also asserted in the Fifth Cause of Action.

IT IS SO ORDERED.

SAMUEL CABASSA,

Plaintiff,

v.

HANS WALKER, Superintendent, Auburn C.F.; D.W. SEITZ, Correctional Officer, Auburn C.F.; CRAIG GUMMERSON, Captain, Auburn C.F.,

Defendants.

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, in his Fourth Amended Complaint, Samuel Cabassa ("Plaintiff") alleges that fifteen employees of the New York State Department of Correctional Services ("DOCS") violated his rights under the First, Eighth and Fourteenth Amendments between January of 1998 and August of 1998 by confining him to the Auburn Correctional Facility ("Auburn C.F.") Special Housing Unit ("S.H.U.") without cause or explanation, and by being deliberately indifferent to his serious medical needs, which included severe dehydration during his hunger strike, a painful eye condition, a painful hemorrhoid condition and a deteriorating mental health condition. (*See generally* Dkt. No. 16 [Plf.'s Fourth Am.

Compl.].)

On January 28, 2005, Defendants filed their *first* motion for summary judgment. (Dkt. No. 58.) By Order filed June 1, 2006, Judge Hurd granted in part, and denied in part, that motion, dismissing all of Plaintiff's claims except two groups of claims: (1) his Fourteenth Amendment claims against Auburn C.F. Superintendent Hans Walker and Correctional Officer D.W. Seitz (asserted in his Fourth Cause of Action); and (2) his First and Fourteenth Amendment claims against Walker, Seitz and Auburn C.F. Captain Craig Gummerson (asserted in his Fifth Cause of Action). (Dkt. No. 68.)

**\*2** Currently before the Court is Defendants' *second* motion for summary judgment. (Dkt. No. 81.) FN1 For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

> FN1. By Order filed March 30, 2006, I granted Defendants leave to file a second motion for summary judgment. (Dkt. No. 62.)

### I. APPLICABLE LEGAL STANDARD

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material FN2 fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. FN3

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

> FN3. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [FN4] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN5] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN6]

> FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).*

> FN5. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita, 475 U.S. at 585-86; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).*

> FN6. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N .Y. Mar. 29, 2004) [internal quotations omitted; emphasis added].

Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.* [FN7] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit. [FN8] (Here, I note that Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746.) [FN9] In any event, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory. [FN10] An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general. [FN11] Finally, even where an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [FN12]

> FN7. *See Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir.2002)* ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

> FN8. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

to be treated as an affidavit for summary judgment purposes.") [citations omitted].

FN9. (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].)

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. *See, e.g., Jeffreys v. City of New York,* 426

F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

It bears noting that Plaintiff is an experienced litigant. For example, before he filed his original Complaint in this action on June 25, 2001, he had litigated at least a half dozen civil actions in state or federal courts, challenging

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

the conditions of his confinement.[FN13] In one of those actions, he was awarded $1,000 following a jury trial.[FN14] (He has also litigated numerous civil actions in state or federal courts since the filing of this action.) However, after carefully reviewing Plaintiff's litigation experience, I have concluded that his experience is not so extensive as to warrant a recommendation that the Court revoke the special solicitude normally afforded *pro se* litigants due to their inexperience.[FN15]

FN13. *See, e.g., Cabassa v. Kuhlmann,* 569 N.Y.S.2d 824 (N.Y.S.App.Div., 3d Dept., 1991) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 78 N.Y.2d 858 (N.Y.1991); *Cabassa v. Coughlin,* 92-CV-6199 (W.D.N.Y. filed May 11, 1992) (personal injury action against prison officials); *Cabassa v. Wende Corr. Fac.,* Index No. 001846/1995 (N.Y.S. Sup.Ct., Erie County, filed March 14, 1995) (Article 78 proceeding to review prison disciplinary conviction); *Cabassa v. Rufat,* 96-CV-6280 (W.D.N.Y. filed June 20, 1996) (prisoner civil rights action); *Cabassa v. Goord,* 720 N.Y.2d 76 (N.Y.S.App.Div., 4th Dept., Feb. 7, 2001) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 96 N.Y.2d 713 (N.Y., June 5, 2001).

FN14. *See Cabassa v. Rufat,* 96-CV-6280, Judgment (W.D.N.Y. filed Sept. 9, 1999) (judgment for Plaintiff in amount of $1.00 in compensatory damages, and $1,000 in punitive damages, following jury trial in prisoner civil rights action).

FN15. "There are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special [liberality or] solicitude" that is normally afforded *pro se* litigants." *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept. 26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted], *accord, Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,*

97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

## II. ANALYSIS

### A. Plaintiff's Fourth Cause of Action

**\*3** Construed with the *extra* degree of leniency with which *pro se* civil rights claims are generally afforded,[FN16] Plaintiff's Fourth Cause of Action alleges as follows: between **January 12, 1998,** and **June 22, 1998,** while Plaintiff was incarcerated at Auburn C.F., **Defendant Hans Walker** (the superintendent of Auburn C.F.) and **Defendant D.W. Seitz** (a lieutenant at Auburn C.F.) violated Plaintiff's rights under the Due Process Clause of the **Fourteenth Amendment** in the following three (related) ways: (1) they "fail[ed] to provide [a] meaningful review of his [original assignment to Administrative Segregation]," which occurred on January 12, 1998; (2) they "never re-visit[ed] the propriety [of] or [made] any meaningful determination as to the legitimacy of[,] the need for his continued confinement [in Administration Segregation]," even though "no new evidence was used to justify his ongoing confinement"; and (3) they intentionally "retain[ed] him in [Administrative Segregation]" for 161 days (i.e., from January 12, 1998, to June 22, 1998) "by perfunctor[ily] rubber-stamping ... [Administrative Segregation] review forms. (Dkt. No. 16, ¶¶ 3[c], 3[h], 6[18], 7 & "Fourth Cause of Action" [Plf.'s Fourth Am. Compl.].)

FN16. Of course, a liberal construction must be afforded to *all* pleadings (whether brought by

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

*pro se* litigants or not), under Fed.R.Civ.P. 8. *See* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). However, an *extra* liberal construction must be afforded to the pleadings of *pro se* plaintiffs (especially those asserting civil rights claims). *See Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir.2000) ("[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.") [internal quotation marks and citation omitted]; *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Defendants argue that Plaintiff's Fourth Cause of Action should be dismissed because the vast majority (if not the entirety) of that claim is based on events that occurred *before* June 20, 1998, and thus are outside the three-year limitations period governing Plaintiff's claims (which were deemed filed, along with his original Complaint, on June 20, 2001). (Dkt. No. 81, Part 5, at 5 [Defs.' Memo. of Law].) Defendants argue further that, even if Plaintiff's Fourth Cause of Action were not barred by the applicable statute of limitations, that cause of action would fail as a matter of law because Plaintiff's confinement at Auburn C.F. between January 12, 1998, and June 22, 1998 (which consisted of a total of 60 days' confinement in the S.H.U. and 101 days' confinement in Auburn C.F. Infirmary because of his "hunger strike") did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (*Id.* at 4-8.)

Plaintiff responds to Defendants' position regarding his Fourth Cause of Action with two arguments. First, Plaintiff argues that the statute of limitations does not bar his claim to the extent the claim is based on events occurring before June 20, 1998, because those events were part of a "continuing violation," and thus his claim is exempt from the applicable statute of limitations. (Dkt. No. 85, Part 3, at 6-8.) Second, Plaintiff argues that his confinement at Auburn C.F. between January 12, 1998, and June 22, 1998, did indeed present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a due process claim under the Fourteenth Amendment because (1) even when Plaintiff was in the Auburn C.F. Infirmary, he was in a part reserved for prisoners confined to S.H.U., and (2)

the conditions of confinement (in S.H.U. and the Infirmary) were so harsh that they were atypical of those normally experienced in either the general populations of, or infirmaries in, correctional facilities in New York State. (*Id.* at 8-10; *see also* Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response].)

*4 Defendants reply to Plaintiff's response regarding his Fourth Cause of Action with two arguments. First, Defendants argue that Plaintiff cannot avail himself of the continuing-violation doctrine because (1) the acts that occurred outside of the statutory period were not sufficiently connected to the acts that occurred within the statutory period, and (2) Plaintiff has not shown the sort of compelling circumstances necessary to permit the application of the continuing-violation doctrine in the Second Circuit. (Dkt. No. 88, Part 1, at 1-2.) Second, Defendants argue that whether or not Plaintiff's residence in the Auburn C.F. Infirmary was particularly restrictive is of no consequence since (1) it is to be expected that inmates housed in prison hospital will not be able to move around, or engage in activities, as much as inmates housed in the general population, and (2) Plaintiff was placed in the Infirmary due to the "hunger strike" that he chose to undertake. (*Id.* at 4-5.)

**1. Continuing Violation Doctrine**

For the sake of argument (and because Defendants do not argue that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983),[FN17] I will assume, for purposes of this Report-Recommendation, that the continuing-violation doctrine *does* apply to actions filed pursuant to 42 U.S.C. § 1983.[FN18] The first issue presented by the parties' arguments with regard to the continuing-violation doctrine is whether the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998). The second issue presented by the parties' arguments is whether Plaintiff has shown *compelling circumstances* to warrant the application of the continuing-violation doctrine.[FN19]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

FN17. (*See* Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law, not arguing that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983], *accord,* Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law], Dkt. No. 66, Part 1 [Defs.' Objections to Judge Lowe's Report-Recommendation Regarding Defs.' *First* Motion for Summary Judgment].)

FN18.*Compare* Pino v. Ryan, 49 F.3d 51, 54 (2d Cir.1995) (finding inmate's deliberate indifference claims under Section 1983 to be time-barred where inmate had "alleged no facts indicating a continuous or ongoing violation of his constitutional rights"), *aff'g,* Pino v. Ryan, 94-CV-0221, Order of Dismissal (N.D.N.Y. March 30, 2004) (Scullin, J.), *with* McFarlan v. Coughlin, 97-CV-0740, 1998 U.S. Dist. LEXIS 5541, at *11 (N.D.N.Y. March 13, 1998) (Homer, M.J.) ("The applicability of the continuing violation doctrine to Section 1983 cases is uncertain.") [collecting cases], *adopted by* 1998 U.S. Dist. LEXIS 5518, at *3 (N.D.N.Y. Apr. 15, 1998) (Pooler, J.) (agreeing with magistrate judge's "carefully-reasoned decision" regarding, inter alia, the application of the continuing violation doctrine).

FN19. The requirement that *compelling circumstances* be shown to warrant the application of the continuing-violation doctrine appears to be a different issue than whether the acts that occurred outside of the relevant statutory period were *sufficiently connected* to the acts that occurred within the statutory period. *See* Young v. Strack, 05-CV-9764, 2007 WL 1575256, at *4 (S.D.N.Y. May 29, 2007) (treating the requirement that *compelling circumstances* exist as something distinct from the requirement that a sufficient connection exist between the acts in question), *accord,* McFadden v. Kralik, 04-CV-8135, 2007 WL 924464, at *6-7 (S.D.N.Y. March 28, 2007); *see also* Blesdell v. Mobil Oil Co., 708 F.Supp. 1408, 1415 (S.D.N.Y.1989) (stating that compelling circumstances are needed to warrant the application of the continuing-violation doctrine,

and that a sufficient connection between the acts in question is necessary to warrant the application of the continuing-violation doctrine, but not stating that compelling circumstances and sufficient connection are the same thing).

According to the undisputed record evidence, the relevant acts of Defendants Walker and Seitz were as follows:

1. On January 12, 1998, Defendant Seitz signed a written recommendation that Plaintiff be placed in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 1 [Defs.' Rule 7 .1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 1 [Plf.'s Rule 7.1 Response, admitting fact in question].) That recommendation was based on information provided by three confidential informants (each an inmate) that Plaintiff had threatened them. (*See* Dkt. No. 85, Part 4, at 15, 17 [Exs. A and B to Plf.'s Decl.].)

2. On January 14 and 15, 1998, Defendant Seitz testified at Plaintiff's administrative segregation hearing. (*See* Dkt. No. 81, Part 4, at 4-5 [Ex. B to Fruchter Decl., attaching Hearing Record Sheet].) At the conclusion of the hearing on January 15, 1998, the hearing officer (Captain Gummerson) found that Plaintiff should be placed in administrative segregation to preserve the safety and security of inmates at Auburn C.F. (including the three inmates in question). (*Compare* Dkt. No. 81, Part 2, ¶ 3 [Defs .'Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 3 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 85, Part 4, at 16-17 [Ex. B to Plf.'s Decl.].)

**\*5** 3. On or about January 30, 1998, Defendant Walker approved a review of Plaintiff's administrative segregation status that had been conducted by a three-member Periodic Review Committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), pursuant to DOCS Directive 4933. (*See* Dkt. No. 85, Part 4, at 23 [Ex. E to Plf.'s Decl.].) [FN20] Defendant Walker approved similar reviews on or about the following five dates: February 6, 1998; February 13, 1998; February 20, 1998; February 27, 1998; and March 6, 1998. (*See* Dkt. No. 85, Part 4, at 24-28 [Ex. E to Plf.'s Decl.].)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

FN20. Specifically, DOCS Directive 4933 required that Plaintiff's administrative segregation status be reviewed every seven (7) days for the first two months of his administrative segregation, and every thirty (30) days thereafter, by a three-member committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), and then (after he receives the committee's review results) by the superintendent. (*See* Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].)

4. Plaintiff's fellow prisoner, Thomas O'Sullivan, swears that, in "late February or early March [of] 1998," Corrections Counselor Robert Mitchell stated to Mr. O'Sullivan that, although he (Robert Mitchell) was a member of the three-member Periodic Review Committee at Auburn C.F., he had "no say in the matter [of assisting prisoners to be released from segregation], since "security makes all of the decisions. They just send me papers periodically to sign. There is no actual committee that meets." (*See* Dkt. No. 85, Part 4, at 30 [Ex. F to Plf.'s Decl.].) FN21

FN21. Defendants argue that Inmate O'Sullivan's affidavit should not be considered by the Court on their second motion for summary judgment (1) because the evidence is inadmissible hearsay and (2) the events described in the affidavit are beyond the applicable limitations period. (Dkt. No. 88, Part 1, at 3-4 [Defs.' Reply Memo. of Law].) I do not understand, or agree with, Defendants' second reason. In any event, I will assume, for purposes of this Report-Recommendation, that Inmate O'Sullivan's affidavit is admissible because I do not believe it to alter the outcome of this Report-Recommendation.

5. On or about March 28, 1998, Plaintiff filed an Article 78 petition in New York State Supreme Court, Cayuga County, challenging the January 15, 1998, Tier III disciplinary determination that placed him in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 5 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 5 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 81, Part 4, at 9 [Ex. D to Fruchter Affid., attaching final decision in the action, which states that Plaintiff's petition was verified on March 28, 1998], *accord,* Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

6. On May 26, 1998, Acting Supreme Court Justice Peter E. Corning (of the New York State Supreme Court, Cayuga County) issued a decision ordering that "the [aforementioned] Tier III disciplinary determination be annulled, the petitioner be restored to the status he held prior to this determination, and that all references [to] this determination be expunged from his institutional record." (*See* Dkt. No. 81, Part 2, ¶ 6 [Defs.' Rule 7.1 Statement, essentially asserting fact in question]; Dkt. No. 85, Part 2, ¶ 6 [Plf.'s Rule 7.1 Response, admitting fact asserted by Defendants]; Dkt. No. 85, Part 4, ¶ 14 [Plf.'s Decl., asserting fact in question]; Dkt. No. 85, Part 4, at 37 [Ex. H to Plf.'s Decl., attaching decision in question].)

7. While it is unclear from the record, it appears that no correctional officials at Auburn C.F. became aware that Plaintiff had won his Article 78 proceeding until the morning of June 19, 2001. (Dkt. No. 85, Part 4, ¶ 15 [Plf.'s Decl., swearing that "[o]n June 19, 1998, early in the morning C.O. Exner (SHU Staff) informed plaintiff that the 'A' Officer *had just received a call* that the plaintiff won his Article 78 [proceeding] ...."] [emphasis added]; *see also* Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, from Assistant Attorney General Louis J. Tripoli to Plaintiff]; *cf* . Dkt. No. 85, Part 4, at 39, 43 [Ex. I to Plf.'s Decl., attaching letters dated June 22, 1998, from Plaintiff to Judge Corning and Assistant Attorney General Louis J. Tripoli, stating that *Plaintiff* was first told of decision on morning of June 19, 1998].)

*6 8. On the evening of June 20, 1998, at approximately 7:40 p.m., Plaintiff asked Defendant Seitz when Plaintiff was going to be returned from S.H.U. to the prison's general population (pursuant to the May 26, 1998, decision of Acting Supreme Court Justice Peter E. Corning); and Defendant Seitz responded that Plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

was not going back into the general population because "Auburn's Administration runs the prison, not the Judge." (*See* Dkt. No. 85, Part 4, ¶ 17 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate time of conversation]; Dkt. No. 16, ¶ 6 [15] [Plf.'s Verified Fourth Am. Compl.].)

9. On the afternoon of June 22, 1998, Plaintiff was released from S.H.U. and returned to the facility's general population. (*Compare* Dkt. No. 81, Part 2, ¶ 7 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 7 [Plf .'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 85, Part 4, ¶ 21 [Plf.'s Decl.]; Dkt. No. 16, ¶ 6[17] [Plf.'s Verified Fourth Am. Compl.].)

Liberally construed, Plaintiff's argument in support of the application of the continuing-violation doctrine is that Defendant Seitz's malicious statement on June 20, 1998 (regarding which Plaintiff filed a timely claim in this action), was yet another manifestation of a conspiracy between Defendants Seitz and Walker (and others) to wrongfully confine Plaintiff in the Auburn C.F. S.H.U., which stretched back to Defendant Walker's "rubber-stamping" of the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), and even to Defendant Seitz's issuance of the written recommendation that Plaintiff be placed in administrative segregation on January 12, 1998. (Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 5-21 [Plf.'s Decl.].) [FN22]

FN22. I note that Plaintiff does not allege or assert, nor does any record evidence suggest, that Defendant Walker played any role during Plaintiff's appeal from the hearing decision in question (issued by Captain Craig Gummerson); rather, Plaintiff took that appeal directly to the Director of the Special Housing/Inmate Disciplinary Program at DOCS, Donald Selsky. (*See* Dkt. No. 16, ¶¶ 6[5]-6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, ¶¶ 6, 13 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 17, 32 [Exs. B and G to Plf.'s Decl.].)

For the sake of argument, I will set aside the fact that I have found no reason to believe that any of the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, violated any provision of the Constitution. A prisoner enjoys no constitutional right against being issued an administrative segregation recommendation that turns out to be false.[FN23] Moreover, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status, a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983.[FN24] The reason that I set these facts aside is that I can find no record evidence that there was any connection whatsoever between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's malicious statement on June 20, 1998.

FN23. *See Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *13 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.; Peebles, M.J.) ("It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report.") [citations omitted]; *Hodges v. Jones,* 873 F.Supp. 737, 743-44 (N.D.N.Y.1995) (Chin, J., sitting by designation) ("A prison inmate does not have a constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in deprivation of a protected liberty interest.") [internal quotation marks and citation omitted].

FN24. A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983. *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim.") [internal quotation marks and citation omitted]. Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation (much less a violation of 42 U.S.C. § 1983). *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) [citation omitted]; *Lopez v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

*Reynolds, 998 F.Supp. 252, 259 (W.D.N.Y.1997).* This is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. *See Farinaro v. Coughlin, 642 F.Supp. 276, 280 (S.D.N.Y.1986).*

For example, there is no record evidence that Defendant Seitz issued his written recommendation of January 12, 1998, maliciously, that is, *knowing* it to be based on information that was false. Judge Corning's decision of May 26, 1998, certainly did not so find. Rather, Judge Corning merely found error in the decision of the officer presiding over Plaintiff's administrative segregation hearing (Captain Gummerson) not to make an independent inquiry into the reliability or credibility of the confidential information provided by three of Plaintiff's fellow inmates, which formed the basis of the recommendation that Plaintiff be placed in administrative segregation. (*See* Dkt. No. 85, Part 4, at 36-37 [Ex. H to Plf.'s Decl.].) [FN25]

FN25. Judge Corning expressly rejected Plaintiff's allegation that the hearing officer was not fair and impartial, and had committed other procedural errors. (*See* Dkt. No. 85, Part 4, at 36-37 [Ex. H to Plf.'s Decl.].)

*7 Similarly, there is no record evidence that Defendant Seitz gave *false* testimony at Plaintiff's administrative segregation hearing on January 14 and 15, 1998, for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue. To the contrary, Judge Corning found that Defendant Seitz acknowledged at the hearing that he had based his recommendation solely on their reports. (*Id.*) [FN26]

FN26. It bears noting that Plaintiff's success in his Article 78 proceeding against Defendant Walker carries no preclusive effect with regard to his prisoner civil rights claims against Defendant Seitz (or Defendant Walker) in this action. Setting aside the issue of whether Judge Corning had the power to award the full measure of monetary damages sought by Plaintiff in this

action, there is the fact that Defendant Seitz was not a party to Plaintiff's Article 78 proceeding, and Defendant Walker was sued only in his official capacity. *See Zavaro v. Coughlin, 775 F.Supp. 84, 87-88 (W.D.N .Y.1991)* (judgment entered in Article 78 proceeding brought by prison inmate for relief from discipline unconstitutionally imposed in reliance on uncorroborated testimony of confidential informers could not be given preclusive effect in inmate's civil rights actions against disciplinary hearing officer and DOCS Commissioner, where hearing officer was not even named as party in Article 78 proceeding, and Commissioner was sued in Article 78 proceeding only in his official capacity and thus had no opportunity to raise defenses available to him in civil rights action, including lack of personal involvement), *aff'd,970 F.2d 1148 (2d Cir.1992).*

Furthermore, there is no record evidence that Defendant Seitz was a member of the aforementioned three-member Periodic Review Committee that (allegedly) shirked its duty, under DOCS Directive 4933, to adequately review Plaintiff's administrative segregation status. (*See* Dkt. No. 85, Part 4, at 23-38 [Ex. E to Plf.'s Decl., not indicating the signature of Def. Seitz on any of the relevant forms]; Dkt. No. 16, ¶ 6[18] [Plf.'s Verified Fourth Am. Compl., asserting that the Periodic Review Committee was made up of individuals other than Def. Seitz].) Nor is there even an allegation that Defendant Seitz somehow caused those Committee members to (allegedly) shirk their duty. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As for Defendant Walker, there is no record evidence that he approved the results of the reviews of the Periodic Review Committee (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998) maliciously, that is, *knowing* Plaintiff's confinement to administrative segregation to be wrongful. For example, Plaintiff does not even allege or argue that Defendant Walker *knew* that the Periodic Review Committee was (as Plaintiff asserts) not physically meeting when it conducted its review of Plaintiff's administrative segregation status. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

4, ¶¶ 8-12 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 23-31 [Exs. E-F to Plf.'s Decl.].)

Plaintiff is reminded that, according to Section 301.4(d) of the version of DOCS Directive 4933 that he submitted to the Court, a facility superintendent does not make a "final determination" of the "results" of the Periodic Review Committee's review of an inmate's administrative segregation status until those results are "forwarded, in writing, to the superintendent." (Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].) As a result, a facility superintendent (such as Defendant Walker) would not, under DOCS Directive 4933, participate in a Periodic Review Committee's review of an inmate's administrative segregation status sufficient to notify him that the review was somehow inadequate. Furthermore, as the superintendent of Auburn C.F., Defendant Walker was entitled to rely on his subordinate correctional officers (including the three members of the Periodic Review Committee) to conduct an appropriate investigation of an issue at the facility, without personally involving Defendant Walker in that issue. [FN27]

> FN27. See Brown v. Goord, 04-CV-0785, 2007 WL 607396, at *6 (N.D . N.Y. Feb. 20, 2007) (McAvoy, J., adopting Report-Recommendation by Lowe, M.J., on de novo review) (DOCS Commissioner was entitled to delegate to high-ranking subordinates responsibility to read and respond to complaints by prisoners without personally involving DOCS Commissioner in constitutional violations alleged) [citations omitted]; see also Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir.1997) (DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for decision, and he responded to plaintiff's letter inquiring as to status of matter); Swindell v. Supple, 02-CV-3182, 2005 WL 267725, at *10 (S.D.N.Y. Feb. 3, 2005) ("[A]ny referral by Goord of letters received from [plaintiff] to a representative who, in turn, responded, without more, does not establish personal involvement."); Garvin v. Goord, 212 F. Supp .2d 123, 126 (W.D.N.Y.(2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action.").

*8 The closest that Plaintiff comes to making any connection at all between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's statement on June 20, 1998, is when he asserts that unidentified corrections officers in S .H.U. told him, at some point between June 19, 1998, and June 21, 1998, that "word came back ... per Superintendent Walker ... that you aren't stepping foot back in [general population]." (Dkt. No. 85, Part 4, ¶ 18 [Plf.'s Decl.].) For the sake of argument, I will set aside (1) the potential hearsay problem with this piece of evidence, (2) the fact that the evidence is so late-blossoming, vague, and self-serving that a reasonable fact-finder would have great difficulty undertaking the suspension of disbelief necessary to believe it,[FN28] (3) the fact that the unidentified corrections officers in question did not state that, whenever Defendant Walker made the statement, he did so knowing of the decision of Judge Corning, and (4) the fact that the statement does not in any way suggest that Defendant Walker made the statement as part of a conspiracy with Defendant Seitz. The more serious problem with this piece of evidence is that, as explained above, there is no record evidence suggesting that the referenced statement by Defendant Seitz was preceded by any malicious (or knowingly wrongful) acts by Defendant Seitz.

> FN28. It bears noting that the June 22, 1998, letters that Plaintiff wrote to Judge Corning and the New York State Attorney General's Office regarding the refusal of Auburn C.F. to release him from administrative segregation despite Judge Corning's decision of May 26, 1998, mentions the malicious statement (allegedly) made by Defendant Seitz on June 20, 1998, and another malicious statement made by Defendant Gummerson on June 19, 1998, but is conspicuously silent as to any order by Defendant Walker, issued between June 19, 1998, and June 21, 1998, that Plaintiff was not going to return to general population. (Dkt. No. 85, Part 4, at 39-45 [Ex. I to Plf.'s Decl.].) It

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

bears noting also that any allegation regarding the referenced order by Defendant Walker is not contained in Plaintiff's Fourth Amended Complaint. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As a result, I find that no rational fact finder could conclude, from the current record, that the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998) for purposes of the continuing-violation doctrine.

In any event, even if I had found that there was such a sufficient connection, I would find that compelling circumstances do not exist to warrant the application of the continuing-violation doctrine. Compelling circumstances (for purposes of the continuing-violation doctrine) exist

where the unlawful conduct takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred; where there is an express, openly espoused policy that is alleged to be discriminatory; or where there is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness.

*Yip v. Bd. of Trustees of State Univ. of N.Y.,* 03-CV-0959, 2004 WL 2202594, at *4 (W.D.N.Y. Sept. 29, 2004) [internal quotation marks and citations omitted].

Here, although the unlawful conduct at issue took place over a period of time, that fact has in no way made it difficult for Plaintiff to pinpoint the exact dates on which the alleged violations occurred. To the contrary, his Fourth Amended Complaint and papers in opposition to Defendants' motion are replete with allegations that events (including violations) occurred on exact dates. (*See, e.g.,* Dkt. No. 16, ¶¶ 4[b][i], 4[b][ii], 6[2], 6[4]-6[17], 6[19], 6[23], 6[30]-6[34], 6[36], 6[38], 6[41]-6[50], 6[52]-6[58], 6[61]-6[63] [Plf.'s Fourth Am. Compl.]; Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response]; Dkt. No. 85, Part 4, ¶¶ 5-7, 9-10, 13-17, 19-22 [Plf.'s Decl.].)

*9 Moreover, while Plaintiff has alleged that the wrongful actions taken against him were part of a conspiracy, he has not adduced evidence that the wrongful actions alleged were part of an express and openly espoused *policy*. Nor has he adduced evidence that any such policy *discriminated* against him because of his membership in any protected class of individuals (e.g., classifications based on race, religion, etc.). Plaintiff would no doubt argue that Defendants Seitz and Walker treated him differently from other prisoners between June 19, 1998, and June 22, 1998 (by not releasing him from S.H.U.) due to the fact that he had won his Article 78 proceeding in New York State Supreme Court on May 26, 1998. However, any such disparate treatment (even if it did occur) came months *after* Defendant Seitz and Walker's actions in January, February, and March of 1998, which (again) have not been shown to have been malicious. Therefore, the two groups of actions cannot be rationally found to have been united under the umbrella of a single "policy" of disparate treatment.

Finally, there is no record evidence that the wrongful actions in question were committed *covertly* such that Plaintiff only belatedly recognized their unlawfulness. To the contrary, the record is clear that Plaintiff knew of the wrongful actions at the time they were committed. That is why, on January 18, 1998, he filed with DOCS an appeal from the decision to confine him in administrative segregation. (Dkt. No. 16, ¶ 6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 32 [Ex. G to Plf.'s Decl .].) That is also why, by the third week of January of 1998, he commenced a hunger strike in protest of his confinement in administrative segregation. (Dkt. No. 85, Part 4, at 29 [Ex. F to Plf.'s Decl.]; Dkt. No. 16, ¶ 6[20] [Plf.'s Verified Fourth Am. Compl.].) That is also why, on March 28, 1998, he filed an Article 78 petition in New York State Court. (Dkt. No. 16, ¶ 6[11] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

Simply stated, once Plaintiff's appeal to DOCS was denied on March 11, 1998 (and thus his administrative remedies were exhausted), he could have, but failed to, file a complaint in this Court complaining of the wrongful actions that had occurred thus far. There was no compelling circumstance that prevented him from filing a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

complaint regarding those actions until June 20, 1998. Thus, there is no reason to toll the starting of the three-year limitations period until that date.

For both of the above-stated alternative reasons, I find that the continuing violation doctrine does *not* apply to the acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998), so as to render timely Plaintiff's claims concerning those acts. As a result, I recommend dismissal of Plaintiff's Fourth Cause of Action based on the three-year statute of limitations governing that claim.

**2. Protected-Liberty-Interest Requirement**

**\*10** The parties' arguments with regard to the protected-liberty-interest requirement present the issue of whether Plaintiff's confinement in the Auburn C.F. Infirmary for a total of 101 days, together with confinement in the Auburn C.F. S.H.U. for a total of 60 days, constituted an "atypical and significant hardship on [Plaintiff] in relation to the ordinary incidents of prison life," under Sandin v. Connor, 515 U.S. 472, 484 (1995).

I have been unable to locate any decisions from within the Second Circuit addressing when an inmate's confinement in a segregated portion of a correctional facility's infirmary may be an atypical and significant hardship. However, Plaintiff has adduced record evidence that the restrictions he experienced in the Auburn C.F. Infirmary were generally harsher than those he experienced in the Auburn C.F. S.H.U. (*See* Dkt. No. 85, Part 4, ¶¶ 23-25 [Plf.'s Decl., describing conditions in Auburn C.F. Infirmary].) As a result, for purposes of Defendants' second motion for summary judgment, I will treat the entire 161-day period in question as a continuous period of administrative segregation under conditions of confinement that varied and/or alternated in their level of restrictiveness.

In order to determine whether Plaintiff possessed a protected liberty interest in avoiding the administrative segregation that he experienced during the 161-day period in question, it is necessary to consider not simply the length of that confinement but the specific circumstances of that confinement (and whether they were harsher than

ordinary). Brooks v. DiFasi, 112 F.3d 46, 49 (2d Cir.1997); Vasquez v. Coughlin, 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (McAvoy, C.J.).

Here, at most, the record evidence establishes that the conditions of Plaintiff's segregated confinement during the time in question were as follows:

(1) for all 161 days in question, he was deprived of the opportunity to work and attend schooling out of his cell; he was deprived of "grooming equipment," "hygiene products," "personal food," and television; and he was allowed only restricted visitation and law library access;

(2) for the 60 days during which he was confined to a cell in the Auburn C.F. S.H.U., he was confined to that cell for twenty-three (23) hours per day; he was allowed into the yard for one hour per day, where he could exercise, and "play hardball and cards" and converse with other inmates; he was allowed (as clothing) two sets of state-issued pants and shirts, and a sweatshirt; he was provided "good heating"; and he was allowed to possess "personal books and correspondence[ ] and family pictures"; and

(3) for the 101 days during which he was confined to a hospital room in the Auburn C.F. Infirmary, he was confined to his room for twenty-four (24) hours per day and not allowed to converse or play with other inmates; he was allowed (as clothing) only "one pair of under-clothes and socks" and a "thin linen-cotton hospital gown"; he was subjected to "cold temperatures"; and he was not allowed to possess "personal books and correspondence[ ] and family pictures." (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl., describing the conditions in the Auburn C.F. Infirmary, and comparing those conditions to the conditions in the Auburn C.F. general population].)

**\*11** The conditions of confinement that Plaintiff experienced during the 60 days he spent in the Auburn C.F. S.H.U. appear to mirror the conditions of confinement ordinarily experienced by inmates confined to Special Housing Units in other correctional facilities within the New York State DOCS.[FN29] Moreover, I can find no evidence in the record that, during the 101 days

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

which Plaintiff spent in the Auburn C.F. Infirmary (which Plaintiff characterizes as the harshest portion of his administrative confinement), he was *completely* denied clothing, medicine and adequate nutrition (e.g., calories, protein, etc.), or that he was *in any way* denied running water, showers and bedding. (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.].)

> FN29. *See Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (describing the following conditions as "normal" conditions of S.H .U. confinement in New York: "Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day ..., limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited. As to duration, Colon was required to serve 305 days of the 360-day sentence imposed.") (citing N.Y.C.R.R. §§ 304.1-304.14).

Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of 161 days or more, under conditions of confinement that were, to varying degrees, more restrictive than those in the prison's general population.[FN30] Several of those cases have also recognized (1) the fact that restrictions (such as the amount of time allowed out of one's cell to exercise and the number of showers allowed per week) are placed even on inmates in the general population,[FN31] and (2) the fact that a sentence in S.H.U. is a relatively common and reasonably expected experience for an inmate in the general population of a New York State correctional facility,[FN32] especially for an inmate serving a sentence of 30 years to life in a maximum-security correctional facility (as Plaintiff appears to be).[FN33]

> FN30. *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr. 17, 1998) (McCurn, J.) (180 days that

plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug. 27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

> FN31. *See, e.g., Husbands,* 990 F.Supp. 218-19 ("The conditions of confinement in SHU also are not dramatically different from those experienced in the general population. For example, as stated previously, all inmates in SHU are allowed one hour of outdoor exercise daily. [7 NYCRR] § 304.3. This is the same amount of time allotted for exercise to general population inmates, *id.* § 320.3(d)(2), and is in full compliance with constitutional requirements.... SHU inmates are allowed a minimum of two showers per week, 7 NYCRR § 304.5(a), while general population inmates are allowed three showers per week, *id.* § 320.3(d)(1). SHU inmates are confined to their cells approximately twenty-three hours a day. General population inmates are confined to their

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

cells approximately twelve hours a day during the week and even more on the weekends.... Thus, conditions at New York correctional facilities involve a significant amount of lockdown time even for inmates in the general population."); *accord, Warren,* 985 F.Supp. at 354-55;*see also Ruiz,* 1997 WL 137448, at *5 ("Indeed, the conditions at Halawa [prison] involve significant amounts of 'lockdown time' even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.").

FN32.*See, e.g., Husbands,* 990 F.Supp. 217 ("[The plaintiff] was convicted of a drug-related crime and was serving an indeterminate sentence of six years to life at the time of the events in question. With respect to the duration of his confinement in SHU, [the plaintiff] spent six months there. Lengthy disciplinary confinement is prevalent in New York State prisons. In fact, New York law imposes no limit on the amount of SHU time that may be imposed for Tier III infractions. 7 NYCRR § 254.7(a)(1)(iii). As of March 17, 1997, there were 1,626 inmates in SHU for disciplinary reasons.... Of those inmates, 28 had SHU sentences of 59 days or less; 129 had SHU sentences of 60-119 days; 127 had SHU sentences of 120-179 days; 545 had SHU sentences of 180-365 days; and 797 had SHU sentences exceeding 365 days. These statistics suggest that lengthy confinement in SHU-for periods as long as or longer than [the plaintiff's 180-day] stay-is a normal element of the New York prison regime."); *accord, Warren,* 985 F.Supp. at 354.

FN33.*See* N.Y.S. DOCS Inmate Locator Service http:// nysdocslookup.docs.state.ny.us [last visited May 29, 2008].

Under the circumstances, I simply cannot find, based on the current record, that the 161 days in question constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (causing Plaintiff to possess a protected liberty interest that conferred upon him a right to procedural due process).

I note that, in *Sandin v. Connor,* the Supreme Court noted that an involuntary commitment to a state mental hospital would be a hardship that would qualify as "atypical and significant," because of the "stigmatizing consequences" caused by such a confinement. *Sandin v. Connor,* 515 U.S. 472, 479, n. 4 (1995). However, here, the Auburn C.F. Infirmary was not a mental hospital. Moreover, it is difficult to characterize Plaintiff's stay there as *involuntary,* since that stay was caused by his choice to conduct a "hunger strike." (Stated differently, who *caused* Plaintiff to be placed in the Auburn C.F. Infirmary is a relevant issue in an atypical-and-significant-hardship analysis.) [FN34]

FN34.*See Goros v. Pearlman,* 03-CV-1303, 2006 U.S. Dist. LEXIS 19661, at *22-24 (N.D.N.Y. Feb. 21, 2006) (DiBianco, M.J..) (reasoning that, in determining whether plaintiff's confinement to prison medical unit constituted an atypical and significant hardship, it was necessary to determine who was responsible for causing plaintiff to be classified as "patient prisoner"), *accepted in pertinent part on de novo review,* 2006 U.S. Dist. LEXIS 19658, at *2 (N.D.N.Y. March 24, 2007) (McAvoy, J.).

In the alternative, even if I were to find that the 161 days at issue constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process), I can find no admissible evidence in the record that Plaintiff was denied any of the process to which he would have been due during the period of January through March of 1998.[FN35] For example, he received notice and a hearing; he received the opportunity to appeal the written hearing decision; and he received several written memoranda regarding his administrative segregation status signed by Defendant Walker and three members of the Periodic Review Committee. Most importantly, even if some sort of due process violation did occur during the period of January through March of 1998, I can find no evidence in the record that either Defendant Seitz or Defendant Walker committed that due process violation.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

FN35. "[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient ...." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460 (1989).

**\*12** As explained above in Part II.A.1. of this Report-Recommendation, a prisoner enjoys no right under the Fourteenth Amendment (or any other constitutional provision) against being issued an administrative segregation recommendation that turns out to be false. Moreover, no record evidence exists that Defendant Seitz gave false testimony at Plaintiff's administrative segregation hearing on January 14 and 15, 1998 (for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue). Finally, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983.

For these reasons, I recommend that, in the alternative, Plaintiff's Fourth Cause of Action should be dismissed due to his failure to adduce sufficient record evidence to demonstrate that he enjoyed a right of procedural due process with regard to the confinement in question, or that (even if he did enjoy such a right) Defendants Seitz or Walker denied him the process to which he was due.

**B. Plaintiff's Fifth Cause of Action**

Construed with the extra degree of leniency with which *pro se* civil rights claims are generally afforded, Plaintiff's Fifth Cause of Action alleges as follows: between **June 19, 1998,** and **June 22, 1998, Defendants Walker, Seitz,** and **Gummerson** violated Plaintiff's right to due process under the **Fourteenth Amendment,** and his right "to access ... the court and ... seek redress" under the **First Amendment,** when they intentionally delayed his release

from the Auburn C.F. S.H.U. for three days (i.e., from June 19, 1998, to June 22, 1998), despite learning (on June 19, 1998) that the Cayuga County Supreme Court had issued an order directing that Plaintiff be released from the S.H.U. (Dkt. No. 16, ¶¶ 3[g], 6[11]-6[17], 7 [Plf.'s Fourth Am. Compl., asserting his Fifth Cause of Action].)

Defendants argue that Plaintiff's Fifth Cause of Action should be dismissed because his confinement at the Auburn C.F. S.H.U. from June 19, 1998, to June 22, 1998, did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].)

Plaintiff responds to Defendants' argument regarding his Fifth Cause of Action with two arguments. First, Plaintiff argues that, in trying to persuade the Court that Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, was too short to constitute an "atypical, significant hardship" for purposes of a due process claim, Defendants fail to take into account the *intentional* and *retaliatory* nature of that four-day deprivation, which in and of itself created a protected liberty interest. (Dkt. No. 85, Part 3, at 10-11, 13-14 [Plf.'s Memo. of Law, arguing that "Defendants [ ] incorrectly couch this claim as a mere 4-day delay to release him from SHU" and that "plaintiff need not show Sand[I]in's atypicality [requirement] because the injury [that Plaintiff experienced consisted of] the retaliatory conduct itself."].) Second, Plaintiff argues that Defendants have ignored the First Amendment claim contained in his Fifth Cause of Action. (*Id.* at 10-13.) In so doing, Plaintiff argues that he was attempting to assert *two* types of First Amendment claims in his Fourth Amended Complaint. (*Id.*) The first type of First Amendment claim was the "access to courts" claim described above. (*Id.*) FN36 The second type of First Amendment claim (according to Plaintiff) was a *retaliation* claim. (*Id.*) Specifically, he argues that, in his Fourth Amended Complaint, he intended to allege, in part, that, when Defendants Walker, Seitz and Gummerson intentionally delayed Plaintiff's release from S.H.U. between June 19, 1998, and June 22, 1998, they were retaliating against him for having filed (and won) an Article 78 proceeding in Cayuga County Supreme Court regarding his confinement in S.H.U. (*Id.*) FN37

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

FN36. I note that, while Plaintiff does not focus much on his access-to-courts claim in his opposition papers, I do not liberally construe anything in those papers as withdrawing his access-to-courts claim, which he rather expressly asserted in his Fourth Amended Complaint. (*See* Dkt. No. 85, Part 3, at 11, 12 [Plf.'s Memo. of Law, arguing that there is "no doubt that plaintiff [alleged] ... that Defendants infringed upon his right to seek redress and access of the courts," and that "the strongest argument in plaintiff's favor is that defendants ... cause[d] injury [to plaintiff] by delaying his release from SHU in violation of his First ... Amendment right[ ] to access of the courts ...."].)

FN37. For example, he cites Paragraph "6(60)" of his Fourth Amended Complaint in which he alleges that, on or about April 30, 1998, Auburn C.F. First Deputy Superintendent Gary Hodges (who has been dismissed as a defendant in this action) "menacingly told plaintiff that ... if he wins his Article 78 [proceeding], he's going to get hit was another [sentence in Administrative Segregation]." (*Id.* at 11-12.)

*13 Defendants reply to Plaintiff's response regarding his Fifth Cause of Action by arguing that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2-3.)

**1. Procedural Due Process Claim Under the Fourteenth Amendment**

In support of his argument that he "need not show Sand[l]in's atypicality [requirement] because the injury [that he experienced consisted of] the retaliatory conduct itself," Plaintiff cites two cases: *Dixon v. Brown,* 38 F.3d 379 (8th Cir.1994), and *Hershberger v. Scaletta,* 33 F.3d 955 (8th Cir.1994). The problem is that neither of these two cases stands for such a proposition.

In *Dixon v. Brown,* an inmate alleged that a correctional officer had violated his rights under the First Amendment by filing a false disciplinary charge against him in retaliation for his having filed a prison grievance against the officer. 38 F.3d 379, 379 (8th Cir.1994). The district court granted the officer's motion for summary judgment on the ground that, because the prison disciplinary committee had dismissed the officer's disciplinary charge against the inmate, the inmate had not been punished and thus had not suffered "an independent injury" *Id.* The Eighth Circuit reversed, holding that, when an inmate has shown that a correctional officer has filed a false disciplinary charge against the inmate in retaliation for having filed a prison grievance against the officer, the inmate need not show an "independent injury" (such as being punished following a conviction on the disciplinary charge) because the retaliatory filing of the false charge is *in and of itself* an injury. *Id.* at 379-80. Such a holding, which regards the requirement for establishing a retaliation claim filed under the First Amendment, has nothing to do with the requirement for a procedural due process claim filed under the Fourteenth Amendment.

Plaintiff cites *Hershberger v. Scaletta,* for the proposition that "a systematic denial of inmates' constitutional right of access to the courts is such a fundamental deprivation that it is an injury in itself." 33 F.3d 955, 956 (8th Cir.1994) [citations omitted]. As an initial matter, in the current action, the Court is not faced with any record evidence (or even an allegation) that there has been a systematic denial of a right of access to the courts possessed by multiple *inmates.* Moreover, *Hershberger* was decided the year *before* the Supreme Court revised its due process analysis in *Sandin v. Connor,* narrowing its focus to whether or not the restraint in question "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 483-84 (1995).

Furthermore, I have found no cases suggesting that *Sandin's* atypicality requirement is automatically satisfied when a prisoner has been subjected to retaliation. Rather, in every on-point case I have found (in my non-exhaustive search), courts have considered allegations (and evidence) of retaliation *separately* from allegations (and evidence) of procedural due process violations. *See, e.g., Wells v. Wade,* 36 F.Supp.2d 154, 158-59 (S.D.N.Y.1996) (finding that evidence did *not* exist that plaintiff experienced

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

atypical and significant hardship, due to placement in pre-hearing keeplock confinement, for purposes of due process claim, but that evidence *did* exist that defendant took adverse action against plaintiff, by causing him to be placed in pre-hearing keeplock confinement, because he engaged in protected activity for purposes of retaliation claim); *Watson v. Norris,* 07-CV-0102, 2007 WL 4287840, at *3-5 (E.D.Ark. Dec. 7, 2007) (finding that prisoner's allegations, arising from placement in segregated housing, did *not* plausibly suggest atypical and significant hardship for purposes of due process claim, and but that his allegations-arising from same placement in segregated housing-did plausibly suggest that defendants took adverse action against him because he engaged in protected activity for purposes of retaliation claim); *Harris v. Hulkoff,* 05-CV-0198, 2007 WL 2479467, at *4-5 (W.D.Mich. Aug. 28, 2007) (first considering whether evidence existed that plaintiff experienced atypical and significant hardship, due to placement on suicide watch, for purposes of due process claim, and *then* considering whether evidence existed that defendants took adverse action against plaintiff, by placing him on suicide watch, because he engaged in protected activity for purposes of retaliation claim).

**\*14** As a result, I reject Plaintiff's argument that he is excused from having to satisfy *Sandin'* s atypicality requirement simply by alleging (and presumptively adducing some evidence) that he has been subjected to retaliation. I turn, then, to the issue of whether Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, constituted an "atypical, significant hardship" for purposes of a due process claim.

I must answer this question in the negative for the reasons stated above in Part II.A.2. of this Order and Report-Recommendation, and for the reasons advanced (and cases cited) by Defendants in their memorandum of law. (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].) Simply stated, considering the three-day length of Plaintiff's continued confinement in the Auburn C.F. S.H.U. *and* the specific circumstances of that continued confinement (which included one hour out of his cell per day, "good heating," and the ability to possess "personal books and correspondence[ ] and family pictures," *see* Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.] ), I find that the three-day continued confinement at issue did not constitute an atypical and significant hardship in relation to the

ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process).

For all of these reasons, I recommend that the procedural due process claim asserted in Plaintiff's Fifth Cause of Action be dismissed for insufficient record evidence to create a genuine issue of material fact, under Fed.R.Civ.P. 56.

I note that, while I do not rely on this evidence in making my recommendation, I believe it worth mentioning that at least some evidence exists in the record that, during the three-day time period in question, various officials at Auburn C.F. were attempting to transfer Plaintiff to another correctional facility in order to avoid his being returned to Auburn C.F.'s general population, where he would have access to the three informants whose statements had been the impetus for his original placement in administrative segregation.[FN38] I believe it would not be extraordinary (or atypical) for a prisoner to reasonably expect to have his release from administrative segregation briefly delayed under such a circumstance.

FN38. (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord,* Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl ., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was subsequently denied], *accord,* Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

**2. Claims Under the First Amendment**

Plaintiff is correct when he argues that Defendants, in their *initial* memorandum of law in support of their motion, ignored the First Amendment claim contained in his Fifth Cause of Action. (Dkt. No. 85, Part 3, at 11-13.) Defendants are partly correct, and partly incorrect, when they argue, in their *reply* memorandum of law, that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2-3.)

**a. Access-to-Courts Claim**

Setting aside for the moment whether or not Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting a First Amendment *retaliation claim,* that Complaint has alleged facts plausibly suggesting a First Amendment *access-to-courts claim*-at least against Defendants Seitz and Gummerson. [FN39]

FN39.*See Carroll v. Callanan,* 05-CV-1427, 2007 WL 965435, at *5-6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts claim arising under First Amendment) [citing cases]; *Stokes v. Goord,* 03-CV-1402, 2007 WL 995624, at *5-6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under Constitution as different than elements of access-to-courts claim arising under Constitution); *Gonzalez-Cifuentes v. Torres,* 04-CV-1470, 2007 WL 499620, at *4-6 (N.D.N.Y. Feb. 13, 2007) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment different than elements of access-to-courts claim arising under First Amendment); *Burke v. Seitz,* 01-CV-1396, 2006 WL 383513, at *1, 6-7, & n. 2 (N.D.N.Y. Feb. 13, 2006) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts claim arising under First Amendment);

*Colondres v. Scoppetta,* 290 F.Supp.2d 376, 381-82 (E.D.N.Y.2003) (recognizing distinction between [1] an access-to-courts claim arising under First Amendment and/or other constitutional provisions and [2] a retaliation claim arising under First Amendment) [citing cases].

**\*15** Plaintiff's "Fifth Cause of Action" alleges as follows:

The action of defendants WALKER, GUMMERSON, and SEITZ stated in paragraph 6(13-15), in intentionally delaying [Plaintiff's] release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First and Fourteenth Amendment [r]ights [under] the United States Constitution. (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].) In Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint, Plaintiff alleges facts plausibly suggesting that (1) on the morning of June 19, 2008, a corrections officer by the name of "Exner" informed Plaintiff that he had won his Article 78 proceeding and would be released into the prison's general population later than morning, (2) on the evening of June 19, 2008, Defendant Gummerson did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor, and (3) on the evening of June 20, 2008, Defendant Seitz did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (*Id.* at ¶¶ 6[13]-6 [15].)

Indeed, in my Report-Recommendation of March 30, 2006 (addressing Defendants' first motion for summary judgment), I expressly found that Plaintiff's Fifth Cause of Action contained a First Amendment access-to-courts claim against Defendants Seitz, Gummerson and *Walker.* (Dkt. No. 62, at 13, 30.)

In their second motion for summary judgment, the only conceivable argument Defendants offer as to why Plaintiff's First Amendment access-to-courts claim should be dismissed is that Plaintiff's allegation of a "conspiracy" is "conclusory." (Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-3.) I interpret this

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

argument as meaning that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Walker (who was the superintendent of Auburn C.F. during the time in question) caused, through some kind of conspiratorial behavior, Defendants Gummerson and Seitz to not release Plaintiff from S.H.U. on the evening of June 19, 2008, the entirety of June 20 and 21, 2008, and the morning of June 22, 2008, despite the fact that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (Dkt. No. 16, "Fifth Cause of Action," & ¶¶ 6[12]-[17].) I also interpret Defendants' argument as attacking that allegation of conspiracy as conclusory. (Dkt. No. 88, Part 1, at 3.)

As a result of this argument, I have carefully reconsidered my finding (in my Report-Recommendation of March 30, 2006) that Plaintiff has, in his Fourth Amended Complaint, alleged facts plausibly suggesting that *Defendant Walker* somehow violated Plaintiff's First Amendment right of access to the courts. Having done so, I now agree with Defendants that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Defendant Walker (who was the superintendent of Auburn C.F.), somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to ignore the decision issued by the Cayuga County Supreme Court. I also agree with Defendants that this allegation, which is woefully vague and speculative, fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged.[FN40]

> **FN40.** I note that, even if I were to not find that Plaintiff's access-to-courts claim against Defendant Walker fails to meet the pleading standard required by Fed.R.Civ.P. 8 and 12, I would find that the claim fails to meet the evidentiary standard required by Fed.R.Civ.P. 56.

**\*16** For these reasons, I recommend that the Court dismiss Plaintiff's First Amendment access-to-courts claim against Defendant Walker. I recommend that this Order of Dismissal be either (1) issued on Defendants' motion for summary judgment (which may, of course, assert a failure-to-state-a-claim argument),[FN41] or (2) issued *sua*

*sponte* pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

> **FN41.** "Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

However, I do not liberally construe Plaintiff's access-to-court claim against *Defendant Seitz* as depending on any sort of conspiracy between him and someone else (such as Defendants Gummerson and/or Walker). Rather, that claim stands on its own. (Dkt. No. 16, "Fifth Cause of Action," & ¶ 6[15].) Nor do I liberally construe Plaintiff's access-to-court claim against *Defendant Gummerson* as depending on any sort of conspiracy between him and someone else (such as Defendants Seitz and/or Walker). Rather, that claim stands on its own. (*Id.* at "Fifth Cause of Action," & ¶ 6[14].) The issue, then, is whether these two claims are specific enough to survive an analysis under Fed.R.Civ.P. 8(a)(2) and 12(b)(6).

It is well settled that inmates have a First Amendment right to "petition the Government for a redress of grievances."[FN42] This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights."[FN43] "However, this right is not 'an abstract, freestanding right ...' and cannot ground a Section 1983 claim without a showing of 'actual injury.'"[FN44] As a result, to state a claim for denial of access to the courts, a plaintiff must allege facts plausibly suggesting that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury as a result of that act.[FN45]

> **FN42.** *See* U.S. CONST. amend I ("Congress shall make no law respecting an establishment of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

FN43.*Bounds v. Smith,* 430 U.S. 817, 828 (1977), *modified on other grounds, Lewis v. Casey,* 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren,* 386 F.2d 88, 92 (2d Cir.2004) [citations omitted].

FN44.*Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 [1996] ).

FN45.*Lewis,* 518 U.S. at 353;*Renelique v. Duncan,* 03-CV-1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr. 12, 2007) (Strom, J.); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, I find that Plaintiff has alleged facts plausibly suggesting both (1) that Defendant Seitz acted *deliberately and maliciously* when he refused to release Plaintiff from the Auburn C .F. S.H.U. on the evening of June 20, 1998 (despite knowing that Acting Supreme Court Justice Peter E. Corning had ruled in Plaintiff's favor in his Article 78 proceeding regarding that segregated confinement), and (2) that Plaintiff suffered an *actual injury* as a result of that deliberate and malicious act, namely, he was not released from S.H.U. for another two days. In addition, I make the same finding with regard to Plaintiff's claim against Defendant Gummerson.

It is all but self-evident that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. (following that inmate's filing a suit requesting that order) would make that official liable for infringing upon the inmate's right of "access to the courts" under the First Amendment. The Southern District thoroughly and clearly so explained in a case similar to ours:

*17 [Plaintiff's] interest in having defendants comply

with the Appellate Division's order [releasing him from SHU, issued in plaintiff's Article 78 proceeding] ... implicates his constitutional right of access to the courts. The First Amendment to the U.S. Constitution prohibits any law abridging the freedom ... to petition the government for a redress of grievances. That freedom ... encompasses the constitutional right of unfettered access to the courts....

.... The right of access is ... implicated by a state official's knowing refusal to obey a state court order affecting a prisoner's rights.... Logic compels the conclusion that if a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.... [Plaintiff's] assertion of this right is not limited by *Sandin* [*v. Connor,* 115 S.Ct. 2293 (1995) ], which dealt exclusively with procedural due process and did not address fundamental rights arising elsewhere in the Constitution. As the Supreme Court explicitly stated [in *Sandin* ], 'prisoners ... retain other protection from arbitrary state action .... They may invoke the First ... Amendment[ ] ... where appropriate ...' *Sandin,* 115 S.Ct. at 2302, n. 11.

*Johnson v. Coughlin,* 90-CV-1731, 1997 WL 431065, at *6-7, 1997 U.S. Dist. LEXIS 11025, at *21-22 (S.D.N.Y. July 30, 1997) [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also Acre v. Miles,* 85-CV-5810, 1991 WL 123952, at *9, 1991 U.S. Dist. LEXIS 8763, at *27 (S.D.N.Y. June 28, 1991) ("Above all else, such conduct has the effect of denying inmates full access to the courts [under, in part, the First Amendment].... If a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.") [internal quotation marks and citations omitted].[FN46]

FN46.*Cf. Woods v. Interstate Realty Co.,* 337 U.S. 535, 538 (1949) ("[A] right which ... does not supply ... a remedy is no right at all ...."); *Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) ("The defendants' failure to implement the multiple rulings in [the inmate's] favor rendered administrative relief 'unavailable'

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

under the [Prison Litigation Reform Act].")
[citations omitted].

Furthermore, it is important to note that a person's right of access to the courts has been found to arise not only under the First Amendment but under other parts of the Constitution, including the Due Process Clause of the Fourteenth Amendment. *See Monsky v. Moraghan, 127 F.3d 243, 246 (2d Cir.1997)* ("[T]he source of this right [of access to the courts] has been variously located in the First Amendment right to petition for redress [of grievances], the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments.") [citations omitted]; *accord, Colondres v. Scoppetta, 290 F. Supp .2d 376, 381 (E.D.N.Y.2003); Brown v. Stone, 66 F.Supp.2d 412, 433 (E.D.N.Y.1999).*

This is why courts have specifically held that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. would make that official liable *also* for infringing upon the inmate's personal liberty protected by the *substantive* due process clause of the Fourteenth Amendment. Again, the Southern District of New York thoroughly and clearly so explained:

*18 A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.... This is true not only when an official keeps an inmate in prison past the date when a court orders his permanent release ... but also when an official disregards a court order for the inmate's temporary release for work during daytime hours, ... *or disregards an order directing the inmate's release from SHU....* This principle is not disturbed by *Sandin [v. Connor,* 515 U.S. 472 (1995) ], since ... the *Sandin* test applies only to determine when a constitutional liberty interest arises from state prison regulations, thus requiring certain process to deny that liberty interest.... The liberty interest at stake in this case arises from the plaintiff's *nonderogable right to be free from restraints or punishments that a court has expressly deemed to be improper.*

*Coughlin, 1997 WL 431065, at *6, 1997 U.S. Dist. LEXIS 11025, at *19-20* [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also Acre, 1991 WL 123952, at *9, 1991 U.S. Dist. LEXIS 8763, at *26-27* ("[I]t is all but self-evident that a state official's knowing refusal to obey a state court order affecting a prisoner's rights would make the official liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *cf. Franco v. Kelly, 854 F.2d 584, 589 (2d Cir.1988)* ("Like the right of access to the courts, the right to petition [the government for the redress of grievances] is substantive rather than procedural and therefore cannot be obstructed, regardless of the procedural means applied.") [internal quotation marks and citations omitted].[FN47]

FN47. *Accord, Fleming v. Dowdell, 434 F.Supp.2d 1138, 1160 & n. 17 (M.D.Ala.2005)* (recognizing that, where state official knows of court order, yet refuses to comply with it, he incurs liability under substantive due process clause of Fourteenth Amendment) [citations omitted]; *Rodriguez v. Northampton County, 00-CV-1898, 2003 WL 22594318, at *4, n. 4, 2003 U.S. Dist. LEXIS 19567, *12, n. 4 (E.D.Pa. Oct. 21, 2003)* ("A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *Huddleston v. Shirley, 787 F.Supp. 109, 111 (N.D.Miss.1992)* ( "[I]t is undisputed that [defendant] continued to confine [plaintiff] in the county jail during the day in direct conflict with the state court order to release him as specified.... [This] refusal to obey the [court] order violated [plaintiff's] substantive due process rights."); *Tasker v. Moore, 738 F.Supp. 1005, 1010-11 (S.D.W.Va.1990)* ("It is beyond peradventure that officials who willfully, intentionally or recklessly keep an inmate in prison past the date he was ordered released are liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [citations

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

omitted].

As to the precise issue of whether the delay alleged by Plaintiff was long enough to constitute an "actual injury" for purposes of an access-to-courts claim, Plaintiff's Fourth Amended Complaint alleges that the delay caused by Seitz occurred from "the evening" of June 20, 1998 (when Defendant Seitz allegedly refused to release Plaintiff because "Auburn's Administration runs the prison, not the Judge") to "[the] afternoon" of June 22, 1998 (when Plaintiff was released from S.H.U. back into the general population). (Dkt. No. 16, ¶¶ 6[15]-6[17] [Plf.'s Fourth Am. Compl.].) As a result, I liberally construe Plaintiff's Fourth Amended Complaint as alleging that the delay in question was between thirty-six (36) and forty-eight (48) hours in length. [FN48] The alleged delay caused by Defendant Gummerson was even longer, his refusal to release Plaintiff allegedly occurred on the evening of June 19, 1998-approximately twenty-four hours before Defendant Seitz's refusal to release Plaintiff. (*Id.* at ¶ 6[14].)

> FN48. Without burdening this already lengthy Report-Recommendation with a detailed and esoteric discussion of semantics, I note that I arrive at this conclusion by reasoning that, by the term "afternoon," Plaintiff meant the period of time between noon and dinnertime (i.e., at approximately 6:00 p.m.), and by the term "evening," Plaintiff meant the period of time between dinnertime and midnight.

**\*19** Delays in releasing prisoners following the issuance of release orders have been found to be actionable under the Constitution even where those delays were much less than thirty-six hours in length. *See Arline v. City of Jacksonville, 359 F.Supp.2d 1300, 1308-09 (M.D.Fla.2005)* (jury question was presented as to whether defendants' imprisonment of plaintiff for *two-and-a-half-hours* after plaintiff had been acquitted at criminal trial was unreasonable for purposes of Fourth Amendment); *Lara v. Sheahan, 06-CV-0669, 2007 WL 1030304, at \*4-5, 2007 U.S. Dist. LEXIS 24261, at \*11-12 (N.D.Ill. March 30, 2007)* (denying defendants' Rule 12[b] [6] motion to dismiss with regard to plaintiff's claim that defendants delayed up to *nine hours and fifteen minutes* in releasing him after judge had issued release

order, because, depending on evidence, delay could have been unreasonable for purposes of Due Process Clause); *Lewis v. O'Grady, 853 F.2d 1366, 1368-70 & n. 9 (7th Cir.1988)* (jury question was presented as to whether defendants' imprisonment of plaintiff for *eleven hours* after judge had determined he was not the man named in arrest warrant was unreasonable for purposes of Fourth and Fourteenth Amendments). [FN49] In addition, it should be remembered that Plaintiff has also alleged facts plausibly suggesting that the approximate-two-day delay in question was accompanied by constructive (and perhaps actual) notice on the part of Defendants Seitz and/or Gummerson that Plaintiff's release had been ordered by Judge Corning *more than three weeks before* the evening of June 19 and 20, 1998, i.e., on May 26, 1998. (Dkt. No. 16, ¶¶ 6[12]-6[15] & "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

> FN49. *Cf. Brass v. County of Los Angeles, 328 F.3d 1192,1195,1199-1202 (9th Cir.2003)* (record evidence on defendants' motion for summary judgment did not present genuine issue of fact as to whether sheriff's department "processing" policy, which caused thirty-nine hour delay after judge had issued release order, was unreasonable under Fourth and Fourteenth Amendments).

As a result of all of the foregoing, I find that Plaintiff has alleged facts plausibly suggesting that the delay he experienced due to the action (or inaction) of Defendants Seitz and Gummerson caused him an "actual injury" for purposes of an access-to-courts claim.

Usually on a motion for summary judgment, when an analysis of the pleading sufficiency of a plaintiff's claims has been completed, it is appropriate to conduct an analysis of the evidentiary sufficiency of that claim. However, here, Defendants have not challenged Plaintiff's access-to-courts claim against Defendants Seitz or Gummerson on the basis of evidentiary insufficiency. By not offering any argument that Plaintiff has not adduced any evidence establishing these access-to-courts claims, Defendants have failed to meet their threshold burden with regard to any request for dismissal of those claims under Fed.R.Civ.P. 56 and Local Rule 7.1. On a motion for summary judgment, before the nonmoving party must

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact.[FN50] This initial burden, while modest, is not without substance.[FN51]

FN50.Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also* *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

FN51.*See* *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 243 (2d Cir.2004) ("[A] district court may not grant [a] motion [for summary judgment] without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996) ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]. This requirement (that the Court determine, as a threshold matter, that the movant's motion has

merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

**\*20** Furthermore, even if Defendants had offered such argument, I am confident that I would find that a genuine issue of fact exists with regard to that claim, based on the current record. (*See, e.g.,* Dkt. No. 85, Part 4, ¶¶ 14-18 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate time of conversation between Plaintiff and Defendant Seitz on evening of June 20, 1998]; Dkt. No. 16, ¶¶ 6[12]-[15] [Plf.'s Verified Fourth Am. Compl.].)

Simply stated, then, because Plaintiff has alleged facts plausibly suggesting First Amendment access-to-courts claims against Defendants Seitz and Gummerson, and because Defendants have not successfully challenged those claims on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed. As a result, I recommend that Plaintiff's First Amendment access-to-courts claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

One more point bears mentioning before I proceed to an analysis of whether or not Plaintiff has successfully asserted a First Amendment retaliation claim: an argument exists (at least in my opinion) that Judge Corning's judgment need not have been acted on until the deadline by which respondents in the Article 78 proceeding could file an appeal from that judgment had expired, since that judgment (arguably) was not "final" until then.[FN52] However, it appears that, under the New York Civil Practice Law and Rules, the deadline by which respondents in an Article 78 proceeding can file an appeal from the judgment against them expires thirty-five days after they mail to the petitioner a copy of the judgment and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

written notice of its entry [FN53] (which mailing presumably occurred, in this case, on the date of the notice, June 18, 1998). [FN54] As a result, such a rule would lead to the rather absurd result that, where the respondents in an Article 78 proceeding successfully brought by a prisoner confined to S.H.U. choose to simply *not* mail the prisoner a copy of the judgment and written notice of its entry, the deadline by which respondents must file an appeal from the judgment (and thus the prisoner's S.H.U. confinement) would be extended indefinitely-in total frustration of a court judgment that has not in any way been invalidated. Rather, I believe that the more sensible rule, and the operative one, is that the judgment is stayed (for purposes of a subsequent constitutional access-to-courts claim by the petitioner) only upon the actual filing of a notice of appeal by the respondent (or the issuance of a court order granting such a stay). [FN55] No evidence exists in the record that such a notice of appeal was filed, or even considered.

FN52.*See* Slone v. Herman, 983 F.2d 107, 110 (8th Cir.1993) ("We conclude that when Judge Ely's order suspending [plaintiff's] sentence became final and nonappealable, the state lost its lawful authority to hold [plaintiff]. Therefore, any continued detention unlawfully deprived [plaintiff] of his liberty, and a person's liberty is protected from unlawful state deprivation by the due process clause of the Fourteenth Amendment.") [citations omitted]; *cf.* Wright v. Rivera, 06-CV-1725, 2007 U.S. Dist. LEXIS 72218, at *11 (E.D.N.Y. Sept. 25, 2007) (stating that "the judgment in [the plaintiff's] Article 78 proceeding [would] become[ ] final by the conclusion of direct review or the expiration of the time for seeking such review ... in state court").

FN53. (Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, stating that Judge Corning's judgment had been "duly entered ... and filed in the Clerk's Office, Cayuga County on May 27, 1998"].)

FN54.N.Y. C.P.L.R. § 5513(a); *see also* David Siegel, 1999 Practice Commentary, "Time to Appeal or Move for Leave, In General,"

C5513:1, reprinted in 7B McKinney's Consolidated Laws of New York Ann., Supplement, p. 82 (West 2005).

FN55.*See* Tasker v. Moore, 738 F.Supp. 1005, 1007, 1011 (S.D.W.Va.1990) (during stay of judge's release orders pending appeal from those orders, no liability ensued for not complying with those orders); *cf.* Coughlin, 1997 WL 431065, at *7, 1997 U.S. Dist. LEXIS 11025, at *23 (recognizing that it was not until the New York State Appellate Division decided respondents' appeal from the judgment of the New York State Supreme Court granting the inmate's Article 78 petition that prison officials incurred liability for not promptly complying with the judgment granting the Article 78 petition).

**b. Retaliation Claim**

Defendants' argument that Plaintiff has failed to assert a retaliation claim is based on the fact that the word "retaliation" does not appear in the portion of Plaintiff's Fourth Amended Complaint labeled "Fifth Cause of Action." (*Id.*) This, of course, is true: Plaintiff's "Fifth Cause of Action" alleges, in pertinent part, that Defendants Walker, Gummerson and Seitz, by "intentionally delaying his release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First ... Amendment [r]ights [under] the United States Constitution." (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

*21 In order to convert the claim raised in this allegation from an access-to-courts claim to a retaliation claim, one would have to stretch the meaning of the word "after" in the allegation so that it means "because of" (thus rendering the allegation as stating that "[Defendants Walker, Gummerson and Seitz] intentionally delay[ed] his release from the 'SHU' [*because of* ] his successful Article 78 [petition] ...." (*Id.*) Fortunately, the Court need not engage in such a reconstruction.

This is because Plaintiff's "Fifth Cause of Action" begins

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

by expressly stating that the wrongful conduct that is the subject of the Cause of Action is described in Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint. (*Id.*) In those paragraphs, Plaintiff alleges facts plausibly suggesting that Defendants Gummerson and Seitz did not release him from S.H.U. (which, of course, constituted adverse action) *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (which, of course, was activity protected under the First Amendment). (*Id.* at ¶¶ 6[13]-6[15] [alleging that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, that he was not being released from S.H.U. because "Auburn's Administration runs the prison, not the judge."] [internal quotation marks omitted].) [FN56]

> FN56. Of course, this sort of adoption of allegations by reference to them in a complaint is expressly permitted under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading ....")

It must be remembered that, in the Second Circuit, when a *pro se* civil rights litigant's allegations are construed with special solicitude, the legal claims he has asserted are limited only by what legal claims his factual allegations plausibly suggest, not by his invocation of legal labels. *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, Phillips has raised. In so doing, the court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.") [citations omitted]. [FN57] Indeed, this is also the case for complaints filed by plaintiffs who are *not* proceeding *pro se. See* Albert v. Carovano, 851 F.2d 561, 571, n. 3 (2d Cir.1988) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.") [citation omitted], *accord,* Wynder v. McMahon, 360 F.3d 73, 75, 77 & n. 11 (2d Cir.2004), Northrup v. Hoffman of Simsbury, Inc., 134 F.3d 41, 46 (2d Cir.1997).

> FN57. It should be noted that the Second Circuit,

in *Phillips v. Girdich,* stated that the legal claims asserted by a *pro se* civil rights litigant are limited only by what legal claims his factual allegations *conceivably* suggest, not what they "plausibly" suggest. *See* 408 F.3d at 130 ("It is enough that [*pro se* litigants] allege that they were injured, and that their allegations can conceivably give rise to a viable claim .... [T]he court's imagination should be limited only by Philips' factual allegations ....") [emphasis added; citations omitted]. To the extent that *Phillips* was based on a *conceivability* standard as opposed to a *plausibility* standard, I interpret *Phillips* to have been abrogated by the Supreme Court's decision last year in *Bell Atlantic Corporation v. Twombly,* 127 S.Ct. 1955, 1965-74 (2007) (rather than turn on the "conceivab[ility]" of an actionable claim," the Rule 8 standard turns on the "plausibility" of an actionable claim in that his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]"); *see also Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (*"Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted].

Simply stated, a plaintiff need not necessarily use the legal term "retaliation" [FN58] in his complaint in order to assert a retaliation claim. *See* Williams v. Manternach, 192 F.Supp.2d 980, 986-87 (N.D.Iowa 2002) ("[E]ven though the Complaint does not use the appropriate term of art for a 'retaliation' claim, it alleges both factual issues that implicated that legal proposition ..., and provides sufficient factual allegations to provide for relief on a retaliation theory.") [internal quotation marks and citations omitted]; Baltoski v. Pretorius, 291 F.Supp.2d 807, 810-11 (N.D.Ind.2003) ( "To state a claim for retaliatory treatment [under the First Amendment], a complaint need only allege a chronology of events from which retaliation may be inferred.") [citation omitted]; *cf.* Thomas v. Hill, 963 F.Supp. 753, 756 (N .D. Ill.1997) ("Mr. Thomas does not claim that the defendants' verbal threats and abuse were motivated by retaliation, and the word 'retaliate' does not appear in his complaint. Nonetheless, the facts alleged would arguably state a retaliation claim."); Lashley v. Wakefield, 367 F.Supp.2d 461, 470, n. 6

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

(W.D.N.Y.2005) ("Even though plaintiff uses the word 'retaliatory' and not 'harassment' in the third claim, ... I construe his third claim as a ... claim against Aidala and Piccolo for cruel and unusual punishment by way of harassment ....").[FN59] Rather, the governing standard is whether a plaintiff has alleged facts plausibly suggesting that a defendant subjected him to retaliation for purposes of the First Amendment. *That* is how the defendant receives fair notice of the plaintiff's claim under Fed.R.Civ.P. 8.

> FN58.*See Trask v. Rios,* 95-CV-2867, 1995 U.S. Dist. LEXIS 18945, at *13 (N.D.Ill.Dec. 18, 1995) (" 'Harass,' 'discriminate,' and 'retaliate' are words to which legal significance attaches. Alone, they are legal conclusions that do not place defendants on notice of the circumstances from which the accusations arise and therefore are inappropriate pleading devices.") [citations omitted].

> FN59. This point of law has also been specifically recognized in the analogous context of prisoner grievances. *See Varela v. Demmon,* 05-CV-6079, 2007 U.S. Dist. LEXIS 35873, at *15 (S.D.N.Y.2007) ("Varela's grievance does not use the word 'retaliation' in describing what occurred. But, fairly read [for purposes of the issue of whether Varela exhausted his administrative remedies regarding his retaliation claim], it does suggest that the assault occurred in response to Varela's prior complaint to Demmon's supervisors."), *adopted,* 2007 U.S. Dist. LEXIS 47939 (S.D.N.Y. June 14, 2007); *accord, Allah v. Greiner,* 03-CV-3789, 2007 U.S. Dist. LEXIS 31700, at *18-19 (S.D.N.Y. Apr. 30, 2007) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance used word "harassment" rather than "retaliation"); *Trenton v. Ariz. Dep't of Corr.,* 04-CV-2548, 2008 U.S. Dist. LEXIS 6990, at *11 (D.Ariz. Jan. 16, 2008) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"); *Wheeler v.. Prince,* 318 F.Supp.2d 767, 772, n. 3 (E.D.Ark.2004) (prisoner's grievance asserted

claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"). This point of law has also been recognized in other contexts. *See, e.g., Manzi v. DiCarlo,* 62 F.Supp.2d 780, 794 (E.D.N.Y.1999) (recognizing that word "discrimination" may be used to articulate a "retaliation" claim for purposes of claim under Americans with Disabilities Act).

**\*22** Based on the extra liberal construction that must be afforded to Plaintiff's Fourth Amended Complaint due to his special status as a *pro se* civil rights litigant, I find that the Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Seitz did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 20, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity). Similarly, I find that Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Gummerson did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 19, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity).

Because Defendants have not challenged Plaintiff's First Amendment retaliation claims against Defendants Seitz and Gummerson on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed.[FN60] As a result, I recommend that Plaintiff's First Amendment retaliation claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

> FN60. To the extent that Plaintiff's allegation that Defendant Gummerson refused to release him from S.H.U. on the evening of June 19, 1998, falls outside the applicable three-year limitations period, I find that Plaintiff may, and should, benefit from the continuing violation doctrine with regard to that specific allegation, because (1) the event in question was *sufficiently*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

*connected* to Plaintiff's continued incarceration in S.H.U. on June 20, June 21 and part of June 22 (which occurred within the applicable limitations period), and (2) Defendant Gummerson's refusal to release Plaintiff, and Plaintiff's continued confinement in S.H.U., was *express, openly espoused,* and *discriminatory* (relative to other prisoners who had not filed Article 78 petitions regarding their confinement to S.H.U.).

Having said all of that, I also find that Plaintiff's Fourth Amended Complaint contains no factual allegations plausibly suggesting that *Defendant Walker* caused Plaintiff to not be released from S.H.U. because Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court. Rather, Plaintiff's sole theory of liability against Defendant Walker (who was the superintendent of Auburn C.F.) appears to be that Walker somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to not release Plaintiff because of the decision issued by the Cayuga County Supreme Court. However, Plaintiff's Fourth Amended Complaint is woefully vague and speculative with regard to the details supporting such a theory of liability. Viewed from another perspective, Plaintiff's Fourth Amended Complaint fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged. As a result, I recommend that Plaintiff's First Amendment retaliation claim against Defendant Walker be *sua sponte* dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

I hasten to add that, in reaching these conclusions, I in no way rely on any allegations made by Plaintiff for the first time in his opposition papers (which Plaintiff urges the Court to do, out of an extension of special solicitude to him).[FN61] That is because it is too late in this proceeding for Plaintiff to constructively amend his pleading in such a way. It should be noted that Plaintiff has already amended his pleading *four* times.

FN61. (*See* Dkt. No. 85, Part 3, at 10-11 [Plf.'s Memo. of Law].)

**\*23** One final point bears mentioning: I imagine that

Defendants may try to prove at trial (or perhaps during a *third* motion for summary judgment, should they be given an opportunity to file such a motion) that Defendants Gummerson and Seitz would have taken the same actions on June 19 and 20, 1998, regardless of whether or not Plaintiff had filed, and won, his Article 78 petition. I say this because, as I mentioned earlier, it appears from the record that corrections officials at Auburn C.F. *may have* kept Plaintiff in S.H.U. between June 19, 1998, and June 22, 1998, merely so that they could transfer him to another correctional facility rather than return him to Auburn C.F.'s general population (where he would have access to the three inmates who had essentially accused him of making threats against them).[FN62] In other words, it appears from the record that the motivation of Defendants Gummerson and/or Seitz *may have* been merely to keep Plaintiff from the three inmates in question, rather than to retaliate against Plaintiff for litigating the legality of his placement in administrative segregation. However, while some evidence exists in the record supporting such a fording, other evidence exists to the contrary.[FN63] Even if such contrary record evidence did not exist, I would find it inappropriate to recommend dismissal of Plaintiff's retaliation claim against Defendants Gummerson and/or Seitz on such a ground. This is because Defendants did not base their motion on this ground.[FN64] As a result, Plaintiff was not notified of this argument and provided an opportunity to adduce evidence in opposition to it. As stated earlier, on a motion for summary judgment, before the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact. This initial burden, while modest, is not without substance.

FN62. (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord,* Dkt. No. 16, ¶ 6[14]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

[Plf.'s Verified Fourth Am. Compl ., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was subsequently denied], *accord,* Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

FN63. (Dkt. No. 16, ¶¶ 6[11]-6[15] [Plf.'s Verified Fourth Amended Compl., swearing that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, that he was not being released from S.H.U. because "Auburn's Administration runs the prison, not [Judge Corning].") [internal quotation marks omitted].) As explained earlier in this Report-Recommendation, verified pleadings have the effect of an affidavit during a motion for summary judgment. *See, supra,* Part I, and note 8, of this Report-Recommendation. Here, Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746. (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].) Furthermore, the statements that Plaintiff asserts Defendants Gummerson and Seitz made to him on the evenings of June 19 and 20, 1998 (which would presumably be offered by Plaintiff to prove the truth of the matters asserted therein) would not be hearsay because they would each be an admission of a party opponent. *See* Fed.R.Evid. 801(d)(2). Even if both statements were hearsay, they would arguably be admissible under the hearsay exception for a statement of the declarant's then-existing state of mind. *See* Fed.R.Evid. 803(3).

FN64. (*See generally* Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law, challenging only the pleading insufficiency of Plaintiff's "conclusory" and "last-minute" retaliation claim].)

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' second motion for summary judgment (Dkt. No. 81) be **GRANTED** in part and **DENIED** in part, in the following respects:

(1) Plaintiff's Fourth Cause of Action be **DISMISSED** in its entirety based on the three-year statute of limitations governing that claim or, in the alternative, based on the lack of record evidence establishing a violation of any right to procedural due process under the Fourteenth Amendment;

(2) Plaintiff's Fifth Cause of Action be **DISMISSED** to the extent that it asserts (a) any Fourteenth Amendment procedural due process claim whatsoever, (b) a First Amendment access-to-courts claim against Defendant Walker, and (c) a First Amendment retaliation claim against Defendant Walker; and

(3) Defendants' second motion for summary judgment be **otherwise DENIED** so that, surviving that motion is (a) Plaintiff's First Amendment access-to-courts claim against Defendants Seitz and Gummerson, asserted in the Fourth Amended Complaint's Fifth Cause of Action, and (b) Plaintiff's First Amendment retaliation claim against Defendants Seitz and Gummerson, also asserted in the Fifth Cause of Action.

**\*24 ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation.** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.**[FN65]

FN65. *See, e.g., Paddington Partners v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

*Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994)
("In objecting to a magistrate's report before the
district court, a party has no right to present
further testimony when it offers no justification
for not offering the testimony at the hearing
before the magistrate.") [internal quotation marks
and citations omitted]; *Pan Am. World Airways,
Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n.
3 (2d Cir.1990) (district court did not abuse its
discretion in denying plaintiff's request to present
additional testimony where plaintiff "offered no
justification for not offering the testimony at the
hearing before the magistrate"); *Alexander v.
Evans,* 88-CV-5309, 1993 WL 427409, at *18 n.
8 (S.D.N.Y. Sept. 30, 1993) (declining to
consider affidavit of expert witness that was not
before magistrate) [citation omitted]; *see also
Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th
Cir.2000) ("Petitioner's failure to raise this claim
before the magistrate constitutes waiver.");
*Marshall v. Chater,* 75 F.3d 1421, 1426 (10th
Cir.1996) ("Issues raised for the first time in
objections to the magistrate judge's
recommendations are deemed waived.")
[citations omitted]; *Cupit v. Whitley,* 28 F.3d
532, 535 (5th Cir.1994) ("By waiting until after
the magistrate judge had issued its findings and
recommendations [to raise its procedural default
argument] ... Respondent has waived procedural
default ... objection [ ].") [citations omitted];
*Greenhow v. Sec'y of Health & Human Servs.,*
863 F.2d 633, 638-39 (9th Cir.1988)
("[A]llowing parties to litigate fully their case
before the magistrate and, if unsuccessful, to
change their strategy and present a different
theory to the district court would frustrate the
purpose of the Magistrates Act."), *overruled on
other grounds by U.S. v. Hardesty,* 977 F.2d
1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v.
Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985,
990-91 (1st Cir.1988) ("[A]n unsuccessful party
is not entitled as of right to de novo review by
the judge of an argument never seasonably raised
before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely
objections to this Report-Recommendation will
PRECLUDE LATER APPELLATE REVIEW of any
Order of judgment that will be entered.***Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v.
Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2008.
Cabassa v. Gummerson
Not Reported in F.Supp.2d, 2008 WL 4416411
(N.D.N.Y.)

END OF DOCUMENT



Page 1

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)
(Cite as: 2009 WL 3049613 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Charles MAY, Plaintiff,
v.
Superintendent DONNELI; Donaldson, Grievance
Coordinator; Dep. Stern; Imam Ahmed; Officer
Matthew; Deacon Bashaw; and James Jones,
Administration Sergeant, Defendants.
**Civil Action No. 9:06-cv-437 (GLS/RFT).**

Sept. 18, 2009.

Charles May, Ray Brook, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, David L. Cochran, Assistant Attorney General,
of Counsel, Albany, NY, for the Defendants.

### *ORDER*

GARY L. SHARPE, District Judge.

**\*1** The above-captioned matter comes to this court
following a Report-Recommendation by Magistrate Judge
Randolph F. Treece, duly filed August 25, 2009.
Following ten days from the service thereof, the Clerk has
sent the file, including any and all objections filed by the
parties herein.

No objections having been filed, and the court having
reviewed the Magistrate Judge's Report-Recommendation
for clear error, it is hereby

ORDERED, that the Report-Recommendation of
Magistrate Judge Randolph Treece filed August 25, 2009

is ACCEPTED in its entirety for the reasons state therein,
and it is further

ORDERED, that the defendants' motion for partial
summary judgment (Docket No. 57) is GRANTED in part
and DENIED in part, and it is further

ORDERED, that the Clerk of the court serve a copy of this
order upon the parties in accordance with this court's local
rules.

IT IS SO ORDERED.

### *REPORT-RECOMMENDATION AND ORDER*

RANDOLPH F. TREECE, United States Magistrate
Judge.

*Pro se* Plaintiff Charles May brings this civil rights action,
pursuant to 42 U.S.C. § 1983, alleging that his First
Amendment rights were violated when he was denied the
opportunity to eat blessed food for seven days with his
fellow Nation of Islam members during the Holy Month of
Ramadan. Dkt. No. 51, Am. Compl. at ¶ 1. In addition,
Plaintiff asserts claims under the Religious Land Use and
Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §
2000cc-1, and New York State Corrections Law § 610. *Id.*
at ¶ 37. Defendants move for Partial Summary Judgment,
to which Plaintiff filed a Response in Opposition. Dkt.
Nos. 57-58. Defendants contend that Plaintiff is (1) barred
from bringing an action for mental or emotional injury
under 42 U.S.C. § 1983 because he failed to allege the
required showing of physical injury pursuant to 42 U.S.C.
§ 1997e(e); and (2) estopped from bringing a pendent state
law claim pursuant to N.Y. CORR. LAWW § 24. Dkt. No.
57-5, Defs.' Mem. of Law at pp. 2-4. For the reasons that
follow, it is recommended that the Defendants' Motion be
**GRANTED in part** and **DENIED in part.**

### I. BACKGROUND

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)
(Cite as: 2009 WL 3049613 (N.D.N.Y.))

The following material facts are not, for purposes of this Motion, in dispute. Plaintiff alleges that in August 2005, approximately one month prior to the Islamic celebration of Ramadan, he was signed up as a member of the Nation of Islam in order to allow him to participate in Ramadan related activities. Dkt. No. 58, Pl.'s 7.1 Statement at p. 2. According to Plaintiff, during the Holy Month of Ramadan, Muslims are unable to eat during mess hall hours because they are required to fast during that time; the fast is then broken at night by eating blessed food. Am. Compl. at ¶ 16.[FN1] On October 5, 2005, Plaintiff fasted and then ate blessed food with his fellow Nation of Islam members. *Id.* at ¶ 13. Plaintiff alleges that on October 6, 2005, he was informed by Defendant Sergeant Jones, in the presence of Defendant Corrections Officer ("C.O.") Mathew, that the administration had him listed as a Sunni Muslim and he would therefore have to eat with them until the administration straightened things out. *Id.* Though Plaintiff was willing to eat with the Sunni Muslims temporarily, he alleges that when he attempted to enter the Masjid [FN2] on October 6th, he was denied access by C.O. Mathew because he was not on the list. *Id.* at ¶ 35. Plaintiff alleges that Defendant Sergeant Jones maliciously failed to put him on the Sunni Muslim list. *Id.* at ¶ 34. Ultimately, Plaintiff was unable to eat with either Muslim sect for seven days until October 13, 2005, when he was permitted to eat with the Sunni Muslims. *Id.* at ¶ 19. During those seven days, Plaintiff observed the fasting strictures of Ramadan, but was unable to properly break his fast, thus resulting in a seven day fast. After informing Defendant Superintendent Donneli of the matter, Plaintiff was immediately placed with the Nation of Islam on October 18, 2005. *Id.* at ¶ 20.

> FN1. Though Plaintiff submitted a "Material Fact" statement in accordance with N.D.N.Y.L.R. 7.1 (Dkt. No. 57), his statement is presented in an argumentative manner and does not clearly lay out all of his factual allegations. Therefore, the Court relies primarily on Plaintiff's Amended Complaint to discern his factual allegations.

> FN2. A Masjid is a Muslim place of worship, commonly referred to in English as a Mosque.

**\*2** Though Plaintiff refrained from eating for seven days,

he alleges no physical injury other than that he "lost a few pounds," was feeling lightheaded because of a possible increase in blood pressure, and suffered mental and emotional distress. Dkt. No. 58, Pl.'s Resp. in Opp'n to Defs.' Mot. (hereinafter "Pl.'s Resp.") at p. 2. In fact, Plaintiff stated candidly during his deposition that he did not suffer any physical injury. Dkt. No. 57-4, David L. Cochran, Esq., Affirm., dated Oct. 15, 2008, Ex. A, Pl.'s Dep., dated Jan. 22, 2008 (hereinafter "Pl.'s Dep.") at p. 2.

Plaintiff alleges a second violation of his constitutional right to freely exercise his religion when Defendants denied him the opportunity to have family visits during the Muslim festival of Eid-Ul-Adha. Am. Compl. at ¶ 22.

As a result of the aforementioned factual allegations Plaintiff claims he suffered emotional, mental, and physical distress, and seeks both compensatory and punitive damages for his alleged injuries. *Id.* at ¶¶ 22, 25 & 26.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In order for an issue of material fact to exist, it must relate to a disputed matter that "might affect the outcome of the suit," and the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

On a motion for summary judgment, the moving party bears the initial burden to demonstrate that there is no genuine issue as to any material fact, and therefore, they are entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must go beyond the pleadings and allege specific facts that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)
(Cite as: 2009 WL 3049613 (N.D.N.Y.))

present a genuine issue for trial. FED. R. CIV. P. 56(e). To that end, the non-movant cannot rest on "mere allegations or denials." *Id.*

When evaluating a motion for summary judgment, the court will draw all inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Moreover, when a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (cited in *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995)). Nevertheless, a party's "bald assertion," unsupported by evidence, is insufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### B. Physical Injury Requirement

**\*3** The Prison Litigation Reform Act of 1995 ("PLRA"), codified in part at 42 U.S.C. § 1997e(e), states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." The purpose of this physical injury requirement is to discourage frivolous suits commenced by inmates. *See Cox v. Malone,* 199 F.Supp.2d 135, 139-140 (S.D.N.Y.2002) ("Section 1997e(e) [ ... ] is a *substantive* limitation on the type of actions that can be brought by prisoners. Its purpose is to weed out frivolous claims where only emotional injuries are alleged.") (emphasis in original). The Second Circuit Court of Appeals has held that the PLRA applies to alleged constitutional violations brought under 42 U.S.C. § 1983. *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002).

In this case, the only physical injury that Plaintiff states he suffered was a loss of a few pounds and a possible increase in blood pressure. Pl.'s Resp. at p. 2. Furthermore, Plaintiff did not allege these injuries in his Amended Complaint, but rather, only after Defendants raised the PLRA defense in their Motion for Partial Summary Judgment. Prior to Defendants' Motion, Plaintiff stated at his deposition that he did not suffer any physical injury. Pl.'s Dep. at p. 2. Even assuming, *arguendo,* that Plaintiff

had properly alleged a physical injury in his Amended Complaint, his allegations do not constitute physical injury for purposes of the PLRA.

Section 1997e(e) provides no definition of "physical injury." *Liner v. Goord,* 196 F.3d 132, 135 (2d Cir.1999). However, courts have held that in order to constitute a physical injury under 1997e(e), an injury must be more than *de minimis,* but need not be significant. *Id.* (citing *Siglar v. Hightower,* 112 F.3d 191, 193 (5th Cir.1997)); *Warren v. Westchester County Jail,* 106 F.Supp.2d 559, 570 (S.D.N.Y.2000) (citing *Siglar* ).

The issue is therefore whether Plaintiff's loss of a few pounds amounts to more than a *de minimis* injury for purposes of the PLRA. In short, it appears this question is answered in the negative. Loss of weight is generally not considered to be a physical injury for purposes of the PLRA, especially the loss of only a few pounds. *See Dawes v. Walker,* 1998 WL 59454, at \*1 n. 1 (N.D.N.Y. Feb. 9, 1998) ("It appears unlikely that lost weight is a physical injury within the meaning of Section 1997e(e)."); *see also Porter v. Coombe,* 1999 WL 587896, at \*8 (S.D.N.Y. Aug. 4, 1999) (plaintiff's loss of twenty-five pounds did not constitute a physical injury); *accord Pearson v. Welborn,* 471 F.3d 732, 744 (7th Cir.2006) (plaintiff's loss of fifty pounds did not constitute a physical injury). Similarly, Plaintiff's alleged increase in blood pressure does not amount to physical injury. *See Jones v. H.H.C. Inc.,* 2003 WL 1960045, at \*5 (S.D.N.Y. Apr. 8, 2003); *accord Davis v. District of Columbia,* 158 F.3d 1342, 1349 (D.C.Cir.1998) (articulating that § 1997e(e) precludes reliance on somatic manifestations of emotional distress). Thus, Plaintiff has not alleged a sufficient physical injury pursuant to the PLRA.

**\*4** Although Plaintiff has not met his burden on the physical injury requirement of the PLRA, his failure to do so is not completely dispositive of his underlying constitutional claim. "The failure of prisoners to plead or establish a compensable actual injury in a § 1983 constitutional tort claim [ ... ] only precludes the recovery of compensatory damages, but does not lead to the dismissal of the underlying claim." *Dawes v. Walker,* 239 F.3d 489, 496 (2d Cir.2001). Plaintiff may still be entitled to injunctive or declaratory relief for a violation of his constitutional rights. *Thompson v. Carter,* 284 F.3d 411,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)
(Cite as: 2009 WL 3049613 (N.D.N.Y.))

416-418 (2d Cir.2002). A plaintiff is not required to show physical injury in order to recover nominal damages, punitive damages, or declaratory relief. *Gill v. Hoadley,* 2007 WL 1341468, at *4 (N.D.N.Y. May 4, 2007). In fact, it is error for courts not to award nominal damages in § 1983 actions when a constitutional violation has been established. *See Robinson v. Cattaraugus,* 147 F.3d 153, 162 (2d Cir.1998).

In the instant case, Plaintiff has requested punitive damages. Am. Compl. at ¶ 26. Defendants do not challenge the merits of Plaintiff's underlying constitutional claim, therefore that issue is not before this Court. Due to Plaintiff's inability to demonstrate a physical injury under 1997e(e), compensatory damages for mental or emotional suffering are barred for his § 1983 claim, but it remains to be decided if Plaintiff is entitled to nominal damages, punitive damages, or declaratory relief.

### C. Plaintiff's Pendent State Law Claim

Plaintiff also brings a pendent state law claim pursuant to N.Y. CORR. LAWW § 610, which guarantees inmates "the free exercise and enjoyment of religious profession and worship" while incarcerated. Am. Compl. at ¶ 37. A federal court exercising pendent jurisdiction must apply state law. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1996). "Thus, if state law does not recognize a plaintiff's right to bring an action in state court, a federal court, exercising pendent jurisdiction, sitting as a state court, must follow the state law limitation on jurisdiction." *Livingston v. Griffin,* 2007 WL 2437433, at *2 (N.D.N.Y. Aug. 22, 2007) (citing *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996)).

Defendants argue that this claim is barred by N.Y. CORR. LAWW § 24, which reads:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

**\*5** Thus, § 24 precludes "the assertion of claims against corrections officers [in their personal capacities] in any court, including the federal courts," by designating the New York State Court of Claims as the only available venue to bring a claim for damages arising out the acts committed by corrections officers within the scope of their employment. *Baker v. Coughlin,* 77 F.3d at 14-15. And, because the Court of Claims is a court of limited jurisdiction, hearing only claims against New York State and no other individual or entity, § 24 amounts to a grant of immunity for corrections officers sued in their personal capacities for claims arising out of the discharge of their duties. N.Y. CT. CLMS. LAW § 9.

After the parties submitted their respective briefs on this Motion, the Supreme Court held in *Haywood v. Drown,* --- U.S. ----, 129 S.Ct. 2108 (2009) that § 24, when used to relegate to the Court of Claims civil rights actions brought pursuant to 42 U.S.C. § 1983, is inconsistent with the Supremacy Clause, U.S. Const. Art. VI, cl. 2, and therefore, unconstitutional. The *Haywood* Court held that New York State, having created courts of general jurisdiction that routinely hear § 1983 actions against all types of state actors, "is not at liberty to shut the courthouse door to federal claims [against corrections officers] that it considers at odds with its local policy." *Id.* at 2117. The Supreme Court found such selective treatment of § 1983 claims brought against corrections officers to be "contrary to Congress' judgment that *all* persons who violate federal rights while acting under color of state law shall be held liable for damages," and therefore, in violation of the Supremacy Clause. *Id.* at 2115 (emphasis in original).

In this case, Plaintiff has brought a state law claim pursuant to N.Y. CORR. LAWW § 610. Although the *Haywood* decision found § 24 to be in violation of the Supremacy Clause, it did so only with respect to claims

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)
(Cite as: 2009 WL 3049613 (N.D.N.Y.))

brought under § 1983, a federal statute. A claim brought pursuant to a state law does not implicate the Supremacy Clause, and therefore, the *Haywood* decision does not affect the question of whether this Court has proper jurisdiction to hear this pendent state law claim.

Even after *Haywood,* a New York state court (other than the Court of Claims) would not have jurisdiction to hear Plaintiff's pendent claim pursuant to § 24 because Plaintiff has alleged acts that clearly fall within the scope of the Defendants' employment duties as corrections officers. Therefore, this Court does not have jurisdiction to hear this pendent state law claim brought pursuant to N.Y. CORR. LAWW § 610, and it is recommended that such claim be **dismissed.***Baker v. Coughlin,* 77 F.3d at 14-16;*see also, e.g., Cancel v. Mazzuca,* 205 F.Supp.2d 128, 139 (S.D.N.Y.2002) (dismissing plaintiff's pendent state law claims pursuant to § 24).

## III. CONCLUSION

For the reasons stated therein, it is hereby

**\*6RECOMMENDED,** that the Defendants' Motion for Partial Summary Judgment (Dkt. No. 57) be **GRANTED in part and DENIED in part;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also*28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2009.
May v. Donneli

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)
(Cite as: 1994 WL 49696 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Maurice PARKER, Plaintiff,
v.
Superintendent Walter FOGG, Correction Officers
Dennis Schoonmaker, Ernest Benevento & Correction
Sergeant Longtin, Defendants.
No. 85-CV-177.

Feb. 17, 1994.

James M. Kerrigan, Ithaca, NY, for plaintiff.

Robert Abrams, Atty. Gen. for the State of New York,
Albany, NY (David B. Roberts, Asst. Atty. Gen., of
counsel), for defendants.

MEMORANDUM-DECISION AND ORDER

McCURN, Senior District Judge.

*1 While incarcerated plaintiff *pro se,* Maurice Parker,
filed the present lawsuit.[FN1] This civil rights action,
brought pursuant to 42 U.S.C. § 1983, is predicated upon
allegations that plaintiff's Eighth and Fourteenth
Amendment rights under the United States Constitution
were violated, as well as his rights under Article I, §§ 5
and 6 of the New York State Constitution,[FN2] during an
altercation which took place on October 12, 1983, at
Coxsackie Correctional Facility ("Coxsackie" or "the
facility"), a maximum security prison. Besides those
alleged constitutional deprivations, plaintiff asserts three
pendent state law claims: (1) intentional infliction of
emotional distress, (2) assault and battery, and (3)
violations of New York Corrections Law § 137(5)[FN3] and
7 N.Y.C.R.R. §§ 250.2(g) and 251.2.[FN4] In his complaint
plaintiff seeks a declaratory judgment "that defendants
have violated [his] constitutional rights as protected by the

Eighth and Fourteenth Amendments to the United States
Constitution;...." Complaint at 5. He also seeks
compensatory damages of $250,000 and punitive damages
of $250,000, as well as reasonable costs and expenses,
including attorney's fees. *Id.*

Named as defendants in the complaint are Walter Fogg,
the Superintendent at Coxsackie at the time of the alleged
incident,[FN5] Correction Officers ("C.O.") Dennis
Schoonmaker and Ernest J. Benevento, and Sergeant
James Longtin.[FN6] On January 18 and 19, 1994 this matter
was tried before the court without a jury. In accordance
with Fed.R.Civ.P. 52(a), following constitutes the court's
findings of fact and conclusions of law in this regard.

*I. FINDINGS OF FACT*

To fully appreciate the relatively brief encounter between
plaintiff Parker and the defendants on the evening of
October 12, 1983, it is necessary to briefly examine the
background against which that incident occurred. There is
evidence in the record, in the form of "Inmate
Misbehavior Reports," showing that plaintiff had been
verbally harassing C.O. Judy Wood prior to October 12,
1983. *See* Defendants' exhs. E and F. Even though
plaintiff did not remember the incidents described in those
reports, he did remember having some differences with
C.O. Wood. Defendants suggest that those differences
arose out of the fact that C.O. Wood is a woman and at the
time was a "Block Officer," which apparently was quite
rare in the early 1980's. Plaintiff disagrees explaining that
his differences with Wood occurred because she accused
him of being a ringleader or instigator, provoking others
to engage in disturbances. In any event, it is against this
history of animosity between plaintiff Parker and Wood
(which most surely did exist, for whatever reason) that the
incident which is the subject of this litigation occurred.

Plaintiff's version of the events of October 12, 1983 is as
follows. That evening he was keeplocked [FN7] in his cell.
When the other inmates returned from evening recreation
there were problems with the "lock in" [FN8] because the
inmates thought that the C.O.s were bringing the inmates
back to the cells ten minutes early. Plaintiff testified that

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)
(Cite as: 1994 WL 49696 (N.D.N.Y.))

the inmates were behaving in a raucous manner, with continued screaming even after being locked in for the night. During this time plaintiff claims to have been writing letters.

**\*2** Then, between 9:15 and 9:40 p.m., the door to plaintiff's cell was opened and he saw the defendants standing there. Plaintiff states that at that time he was wearing pajamas with no pockets and his slippers. When he tried to put on his boots, Schoonmaker, whom plaintiff believes had a baton, ordered him not to. In response to plaintiff's inquiry as to what was going on, Schoonmaker told him to, "Shut up," in no uncertain terms. Upon leaving the cell, plaintiff testified that he was not pat frisked, but that he was only escorted by the defendants to the center room. Apparently that room is so called because it is located between two sets of cell blocks. *See* Defendants' exh. A.

As they proceeded down the corridor, plaintiff admits to talking loudly and continuing to question defendants as to where he was being taken. He did that because he was the only one not locked in and he wanted his fellow inmates to know that he was being taken away by the defendants. Plaintiff was then placed in the corner of the center room, making it difficult for him to be seen or heard by other inmates in the surrounding cells. *See* Defendants' exh. A. At this time plaintiff's hands were behind his back, as they had been since he left the cell, and pressed against the wall. C.O.s Benevento and Schoonmaker flanked plaintiff, and by plaintiff's estimation Sergeant Longtin was behind the C.O.s, about two and a half feet from plaintiff.

Plaintiff further testified that it was only about three seconds from the time he was placed in the corner until Schoonmaker first hit him-either with an open right hand or a fist, plaintiff is not sure which. Prior to being struck, plaintiff testified that Schoonmaker was basically telling him that he had a big mouth and that he was a troublemaker. Trying to avoid getting hit, the plaintiff ducked. Plaintiff then claims that after that initial strike by Schoonmaker, both Benevento and Schoonmaker beat him up a little. Schoonmaker then hit plaintiff a second time with a right fist to plaintiff's temple, causing plaintiff's head to hit the wall and he began to bleed. Plaintiff testified that he was ducking and trying to protect himself after Schoonmaker struck him the first time. In fact, the

plaintiff went so far as to demonstrate for the court the crouching position he assumed, with his hands covering his face, when the altercation started. Thus, because by his own admission plaintiff was protecting his face and head and in so doing obstructing his own vision, the court simply cannot credit plaintiff's testimony that C.O. Benevento struck or kicked plaintiff. Perhaps plaintiff was kicked or hit by more than one of the defendants, but the fact remains that he could not reasonably testify to that because at that point, he could not see what was happening.

In any event, after this plaintiff claims that Benevento subdued him with a stick and no more punches were thrown. Plaintiff also claims that he was kicked in the groin, but again there is no credible testimony as to which defendant, if any, engaged in that conduct. Moreover, the medical records do not corroborate plaintiff's statement that he sustained injuries to the groin area as a result of this incident.

**\*3** The medical report contained in the "Unusual Incident Report" reveals that plaintiff sustained a cut measuring approximately 1 and 1/8 inches long on the outer area of his right eyebrow. Defendants' exh. B and H at 5. The facility nurse applied butterfly bandages. *Id.* The next day plaintiff was seen by a doctor who administered sutures. Defendants' exh. H at 5. Plaintiff received somewhere between four and six sutures.[FN9] The sutures were removed eleven days later. Defendants' exh. H. Photos of plaintiff taken eight days after the incident show that his right eye was still quite swollen, with significant bruising around it. Defendants' exh. I and plaintiff's exhs. 3A and 3B.[FN10] To this day, plaintiff still has a small scar (about one and a half inches long) above his right eyebrow, visible from approximately five feet away.

In addition to the scar, plaintiff claims that in the months after the incident he had a lot of headaches and vision problems, as well as pain in the groin area. Even today plaintiff claims that he continues to suffer from headaches, although he could not testify to the frequency of the same. Significantly, however, there is no mention in any of plaintiff's medical records, which are a part of the trial record, of headaches or vision problems. If plaintiff had, as he testified, a number of headaches in the two weeks immediately following the incident, surely that would be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)
(Cite as: 1994 WL 49696 (N.D.N.Y.))

noted in his medical records from that time.

Likewise, even though plaintiff claimed at trial that he also sustained injury to his groin area, there is no mention of that in either the medical portion of the "Unusual Incident Report" or in his medical records for the date of the incident, or the visits immediately following that. In fact, there is no mention in the medical records of any such problem until nearly six weeks after the incident. Defendants' exh. H. In addition, when plaintiff again saw the doctor on November 28, 1983, he mentioned that problems with "bloody ejaculate" were intermittent for the past two months "and also 1 yr. [year] ago." *Id.* Following treatment for prostate difficulties, by plaintiff's own admission, this problem subsided. Thus, insofar as plaintiff's injuries are concerned, the court finds that plaintiff did sustain a laceration to the area above his right eyebrow, which required sutures and resulted in a small permanent scar.

The court will not attribute plaintiff's other complaints of headaches, vision problems and pain and discomfort in the groin area to this incident, however, because those problems are not substantiated in plaintiff's medical records during the weeks immediately following the incident. Furthermore, the fact that headaches can be so easily feigned is another reason for not attributing that particular symptom to the October 12, 1983 incident, especially where these supposed headaches are not mentioned anywhere in plaintiff's medical records.

Not surprisingly, defendants' version of events is at odds with that offered by plaintiff. The defendants claim that earlier in the evening of October 12, 1983, plaintiff had again been verbally harassing C.O. Wood. Sergeant Longtin claims that he first became aware of this when he received a call from C.O. Wood at approximately 7:50 p.m. In response to that call, Sergeant Longtin testified that he went to plaintiff's cell to work out the problem by talking with plaintiff. According to Longtin he and plaintiff agreed to "forgive and forget" the whole matter. Sometime later, while he was making his rounds in another part of the facility, Longtin received a second call from C.O. Wood, again complaining about plaintiff Parker. This time she advised Longtin that the keeplocked inmates, including Parker, were creating a disturbance. Wood also expressed concern that plaintiff had indicated

that when the nurse and another C.O. made their usual nightly rounds at 10:00 p.m., the inmates, led by plaintiff, planned to "break on" them, or, in other words, create a disturbance. Defendants' exh. G. Longtin advised Wood that he would be up shortly after finishing his rounds.

**\*4** The Sergeant did not come alone, though, as he had earlier. This time he was accompanied by defendants, Benevento and Schoonmaker. Sergeant Longtin testified that Schoonmaker was called to accompany him because that was part of his job. At the time, Schoonmaker had the official sounding title of "Evening Shift Assembly Desk Escort Officer," which in Schoonmaker's own words meant that he was a "gopher," or as Longtin described it, a "go-getter." Longtin testified that he did not know why Benevento was also called upon to accompany the Sergeant, but he hypothesized that perhaps Benevento was working overtime that night. The Sergeant further testified that it was customary for one Sergeant to be accompanied by two Corrections Officers in a situation such as this, where they anticipated moving an inmate, as they did Parker.

When the three defendants arrived at plaintiff's cell, prior to giving the signal for the door to be opened, Sergeant Longtin testified that he informed plaintiff that he was being taken to the center room so that they could talk to him. Schoonmaker then ordered plaintiff Parker to put on his pants and plaintiff did that. After exiting the cell, Schoonmaker pat frisked plaintiff and he found contraband-namely a blade from a Bic brand razor measuring approximately 1 1/2 inches by 3/8 inches. Defendants' exh. D and D1. Despite finding that contraband, the three defendants proceeded to escort plaintiff to the center room. Later that night, Schoonmaker wrote up an Inmate Misbehavior Report pertaining to both the contraband and the altercation; but no action was taken with respect to the contraband at the time it was found. Defendants' exh. D.

Upon entering the center room, plaintiff was ordered to stand in the corner and he did that. At that point, while directly in front of the plaintiff, Sergeant Longtin claims that he began talking to him, and questioning plaintiff about the alleged harassment and his supposed plan to instigate a disturbance on the block later that evening. Before he could finish, plaintiff began yelling.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)
(Cite as: 1994 WL 49696 (N.D.N.Y.))

Schoonmaker told the plaintiff to stop yelling and to show a little more respect for the Sergeant, or words to that effect. According to the defendants, that prompted plaintiff to respond by removing his hands from his pockets, where he had been instructed to keep them, and to swing at Schoonmaker with a closed fist. Schoonmaker claims that in self-defense he responded by striking plaintiff on the left side of his head, causing plaintiff's head to hit the wall. Schoonmaker and Benevento then turned the plaintiff around, and both applied "bar hammer locks" to plaintiff's arms. Defendants' exh. B. Longtin issued handcuffs to Schoonmaker who handcuffed the plaintiff. After being escorted to the infirmary, plaintiff was seen by a facility nurse and then placed in another cell area.

Ascertaining exactly what happened on the evening of October 12, 1983 at Coxsackie is not easy because, admittedly, there are discrepancies, in varying degrees of significance, in the testimony of each of the witnesses, all of whom are parties to this action.[FN11] In addition to the discrepancies, the court's task of deciding the "facts" of this case is made even more difficult because it appears that all of the witnesses embellished their testimony to some extent. Difficulty in ascertaining where the "truth" lies here is also compounded by the fact that this incident occurred over ten years ago; and thus, understandably, the independent recollection of each party was significantly impaired. Nevertheless, after considering all of the evidence, and after having the opportunity to judge the credibility of the witnesses, the court concludes that plaintiff's version of events more closely resembles what happened between plaintiff and defendants on the evening of October 12, 1983 than does the defendants' version, and the matter will be decided based predominately upon that view of events.

**\*5** There are two primary reasons that the court is willing, for the most part, to accept plaintiff's version of events. First, the court is greatly troubled by the fact that once contraband was found on the plaintiff, the defendants did not proceed to immediately write him up or focus upon that undisputed violation of prison policy. It is incredible to the court that after finding that contraband on the plaintiff, who according to the Sergeant, had already been reprimanded earlier that same evening for verbal assaults, the defendants' agenda remained to take plaintiff down the hall and talk to him about Wood's claim that he planned to

instigate another disturbance later that night. Given the sequence of events, the court finds it perplexing that once the contraband was found, the defendants did not simply remove plaintiff from his cell block, especially when they were supposedly concerned about him causing a disturbance there later on that night. If that remained defendants' concern, it seems only logical that once they found the contraband, in combination with plaintiff's earlier difficulties with C.O. Wood and her fear about the possibility of plaintiff instigating another cell block disturbance, the defendants would have taken immediate action to segregate plaintiff. Or, at the very least, they would have taken some action more severe then just taking plaintiff down the hall to discuss matters with him. After all, as defendants themselves emphasized at trial, Coxsackie is a maximum security prison and plaintiff had a history of behavior problems, including problems with C.O. Wood-the very same C.O. who complained about him the night of October 12, 1983. Had defendants segregated plaintiff, any fear about his causing another disturbance would have been alleviated.

The court finds the defendants' description of what happened on the night of October 12, 1983 suspect for a second reason. As all the parties testified, although not in precisely this way, plaintiff, a 19 year old, 160 pound unarmed inmate, and familiar with prison mores having already served part of his sentence, was surrounded and literally cornered, by three guards whose combined weight was, conservatively, 500 pounds. Regardless of whether or not the defendants had batons,[FN12] it is implausible to the court that in this situation plaintiff would have "thrown the first punch," [FN13] "in an effort to 'get in his licks,' " [FN14] as the defendants steadfastly maintain. It is far more likely, in the court's opinion, that defendants were agitated by plaintiff Parker's ongoing insolence, as documented in the Inmate Misbehavior Reports of C.O. Woods, and which apparently continued earlier that evening. And thus they, or at least defendant Schoonmaker, made the decision to take some action beyond just talking to the plaintiff.

II. CONCLUSIONS OF LAW

*A. Eighth Amendment-Excessive Force*

Given the proliferation of inmate instituted lawsuits over

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)
(Cite as: 1994 WL 49696 (N.D.N.Y.))

the years, [FN15] it is not surprising that the law is fairly well circumscribed, with respect to Eighth Amendment excessive force claims. Recently, Chief Judge McAvoy of this District had occasion to set forth the legal principles governing such claims. *See Richardson v. VanDusen, 833 F.Supp. 146 (N.D.N.Y.1993); see also Boyd v. Selmer, 842 F.Supp. 52, 55-56 (N.D.N.Y.1994).* Set forth in those decisions is a thorough and accurate recitation of the relevant legal principles, which closely follows that set forth by other courts in this Circuit when faced with Eighth Amendment excessive force claims. [FN16] Consequently, the court sees no need to restate what has already been so well put by a number of courts; instead the court will quote liberally from Judge McAvoy's recent published decision in *Richardson.*

**\*6** The Eighth Amendment protects prisoners from "cruel and unusual punishment." *See Wilson v. Seiter, 501 U.S. 294, ----, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991); Estelle v. Gamble, 429 U.S. 97, 102-05, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251 (1976).* However, it is "the unnecessary and wanton infliction of pain", *Estelle v. Gamble, 429 U.S. at 103, 97 S.Ct. at 290,* and not simply the "ordinary lack of due care for the prisoner's interests or safety" *Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986),* which the Eighth Amendment prohibits.

To prevail in this civil rights action grounded in the Eighth Amendment, the plaintiff must show that the defendants used such excessive force to subdue him that the force could fairly be characterized as the "unnecessary and wanton infliction of pain." *See Hendricks v. Coughlin, 942 F.2d 109, 113 (2nd Cir.1991).* What is necessary to establish an "unnecessary and wanton infliction of pain" varies according to the nature of the constitutional violation. *Whitley v. Albers, 475 U.S. at 320, 106 S.Ct. at 1084.* "Wantonness does not have a fixed meaning but must be determined with 'due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged.' " *Wilson v. Seiter, 501 U.S. at ----, 111 S.Ct. at 2326 (1991) (quoting Whitley v. Albers, 475 U.S. at 320, 106 S.Ct. at 1084).* In this manner, the court must consider the "wantonness" element within the context of the situation in which the underlying force occurred. *Id.* What may amount to the "unreasonable and wanton infliction of pain" is determined by the constraints facing the state official. As the *Whitley* court stated:

Where a prison security measure is undertaken to resolve a disturbance, such as occurred in this case, that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

*Id.* at 321-322, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom. John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

The Supreme Court has recently re-affirmed use of the *Whitley* test in situations such as the one now before the court. *See Hudson v. McMillian, 503 U.S. 1, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992).* In *Hudson,* the Court stated that "whenever prison officials stand accused of using excessive force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley:* whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.*

**\*7** Applying the *Whitley/Hudson* test, the Second Circuit recently stated:

To determine whether the defendants acted maliciously, a jury should consider the following factors: the extent of the plaintiff's injuries; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response. Id. (citing *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085).* If an evaluation of these factors leads the jury to conclude that the defendants acted maliciously, wantonness has been established. And an Eighth Amendment violation has occurred. If, on the other hand, reflection upon these factors leads the jury to find that the defendants acted in a good-faith effort to maintain and restore discipline, no constitutional violation has occurred because the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)
(Cite as: 1994 WL 49696 (N.D.N.Y.))

subjective component of the claim has not been satisfied.

Romano v. Howarth, 998 F.2d 101 (2d Cir.1993).

Id. at 151-52.

*1. Defendant Schoonmaker*

Convinced that defendant Schoonmaker delivered the first blow, the court must now consider whether, under the circumstances, that conduct amounted to a deprivation of plaintiff Parker's constitutional rights such that liability should be imposed under section 1983. When the facts of this case are analyzed in light of the *Romano* factors, the court is compelled to conclude that Schoonmaker's unprovoked attack on plaintiff, albeit brief, renders him liable under section 1983. Although plaintiff's injuries were not extensive, that does not militate against a finding of excessive force violative of the Eighth Amendment. *See* Hudson, 112 S.Ct. at 1000 (use of excessive physical force against an inmate may constitute cruel and unusual punishment even though the inmate does not suffer serious injury). In addition, crediting plaintiff's testimony that Schoonmaker struck him first, there is absolutely nothing in the record demonstrating that Schoonmaker needed to apply force when plaintiff, a 19 year old, 160 pound unarmed inmate, was in a corner virtually surrounded by three prison guards who together substantially outweighed him. Again, accepting plaintiff's version of events, as just explained, Schoonmaker could not reasonably perceive plaintiff as a threat to Schoonmaker's well being. Lastly, Schoonmaker made no effort to temper his response to plaintiff's supposed disrespect; after verbally attacking plaintiff, Schoonmaker just hauled off and struck him. Based on all of the foregoing, the court finds that the force applied by defendant Schoonmaker was not done "in a good faith effort to maintain or restore discipline[,]" but rather was done "maliciously and sadistically to cause harm." *See* id. at 999. Consequently, plaintiff has shown to the court's satisfaction that Dennis Schoonmaker violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishments.

*2. Defendant Longtin*

**\*8** The legal analysis set forth above, and particularly those factors enumerated in *Romano,* are not necessarily applicable with respect to the other two defendants however. More specifically, as to Sergeant Longtin, because the court does not credit plaintiff's testimony that he was attacked by any defendant other than Schoonmaker, obviously Longtin cannot be held liable on the same basis as Schoonmaker-as a direct participant in the attack. At the time of the incident, along with the other Sergeant on duty during that shift, by his own admission Sergeant Longtin was the second highest ranking prison official on duty then. (The highest ranking on duty official was a Lieutenant.) As such, Sergeant Longtin stands in a different position legally from that of the other two defendants. And because of that status, the fact that Longtin himself did not actually strike the plaintiff, does not necessarily extricate him from a finding of liability under § 1983.

A defendant's liability for a constitutional deprivation under 42 U.S.C. § 1983 may arise in several different ways, as the Second Circuit has recognized.

The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

Moffitt v. Town of Brookfield, 950 F.2d 880, 886 (2d Cir.1991) (quoting Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir.1986) (citations omitted)); *see also Van Pelt v. Finn,* No. 92 Civ. 2977, 1993 U.S.Dist. LEXIS 15951, at *19 (S.D.N.Y. filed Nov. 12, 1993) (same); and Garrido v. Coughlin, 716 F.Supp. 98, 100 (S.D.N.Y.1989) (quoting Duchesne v. Sugarman, 566 F.2d 817, 830 (2d Cir.1977)) ("Supervisory officials cannot be held liable under § 1983 solely for the acts of others; 'there must be some showing of personal responsibility.' "). In the present case there is simply no proof that Longtin participated in striking plaintiff; that he created a policy or custom under which this attack was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)
(Cite as: 1994 WL 49696 (N.D.N.Y.))

allowed to take place; or that he allowed a policy or custom of unprovoked attacks on inmates to continue. Thus, of the types of personal involvement just described, the only category into which Sergeant Longtin could possibly be placed would be as a supervisor who was grossly negligent in managing a subordinate-C.O. Schoonmaker.

Sergeant Longtin cannot be found liable on that basis, however, because this was a single incident which happened in a matter of seconds. Therefore, even though he was acting in a supervisory capacity at the time plaintiff's constitutional rights were violated, Sergeant Longtin still cannot be held liable because he is no different than any other non-supervisory prison official who does not act because there is no reasonable opportunity to intercede. As defense counsel correctly pointed out, this case is no different than *O'Neill v. Krzeminiski*, 839 F.2d 8 (2d Cir.1988), where the Court held that there was "insufficient evidence to permit a jury reasonably to conclude that [an officer's] failure to intercede was a proximate cause of the beating [,]" where "the three blows were struck in such rapid succession that [the officer] had no realistic opportunity to a prevent them." *Id.* at 11. Just as in *O'Neill,* the blows by Schoonmaker were over and done with so quickly here that Sergeant Longtin "had no realistic opportunity to attempt to prevent them." *Id. see also Gaudreault v. Municipality of Salem, Mass.,* 923 F.2d 203, 207 n. 3 (1st Cir.1990), *cert. denied,* 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 1991) (no "realistic opportunity" for a police officer to prevent an attack in a police station booking room where it was over in a matter of seconds). Thus, while generally a corrections officer such as Longtin bears "an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers [,]" Sergeant Longtin was excused from that duty because there was no "realistic opportunity" to prevent this attack which was over in a matter of seconds. *See id.*

*3. Defendant Benevento*

**\*9** Similarly, there is no basis for finding liability under section 1983 as against C.O. Benevento. Not only was C.O. Benevento not in a supervisory position at the time of the incident, but just like Sergeant Longtin, he too did

not have a reasonable opportunity to intercede. Therefore the legal analysis set forth above with respect to Sergeant Longtin applies with equal force to C.O. Benevento. Thus there is no basis for a finding that defendant Benevento violated plaintiff's rights under the Eighth Amendment.

*B. Fourteenth Amendment-Due Process*

Given the complete lack of proof at trial on any due process claim other than one based upon Schoonmaker's unprovoked attacked on plaintiff Parker,[FN17] the court assumes that plaintiff has abandoned all other aspects of this claim. In other words, the court finds that defendant Schoonmaker is also liable under § 1983 for violating plaintiff's due process rights when Schoonmaker struck plaintiff in the head, but the other two defendants are not liable in any way for violating plaintiff's due process rights.

*C. Pendent State Law Claims*

Before turning to a consideration of plaintiff's pendent state law claims, the court notes that although this case has been pending for nearly nine years, it was not until defendants' opening statement at trial that a statute of limitations defense was raised. Having failed to assert that affirmative defense in their answer, however, the defendants are deemed to have waived it. *See Litton Indus. v. Lehman Bros. Kuhn Loeb Inc.,* 967 F.2d 742, 752 (2d Cir.1992). In light of that waiver, the court need not address the defendants' untimely statute of limitations argument.

During their opening statement, defendants raised a second procedural point with respect to plaintiff's pendent claims and that is that those claims are barred by § 24 of the New York State Corrections Law. That statute expressly states, in relevant part:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department [of corrections], in his personal capacity, for damages arising out of any act done or the failure to perform any act within

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)
(Cite as: 1994 WL 49696 (N.D.N.Y.))

the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y.Correc.Law §§ 24(1) and 24(2) (McKinney 1987) (emphasis added). Relying upon that statute, defendants argue that because a state court would lack jurisdiction thereunder to decide plaintiff's pendent state claims, then so too would this court lack jurisdiction over those claims.[FN18] Case law construing section 24 is not plentiful. The few federal cases discussing that statute do make clear, though, that "a New York State inmate is foreclosed in New York State court- ...-from a private damage action against prison employees in their personal capacity for damages arising out of acts or failures to act taken within the scope of employment and in the discharge of duty." *Selby v. Ribeiro,* No. 78 Civ. 1281-CSH, slip op. at 3 (S.D.N.Y. Jan. 9, 1980) (citing *Ray v. Fritz,* 468 F.2d 586, 587 n. 2 (2d Cir.1972)) (emphasis added); *see also Boyd, supra,* slip op. at *13-*14; and *Brown v. Coughlin,* 758 F.Supp. 876, 886 (S.D.N.Y.1991). Thus, the court agrees that § 24 bars plaintiff's pendent tort claims.[FN19]

### D. Damages

*10 Having determined that defendant Schoonmaker is liable to plaintiff for violating his Eighth and Fourteenth Amendment rights, the only remaining question for the court is the amount of damages to be awarded. In that regard, the court notes its disagreement with defendants that plaintiff Parker should only be entitled to recover nominal damages. An award of nominal damages is proper "[a]bsent a showing of causation and actual injury." *Miner v. City of Glens Falls,* 999 F.2d 655, 660 (2d Cir.1993) (emphasis added) (citing, *inter alia, Carey v. Piphus,* 435 U.S. 247, 263, 266-67, 98 S.Ct. 1042, 1052, 1054, 55 L.Ed.2d 252 (1978)). As fully set forth herein, the plaintiff has made the requisite showing of causation and actual injury, at least with respect to the injury he sustained to his head. Thus, something more than a nominal damage award

is mandated here.

After reviewing the medical records, listening to all of the testimony, and having an opportunity to observe the permanent scar near plaintiff's right eyebrow, which although not disfiguring, does remain visible today-some nine years later, the court is convinced that plaintiff is entitled to damages totalling $2,500.00. An award of that amount will, in the court's opinion, adequately compensate plaintiff for the actual injury he sustained, as well as for his pain and suffering.

An award of punitive damages is not, however, justified on the present record. In *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), the Supreme Court set forth the standard for assessing punitive damages in § 1983 actions. The Court held that punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56, 103 S.Ct. at 1640. The *Smith* Court further "observed that though entitlement to compensatory damages is automatic upon a finding that the plaintiff's rights have been violated, an award of punitive damages is discretionary, reflecting a 'moral judgment,' and that the threshold of proof need not be different." *Vasbinder v. Ambach,* 926 F.2d 1333, 1342 (2d Cir.1991) (quoting *Smith,* 461 U.S. at 52, 52-55, 103 S.Ct. at 1638, 1638-40). The Supreme Court has also explained that the purpose of punitive damages "is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Memphis Community School District v. Stachura,* 477 U.S. 299, 306 n. 9, 106 S.Ct. 2537, 2542 n. 9, 91 L.Ed.2d 249 (1986); *see also In re Air Disaster at Lockerbie, Scotland,* 928 F.2d 1267, 1272 (2d Cir.), *cert. denied,* 502 U.S. 920, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991) (reviewing history of punitive damages).

Keeping these general principles in mind, the court cannot find that punitive damages are warranted based upon the record before it. There is simply nothing in the record showing that defendant Schoonmaker acted recklessly or with "callous indifference" to plaintiff Parker's rights. Although defendant Schoonmaker violated plaintiff's constitutional rights, in the court's view his conduct was not sufficiently egregious to justify an award of punitive

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)
(Cite as: 1994 WL 49696 (N.D.N.Y.))

damages.

*E. Attorney's Fees*

**\*11** In light of the foregoing, plaintiff's counsel has thirty (30) days from the date of entry of this memorandum-decision and order in which to file his application for attorney's fees. Counsel is reminded that such application must be submitted in a form consistent with the requirements for the same in this Circuit. Defendant Schoonmaker will then have fifteen (15) days in which to file any objections thereto. If no objections are filed by the end of that time, the court will award attorney's fees in the full amount sought by plaintiff's counsel. Having said all this, the court strongly urges both counsel to resolve the attorney's fees matter without further court intervention. If that is not possible, however, the above time frame applies.

*III. CONCLUSION*

For the violation of his Eighth and Fourteenth Amendment rights, plaintiff Maurice Parker is awarded compensatory damages of $2,500.00 against defendant Dennis Schoonmaker. Plaintiff Parker is also entitled to a declaratory judgment that defendant Dennis Schoonmaker violated his Eighth and Fourteenth Amendment as fully explained herein. Plaintiff Parker is not, however, entitled to recover on any other aspect of this action.

Accordingly, the Clerk of the Court is directed to enter judgment on behalf of the plaintiff in the total amount of $2,500.00 as against defendant Dennis Schoonmaker. The Clerk of the Court is further directed to enter judgment dismissing the plaintiff's claims as against defendants Ernest Benevento and James Longtin, and dismissing plaintiff's state law claims as against all defendants.

IT IS SO ORDERED.

FN1. Although plaintiff initially proceeded *pro se,* by order dated July 19, 1989 Magistrate Judge Gustave DiBianco appointed attorney

David Damico to represent the plaintiff. Docket Entry # 24. When Mr. Damico asked to be relieved as counsel because it was a hardship for him to travel to the prison where plaintiff was incarcerated, the Magistrate Judge granted that request. Docket Entry # 26. He then appointed attorney James Kerrigan to represent plaintiff on a *pro bono* basis. Docket Entry # 27. The court acknowledges its gratitude to Mr. Kerrigan's for his willingness to accept this *pro bono* assignment.

FN2. As does the Eighth Amendment of the United States Constitution, section 5 of the New York State Constitution contains a prohibition against "cruel and unusual punishments," and presumably it is that provision upon which plaintiff is relying, although the same is not specified in his complaint. *See* N.Y. Const. art. I, § 5 (McKinney 1982). Section 6 of the State Constitution is likewise similar to the Fourteenth Amendment of the United States Constitution in that it contains, *inter alia,* a due process clause. *See* N.Y. Const. art. I, § 6 (McKinney 1982). And once again, although not indicated in his complaint, it is apparently that provision of section 6 upon which plaintiff relies in this action.

FN3. Although not identified in his complaint, plaintiff is apparently relying upon the first part of this statute, which states:

No inmate in the care or custody of the department [of corrections] shall be subjected to degrading treatment, and no officer or other employee of the department shall inflict any blows whatever upon any inmate, unless in self defense, or to suppress a revolt or insurrection.

N.Y.Correct. § 137(5) (McKinney 1987). This statute is not as one-sided as a reading of the just quoted passage might suggest. Section 137(5) goes on to provide:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)
(Cite as: 1994 WL 49696 (N.D.N.Y.))

When any inmate, or group of inmates, shall offer violence to any person, or do or attempt to do any injury to property, or attempt to escape, or resist or disobey any lawful direction, the officers and employees shall use all suitable means to defend themselves, to maintain order, to enforce observation of discipline, to secure the persons of the offenders and to prevent any such attempt or escape.

*Id.*

FN4. Section 250.2(g) of the New York Code of Rules and Regulations plainly states: "Corporal punishment is absolutely forbidden for any purpose and under all circumstances." 7 N.Y.C.R.R. § 250.2(g). Section 251-1.2 of the Code, contained in the section entitled "Initial Actions in Cases of Inmate Misbehavior," basically describes the circumstances under which it may be appropriate for physical force to be used in connection with an inmate who has misbehaved.

FN5. Just prior to trial, plaintiff moved to voluntarily discontinue this action as against Superintendent Fogg, and the court granted that motion. Docket Entry # 41.

FN6. The court observes that the complaint is silent as to which capacity-individual or official-the defendants are being sued. This is not an uncommon deficiency in a case such as this. *Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 252 (2d Cir.1991) (quoting *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985) (quoting in turn *Brandon v. Holt,* 469 U.S. 464, 469, 105 S.Ct. 873, 876, 88 L.Ed.2d 878 (1985)) (" 'In many cases,' a complaint against public officials 'will not clearly specify whether officials are sued personally, in their official capacity, or both,' and only" [t]he course of proceedings' ... will indicate the nature of the liability imposed.' "). Furthermore, in part because the defendants

never filed any motions in this case, the issue of the capacity in which the defendants are being sued was never fully explored. The court will assume, however, that plaintiff Parker is suing the defendants in both their individual and official capacities.

It is true that in their answer defendants asserted a qualified immunity defense, which applies, if at all, only insofar as they are being sued in their personal or individual capacities. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529-530 (2d Cir.1993). Presumably if defendants believed that they were also being sued in their official capacity, they would have included an Eleventh Amendment immunity defense in their answer. *See id.* at 529 (citations omitted) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."). Nonetheless, given the following comment by the Second Circuit, except as explained below, the court will not presume, as defendants seemingly did, that they are being sued only in their personal capacities.

[A] plaintiff who has not clearly identified in her complaint the capacity in which the defendant is sued should not have the complaint automatically construed as focusing on one capacity to the exclusion of the other. By the same token, a party who is unclear in argument as to the capacity in which the defendant can be pursued should not lightly be deemed to have withdrawn a claim that was expressly stated. When the party's defense of her stated claim bespeaks a doctrinal confusion, the court should not presume that there has been abandonment but should instead give her the opportunity either to abandon the claim or to pursue it with a corrected understanding as to what proof will be required to establish it.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)
(Cite as: 1994 WL 49696 (N.D.N.Y.))

*Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.1993).

Having given plaintiff some leeway on this pleading issue, consistent with the relevant case law, the court will not read plaintiff's complaint as asserting a claim for monetary damages against the defendants in their official capacities, however, because such claim obviously would be barred by the Eleventh Amendment. *Gan,* 996 F.2d at 529. Thus, the court will construe plaintiff's complaint as seeking monetary damages against defendants in their personal or individual capacities only. The court will construe the complaint as seeking declaratory relief against defendants in both their personal and official capacities, however. (It is undisputed that a claim for declaratory relief is not barred by the Eleventh Amendment. *See Berman Enterprises, Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.1993)).

FN7. Keeplock is a means of administrative confinement. As plaintiff explains it, an inmate is keeplocked in his cell because of certain misbehavior. While keeplocked, an inmate must spend nearly the entire day in the cell, including taking meals there.

FN8. Sergeant Longtin testified that at 10:00 p.m. all the inmates are locked in their cells for the night and a head count is taken.

FN9. Plaintiff testified that he received six sutures, and the medical records are ambiguous. The one entry pertaining to the number of sutures appears to read four, but it is followed by and entry which is illegible. Defendants' exh. H at 5. This discrepancy, if it even exists, in the court's view, is inconsequential.

FN10. The court takes umbrage at the suggestion by plaintiff that the original photographs were "hidden away in the court's files for years [,]" implying an element of deceit on the part of the

court or defense counsel. First of all, those photographs were provided by Prisoner's Legal Services of New York, which was at least nominally representing plaintiff at the time. *See* Docket Entry # 46 (Court Exhibit # 1). Second, the court file in this action is a matter of public record. Therefore, at any time prior to the trial plaintiff's counsel was free to review it. Indeed, the court would be surprised to learn if that was not done shortly after the appointment of plaintiff's current counsel. Thus, any suggestion that either the court or defense counsel were secreting these photographs is patently absurd.

FN11. In defendants' post-trial submission, they suggest that the plaintiff's testimony is inherently suspect because, among other reasons, he is a party to this action. While that may be true, obviously the same can also be said of the defendants, and thus the court is not willing to discredit the testimony of any witness here simply because he is a party to this action.

As an additional basis for challenging plaintiff's testimony, defendants assert that he should be disbelieved simply because he is a convicted felon. The court declines to accept that view. Automatically discounting the testimony of a plaintiff-inmate would mean that he or she would never prevail in a case such as this. Certainly the Supreme Court did not intend such a harsh result when it stated, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). An obvious and dangerous ramification of the view suggested by defendants is that plaintiff-inmates would be deprived of all their constitutional rights solely by virtue of their status as inmates. Such a cynical view flies in the face of the Supreme Court's clear pronouncement in *Turner.*

FN12. The testimony conflicts on this point.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)
(Cite as: 1994 WL 49696 (N.D.N.Y.))

FN13. Letter of David B. Roberts to Court (Jan. 24, 1994) at 1.

FN14. *Id.* at 3.

FN15. *See* Report of the Federal Courts Study Committee-Part II, April 2, 1990 at 49; *see also* N.Y.Correc.Law § 137, Practice Commentary thereto at 137 ("Claims that unnecessary force was used against inmates by corrections officers have formed the basis for numerous lawsuits alleging a violation of the 8th Amendment."). In this District alone, inmate instituted cases, with the vast majority being brought under 42 U.S.C. § 1983, represented 34.3% of the total civil caseload for 1993. *See* Northern District of New York, 1993 Annual Report, *Pro Se* Staff Attorney's Office.

FN16. *See, e.g., Candelaria v. Coughlin,* 787 F.Supp. 368, 374 (S.D.N.Y.), *aff'd without published opinion,* 979 F.2d 845 (2d Cir.1992); *Gabai v. Jacoby,* 800 F.Supp. 1149, 1154-55 (S.D.N.Y.1992) (Grubin, Mag. J.), *Report-Recommendation Adopted in its Entirety,* No. 91 Civ. 2605 (S.D.N.Y. Sept. 9, 1992).

FN17. Besides forming the basis for an Eighth Amendment violation, an unprovoked attack such as the one which occurred in this case may also be the basis for a violation of an inmate's due process rights. *See Wilson v. White,* 656 F.Supp. 877, 879 (S.D.N.Y.1987) ("An attack on a prison inmate ... which is not part of an attempt to maintain or restore discipline violates the inmate's due process right to be free from unprovoked attack."); and *Vargas v. Correa,* 416 F.Supp. 266, 268-69 (S.D.N.Y.1976) (court held that an unprovoked assault upon an inmate constituted a violation of his due process rights).

FN18. Defendants also failed to raise this defense in their answer. Nevertheless, defendants are not deemed to have waived it because, as Fed.R.Civ.P. 12(h)(3) plainly states, "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3) (emphasis added); *see also Tongkook America, Inc. v. Shipton Sportswear Company,* 14 F.3d 781, 783 (2d Cir. Jan. 26, 1994) (citations omitted) ("The fact that [defendant] did not raise the defense of lack of subject-matter jurisdiction in its answer is not determinative, since subject-matter jurisdiction cannot be waived and the issue can be raised at any time in the course of the litigation.").

FN19. One thing is clear from the complaint and that is that plaintiff is seeking only monetary damages with respect to the pendent tort claims. His claim for declaratory relief is, as mentioned earlier, limited to the claims arising out of the alleged constitutional deprivations. *See supra* at 3.

N.D.N.Y.,1994.
Parker v. Fogg
Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 2922805 (N.D.N.Y.)
(Cite as: 2009 WL 2922805 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
David STEPHENSON, Plaintiff,
v.
ALBANY COUNTY POLICYMAKERS, et al.,
Defendants.
**Civ. No. 6:09-CV-326 (LEK/RFT).**

Aug. 14, 2009.

David Stephenson, Marcy, NY, pro se.

***REPORT-RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate
Judge.

**\*1** The Clerk has sent to the Court a civil rights Complaint
(Dkt. No. 1), Motion to Proceed *In Forma Pauperis* (IFP)
(Dkt. No. 2), Motion for Joinder of Claims (Dkt. No. 3),
and a Motion to Appoint Counsel and Conduct Discovery
(Dkt. No. 6), filed by *pro se* Plaintiff David Stephenson,
who is currently incarcerated at Marcy Correctional
Facility.[FN1] In his *pro se* Complaint, Stephenson alleges
civil rights violations based upon, *inter alia,* malicious
prosecution, abuse of process, conspiracy, fraud, invasion
of privacy, and attorney malpractice. For a more complete
statement of Plaintiff's claims, reference is made to the
Complaint.

> FN1. In 2006, Stephenson filed a civil rights
> action in this Court, pursuant to 42 U.S.C. §
> 1983, *Stephenson v. Herrick,* Civ. No.
> 1:06-CV-1466 (GLS/DRH), which was
> dismissed by the Court, *sua sponte,* for failure to
> state a claim upon which relief could be granted.
> Stephenson's Petition for a Writ of *Habeas*

*Corpus,* pursuant to 28 U.S.C. § 2254, is also
pending in this Court, *Stephenson v.
Superintendent,* Civ. No. 9:08-CV-1243
(LEK/RFT).

**I. DISCUSSION**

**A. Application to Proceed *In Forma Pauperis***

Plaintiff has submitted an *In Forma Pauperis* Application.
The Prison Litigation Reform Act (PLRA), codified in
part at 28 U.S.C. § 1915(b), provides that an inmate who
seeks *in forma pauperis* status is required to pay over a
period of time the full amount of the filing fee provided
for in 28 U.S.C. § 1914(a), which is currently $350.00 for
most civil actions. After reviewing Plaintiff's Application,
we find that he may properly proceed *in forma pauperis.*

**B. Allegations Contained in the Complaint**

Section 1915(e) of Title 28 of the United States Code
directs that, when a plaintiff seeks to proceed *in forma
pauperis,* "the court shall dismiss the case at any time if
the court determines that ... the action or appeal (i) is
frivolous or malicious; (ii) fails to state a claim on which
relief may be granted; or (iii) seeks monetary relief against
a defendant who is immune from such relief." 28 U.S.C.
§ 1915(e)(2)(B). Thus, it is a court's responsibility to
determine that a plaintiff may properly maintain his
complaint before permitting him to proceed further with
his action.

Moreover, under 28 U.S.C. § 1915A, a court must, as
soon as practicable, *sua sponte* review "a complaint in a
civil action in which a prisoner seeks redress from a
governmental entity or officer or employees of a
governmental agency" and must "identify cognizable
claims or dismiss the complaint, or any portion of the
complaint, if the complaint (1) is frivolous, malicious, or
fails to state a claim upon which relief may be granted; or
(2) seeks monetary relief from a defendant who is immune
from such relief." 28 U.S.C. §§ 1915A(a) & (b); *see also*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)
(Cite as: 2009 WL 2922805 (N.D.N.Y.))

---

*Carr v. Dvorin,* 171 F.3d 115, 116 (2d Cir.1999) (*per curiam* ).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which "establishes a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortgage Corp.,* 885 F.Supp. 537, 573 (S.D.N.Y.1995) (quoting *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508 (1990) & 42 U.S.C. § 1983)); *see also Myers v. Wollowitz,* 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (stating that " § 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights"). In this action, Plaintiff seeks to hold Defendants liable for various alleged constitutional violations, including, but not limited to:

**\*2** • conspiracy claims against all Defendants;

• claims for malicious prosecution and abuse of process against Defendants Mark Haskins, New York State Bureau of Narcotics, P. David Soares, Albany County District Attorney, and Christopher Baynes, Albany County Assistant District Attorney;

• claims of "undue influence and fraud" against Defendants Haskins, Albany County Task Force, and Albany County Prosecutors;

• claims of "common law fraud" and attorney malpractice against Defendant F. Stanton Ackerman, his court appointed attorney;

• invasion of privacy claims against Defendants Haskins, Andrew Zostant, Town of Colonie Police Detective, Steven Heider, Town of Colonie Police Superintendent, and other members of the Albany County Task Force for interfering with Plaintiff's expectation of privacy and private communications without probable cause; and

• what appears to be a *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 691 (1978), claim against Albany County for various policies and customs.

*See generally* Compl.

The initial impediment to Plaintiff's pursuit of this action is aptly summarized in Plaintiff's Complaint: "The Plaintiff has a pending Federal Habeas Corpus Petition in the Northern District of New York Federal Court, Case No. 9:08-CV-1243. **This 1983 action and complaint is intended to supplement that Petition, as these claims for money damages are relevant to the same set of facts.**" Compl. at ¶ 17 (emphasis added). Indeed, as Plaintiff overtly admits, this entire § 1983 action (including state claims for malpractice and fraud) relates to events leading up to and including his guilty plea and sentence in Albany County Court in 2006.[FN2] The Supreme Court has held that

FN2. A similar *fait accompli* vanquished Stephenson's prior attempt to sue various individuals in this Court, *Stephenson v. Herrick, et al.,* Civ. No. 1:06-CV-1466 (GLS/DRH). Upon information and belief, the core events giving rise to Stephenson's prior § 1983 action are the same events giving rise to the current action. That prior civil rights action was dismissed in light of *Heck v. Humphrey,* 512 U.S. 477 (1994). *See Stephenson v. Herrick, et al.,* Civ. No. 1:06-CV-1466, Dkt. No. 9, Decision and Order, dated Mar. 8, 2007.

in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Heck v. Humphrey,* 512 U.S. 477, 486-87 (1994).

Plaintiff's claims in this action are barred because he has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)
(Cite as: 2009 WL 2922805 (N.D.N.Y.))

failed to show that his conviction or sentence has been overturned. *See* Duamutef v. Morris, 956 F.Supp. 1112, 1115-18 (S.D.N.Y.1997) (dismissing § 1983 claims of malicious prosecution, false arrest, perjury, retaliation, and civil rights conspiracy under *Heck* where the plaintiff's underlying conviction had not been overturned). Because all of Plaintiff's claims relate to events that gave rise to Plaintiff's conviction and the sentence he is currently serving, many of which are currently interposed in his pending *Habeas Corpus* Petition, FN3 this action is barred under *Heck* and we recommend dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) and (ii) as it lacks an arguable basis in law. We note that this recommendation is limited to all § 1983 claims asserted by Plaintiff. Plaintiff has also inserted some state law claims sounding in fraud and attorney malpractice. It is not clear whether Plaintiff intended to assert these claims in support of his § 1983 claims, or if he intended them to stand on their own, thereby invoking the Court's pendent jurisdiction to entertain state law claims. To the extent they are part and parcel of the § 1983 claims, then they too suffer the same infirmity and are barred by *Heck*. To the extent, however, that they are purely state law claims, in light of this Court's recommendation of dismissal of the federal claims, we would recommend the Court not exercise pendent jurisdiction of such state law claims, pursuant to 28 U.S.C. § 1367, which authorizes a federal court to decline to exercise supplemental jurisdiction over a state claim if all of the claims over which the court had original jurisdiction were dismissed. 28 U.S.C. § 1367(c)(3).

FN3. Stephenson raises the following grounds, *inter alia,* in support of his *Habeas* Petition:

1) he was denied equal protection and due process in state court when he was denied, *inter alia,* a grand jury and was subjected to an insufficient accusatory process and was victim of an illegal search and seizure;

2) he was a victim of selective prosecution and "Mode of Proceedings error"; and

3) his guilty plea was unknowing and unintelligent due to ineffective assistance of counsel.

*Stephenson v. Superintendent,* Civ. No. 9:08-CV-1243 (LEK/RFT), Dkt. No. 1, Pet.

### C. Other Pending Motions

**\*3** Presently pending in this matter are Plaintiff's Motions for Joinder of Claims, Appointment of Counsel, and to Conduct Discovery. In light of the Court's recommendation of full dismissal, we find it unnecessary at this juncture to adjudicate such claims. Should the District Judge assigned to this matter accept this recommendation, such Motions would be automatically terminated upon the closing of this case. If, however, the recommendation is not accepted, the Clerk shall forward this file to the undersigned for consideration of these Motions.

**WHEREFORE,** it is hereby

**ORDERED,** that Plaintiff's *In Forma Pauperis* Application (Dkt. No. 2) is **granted;** and it is further

**RECOMMENDED,** that pursuant to the Court's review under 28 U.S .C. § 1915 and § 1915A, Plaintiff's entire Complaint be should be **dismissed** as barred by Heck v. Humphrey, 512 U.S. 477, 486-87 (1994), and the Court should decline to exercise pendent jurisdiction over any purported state claims pursuant to 28 U.S.C. § 1367(c)(3); and it is further

**ORDERED,** that in the event the District Court does not adopt the above recommendation, the entire file be returned to the undersigned for consideration of Plaintiff's other Motions (Dkt. Nos. 3 & 6); and it is further

**ORDERED,** that the Clerk serve a copy of this Report-Recommendation and Order on Plaintiff by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)
(Cite as: 2009 WL 2922805 (N.D.N.Y.))

(10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

## DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

This matter comes before the Court following a Report-Recommendation filed on August 14, 2009 by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 7). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff David Stephenson, which were filed on August 24, 2009. Objections (Dkt. No. 8).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

**\*4** Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 7) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that pursuant to the Court's review under 28 U.S.C. § 1915 and § 1915A, Plaintiff's entire Complaint is **DISMISSED WITHOUT PREJUDICE,** pending the outcome of Plaintiff's pending habeas petition; and accordingly all other pending Motions in this case (Dkt. Nos. 3 and 6) should be **DENIED** and **DISMISSED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2009.
Stephenson v. Albany County Policymakers
Slip Copy, 2009 WL 2922805 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.